# EXHIBIT B

# EXHIBIT B

skip to main content

Print

# CASE INFORMATION

## CV-24-993402 NATIONS LENDING CORPORATION vs. ACADEMY MORTGAGE CORPORATION, ET AL.

### Docket Information

| Filing Date | Docket Party | Docket Type | Docket Description | View Image |
|---|---|---|---|---|
| 03/06/2024 | P1 | BR | BRIEF IN OPPOSITION FILED BY P1 NATIONS LENDING CORPORATION DAVID J. HEARTY 0093827 PLAINTIFF NATIONS LENDING CORPORATION'S BRIEF IN OPPOSITION TO DEFENDANT ACADEMY MORTGAGE CORPORATION'S EMERGENCY MOTION TO DISSOLVE EX PARTE TEMPORARY RESTRAINING ORDER & OBJECTIONS TO MAGISTRATE'S DECISION | 🖹 |
| 03/05/2024 | N/A | SC | TELEPHONE DEFAULT HEARING SCHEDULED FOR 04/17/2024 AT 03:30 PM IS CANCELLED. | |
| 03/05/2024 | N/A | MG | TELEPHONE DEFAULT HEARING SET FOR 04/17/2024 AT 03:30 PM. ANY PARTY MAY APPEAR AT THE TELEPHONE DEFAULT HEARING BY CALLING 216-443-8505 TEN MINUTES PRIOR TO THE SCHEDULED TIME OF THE HEARING. THE PARTY MOVING FOR DEFAULT JUDGMENT MUST SEND NOTICE TO ALL PARTIES OF THE DEFAULT HEARING AT LEAST SEVEN DAYS PRIOR TO THE HEARING. THIS NOTICE MUST PROVIDE THE CALL-IN INFORMATION ABOVE. THIS HEARING MAY BE ATTENDED ONLY VIA TELEPHONE. NOTICE ISSUED | 🖹 |
| 02/29/2024 | D1 | MO | MOTION FILED FOR D1 ACADEMY MORTGAGE CORPORATION CAITLIN THOMAS 0093857 ACADEMY MORTGAGE CORPORATION'S EMERGENCY MOTION TO DISSOLVE EX PARTE TEMPORARY RESTRAINING ORDER & OBJECTIONS TO MAGISTRATE'S DECISION | 🖹 |
| 02/29/2024 | D1 | NT | NOTICE OF APPEARANCE, FILED D1 ACADEMY MORTGAGE CORPORATION CAITLIN THOMAS 0093857. NOTICE OF APPEARANCE | 🖹 |
| 02/29/2024 | D8 | SR | SUMS COMPLAINT(53167769) SENT BY CERTIFIED MAIL. TO: ILDA GONZALEZ 3270 FLEMING STREET RIVERSIDE, CA 92509 | 🖹 |
| 02/29/2024 | D7 | SR | SUMS COMPLAINT(53167768) SENT BY CERTIFIED MAIL. TO: BROOKS ONISHI 46-1058 EMEPELA WAY #10C KANEOHE, HI 96744 | 🖹 |
| 02/29/2024 | D6 | SR | SUMS COMPLAINT(53167767) SENT BY CERTIFIED MAIL. TO: KAWAI CHANDEE HOOPER 74-5158 PUUOLOKAA PLACE KAILUA KONA, HI 96740 | 🖹 |
| 02/29/2024 | D5 | SR | SUMS COMPLAINT(53167766) SENT BY CERTIFIED MAIL. TO: CHRISTINA IUKEA-ALVES 75-6203 PIENA PLACE KAILUA KONA, HI 96740 | 🖹 |
| 02/29/2024 | D4 | SR | SUMS COMPLAINT(53167765) SENT BY CERTIFIED MAIL. TO: JESSICA BROWN 322 AINAKO AVENUE HILO, HI 96720 | 🖹 |
| 02/29/2024 | D3 | SR | SUMS COMPLAINT(53167764) SENT BY CERTIFIED MAIL. TO: JOAN PAGAN 1469 KULEANA PLACE HILO, HI 96720 | 🖹 |
| 02/29/2024 | D2 | SR | SUMS COMPLAINT(53167763) SENT BY CERTIFIED MAIL. TO: LEONARD PAGAN 1469 KULEANA PLACE HILO, HI 96720 | 🖹 |
| 02/29/2024 | D4 | SR | JUDGMENT ENTRY(53156032) SENT BY REGULAR MAIL SERVICE. TO: JESSICA BROWN 322 AINAKO AVENUE HILO, HI 96720 | |
| 02/29/2024 | D8 | SR | JUDGMENT ENTRY(53156031) SENT BY REGULAR MAIL SERVICE. TO: ILDA GONZALEZ 3270 FLEMING STREET RIVERSIDE, CA 92509 | |
| 02/29/2024 | D2 | SR | JUDGMENT ENTRY(53156030) SENT BY REGULAR MAIL SERVICE. TO: LEONARD PAGAN 1469 KULEANA PLACE HILO, HI 96720 | |
| 02/29/2024 | D7 | SR | JUDGMENT ENTRY(53156029) SENT BY REGULAR MAIL SERVICE. TO: BROOKS ONISHI 46-1058 EMEPELA WAY #10C KANEOHE, HI 96744 | |
| 02/29/2024 | D5 | SR | JUDGMENT ENTRY(53156028) SENT BY REGULAR MAIL SERVICE. TO: CHRISTINA IUKEA-ALVES 75-6203 PIENA PLACE KAILUA KONA, HI 96740 | |
| 02/29/2024 | D1 | SR | JUDGMENT ENTRY(53156025) SENT BY REGULAR MAIL SERVICE. TO: ACADEMY MORTGAGE CORPORATION 339 WEST 13490 SOUTH DRAPER, UT 84020 | |

| 02/29/2024 | D6 | SR | JUDGMENT ENTRY(53156023) SENT BY REGULAR MAIL SERVICE. TO: KAWAI HOOPER 74-5158 PUUOLOKAA PLACE KAILUA KONA, HI 96740 |
|---|---|---|---|
| 02/29/2024 | D3 | SR | JUDGMENT ENTRY(53156022) SENT BY REGULAR MAIL SERVICE. TO: JOAN PAGAN 1469 KULEANA PLACE HILO, HI 96720 |
| 02/28/2024 | N/A | SR | SUMMONS E-FILE COPY COST |
| 02/28/2024 | N/A | SR | SUMMONS E-FILE COPY COST |
| 02/28/2024 | N/A | SR | SUMMONS E-FILE COPY COST |
| 02/28/2024 | D8 | CS | WRIT FEE |
| 02/28/2024 | D7 | CS | WRIT FEE |
| 02/28/2024 | D6 | CS | WRIT FEE |
| 02/28/2024 | N/A | SR | SUMMONS E-FILE COPY COST |
| 02/28/2024 | N/A | SR | SUMMONS E-FILE COPY COST |
| 02/28/2024 | D5 | CS | WRIT FEE |
| 02/28/2024 | D4 | CS | WRIT FEE |
| 02/28/2024 | D3 | CS | WRIT FEE |
| 02/28/2024 | N/A | SR | SUMMONS E-FILE COPY COST |
| 02/28/2024 | N/A | SR | SUMMONS E-FILE COPY COST |
| 02/28/2024 | D2 | CS | WRIT FEE |
| 02/28/2024 | N/A | SR | SUMMONS E-FILE COPY COST |
| 02/28/2024 | D1 | SR | WAIVER OF SER. OF SUM. REQUEST(53167762) SENT BY PLAINTIFF. TO: ACADEMY MORTGAGE CORPORATION C/O CORPORATION SERVICE COMPANY 1160 DUBLIN ROAD, SUITE 400 COLUMBUS, OH 43215-0000 |
| 02/28/2024 | D8 | SR | MAGISTRATE'S DECISION(53156652) SENT BY REGULAR MAIL SERVICE. TO: ILDA GONZALEZ 3270 FLEMING STREET RIVERSIDE, CA 92509 |
| 02/28/2024 | D2 | SR | MAGISTRATE'S DECISION(53150651) SENT BY REGULAR MAIL SERVICE. TO: LEONARD PAGAN 1469 KULEANA PLACE HILO, HI 96720 |
| 02/28/2024 | D7 | SR | MAGISTRATE'S DECISION(53156650) SENT BY REGULAR MAIL SERVICE. TO: BROOKS ONISHI 46-1058 EMEPELA WAY #10C KANEOHE, HI 96744 |
| 02/28/2024 | D5 | SR | MAGISTRATE'S DECISION(53150649) SENT BY REGULAR MAIL SERVICE. TO: CHRISTINA IUKEA-ALVES 75-6203 PIENA PLACE KAILUA KONA, HI 96740 |
| 02/28/2024 | D1 | SR | MAGISTRATE'S DECISION(53150648) SENT BY REGULAR MAIL SERVICE. TO: ACADEMY MORTGAGE CORPORATION 339 WEST 13490 SOUTH DRAPER, UT 84020 |
| 02/28/2024 | D6 | SR | MAGISTRATE'S DECISION(53150647) SENT BY REGULAR MAIL SERVICE. TO: KAWAI HOOPER 74-5158 PUUOLOKAA PLACE KAILUA KONA, HI 96740 |
| 02/28/2024 | D3 | SR | MAGISTRATE'S DECISION(53150646) SENT BY REGULAR MAIL SERVICE. TO: JOAN PAGAN 1469 KULEANA PLACE HILO, HI 96720 |
| 02/27/2024 | N/A | JE | PURSUANT TO THE MAGISTRATE'S 02/26/2024 DECISION GRANTING IN PART THE REQUESTED TEMPORARY RESTRAINING ORDER AT ISSUE, A PRELIMINARY INJUNCTION HEARING IS SCHEDULED AS FOLLOWS: HEARING SET FOR 03/11/2024 AT 01:30 PM. COURTROOM 16-B. PLEASE CONTACT THE COURT'S STAFF ATTORNEY, BRANDILYN COOK, AT 216-443-8588 SHOULD ANY ISSUE(S) ARISE. NOTICE ISSUED |
| 02/27/2024 | P1 | SR | JUDGMENT ENTRY(53156021) SENT BY EMAIL. TO: DAVID J. HEARTY DHEARTY@STEFANIKOSUE.COM |
| 02/27/2024 | P1 | SR | JUDGMENT ENTRY(53156020) SENT BY EMAIL. TO: JEFFREY C MILLER JMILLER@STEFANIKIOSUE.COM |
| 02/27/2024 | N/A | MG | HEARING HELD BY MAGISTRATE ON PLAINTIFF'S MOTION FOR TRO. SAID MOTION IS GRANTED. THE MAGISTRATE WILL ISSUE A MAGISTRATE'S DECISON MAKING SPECIFIC FINDINGS. NOTICE ISSUED |
| 02/27/2024 | N/A | JE | THE COURT ADOPTS THE MAGISTRATE'S DECISION DATED 2-26-24 AND ATTACHED HERETO. PLAINTIFF'S MOTION FOR TRO IS GRANTED. A TEMPORARY RESTRAINING ORDER IS GRANTED AGAINST DEFENDANTS ACADEMY MORTGAGE CORPORATION, LEONARD PAGAN, JOAN PAGAN, JESSICA BROWN, CHRISTINA ALVES, KAWAI "CHANDEE" HOOPER, BROOKS ONISHI, AND ILDA GONZALEZ AND THEIR AGENTS, REPRESENTATIVES, RELATED ENTITIES, ENTITIES DOING BUSINESS AS, AND ALL PERSONS ACTING IN AID OF, CONJUNCTION WITH, OR IN CONCERN WITH THEM, FROM DIRECTLY OR INDIRECTLY: I. USING, DISCLOSING, OR OTHERWISE MISAPPROPRIATING NATIONS LENDING'S CONFIDENTIAL INFORMATION AND TRADE SECRETS; II. INDUCING OR ATTEMPTING TO INDUCE THE VIOLATION OF THE CONTRACTUAL |

RELATIONSHIPS OF NATIONS LENDING; AND III. SOLICITING OR ATTEMPTING TO SOLICIT NATIONS LENDING'S CUSTOMERS, PROSPECTIVE CUSTOMERS, AND/OR EMPLOYEES. A TEMPORARY RESTRAINING ORDER IS GRANTED AGAINST DEFENDANTS LEONARD PAGAN, JOAN PAGAN, JESSICA BROWN, CHRISTINA ALVES, KAWAI "CHANDEE" HOOPER, AND BROOKS ONISHI AND THEIR AGENTS, REPRESENTATIVES, RELATED ENTITIES, ENTITIES DOING BUSINESS AS, AND ALL PERSONS ACTING IN AID OF, CONJUNCTION WITH, OR IN CONCERN WITH THEM, FROM DIRECTLY OR INDIRECTLY: A. OWNING, MAINTAINING, OPERATING OR ENGAGING IN THE SAME OR SIMILAR BUSINESS ACTIVITIES AS NATIONS LENDING OR IN ANY BUSINESS ACTIVITY WHICH COMPETES WITH NATIONS LENDING; B. SERVING, ADVISING, MANAGING, CONSULTING WITH, PROVIDING SERVICES FOR, OR BEING EMPLOYED BY ANY FIRM, AGENCY, PARTNERSHIP OR CORPORATION WHICH ENGAGES IN THE SAME OR SIMILAR BUSINESS ACTIVITIES AS NATIONS LENDING OR COMPETES WITH NATIONS LENDING; C. UNDERTAKING ANY EFFORTS OR ACTIVITIES TOWARD FORMING OR INCORPORATING, FINANCING, OR COMMENCING ANY COMPETING BUSINESS ACTIVITY WHICH ENGAGES IN THE SAME OR SIMILAR BUSINESS ACTIVITIES AS NATIONS LENDING; OR D. ADVISING, SERVING, OR CONSULTING WITH ANY PERSON, BUSINESS, OR ENTITY WHICH IS OR WILL BE UNDERTAKING EFFORTS TOWARD INCORPORATING, FINANCING, FORMING, OR COMMENCING ANY COMPETING BUSINESS OR ACTIVITY WHICH ENGAGES IN THE SAME OR SIMILAR BUSINESS ACTIVITIES AS NATIONS LENDING. A BOND IS UNNECESSARY, AND ITS REQUIREMENT HAS BEEN WAIVED BY THE PARTIES. DESPITE THIS ADOPTION, THE PARTIES MAY OBJECT TO THE MAGISTRATE'S DECISION AS PROVIDED IN CIV.R. 53(D)(4)((E)(II). PURSUANT TO CIV.R. 58(B), THE CLERK OF COURTS MUST SERVE, IN A MANNER PRESCRIBED BY CIV.R. 5(B), ALL PARTIES NOT IN DEFAULT FOR FAILURE TO APPEAR NOTICE OF THIS JUDGMENT AND ITS DATE OF ENTRY UPON THE JOURNAL AND MUST NOTE THE SERVICE ON THE APPEARANCE DOCKET. PURSUANT TO CIV.R. 58(B), THE CLERK OF COURTS MUST SERVE, IN A MANNER PRESCRIBED BY CIV.R. 5(B), ALL PARTIES NOT IN DEFAULT FOR FAILURE TO APPEAR NOTICE OF THIS JUDGMENT AND ITS DATE OF ENTRY UPON THE JOURNAL AND MUST NOTE THE SERVICE ON THE APPEARANCE DOCKET. NOTICE ISSUED

| Date | Party | Type | Description | |
|------|-------|------|-------------|---|
| 02/26/2024 | P1 | SR | MAGISTRATE'S DECISION(53150645) SENT BY EMAIL. TO: DAVID J. HEARTY DHEARTY@STEFANIKOSUE.COM | |
| 02/26/2024 | P1 | SR | MAGISTRATE'S DECISION(53150644) SENT BY EMAIL. TO: JEFFREY C MILLER JMILLER@STEFANIKIOSUE.COM | |
| 02/26/2024 | N/A | OT | MAGISTRATE'S DECISION WITH FINDINGS OF FACT AND CONCLUSIONS OF LAW FILED AND SENT TO ALL PARTIES ON SERVICE PAGE. | 📄 |
| 02/26/2024 | P1 | MO | PLAINTIFFS NATIONS LENDING CORPORATION MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION. 02/27/2024 - GRANTED IN PART | 📄 |
| 02/26/2024 | N/A | SF | JUDGE EMILY HAGAN ASSIGNED (RANDOM); COMMERCIAL DOCKET CASE, REASSIGNED TO JUDGE JOHN J RUSSO (RANDOM) | |
| 02/26/2024 | N/A | SF | JUDGE EMILY HAGAN ASSIGNED (RANDOM) | |
| 02/26/2024 | P1 | SF | LEGAL RESEARCH | |
| 02/26/2024 | P1 | SF | LEGAL NEWS | |
| 02/26/2024 | P1 | SF | LEGAL AID | |
| 02/26/2024 | P1 | SF | COURT SPECIAL PROJECTS FUND | |
| 02/26/2024 | P1 | SF | COMPUTER FEE | |
| 02/26/2024 | P1 | SF | CLERK'S FEE | |
| 02/26/2024 | P1 | SF | DEPOSIT AMOUNT PAID JEFFREY C MILLER | |
| 02/26/2024 | N/A | SF | CASE FILED: COMPLAINT, MOTION | 📄 |

Only the official court records available from the Cuyahoga County Clerk of Courts, available in person, should be relied upon as accurate and current.
Website Questions or Comments.
Copyright © 2024 PROWARE. All Rights Reserved. 1.1.280



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: MOTION**
**February 26, 2024 13:20**

By: JEFFREY C. MILLER 0068882

Confirmation Nbr. 3097247

NATIONS LENDING CORPORATION                           CV 24 993402

     vs.

ACADEMY MORTGAGE CORPORATION, ET AL.          **Judge:**  JOHN J. RUSSO

**Pages Filed:**  29

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| NATIONS LENDING CORPORATION, | ) | CASE NO. |
| | ) | |
| *Plaintiff,* | ) | JUDGE |
| | ) | |
| v. | ) | **DEFENDANT NATIONS LENDING** |
| | ) | **CORPORATION'S MOTION FOR** |
| ACADEMY MORTGAGE | ) | **TEMPORARY RESTRAINING ORDER** |
| COROPORATION, et al., | ) | **AND PRELIMINARY INJUNCTION** |
| | ) | |
| *Defendant.* | | |

Pursuant to Ohio Rule of Civil Procedure 65 (Injunctions), Plaintiff Nations Lending

Corporation ("Plaintiff or "Nations Lending"), by and through the undersigned counsel, moves

the Court for a Temporary Restraining Order and Preliminary Injunction against Defendants

Academy Mortgage Corporation, Leonard Pagan, Joan Pagan, Jessica Brown, Christina Alves,

Kawai "Chandee" Hooper, Brooks Onishi, and Ilda Gonzalez from directly or indirectly

(i.)using, disclosing, or otherwise misappropriating Nations Lending's Confidential Information

and trade secrets; (ii)  inducing or attempting to induce the violation of the contractual

relationships of Nations Lending; and/or (iii) soliciting or attempting to solicit Nations Lending's

customers, prospective customers, and/or employees.

Nations Lending also moves the Court for a Temporary Restraining Order and

Preliminary Injunction against Defendants Leonard Pagan, Joan Pagan, Jessica Brown, Christina

Iukea-Alves, Chandee Hooper, and Brooks Onishi, from directly or indirectly (i) owning,

maintaining, operating or engaging in the same or similar business activities as Nations Lending

or in any business activity which competes with Nations Lending; (ii) serving, advising,

managing, consulting with, providing services for, or being employed by any firm, agency,

partnership or corporation which engages in the same or similar business activities as Nations

Lending or competes with Nations Lending; (iii) undertaking any efforts or activities toward forming or incorporating, financing, or commencing any competing business activity which engages in the same or similar business activities as Nations Lending; and/or (iv) advising, serving, or consulting with any person, business, or entity which is or will be undertaking efforts toward incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as Nations Lending.

A Brief in Support is attached incorporated by reference. A proposed order is also attached.

Respectfully submitted,

*/s/ Jeffrey C. Miller*
Jeffrey C. Miller (0068882)
David J. Hearty (0093827)
Stefanik & Iosue
1109 Carnegie Avenue, Floor 2
Cleveland, OH 44115
(216) 651-0451
jmiller@stefanikiosue.com
dhearty@stefanikiosue.com
*Attorneys for Nations Lending Corporation*

**BRIEF IN SUPPORT OF MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I.     INTRODUCTION

Plaintiff Nations Lending Corporation (Nations Lending) requires immediate injunctive relief to prevent further irreparable harm caused when the Defendants engaged in a coordinated attack upon the operations of Nations Lending in its Hawaii branch, and the misappropriation of the trade secrets of Nations Lending, which can be used to its detriment across the U.S.

## II.     PARTIES

Nations Lending is a national mortgage lender helping families achieve their dream of homeownership.  (Goshert Verification, para. 12).  Proudly based in Cleveland, Ohio, Nations Lending lends throughout branches across the United States, including Hawaii. (Id., para. 13).

Defendant Academy Mortgage Corporation, ("Academy"), is a Utah corporation, which does business in Ohio, and is a direct competitor of Nations Lending throughout the U.S., providing same loans and services as Nations Lending.  (Id., para. 14).

Defendant Leonard Pagan was employed by Nations Lending on July 27, 2022 as Area Sales Manager and executed an Employment Agreement governing the terms and conditions of his employment.  (Id., paras. 15-117, Ex. A).  As Area Sales Manager, Leonard Pagan's position required him to strategically plan, lead and control all activities of branch sales offices within a specific geographic area designated as Hawaii County, Hawaii.  (Id.).

Defendant Joan Pagan was employed by Nations Lending on July 28, 2022 as a Personal Mortgage Advisor and executed an Employment Agreement governing the terms and conditions of her employment.  (Id., paras. 19-22, Ex. B).  As a Personal Mortgage Advisor, Joan Pagan's position required her to solicit, receive, and originate loan applications from customers and prospective customers of Nations Lending.   (Id.).

Defendant Jessica Brown was employed by Nations Lending on July 27, 2022 as an Originator Assistant and executed an Employment Agreement governing the terms and conditions of her employment.  (Id., paras. 23-25, Ex. C).  As an Originator Assistant, Defendant Brown's position required her to provide documentation and record maintenance of loan files for customers and prospective customers of Nations Lending. (Id.).

Defendant Christina Iukea-Alves was employed by Nations Lending on July 27, 2022 as Sales Manager and executed an Employment Agreement governing the terms and conditions of her employment.  (Id., paras. 26-28, Ex. D).  As a Sales Manager, Defendant Iukea-Alves 's position required her to strategically manage the sales team of Personal Mortgage Advisors, while closing loan files for customers and prospective customers of Nations Lending.

Defendant Kawai "Chandee" Hooper was employed by Nations Lending on may 27, 2023 as a Personal Mortgage Advisor and executed an Employment Agreement governing the terms and conditions of her employment.  (Id., paras. 29-31, Ex. E).  As a Personal Mortgage Advisor, Defendant Hooper's position required her to solicit, receive, and originate loan applications from customers and prospective customers of Nations Lending. (Id.).

Defendant Brooks Onishi was employed by Nations Lending on August 29, 2023 as a Personal Mortgage Advisor and executed an Employment Agreement governing the terms and conditions of his employment.  (Id., paras. 32-34, Ex. F). As a Personal Mortgage Advisor, Defendant Onishi's position required him to solicit, receive, and originate loan applications from customers and prospective customers of Nations Lending. (Id.).

Defendant Ilda Gonzales was employed by Nations Lending on October 12, 2022 as a Processor and executed an Employment Agreement governing the terms and conditions of her employment.  (Id., paras. 35-37, Ex. G).  As a Processor, Defendant Gonzalez's position required

her to verify and process information of loan files for customers and prospective customers of Nations Lending and to submit completed files for settlement. (Id.).

Nations Lending's office in Hawaii, during times relevant to this suit, was located at 75-167 Hualalai Road, Suite 101, Kailua-Kona, HI 96740 and was informally referred to as the "Hilo, HI Branch." (Id., para. 39).  At all times relevant, Individual Defendants made up the collective workforce of the Nations Lending Hilo, HI Branch. (Id., para 40).

In making the decision to open an office in Hawaii, Nations Lending recognized the extraordinary expenses and operational challenges it would incur with such an isolated and remote location.  (Id., para. 41)  At the same time, Nations Lending recognized that its established systems of production, including its Confidential Information, would result in a successful branch if it could aggressively capture market share and producers. (Id., para. 42).  As such, Nations Lending entered into Employment Agreements with all employees of the Hilo, HI Branch, and included specific protections of confidential information and restrictive covenants. (Id., para. 43).

The purpose of the Employment Agreements was to protect the Confidential Information of Nations Lending, its market share as acquired, and to provide an extended timeframe of competitive advantage reflecting its extensive investment in this undertaking. (Id., para 44).  Pursuant to each Employment Agreement, Nations Lending provided each Individual Defendant with access to Nations Lending's "Confidential Information" as defined in Section 3(a).) (Id., para. 45).

The Confidential Information of Nations Lending included "personnel information," "customer information," and other trade secrets:

> Confidential Information Defined. For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans,

documents, operations, services, strategies, techniques, agreements and terms of agreements, transactions, negotiations, know-how, trade secrets, applications, work-in-process, databases, compilations, technologies, records, systems, sources, supplier information, vendor information, financial information, accounting information, marketing information, pricing information, credit information, payroll information, personnel information, employee lists, reports, internal controls, security procedures, customer information or lists, buyer lists, or other information generally considered private and confidential in the industry or by any existing or prospective customer, other associated third party, or of any other person or entity that has entrusted information to the Company in confidence.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

In addition to the Confidential Information, Nations Lending also provided access to "Customer Information," which was set forth in Section 5(b)(ii):

"Customer Information" includes, but is not limited to, names, phone numbers, addresses, email addresses, transaction history, preferences, financial condition, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to Company's services.

(Id., paras. 46-47).

Because the Employment Agreement granted each Individual Defendant access to Nations Lending's proprietary information and trade secrets, each Employment Agreement at Section 5 included three (3) restrictive covenants that applied during employment and for twelve (12) months following separation from Nations Lending. (Id., para. 48).

First, each Individual Defendant agreed not to directly or indirectly solicit Nations Lending's employees:

The Employee agrees and covenants not to directly or indirectly solicit, hire, recruit, or attempt to solicit, hire, or recruit, any employee of the Company or any employee who has been employed by the Company in the six months preceding the last day of Employee's employment (collectively, "Covered Employee"), or induce the termination of employment of any Covered Employee during the Restricted Period. . . . This non-solicitation provision explicitly covers all forms of oral, written, or

electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, Twitter, and any other social media platform, whether or not in existence at the time of entering into this Agreement.

Second, each Individual Defendant agreed not to solicit any customers "for purposes of offering or accepting goods or services similar to or competitive with those offered by [Nations Lending]":

> The Employee agrees and covenants, for the duration of the [12-month] Restricted Period, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this agreement, or meet with the Company's current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section. This Section does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company.

Third, during their employment, each Individual Defendant agreed not to compete or otherwise engage in "the same or similar business activities as [Nations Lending]":

> Because Employee will have access to proprietary information belonging to Company that would provide an unfair advantage to competition, during the period of employment Employee agrees not to, for any person, business, or entity, a) own, maintain, operate, or engage in the same or similar business activities as Company or in any business activity which competes with Company; b) serve, advise, manage, consult with, provide services for, or be employed by any individual, firm agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company; c) undertake any efforts or activities toward forming or incorporating, financing, or commencing any competing business

7

activity which engages in the same or similar business activities as the Company; or d) advise, serve, or consult with any person, business, or entity which is or will be undertaking efforts toward incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as the Company. During the Restricted Period, Employee agrees not to divert or refer Company customers or prospective customers to any other individual, firm, agency, partnership, venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company. If Employee's job assignment location with Company is within a branch office or retail location, then Employee agrees and covenants not to open or relocate a similar office or location within a five-mile radius of such location (the "Restricted Territory") which would engage in the business of residential mortgage lending for the duration of the Restricted Period. "Relocate" includes Employee joining an existing office location of a competitor if such office was opened at such location within the six-month period before the beginning of the Restricted Period. This Section does not restrict or impede, in any way, Employee from seeking gainful employment in the industry which does not harm Company's vital and legitimate business interests and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

(Id., paras. 49-51).

Nations Lending fulfilled all of its obligations to the Individual Defendants under the Employment Agreements, but the Individual Defendants violated their agreements, both while employed with Nations Lending and after their resignation from Nations Lending. (Id., para. 52-53)

## III.     FACTS IN SUPPORT OF CLAIMS

On January 2, 2024, Defendant Joan Pagan resigned from Nations Lending, and took employment with Defendant Academy.  (Id., para 54, 63).  On January 16, 2024, Defendants Leonard Pagan, Jessica Brown, Christina Iukea-Alves, Chandee Hooper, and Ilda Gonzalez resigned from Nations Lending.  (Id., para 55). On January 26, 2024, Defendant Onishi resigned from Nations Lending. (Id., para. 56).

Despite their restrictive covenants, on behalf of Defendant Academy, the Individual Defendants began operating a mortgage lending branch competitive with Nations Lending at 234

Waianuenue Ave, Hilo, HI 96720, approximately 1.3 miles from the Nations Lending branch. (Id., para 57).

Nations Lending investigated the circumstances of the resignations and competition, and has uncovered and continues to uncover the actionable and coordinated conduct of the Defendants to divert and misappropriate the confidential and proprietary information of Nations Lending, divert customers and prospective customers of Nations Lending, and otherwise violate the Employment Agreements. (Id., para. 58).

As of December 8, 2023, Defendant Academy was engaged in direct communication with Defendants Leonard Pagan and/or Joan Pagan for the purpose of misappropriating the Confidential Information of Nations Lending and diverting customers and prospective customers of Nations Lending. (Id., para. 59). On or about December 8, 2023, in coordination with Defendant Academy, which likely occurred prior to that date, Defendants Leonard and/or Joan Pagan redirected a Nations Lending customer (Meek) to Defendant Academy. (Id., para. 60).

Throughout December of 2023, the Defendants conspired to prepare their misappropriation and diversion of Nations Lending's customers and Confidential Information. (Id., para. 61). Continuing into January of 2024, Defendant Academy collaborated with Defendant Leonard Pagan and other Individual Defendants to transfer loan transactions and Confidential Information of Nations Lending to Defendant Academy. (Id. para. 62)

After Joan Pagan resigned, and even though they were still employed by Nations Lending, the other Individual Defendants and Defendant Academy then unleashed their campaign of improperly soliciting and diverting the customers and prospective customers of Nations Lending, and misappropriating the Confidential Information of Nations Lending without compunction for the benefit of Academy. (Id., paras 63-64).

On January 3, 2024, Defendant Brown created a consumer transfer request using Nations Lending's system to transfer a consumer loan transaction (Preston) in the amount of $292,000 to Defendant Academy so that the borrower could continue working with Defendant Hooper.  (Id., para. 65).  The document was created at the direction of Defendant Academy and/or other Individual Defendants, who neglected to check the dates before they launched the scheme. Defendant Hooper was then an employee of Nations Lending and remained an employee of Nations Lending until January 16, 2024.  (Id., para. 66, Ex. H).  As a result, Nations Lending lost the loan transaction. (Id.).

On January 9, 2024, Defendant Academy provided Defendant Leonard Pagan and Defendant Iukea-Alves, via their personal email accounts, with pricing for a loan for one of Nation Lending's customers (Yang).  (Id., para 69, Ex. I).  Defendant Leonard Pagan and/or other Individual Defendants provided that information to the customer and assisted with the transition of a $232,500 transaction to Defendant Academy.  (Id., para. 69-70).

On January 9, 2024, Defendant Brown created an Appraisal Transfer Request Letter using Nations Lending's system to transfer a consumer loan transaction (Gates) to Defendant Academy. (Id., para. 72, Ex J).  The document was created at the direction of Defendant Academy and/or other Individual Defendants, and, after procuring the transfer letter, Defendant Academy then requested transfer of the appraisal already obtained by Nations Lending on January 12, 2024.  (Id., para73, Ex. K).

In coordination with Defendant Academy, the Individual Defendants have engaged in a campaign of deceit wherein they transferred loans of Nations Lending into the names of loan originators of Defendant Academy beginning in December of 2023.  (Id., para. 74).  Nations Lending has identified not less than thirteen (13) actual diversions of customers of Nations

Lending by Defendants, and ten (10) other diversions of prospective customers of Nations Lending by Defendants. (Id., paras 75-76).  Nations Lending has also discovered that, prior to their departure from Nations Lending, the Individual Defendants downloaded lists of contacts and customers of Nations Lending, as well as other Confidential Information of Nations Lending to use in competition against Nations Lending with Defendant Academy.  (Id., para 77).

On January 16, 2024, Nations Lending sent written notice to Defendant Academy of the misappropriation, diversion, and violation of restrictive covenants of certain Individual Defendants, and Cease and Desist letters to certain Individual Defendants reminding them of their Restrictive Covenants. (Id., paras 82-83, Ex. L and Ex. M).

On January 26, 2024, Defendant Academy responded to Nations Lending and made the false promise that, if Nations Lending provided detailed documentation, Defendant Academy would "take appropriate actions" and address the allegations in a "fair and transparent manner."  (Id., para 85, Ex. N).  On February 14, 2024, Nations Lending delivered a written response wherein it provided the detailed explanation as set forth in this Complaint, and included the exhibits attached to this Complaint; however, Defendant Academy has not responded, the Individual Defendants remain employed by Defendant Academy, and the Defendants have continued their actionable course of conduct.  (Id., paras 85-86, Ex. O).  Defendant Academy competes against Nations Lending in other markets across the U.S. and can utilize the Confidential Information of Nations Lending in Hawaii and other markets. (Id., para 87).

As a direct and proximate result of the actionable conduct of Defendants, Nations Lending has incurred damages in excess of $750,000.00.  (Id., para 88).  As a direct and proximate result of Defendants' actions, Nations Lending has already lost at least thirteen (13) customers, another ten (10) prospective customers, and the Confidential Information of Nations Lending, including

contact, customer lists, pricing, and product modeling which can be used to compete with Nations Lending across the U.S. (Id., para. 89). The individual Defendants have violated and are continuing to violate their agreements with Nations Lending, including the confidentiality provisions and restrictive covenants. (Id., para. 90). Unless the Defendants are prohibited from utilizing the confidential information of Nations Lending, and unless the Individual Defendants are prohibited from soliciting employees of Nations Lending, soliciting customers and prospective customers of Nations Lending, and from violating the applicable non-compete provisions, Nations Lending will continue to suffer irreparable damages. (Id., para. 91). To prevent irreparable harm, Nations Lending requests a Temporary Restraining Order, Preliminary and Permanent Injunction against all Individual Defendants their agents, representatives, related entities, entities doing business as, and all persons acting in aid of, conjunction with, or in concern with them, from directly or indirectly soliciting consumers or attempting to violate the Employment Agreements and the restrictive covenants contained therein. (Id. para. 92). To prevent irreparable harm, Nations Lending requests a Temporary Restraining Order, Preliminary and Permanent Injunction against all Defendants their agents, representatives, related entities, entities doing business as, and all persons acting in aid of, conjunction with, or in concern with them, from directly or indirectly utilizing the Confidential Information of Nations Lending. (Id., para. 93).

## IV.    LAW AND ARGUMENT

A temporary restraining order ("TRO") and a preliminary injunction are both equitable remedies. *KLNLogistics Corp. v. Norton*, 8th Dist. No. 89628,174 Ohio App.3d 712,2008-Ohio212, 884 N.E.2d 631, 10-12 (regarding preliminary injunctions); *Mike Lupine, Inc. v. Cleveland Business Show, Inc.*, 8th Dist. Cuyahoga No. 50028, 1986 WL 3700, *3 (March 27, 1986) (regarding temporary restraining orders). The legal standards for obtaining a temporary

12

restraining order and a preliminary injunction are the same. *Id.* The party seeking a TRO or preliminary injunction must show the following:

1. A substantial likelihood of success on the merits of the underlying claim;
2. Irreparable harm will be suffered if the injunction is not granted;
3. Issuing the injunction will not harm third parties; and
4. The public interest would be served by issuing the injunction.

*Id.* No single factor is dispositive. *Kyrkos v. Superior Beverage Group, Ltd*, 8th Dist. Cuyahoga No. 99444, 2013-Ohio-4597, ¶ 13. The factors must be balanced with the "flexibility which traditionally has characterized the law of equity." *Id.*

**A.     There is a substantial likelihood that Nations Lending will succeed on its claims of misappropriation of trade secrets, breach of contract, and tortious interference with business relationships.**

**1.     Misappropriation of Trade Secrets**

For Nations Lending to prevail on a misappropriation of trade secrets claim, Nations Lending must prove the following by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *Tomaydo-Tomahhdo L.L.C, v. Vozary*, 8th Dist. No. 104446, 2017-Ohio-4292, 82 N.E.3d 11804, ¶ 9; R.C. § 1333.62; R.C. § 133.63.

**a.     The Confidential Information is a trade secret.**

The Ohio Uniform Trade Secrets Act defines a "trade secret" as:

[I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

Electronically Filed 02/26/2024 13:20 / / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

R.C. § 1333.61(D). In determining whether a trade secret exists, the court must consider the following factors:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., _by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Tomaydo-Tomahhdo*, 2017-Ohio-4292, ¶ 11. Although the trade secret definition is broad enough to cover countless things, the term commonly applies to customer lists. *See, e.g.*, *Salemi v. Cleveland Metroparks*, 145 Ohio St. 3d 408, 414, 49 N.E.3d 1296, 2016-Ohio-1192, ¶ 26. So long as the customer lists are not "readily ascertainable through ordinary business channels or through classified business or trade directories," courts regularly find that customer lists constitute trade secrets. *Id.*

In this case, Nations Lending's Confidential Information, including "customer information or lists," is a trade secret. (Employment Agreement, Sections 3(a) and 5(b)(ii).) First, the parties agreed that Nations Lending's Confidential Information, including its Confidential Information, is not known to the public. (Employment Agreement, Section 3(a).) Second, the Confidential Information is not even known to those within the business, only to those with a "need to know." (Employment Agreement, Section 3(c).) Third, Nations Lending takes precautions to protect its Confidential Information, such as including in its employment agreements confidentiality provisions and restrictive covenants. (Employment Agreement, Sections 3 and 5.) Fourth, there is no genuine dispute as to value to Nations Lending in having the information against competitors. The Individual Defendants repeatedly confirmed that the Confidential Information provided

Nations Lending with a "competitive advantage" over competitors (Employment Agreement, Sections 3 and 5(b).) Fifth, the amount of effort or money Nations Lending expended in acquiring the Confidential Information is not reasonably subject to dispute. The Individual Defendants previously agreed that Nations Lending invested "substantial" time, money, and specialized knowledge into its Confidential Information, including Nations Lending's "customer base" and "customer and potential customer lists." (Employment Agreement, Section 3(b).) Sixth, there is also no genuine dispute that it would take others a substantial amount of time to acquire the Confidential Information, considering that the Individual Defendants agreed the Confidential Information resulted from Nations Lending's "substantial time, money, and specialized knowledge." (Employment Agreement, Section 3(b).)

Defendant Academy is a direct competitor of Nations Lending, and its misappropriation of the pricing, customers, prospective customers, and other Confidential Information of Nations Lending cannot be justified or permitted.

> **b.    The Individual Defendants acquired the Confidential Information as a result of his confidential relationship with Nations Lending.**

Courts may infer a confidential relationship from the circumstances surrounding the trade secrets owner and the defendant. *Dayton Superior Corp. v. Yan*, S.D.Ohio No. 3:12-CV-380, 2013 WL 1694838, *15 (April 18, 2013). A common example of a confidential relationship is an employment relationship. *See, e.g.*, *id.* In the trade secrets context, it is well-established that: "[W]here an express agreement bars disclosure of trade secrets, the defendant acquires trade secrets through a confidential relationship." *Id.*

Here, pursuant to the Employment Agreement, Nations Lending provided the Individual Defendants with Confidential Information, including pricing, personnel information and Customer

Information, for the Individual Defendants to perform their jobs. (Employment Agreement, Section 3(a) and 5(b)(ii). The Employment Agreement's confidentiality provisions and restrictive covenants barred them from disclosing or otherwise using that Confidential Information without Nations Lending's authorization. (Employment Agreement, Section 3 and 5.) As a result, under *Dayton Superior Corp.*, a confidential relationship existed between Nations Lending and the Individual Defendants, and the Individual Defendants acquired the Confidential Information pursuant to that confidential relationship.

> **c.     The Individual Defendants and Academy used the Confidential Information and Customer Information without Nations Lending's authorization.**

Beginning in December of 2023, the Individual Defendants and Academy engaged in a coordinated effort to misappropriate and use the Confidential Information of Nations Lending.

On or about December 8, 2023, the Defendants redirected a Nations Lending customer to Academy. (Goshert Verification, paras 59-60). During January of 2024, the Defendants, while still employed by Nations Lending, utilized pricing and customer information of Nations Lending to redirect its customers to Academy. In coordination with Defendant Academy, the Individual Defendants have engaged in a campaign of deceit wherein they transferred loans of Nations Lending into the names of loan originators of Defendant Academy. (Id., para. 74). Nations Lending has identified not less than thirteen (13) actual diversions of customers of Nations Lending by Defendants, and ten (10) other diversions of prospective customers of Nations Lending by Defendants. (Id., paras 75-76). Prior to their departure from Nations Lending, the Individual Defendants downloaded lists of contacts and customers of Nations Lending, as well as other Confidential Information of Nations Lending to use in competition against Nations Lending with Defendant Academy. (Id., para 77).

16

Nations Lending never authorized any of this activity.  To the contrary, the Employment Agreement contains numerous restrictive covenants that prohibit Individual Defendants from soliciting employees, soliciting customers, and competing with Nations Lending.  Nations Lending reminded the Individual Defendants about these restrictive covenants and sent a letter directly to Defendant Academy regarding the misappropriation.  Defendant Academy responded with false promises to remedy the misappropriation.

Moreover, it is inevitable that Defendants will use or otherwise disclose Nations Lending's Confidential Information based on the inevitable disclosure doctrine.  *Litigation Mgt., Inc. v. Bourgeois*, 8th Dist. Cuyahoga No. 95730, 2011-Ohio-2794, ¶ 32; *Jacono v. Invacare Corp.*, 8th Dist. Cuyahoga No. 86605, 2006-Ohio-1596, ¶ 38. "According to the inevitable-disclosure rule, a threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." *Procter & Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 274, 747 N.E.2d 268, 279 (1st Dist.2000).

Applying the doctrine to the case at bar, Nations Lending's former employees resigned and began working for a competitor within the exact same geographical footprint.  The Defendants have utilized and are continuing to utilize the Confidential Information of Nations Lending to compete with Nations Lending.  Accordingly, the requirements to invoke the inevitable disclosure doctrine are satisfied, and the Court may properly find that it is inevitable that Individual Defendants will use or otherwise disclose Nations Lending's Confidential Information in their new employment position.

### 2.     Breach of Employment Agreements

For Nations Lending to prevail on its claim that Individual Defendants breached the Employment Agreements, Nations Lending must prove the following elements by a preponderance of evidence: 1) the existence of a binding contract; 2) Nations Lending's performance; 3) breach by the Individual Defendants; and 4) damage or loss as a result of such breach. *MP TotalCare Services, Inc. v. Mattimoe*, 648 F.Supp.2d 956, 962 (N.D. Ohio 2009).

### a.     The Employment Agreements are binding contracts.

Nations Lending and the Individual Defendants entered into binding Employment Agreements with restrictive covenants in place during employment and after employment. (Employment Agreement, Section 5.)  The non-solicitation and non-competition provisions are enforceable against the Individual Defendants.[1]  In Ohio, courts generally treat non-solicitation and non-competition agreements the same way. *Century Business Servs., Inc. v. Urban*, 8th Dist. No. 90741, 179 Ohio App.3d 111, 2008-Ohio-5744, 900 N.E.2d 1048, ¶ 12. Non-solicitation and non-competition agreements that are reasonable are enforced, and those that are unreasonable are "enforced to the extent necessary to protect an employer's legitimate interests." *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544 (1975); *Century Business Servs.*, 2008-Ohio5744, ¶ 12. A non-solicitation or non-competition agreement is enforceable and reasonable if "the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public. *Raimonde*, 42 Ohio St.2d at 26; *Century Business Servs.*, 2008-Ohio-5744, ¶ 12. In making its determination, the court may consider the following factors:

> [T]he absence or presence of limitations as to time and space, * * * whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the

---

[1] Nations Lending does not seek to enforce the non-competition provision against Individual Defendant Gonzalez.

inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment to the employee; whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.

*Raimonde*, 42 Ohio St.2d at 25; *Century Business Servs.*, 2008-Ohio-5744, ¶ 13-14.

After considering all these factors, nothing should prevent the Court from finding that the non-solicitation and non-competition provisions are reasonable and enforceable.  First, both the non-solicitation and non-competition provisions contain limitations as to time.  (Employment Agreement, Sections 5(a) and 5(e).)  The provisions are applicable only during the "Restrictive Period," which is twelve (12) months.  (Employment Agreement, Section 5(a).) Second, the Individual Defendants were the primary contact for customers for matters within their scope of employment.  (Employment Agreement, Section 3; Employment Agreement, Section 5(b)(ii); Employment Agreement, Supplement A, p. 1.)  Third, the Individual Defendants possessed Nations Lending's Confidential Information and trade secrets pursuant to their confidential relationship with Nations Lending.

Fourth, the non-solicitation and non-competition provisions do not seek to eliminate ordinary competition under their plain terms.   The non-solicitation of customers provisions only bar solicitation "for purposes of offering or accepting good or services similar to or competitive with those offered by [Nations Lending]."  (Employment Agreement, Section 5(b)(ii).)  Likewise, the non-competition provision only applies if a former employee "engages in the same or similar business activities of [Nations Lending]."  (Employment Agreement, Section 5(b)(iii).) Thus, based on their plain language, the non-solicitation of customers and non-competition provisions do not seek to eliminate ordinary competition, only competition that necessarily involves Nations Lending's competitive interests and trade secrets.   Fifth, the non-solicitation and non-competition

provisions do not seek to stifle skill and experience of Individual Defendants.  They only seek to protect Nations Lending's trade secrets and legitimate competitive business interests.

Sixth, the benefit to Nations Lending is not disproportional to detriment to the Individual Defendants.  Nations Lending is seeking to protect its trade secrets and is otherwise only enforcing its right to maintain its competitive interest for twelve (12) months under the Restrictive Period. Seventh, the non-solicitation and non-competition provisions are not a bar to any sole means of support.  To the contrary, the Individual Defendants are free to pursue any opportunities that do not use Nations Lending's trade secrets (including its customers and prospective customers) and/or are not competitive with Nations Lending during the 12-month Restrictive Period. Eighth, the employment that the non-competition provision forbids is not merely incidental to the main employment. It is almost identical to the main employment. The Individual Defendants utilized the Confidential Information of Nations Lending to the detriment of Nations Lending during their employment, and have continued to do so after their employment in violation of their Employment Agreements.

**b.      Nations Lending performed under the Employment Agreement.**

Nations Lending performed its obligations under the Employment Agreement.  (Goshert Verification, para. 52).

**c.      The Individual Defendants breached the Employment Agreements.**

The Individual Defendants breached the Employment Agreements.  As set forth above, they violated the provisions regarding use, protection and misappropriation of Nations Lending's Confidential Information.  (Employment Agreement, Section 3).  They violated the provisions not to directly or indirectly solicit Nations Lending's employees. (Employment Agreement, Section

5(b)(i).)  They violated the provisions not to solicit customers "for purposes of offering or accepting goods or services similar to or competitive with those offered by [Nations Lending]" both during employment and within the 12-months after employment. (Employment Agreement, Section 5(b)(ii).  They violated the provisions not to compete or otherwise engage in "the same or similar business activities as [Nations Lending]" both during employment and after employment. (Employment Agreement, Section 5(b)(iii).)

The Individual Defendants plainly breached the provision when, both during employment and continuing after employment, they began directing loans, services, customers, and prospective customers to Defendant Academy.  As a result of the breaches, the Individual Defendants have diverted at least thirteen (13) Nations Lending customers and ten (10) other prospective customers to Academy.

### d. Nations Lending suffered losses as a result of the breach.

As a result of breaches of contract, Nations Lending suffered and will continue to suffer losses.   In the trade secrets context, the misappropriation of trade secrets or otherwise the loss of proprietary information creates a presumption of irreparable harm.  *Litigation Mgt.*, 2011-Ohio-2794, ¶¶ 14, 28, 33, 36. That is because the whole point of a "secret" is that no one else knows about it. *Id.* Indeed, the "proprietary aspect" of a trade secret flows "not from the knowledge itself, but from its secrecy." *Id.*

In this case, Individual Defendants began working for a mortgage lending company that directly competes with Nations Lending both during and after their employment with Nations Lending.  They have already solicited and diverted 23 customers and prospective customers.  They have downloaded the entire database of Nations Lending's Confidential Information.  As such, Nations Lending has suffered and will continue to suffer irreparable harm.

### 3. Tortious Interference with Business Relationships

For Nations Lending to prevail on a claim for tortious interference with business relationships, Nations Lending must show: (1) a business relationship; (2) Defendants' knowledge of the relationship; (3) Defendants' intentional and improper action taken to prevent a contract formation, procure a contractual breach, or terminate a business relationship; (4) a lack of privilege; and (5) resulting damages. *N. Chem. Blending Corp. v. Strib Indus., Inc.*, 8th Dist. Cuyahoga No. 105911, 2018-Ohio-3364, ¶¶ 42-45. To determine whether Defendants' actions lacked privilege or were otherwise improper, the Court must consider the following:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Id.*

Here, there is a substantial likelihood that Nations Lending will establish all the necessary elements.  Nations Lending maintained its Confidential Information in a manner so that it would not be known, discovered, or misappropriated.  Nations Lending established and maintained business relationships with its customers and prospective customers, including the 23 diverted to Defendant Academy.  Defendants knew about Nations Lending's interest in its Confidential Information and its business relationships with the customers and prospective customers, both through their Employment Agreements and the correspondence reminders.

Nonetheless, while the Individual Defendants were employed by Nations Lending and continuing after their resignation, the Individual Defendants and Defendant Academy engaged in a deceitful scheme to misappropriate the Confidential Information of Nations Lending and divert the customers and prospective customers of Nations Lending to Academy.  The  Defendants lacked

privilege because their actions violated the Ohio Trade Secrets Act, the federal Defend Trade Secrets Acte, and the Employment Agreement's non-solicitation and non-competition provisions. Fifth, Nations Lending suffered damages and irreparable harm due to the misappropriation of Nations Lending's trade secrets or otherwise loss of proprietary information.

**B.      Nations Lending will suffer irreparable harm if the Court does not award injunctive relief immediately.**

If the Court does not grant immediate injunctive relief, Nations Lending will suffer and continue to suffer irreparable harm. "Irreparable harm is harm for which there is no plain, adequate, and complete remedy at law, and for which money damages would be impossible, difficult, or incomplete." *Kyrkos*, 2013- Ohio-4597, ¶ 14. "[A]dequate remedy at law 'means that the legal remedy must be as efficient as the indicated equitable remedy would be; that such legal remedy must be presently available in a single action; and that such remedy must be certain and complete.' " *Id.*

In the trade secrets context, irreparable harm or the threat of irreparable harm is presumed when a trade secret is misappropriated.  *Litigation Mgt.*, 2011-Ohio-2794, ¶¶ 14, 28, 33, 36; *accord.* R.C. § 1333.62 ("Actual or threatened misappropriation may be enjoined.") That is because the whole point of a "secret" is that no one else knows about it. *Id.* Indeed, the "proprietary aspect" of a trade secret flows "not from the knowledge itself, but from its secrecy." *Id.*  Courts, including the Eighth District Court of Appeals, therefore find that "[t]he existence of an actual threat of irreparable injury may be established by showing that the employee possessed knowledge of the employer's trade secrets." *Litigation Mgt.*, 2011-Ohio-2794, ¶¶ 14, 28, 33, 36; *Levine v. Beckman*, 48 Ohio App.3d 24, 27, 548 N.E.2d 267, 271 (10th Dist.1988).

In this case, irreparable harm is presumed. As demonstrated earlier, the Defendants misappropriated Nations Lending's trade secrets when they used Nations Lending's Confidential

Information and Customer Information to solicit and divert Nations Lending's customers and employees.  The diversion of Nations Lending's customers and prospective customers began while the Individual Defendants remained in Nation Lending's employ.  The actions of the Individual Defendants also violated the Employment Agreement non-solicitation and non-competition provisions.  Therefore, under well-established precedent, the Court must presume irreparable harm or the threat of irreparable harm in this case.

**C.**     **Issuing a temporary restraining order and preliminary injunction will not harm third parties.**

Simply put, there are no third parties that will suffer any cognizable harm. If the Court grants the requested injunctive relief, the Court is simply maintaining the status quo for all the relevant parties in the case.

**D.**     **A temporary restraining order and preliminary injunction will serve the public interest.**

A TRO and preliminary injunction are in the public's best interest. It is well-established that "the public interest weighs in favor of enforcing contractual obligations between the parties." *Clifton Steel Co.*, 2018-Ohio-2186, ¶ 43; *Dayton Superior Corp.*, 2013 WL 1694838, *21 (collecting cases). "[P]ersons have a fundamental right to contract freely with the expectation that the terms of the contract will be enforced." *Clifton*, 2018-Ohio-2186, 43. Also, "preserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest." *Id.* With this in mind, a TRO and preliminary injunction serve to enforce the non-solicitation and non-competition provisions protecting the trade secrets that allow Nations Lending to remain competitive and profitable in the mortgage industry. Moreover, the Ohio Trade Secrets Act expressly allows the Court to enjoin "[a]ctual or threatened misappropriation." R.C. § 1333.62. Thus, issuing injunctive relief to enforce the Ohio Trade Secrets Act would support the public

24

interest in the Act itself. Therefore, the clear and convincing evidence shows that a TRO and preliminary injunction serves the public interest.

### E. No Bond is Required by Agreement of the Parties.

Ohio Civ. R. 65(C) provides:

> No temporary restraining order or preliminary injunction is operative until the party obtaining it gives bond executed by sufficient surety, approved by the clerk of the court granting the order or injunction, in an amount fixed by the court or judge allowing it, to secure to the party enjoined the damages he may sustain, if it is finally determined that the order or injunction should not have been granted.

In assessing bond under Ohio Civ. R. 65(C), the trial court has discretion in determining its appropriate amount. *Vanguard Transp. Svcs. v. Edwards Transfer Storage Co, General Commodities Div.*, 109 Ohio App. 3d 786 (10th Dist. 1996); *citing*, *Colquett v. Byrd*, 59 Ohio Misc. 45 (M.C. 1979). However, in *Vanguard*, the Court relied on the holding set forth by the *Colquett* Court in determining that the amount of bond required under Ohio Civ. R. 65(C) could be zero dollars. *Id.*

Here, a bond is unnecessary. The Employment Agreement addresses the procedures for enforcement of restrictive covenants, and Individual Defendants have agreed to waive "any requirement of posting a bond as precondition of obtaining such injunction." (See Employment Agreement, Sections 5(d) and 10(e).) Therefore, Nations Lending respectfully requests that a bond not be required in this action.

### III. CONCLUSION

The clear and convincing evidence shows that Defendants misappropriated trade secrets upon which Nations Lending's survival as a business depends. The clear and convincing evidence shows that the Individual Defendants, working with Defendant Academy, violated the Employment Agreements, both during their employment with Nations Lending and thereafter

25

within the restricted period.  If the Court does not grant a TRO or a preliminary injunction, Nations Lending will suffer irreparable harm. Therefore, the Court should grant this motion and issue a TRO and preliminary injunction requiring Defendants to cease utilizing the Confidential Information, providing business operations that are in competition with Nations Lending, and otherwise violating their contractual and/or legal obligations.  A proposed Temporary Restraining Order is attached hereto.

Respectfully submitted,

*/s/ Jeffrey C. Miller*
Jeffrey C. Miller (0068882)
David J. Hearty (0093827)
Stefanik & Iosue
1109 Carnegie Avenue, Floor 2
Cleveland, OH 44115
(216) 651-0451
jmiller@stefanikiosue.com
dhearty@stefanikiosue.com
*Attorneys for Nations Lending Corporation*

26

## RULE 65 CERTIFICATION

On February 26, 2024, Plaintiff Nations Lending Corporation, by and through the undersigned counsel, notified Defendants, that Plaintiff authorized the instant filing, provided a copy of this filing and the Verified Complaint and this Motion, and identified that Plaintiff would be proceeding to Court that same day via electronic mail at

Leonard Pagan
lenpagan@hotmail.com

Joan Pagan
jniaukea@hawaii.edu

Christina Alves
cpiaukea@gmail.com

Chandee Hooper
Kawai.hooper@gmail.com

Jessica Brown
iaukea@hawaii.edu

Brooks Onishi
bonishi@me.com

Ilda Gonzalez
Ildagonzalez183@gmail.com

Academy Mortgage Corporation
Mike Huber – General Counsel
mike.huber@academymortgage.com


*/s/ Jeffrey C. Miller*
Jeffrey C. Miller (0068882)
*One of the attorneys for Nations Lending Corporation*

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| NATIONS LENDING CORPORATION | ) | CASE NO. |
| | ) | |
| *Plaintiff,* | ) | JUDGE |
| | ) | |
| v. | ) | **TEMPORARY RESTRAINING ORDER** |
| | ) | |
| ACADEMY MORTGAGE | ) | |
| CORPORATION, et al., | ) | |
| | ) | |
| *Defendants.* | | |

This matter came before this Court on Plaintiff, Nations Lending Corporation's ("Nations Lending" or "Plaintiff") Motion for Temporary Restraining Order and Preliminary Injunction. Based upon the Plaintiff's Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction, and upon good cause shown, the Court makes the following orders:

A. For a Temporary Restraining Order against Defendants Academy Mortgage Corporation, Leonard Pagan, Joan Pagan, Jessica Brown, Christina Alves, Kawai "Chandee" Hooper, Brooks Onishi, and Ilda Gonzalez and their agents, representatives, related entities, entities doing business as, and all persons acting in aid of, conjunction with, or in concern with them, from directly or indirectly:

   i. using, disclosing, or otherwise misappropriating Nations Lending's Confidential Information and trade secrets;
   ii. inducing or attempting to induce the violation of the contractual relationships of Nations Lending; and
   iii. soliciting or attempting to solicit Nations Lending's customers, prospective customers, and/or employees.

B. For a Temporary Restraining Order against Defendants Leonard Pagan, Joan Pagan, Jessica Brown, Christina Alves, Kawai "Chandee" Hooper, and Brooks Onishi and their agents, representatives, related entities, entities doing business as, and all persons acting in aid of, conjunction with, or in concern with them, from directly or indirectly:

   a. Owning, maintaining, operating or engaging in the same or similar business activities as Nations Lending or in any business activity which competes with Nations Lending;
   b. Serving, advising, managing, consulting with, providing services for, or being employed by any firm, agency, partnership or corporation which engages in the same or similar business activities as Nations Lending or competes with Nations Lending;
   c. undertaking any efforts or activities toward forming or incorporating, financing, or commencing any competing business activity which engages in the same or similar business activities as Nations Lending; or

28

    d.   advising, serving, or consulting with any person, business, or entity which is or will be undertaking efforts toward incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as Nations Lending.

C.  This Court further orders that a bond is unnecessary, and its requirement has been waived by the parties.

D.  This matter shall come for a hearing on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction on _____ ,2024, at _____.

**IT IS SO ORDERED**

_____
JUDGE



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**February 26, 2024 13:20**

By: JEFFREY C. MILLER 0068882

Confirmation Nbr. 3097247

NATIONS LENDING CORPORATION                    CV 24 993402

     vs.

ACADEMY MORTGAGE CORPORATION, ET AL.    **Judge:** JOHN J. RUSSO

**Pages Filed:** 214

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| NATIONS LENDING CORPORATION | ) | CASE NO. |
| 4 Summit Park Drive, Suite 200 | ) | |
| Independence, OH 44131 | ) | JUDGE |
| | ) | |
| *Plaint₍ᵢ₎f*, | ) | **VERIFIED COMPLAINT FOR** |
| | ) | **COMPENSATORY AND PUNITIVE** |
| v. | ) | **DAMAGES, TEMPORARY** |
| | ) | **RESTRAINING ORDER, PRELIMINARY** |
| ACADEMY MORTGAGE | ) | **AND PERMANENT INJUNCTION, AND** |
| CORPORATION | ) | **ALL LEGAL AND EQUITABLE** |
| 339 West 13490 South | ) | **REMEDIES** |
| Draper, UT 84020 | ) | |
| c/o Corporation Service Company | ) | |
| 1160 Dublin Road, Suite 400 | ) | |
| Columbus, OH 43215 | ) | |
| | ) | |
| LEONARD PAGAN | ) | |
| 1469 Kuleana Place | ) | |
| Hilo, HI 96720 | ) | |
| | ) | |
| JOAN PAGAN | ) | |
| 1469 Kuleana Place | ) | |
| Hilo, HI 96720 | ) | |
| | ) | |
| JESSICA BROWN | ) | |
| 322 Ainako Avenue | ) | |
| Hilo, HI 96720 | ) | |
| | ) | |
| CHRISTINA IUKEA-ALVES | ) | |
| 75-6203 Piena Place | ) | |
| Kailua Kona, HI 96740 | ) | |
| | ) | |
| KAWAI "CHANDEE" HOOPER | ) | |
| 74-5158 Puuolokaa Place | ) | |
| Kailua Kona, HI 96740 | ) | |
| | ) | |
| BROOKS ONISHI | ) | |
| 46-1058 Emepela Way #10C | ) | |
| Kaneohe, HI 96744 | ) | |
| | ) | |
| ILDA GONZALEZ | ) | |
| 3270 Fleming Street | ) | |
| Riverside, CA 92509 | ) | |

```
                                      )
                                      )
and                                   )
                                      )
JOHN DOES 1-5                         )
                                      )
              Defendants.             )
```

Plaintiff Nations Lending Corporation ("Plaintiff" or "Nations Lending"), by and through the undersigned counsel, submits its Verified Complaint against Defendants Leonard Pagan, Joan Pagan, Jessica Brown, Christina Alves, Kawai "Chandee" Hooper, Brooks Onishi, Ilda Gonzalez, Academy Mortgage Corporation, and John Does 1-5 ("Defendants"), together with the Verification of Jeff Goshert, and states as follows:

### THE PARTIES, JURISDICTION, AND VENUE

1.     Nations Lending is an Ohio corporation with its corporate headquarters located at 4 Summit Park Drive, Suite 200, Independence, OH 44131 in Cuyahoga County, Ohio.

2.     Academy Mortgage Corporation ("Academy") is a Utah corporation registered and licensed to do business in Ohio as a foreign corporation bearing entity #1808949 by the Ohio Secretary of State with a registered agent for service of Corporation Service Company 1160 Dublin Road, Suite 400, Columbus, OH 43215.

3.     Leonard Pagan is an individual and a former Nations Lending employee who resides at 1469 Kuleana Place, Hilo, HI 96720.

4.     Joan Pagan is an individual and a former Nations Lending employee who resides at 1469 Kuleana Place, Hilo, HI 96720.

5.     Jessica Brown is an individual and a former Nations Lending employee who resides at 322 Ainako Avenue, Hilo, HI 96720.

Electronically Filed 02/26/2024 13:20 /  / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

6.    Christina Iaukea-Alves is an individual and a former Nations Lending employee who resides at 75-6203 Piena Place, Kailua Kona, HI 96740.

7.    Kawai "Chandee" Hooper is an individual and a former Nations Lending employee who resides at 74-5158 Puuolokaa Place, Kailua Kona, HI 96740.

8.    Brooks Onishi is an individual and a former Nations Lending employee who resides at 46-1058 Emepela Way #10C, Kaneohe, HI 96744.

9.    Ilda Gonzalez is an individual and a former Nations Lending employee who resides at 3270 Fleming Street, Riverside, CA 92509.

## <u>VENUE AND JURISDICTION</u>

10.    Venue and personal jurisdiction are appropriate with this Court over Defendants Leonard Pagan, Joan Pagan, Jessica Brown, Christina Iukea-Alves, Chandee Hooper, Brooks Onishi, and Ilda Gonzalez (collectively "Individual Defendants") as each has entered into an Employment Agreement with Nations Lending, attached as Exhibits A through G, in which each agreed to submit to the jurisdiction of Ohio courts for actions seeking a restraining order or injunction to enforce the Employment Agreement. Each Employment Agreement at Section 10(i), which states:

> (i) Governing Law; Jurisdiction and Venue. This Agreement, for all purposes, to the maximum extent permitted by applicable law, shall be construed in accordance with the laws of Ohio without regard to any conflicts of law principles.  Should applicable law specifically prohibit the use of the law of a foreign jurisdiction, then the law of the relevant jurisdiction shall be used.  Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in accordance with the arbitration provision contained within this Agreement except that action may be brought in a state or federal court located in the state of Ohio or the state of Employee's primary residence, if different, for the purposes of obtaining a restraining order or injunction against a violation of provisions of this Agreement or to enforce a judgment rendered in accordance with the results of arbitration between the parties. The parties hereby irrevocably submit to the nonexclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue. EACH PARTY

IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO PARTICIPATE IN A CLASS ACTION OR A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

11.    Venue and personal jurisdiction are appropriate with this Court over Defendant Academy pursuant to Civ. R. 3(C)(3), (6), and/or (12) as it is registered and licensed to do business within the State of Ohio, part of the activity that gives rise to Nations Lending's claims for relief and/or in which part of the claim for relief arose in Cuyahoga County, and/or the principal place of business of Nations Lending is Cuyahoga County.

## GENERAL FACTUAL ALLEGATIONS

12.    Founded in 2003, Nations Lending is a national mortgage lender helping families achieve their dream of homeownership.

13.    Proudly based in Cleveland, Ohio, Nations Lending holds licenses to lend from its corporate headquarters and throughout branches across the United States, including the Hawaii office relevant to this suit.

14.    Defendant Academy is a direct competitor of Nations Lending throughout the U.S., and provides and services the same types of loans and services as Nations Lending.

15.    On July 27, 2022, Nations Lending entered into the Employment Agreement with Defendant Leonard Pagan attached as Exhibit A.

16.    This Employment Agreement governed the terms and conditions of Leonard Pagan's employment as Area Sales Manager.

17.    As Area Sales Manager, Leonard Pagan's position required him to strategically plan, lead and control all activities of branch sales offices within a specific geographic area designated as Hawaii County, Hawaii.

18.     Hawaii County, Hawaii includes all cities on "The Big Island" of Hawaii in the State of Hawaii.

19.     On July 28, 2022, Nations Lending entered into the Employment Agreement with Defendant Joan Pagan attached as Exhibit B.

20.     Joan Pagan is the wife of Leonard Pagan.

21.     This Employment Agreement governed the terms and conditions of Joan Pagan's employment as Personal Mortgage Advisor.

22.     As a Personal Mortgage Advisor, Joan Pagan's position required her to solicit, receive, and originate loan applications from customers and prospective customers of Nations Lending.

23.     On July 27, 2022, Nations Lending entered into the Employment Agreement with Defendant Jessica Brown attached as Exhibit C.

24.     This Employment Agreement governed the terms and conditions of Defendant Brown's employment as Originator Assistant.

25.     As an Originator Assistant, Defendant Brown's position required her to provide documentation and record maintenance of loan files for customers and prospective customers of Nations Lending.

26.     On July 27, 2022, Nations Lending entered into the Employment Agreement with Defendant Christina Iaukea-Alves attached as Exhibit D.

27.     This Employment Agreement governed the terms and conditions of Defendant Iaukea-Alves's employment as Sales Manager.

Electronically Filed 02/26/2024 13:20  /  / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

28.     As a Sales Manager, Defendant Iukea-Alves 's position required her to strategically manage the sales team of Personal Mortgage Advisors, while closing loan files for customers and prospective customers of Nations Lending.

29.     On May 27, 2023, Nations Lending entered into the Employment Agreement with Defendant Kawai "Chandee" Hooper attached as Exhibit E.

30.     This Employment Agreement governed the terms and conditions of Defendant Hooper's employment as a Personal Mortgage Advisor.

31.     As a Personal Mortgage Advisor, Defendant Hooper's position required her to solicit, receive, and originate loan applications from customers and prospective customers of Nations Lending.

32.     August 29, 2023 Nations Lending entered into the Employment Agreement with Defendant Brooks Onishi attached as Exhibit F.

33.     This Employment Agreement governed the terms and conditions of Defendant Onishi's employment a Personal Mortgage Advisor.

34.     As a Personal Mortgage Advisor, Defendant Onishi's position required him to solicit, receive, and originate loan applications from customers and prospective customers of Nations Lending.

35.     October 12, 2022, Nations Lending entered into the Employment Agreement with Defendant Ilda Gonzalez attached as Exhibit G.

36.     This Employment Agreement governed the terms and conditions of Defendant Gonzalez's employment as a Processor.

6

37.     As a Processor, Defendant Gonzalez's position required her to verify and process information of loan files for customers and prospective customers of Nations Lending and to submit completed files for settlement.

38.     Defendant John Does 1-5 are individuals who assisted and/or co-conspired with the other Defendants in the conduct giving rise to this Complaint.  While their identity is suspected, it has not yet been confirmed and Nations Lending reserves the right to amend this Complaint as warranted.

39.     Nations Lending's office in Hawaii, during times relevant to this suit, was located at 75-167 Hualalai Road, Suite 101, Kailua-Kona, HI 96740 and was informally referred to as the "Hilo, HI Branch."

40.     At all times relevant, Individual Defendants made up the collective workforce of the Nations Lending Hilo, HI Branch.

41.     In making the decision to open an office in Hawaii, Nations Lending recognized the extraordinary expenses and operational challenges it would incur with such an isolated and remote location.

42.     At the same time, Nations Lending recognized that its established systems of production, including its Confidential Information, would result in a successful branch if it could aggressively capture market share and producers.

43.     As such, Nations Lending entered into Employment Agreements with all employees of the Hilo, HI Branch, and included specific protections of confidential information and restrictive covenants.

Electronically Filed 02/26/2024 13:20 /  / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

44.     The purpose of the Employment Agreements was to protect the Confidential Information of Nations Lending, its market share as acquired, and to provide an extended timeframe of competitive advantage reflecting its extensive investment in this undertaking.

45.     Pursuant to each Employment Agreement, Nations Lending provided each Individual Defendant with access to Nations Lending's "Confidential Information." (Employment Agreement, Section 3(a).)

46.     This Confidential Information included "personnel information," "customer information," and other trade secrets:

> Confidential Information Defined. For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, documents, operations, services, strategies, techniques, agreements and terms of agreements, transactions, negotiations, know-how, trade secrets, applications, work-in-process, databases, compilations, technologies, records, systems, sources, supplier information, vendor information, financial information, accounting information, marketing information, pricing information, credit information, payroll information, personnel information, employee lists, reports, internal controls, security procedures, customer information or lists, buyer lists, or other information generally considered private and confidential in the industry or by any existing or prospective customer, other associated third party, or of any other person or entity that has entrusted information to the Company in confidence.

> The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

(Employment Agreement, Section 3(a).)

47.     In addition to the Confidential Information, Nations Lending also provided access to "Customer Information," which was:

> "Customer Information" includes, but is not limited to, names, phone numbers, addresses, email addresses, transaction history, preferences, financial condition,

Electronically Filed 02/26/2024 13:20 / / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

> pricing information, and other information identifying facts and circumstances specific to the customer and relevant to Company's services.

(Employment Agreement, Section 5(b)(ii).)

48.     Because the Employment Agreement granted each Individual Defendant access to Nations Lending's proprietary information and trade secrets, each Employment Agreement included three (3) restrictive covenants that applied during employment and for twelve (12) months following separation from Nations Lending. (Employment Agreement, Section 5.)

49.     First, each Individual Defendant agreed not to directly or indirectly solicit Nations Lending's employees:

> The Employee agrees and covenants not to directly or indirectly solicit, hire, recruit, or attempt to solicit, hire, or recruit, any employee of the Company or any employee who has been employed by the Company in the six months preceding the last day of Employee's employment (collectively, "Covered Employee"), or induce the termination of employment of any Covered Employee during the Restricted Period. . . . This non-solicitation provision explicitly covers all forms of oral, written, or electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, Twitter, and any other social media platform, whether or not in existence at the time of entering into this Agreement.

(Employment Agreement, Section 5(b)(i).)

50.     Second, each Individual Defendant agreed not to solicit any customers "for purposes of offering or accepting goods or services similar to or competitive with those offered by [Nations Lending]":

> The Employee agrees and covenants, for the duration of the [12-month] Restricted Period, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this agreement, or meet with the Company's current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company. However, it will not

be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section. This Section does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company.

(Employment Agreement, Section 5(b)(ii).

51.     Third, during their employment, each Individual Defendant agreed not to compete

or otherwise engage in "the same or similar business activities as [Nations Lending]":

Because Employee will have access to proprietary information belonging to Company that would provide an unfair advantage to competition, during the period of employment Employee agrees not to, for any person, business, or entity, a) own, maintain, operate, or engage in the same or similar business activities as Company or in any business activity which competes with Company; b) serve, advise, manage, consult with, provide services for, or be employed by any individual, firm agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company; c) undertake any efforts or activities toward forming or incorporating, financing, or commencing any competing business activity which engages in the same or similar business activities as the Company; or d) advise, serve, or consult with any person, business, or entity which is or will be undertaking efforts toward incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as the Company. During the Restricted Period, Employee agrees not to divert or refer Company customers or prospective customers to any other individual, firm, agency, partnership, venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company. If Employee's job assignment location with Company is within a branch office or retail location, then Employee agrees and covenants not to open or relocate a similar office or location within a five-mile radius of such location (the "Restricted Territory") which would engage in the business of residential mortgage lending for the duration of the Restricted Period. "Relocate" includes Employee joining an existing office location of a competitor if such office was opened at such location within the six-month period before the beginning of the Restricted Period. This Section does not restrict or impede, in any way, Employee from seeking gainful employment in the industry which does not harm Company's vital and legitimate business interests and shall not be interpreted

or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

(Employment Agreement, Section 5(b)(iii).)

52.     Nations Lending fulfilled all of its obligations to the Individual Defendants under the Employment Agreements.

53.     As set forth hereafter, the Individual Defendants violated their agreements, both while employed with Nations Lending and after their resignation of employment from Nations Lending

## FACTS IN SUPPORT OF CLAIMS

54.     On January 2, 2024, Defendant Joan Pagan resigned from Nations Lending.

55.     On January 16, 2024, Defendants Leonard Pagan, Jessica Brown, Christina Iukea-Alves, Chandee Hooper, and Ilda Gonzalez resigned from Nations Lending.

56.     On January 26, 2024, Defendant Onishi resigned from Nations Lending.

57.     Despite their restrictive covenants, on behalf of Defendant Academy, the Individual Defendants began operating a mortgage lending branch competitive with Nations Lending at 234 Waianuenue Ave, Hilo, HI 96720.  This location is approximately 1.3 miles from the Nations Lending branch.

58.     As Nations Lending has investigated the circumstances of the resignations and competition, it has uncovered and continues to uncover the actionable and coordinated conduct of the Defendants to divert and misappropriate the confidential and proprietary information of Nations Lending, divert customers and prospective customers of Nations Lending, and otherwise violate the Employment Agreements.

59.     The evidence found to date is that as of December 8, 2023, Defendant Academy was engaged in direct communication with Defendants Leonard Pagan and/or Joan Pagan for the

purpose of misappropriating the Confidential Information of Nations Lending and diverting customers and prospective customers of Nations Lending.

60.     On or about December 8, 2023, in coordination with Defendant Academy and Defendants John Doe 1-5 which likely occurred prior to that date, Defendants Leonard and/or Joan Pagan redirected  a Nations Lending customer (Meek) to Defendant Academy.

61.     Throughout December of 2023, the Defendants conspired to prepare their misappropriation and diversion of Nations Lending's customers and Confidential Information.

62.     Continuing into January of 2024, Defendant Academy and Defendants John Doe 1-5 collaborated with Defendant Leonard Pagan and other Individual Defendants to transfer loan transactions and Confidential Information of Nations Lending to Defendant Academy.

63.     On January 2, 2024, Defendant Joan Pagan resigned from Nations Lending and began formal employment with Defendant Academy as evidenced by her Nationwide Multistate Licensing System ("NMLS") report.

64.     Even though they were still employed by Nations Lending, the other Individual Defendants and Defendant Academy then unleashed their campaign of improperly soliciting and diverting the customers and prospective customers of Nations Lending, and misappropriating the Confidential Information of Nations Lending without compunction.

65.     For example, on January 3, 2024, Defendant Brown created a consumer transfer request using Nations Lending's system to transfer a consumer loan transaction (Preston) to Defendant Academy so that the borrower could continue working with Defendant Hooper.

66.     Upon information and belief, the document was created at the direction of Defendant Academy and/or other Individual Defendants, who neglected to check the dates before

they launched the scheme. Defendant Hooper was then an employee of Nations Lending and remained an employee of Nations Lending until January 16, 2024.

67. A true and accurate copy of the document and audit report is attached as Exhibit H.

68. As a result of these actions, Nations Lending lost a loan transaction valued at $292,000.

69. Also, for example, on January 9, 2024, Defendant Academy provided Defendant Leonard Pagan and Defendant Iukea-Alves, via their personal email accounts, with pricing for a loan for one of Nation Lending's customers (Yang). A true and accurate copy of the exchange is attached as Exhibit I.

70. Defendant Leonard Pagan and/or other Individual Defendants provided that information to the customer and assisted with the transition to Defendant Academy.

71. As a result of these actions, Nations Lending lost a loan transaction valued at $232,500.

72. Also, for example, on January 9, 2024, Defendant Brown created an Appraisal Transfer Request Letter using Nations Lending's system to transfer a consumer loan transaction (Gates) to Defendant Academy. A true and accurate copy of the document and audit report is attached as Exhibit J.

73. Upon information and belief, the document was created at the direction of Defendant Academy and/or other Individual Defendants. After procuring the transfer letter, Defendant Academy then requested transfer of the appraisal already obtained by Nations Lending on January 12, 2024, a true and accurate copy of which is attached as Exhibit K.

Electronically Filed 02/26/2024 13:20 / / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

74. In coordination with Defendant Academy and Defendants John Doe 1-5, the Individual Defendants engaged in a campaign of deceit wherein they transferred loans of Nations Lending into the names of loan originators of Defendant Academy beginning in December of 2023.

75. As of the date of filing, Nations Lending has identified not less than thirteen (13) actual diversions of customers of Nations Lending by Defendants.

76. As of the date of filing, Nations Lending has preliminarily identified not less than ten (10) other diversions of prospective customers of Nations Lending by Defendants.

77. Prior to their departure from Nations Lending, the Individual Defendants downloaded lists of contacts and customers of Nations Lending, as well as other Confidential Information of Nations Lending to use in competition against Nations Lending with Defendant Academy.

78. On January 16, 2024, after they completed their misappropriation and diversion, Defendants Leonard Pagan, Brown, Iukea-Alves, Hooper, and Gonzalez resigned from Nations Lending and joined Defendant Academy.

79. Defendant Onishi remained employed with Nations Lending, but only as a trailing defector.

80. Nations Lending intended to replace the other Individual Defendants and promote Defendant Onishi, which would allow Nations Lending to maintain the market presence and market share of this office.

81. However, after learning of the plans of Nations Lending and ensuring that all information of value had been obtained, Defendant Onishi resigned on January 26, 2024 and joined the co-Defendants with Defendant Academy.

82.    On January 16, 2024, Nations Lending sent written notice to Defendant Academy of the misappropriation, diversion, and violation of restrictive covenants of certain Individual Defendants.  A true and accurate copy is attached as Exhibit L.

83.    On January 16, 2024, Nations Lending also sent written notice to Individual Defendants of a reminder of their Restrictive Covenants.  A true and accurate copy of the Cease and Desist correspondence to Defendant Leonard Pagan is attached as Exhibit M.

84.    On January 26, 2024, Defendant Academy responded to Nations Lending and made the false promise that, if Nations Lending provided detailed documentation, Defendant Academy would "take appropriate actions" and address the allegations in a "fair and transparent manner." Exhibit N.

85.    On February 14, 2024, Nations Lending delivered a written response wherein it provided the detailed explanation as set forth in this Complaint, and included the exhibits attached to this Complaint.  A true and accurate copy of the February 14, 2024 correspondence without the attachments is attached as Exhibit O.

86.    As of the date of this Complaint, Defendant Academy has not responded, the Individual Defendants remain employed by Defendant Academy, and the Defendants have continued their actionable course of conduct.

87.    Defendant Academy competes against Nations Lending in other markets across the U.S. and can utilize the Confidential Information of Nations Lending in Hawaii and other markets.

88.    As a direct and proximate result of the actionable conduct of Defendants, Nations Lending has incurred damages in excess of $750,000.00.

89.    As a direct and proximate result of Defendants' actions, Nations Lending has already lost at least thirteen (13) customers, another ten (10) prospective customers, and the

Confidential Information of Nations Lending, including contact, customer lists, pricing, and product modeling which can be used to compete with Nations Lending across the U.S.

90. The individual Defendants have violated and are continuing to violate their agreements with Nations Lending, including the confidentiality provisions and restrictive covenants.

91. Unless the Defendants are prohibited from utilizing the confidential information of Nations Lending, and unless the Individual Defendants are prohibited from soliciting employees of Nations Lending, soliciting customers and prospective customers of Nations Lending, and from violating the applicable non-compete provisions, Nations Lending will continue to suffer irreparable damages.

92. To prevent irreparable harm, Nations Lending requests a Temporary Restraining Order, Preliminary and Permanent Injunction against all Individual Defendants their agents, representatives, related entities, entities doing business as, and all persons acting in aid of, conjunction with, or in concern with them, from directly or indirectly soliciting consumers or attempting to violate the Employment Agreements and the restrictive covenants contained therein.

93. To prevent irreparable harm, Nations Lending requests a Temporary Restraining Order, Preliminary and Permanent Injunction against all Defendants their agents, representatives, related entities, entities doing business as, and all persons acting in aid of, conjunction with, or in concern with them, from directly or indirectly utilizing the Confidential Information of Nations Lending.

**COUNT ONE**
**Misappropriation of Trade Secrets Against All Defendants - Ohio Law**

94. Nations Lending restates the foregoing allegations as if fully rewritten herein.

95. Nations Lending's "Confidential Information" is a trade secret.

16

96.     Nations Lending's Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, documents, operations, services, strategies, techniques, agreements and terms of agreements, transactions, negotiations, know-how, trade secrets, applications, work-in-process, databases, compilations, technologies, records, systems, sources, supplier information, vendor information, financial information, accounting information, marketing information, pricing information, credit information, payroll information, personnel information, employee lists, reports, internal controls, security procedures, customer information or lists, buyer lists, or other information generally considered private and confidential in the industry or by any existing or prospective customer, other associated third party, or of any other person or entity that has entrusted information to Nations Lending in confidence.

97.     Nations Lending's Confidential Information was not in the public domain, was not generally known outside of Nations Lending, and Nations Lending took reasonable steps to keep the information confidential.

98.     Nations Lending's Confidential Information has independent economic value as it is important, if not vital, to the business success of Nations Lending across the U.S.

99.     The Individual Defendants acquired Nations Lending's Confidential Information pursuant to a confidential relationship with Nations Lending protected by terms and conditions of Employment Agreements.

100.    Defendant Academy willfully and maliciously acquired Nations Lending's Confidential Information through improper means from the Individual Defendants.

101.    The Defendants have used Nations Lending's Confidential Information to the detriment of Nations Lending and for their own improper competitive advantage.

102.    The Defendants used Nations Lending's Confidential Information without Nations Lending's authorization.

103.    As a direct and proximate result of Defendants' misappropriation of Nations Lending's trade secrets, Nations Lending has suffered irreparable harm and is exposed to the risk of further irreparable harm through loss of customers, loss of goodwill, and the disclosure and dilution of confidential information, including business methods, customer/client lists, pricing strategies, marketing strategies, and corporate strategies.

104.    The potential harm to Nations Lending greatly outweighs any harm to Defendants or third parties, should the Court grant Nations Lending's request for injunctive relief.

105.    Public interest is in favor of granting injunctive relief as, in doing so, the Court would be protecting trade secrets protected by the Ohio Trade Secrets Act.

106.    Pursuant to the Employment Agreements, Nations Lending is entitled to injunctive relief as prayed for in this Verified Complaint and the accompanying Motion for Temporary Restraining Order and Preliminary Injunction, without the requirement that it post a bond as a precondition to obtaining such relief.  See Employment Agreement, Sections 5(d) and 10(e).

107.    Pursuant to the Employment Agreement, Nations Lending is entitled to recovery of all costs, fees, expenses and attorney fees from the Individual Defendants related to this action. (See Employment Agreement, Section 5(d).)

108.    The Defendants' misappropriation was willful and malicious and warrants the imposition of punitive damages, costs, and fees, jointly and severally, against the Defendants

109.    As a direct and proximate result of Defendants' actions, Nations Lending has incurred damages in excess of $750,000 and is entitled to such recovery as well as injunctive relief, punitive and exemplary damages, costs, fees, and attorney fees.

## COUNT TWO
**Misappropriation of Trade Secrets Against All Defendants – 18 U.S.C. §1836, et seq.**

110.    Nations Lending restates the foregoing allegations as if fully rewritten herein.

111.    Nations Lending's "Confidential Information" is a trade secret.

112.    Nations Lending's Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, documents, operations, services, strategies, techniques, agreements and terms of agreements, transactions, negotiations, know-how, trade secrets, applications, work-in-process, databases, compilations, technologies, records, systems, sources, supplier information, vendor information, financial information, accounting information, marketing information, pricing information, credit information, payroll information, personnel information, employee lists, reports, internal controls, security procedures, customer information or lists, buyer lists, or other information generally considered private and confidential in the industry or by any existing or prospective customer, other associated third party, or of any other person or entity that has entrusted information to the Company in confidence.

113.    Nations Lending's Confidential Information is related to a product or service used in, or intended for use in, interstate or foreign commerce.

114.    The Individual Defendants acquired Nations Lending's Confidential Information pursuant to a confidential relationship with Nations Lending.

19

115.    In the Employment Agreement at Section 3(d), Nations Lending provided the Individual Defendants with Notice of Immunity Under the Defend Trade Secrets Act of 2016, 18 USC § 1836 (DTSA).

116.    Nations Lending's Confidential Information was not in the public domain, was not generally known outside of Nations Lending, and Nations Lending took reasonable steps to keep the information confidential.

117.    Nations Lending's Confidential Information has independent economic value as it is important, if not vital, to the business success of Nations Lending across the U.S.

118.    The Individual Defendants acquired Nations Lending's Confidential Information pursuant to a confidential relationship with Nations Lending protected by terms and conditions of Employment Agreements.

119.    Defendant Academy and Defendants John Doe 1-5 willfully and maliciously acquired Nations Lending's Confidential Information through improper means from the Individual Defendants.

120.    The Defendants have used Nations Lending's Confidential Information to the detriment of Nations Lending and for their own improper competitive advantage.

121.    The Defendants used Nations Lending's Confidential Information without Nations Lending's authorization and outside of any authorized purpose under DTSA.

122.    As a direct and proximate result of Defendants' misappropriation of Nations Lending's trade secrets, Nations Lending has suffered irreparable harm and is exposed to the risk of further irreparable harm through loss of customers, loss of goodwill, and the disclosure and dilution of confidential information, including business methods, customer/client lists, pricing strategies, marketing strategies, and corporate strategies.

123.    The potential harm to Nations Lending greatly outweighs any harm to Defendants or third parties, should the Court grant Nations Lending's request for injunctive relief.

124.    Public interest is in favor of granting injunctive relief as, in doing so, the Court would be protecting trade secrets protected by the Defend Trade Secrets Act.

125.    Pursuant to the Employment Agreements, Nations Lending is entitled to injunctive relief as prayed for in this Verified Complaint and the accompanying Motion for Temporary Restraining Order and Preliminary Injunction, without the requirement that it post a bond as a precondition to obtaining such relief.  See Employment Agreement, Sections 5(d) and 10(e).

126.    Pursuant to the Employment Agreement, Nations Lending is entitled to recovery of all costs, fees, expenses and attorney fees from the Individual Defendants related to this action. (See Employment Agreement, Section 5(d).)

127.    The Defendants' misappropriation was willful and malicious and warrants the imposition of punitive damages, costs, and fees, jointly and severally, against the Defendants.

128.    As a direct and proximate result of Defendants' actions, Nations Lending has incurred damages in excess of $750,000 and is entitled to such recovery as well as injunctive relief, punitive and exemplary damages, costs, fees, and attorney fees.

**COUNT THREE**
**Tortious Interference with Contracts Against Defendant Academy**

129.    Nations Lending restates its foregoing allegations as if fully rewritten herein.

130.    Defendant Academy and Defendants John Doe 1-5 solicited the employees of Nations Lending for the purpose of inducing them to terminate their employment with Nations Lending, misappropriate confidential information of Nations Lending, and join Defendant Academy to compete directly with Nations Lending.

21

131.    Defendant Academy and Defendants John Doe have unfairly solicited business from customers and potential customers of Nations Lending with which Nations Lending had a contract or business relationship.

132.    Defendant Academy and Defendants John Doe 1-5 had knowledge of the Employment Agreements in place between Nations Lending and the Individual Defendants, who were employees of Nations Lending.

133.    Defendant Academy and Defendants John Doe 1-5 had knowledge of the contracts and/or business relationships and/or prospective contracts between Nations Lending and its customers and prospective customers.

134.    Defendant Academy and Defendants John Doe 1-5 intended to induce and did induce the Individual Defendants to terminate and/or breach their contracts and business relationships with Nations Lending.

135.    Defendant Academy and Defendants John Doe 1-5 intended to induce and did induce the customers and prospective customers of Nations Lending to terminate their contracts and business relationships with Nations Lending.

136.    Defendant Academy and Defendants John Doe 1-5, without privilege or justification to do so, acted intentionally, improperly, and with actual malice, by interfering with Nations Lending's contracts and/or business relations with its customers, prospective customers and employees, and/or interfering with Nations Lending's business relations with its prospective customers and employees.

137.    As a direct and proximate result of the actions of Defendant Academy and Defendants John Doe 1-5, Nations Lending has suffered and will continue to suffer injury, including but not limited to, loss of business, irreparable harm to its legitimate business interests,

including protection of its Confidential Information, trade secrets, referral sources, clients and prospective client relationships, reputation, and goodwill, and money damages in an amount in excess of $750,000.00.

## COUNT FOUR
### Tortious Interference with Contracts Against Individual Defendants

138.    Nations Lending restates its previous allegations as if fully rewritten herein.

139.    The Individual Defendants knew or should have known that Nations Lending had business and prospective business relationships with its customers and prospective customers.

140.    The Individual Defendants have solicited, or otherwise attempted to solicit, Nations Lending's customers and prospective customers with the purpose of inducing them to terminate their contractual or business relationships with Nations Lending and form contracts or business relationships with Defendant Academy, a company that directly competes with Nations Lending.

141.    Individual Defendants had knowledge of the Confidential Information related to Nations Lending's customers and prospective customers.

142.    During and following their separation from Nations Lending, the Individual Defendants acted willfully, maliciously, and with the intent to induce Nations Lending's customers and prospective customers to end their contracts or business relationships with Nations Lending.

143.    Individual Defendants, without privilege or justification to do so, acted intentionally, improperly, and with actual malice, by interfering with Nations Lending's agreement(s) or business relationships with its customers and prospective customers.

144.    As a direct and proximate result of the actions of the Individual Defendants, Nations Lending has suffered and will continue to suffer injury, including but not limited to loss of customers, irreparable harm to its legitimate business interests, reputation, and goodwill, and money damages in an amount in excess of $750,000.00.

23

145.    The actions of Individual Defendants warrant the imposition of punitive and exemplary damages, plus costs, fees, and attorney fees.

**COUNT FIVE**
**Breach of Employment Agreements – Non-Solicitation Provisions**
**Against All Individual Defendants**

146.    Nations Lending restates the foregoing allegations as if fully rewritten herein.

147.    The Employment Agreements with the Individual Defendants are binding, valid, and enforceable contracts.

148.    Nations Lending performed its obligations under the Employment Agreements.

149.    The Individual Defendants breached the non-solicitation of employees provision and the non-solicitation of customers provision when they solicited at least one Nations Lending employee and at least twenty-three (23) Nations Lending customers and prospective customers. (See Employment Agreement, Sections 5(b)(i) and (ii).)

150.    As a direct and proximate result of Individual Defendants' violations of the Employment Agreements, Nations Lending has suffered irreparable harm and is exposed to the risk of further irreparable harm through loss of employees and customers.

151.    The potential harm to Nations Lending greatly outweighs any harm to Individual Defendants or third parties, should the Court grant Nations Lending's request for injunctive relief.

152.    Public interest is in favor of granting injunctive relief as, in doing so, the Court would be preserving and promoting the integrity and enforceability of the valid, binding Employment Agreement.

153.    Pursuant to the Employment Agreements, Nations Lending is entitled to injunctive relief as prayed for in this Verified Complaint and the accompanying Motion for Temporary

24

Restraining Order and Preliminary Injunction, without the requirement that it post a bond as a precondition to obtaining such relief.  (See Employment Agreement, Sections 5(d) and 10(e).)

154.    Pursuant to the Agreement, Nations Lending is entitled to recovery of all costs, fees, expenses and attorney fees from the Individual Defendants related to this action.  (See Employment Agreement, Section 5(d).)

155.    As a direct and proximate result of the actions of Individual Defendants in breach of their contracts, Nations Lending has incurred damages in excess of $750,000.

### COUNT SIX
### Breach of Employment Agreements – Non-Compete Provisions
### Against Certain Individual Defendants

156.    Nations Lending restates the foregoing allegations as if fully rewritten herein.

157.    The Employment Agreements with the Individual Defendants are binding, valid, and enforceable contract.

158.    Nations Lending performed its obligations under the Employment Agreements.

159.    Certain Individual Defendants, specifically Defendant Leonard Pagan, Defendant Joan Pagan, Defendant Jessica Brown, Defendant Christina Iukea-Alves, Defendant Chandee Hooper, and Defendant Brooks Onishi breached the non-competition provisions when they began working for a competitor of Nations Lending in positions that are substantially similar to the position held at Nations Lending.  (See Employment Agreement, Section 5(b)(iii).)

160.    By working for a direct competitor within the geographic restriction, these Individual Defendants have prevented Nations Lending from resuming operations and mitigating its damages.

25

161.    Nations Lending enjoyed a distinct competitive advantage in the Hawaii County market by having these Individual Defendants under contract and providing services on behalf of Nations Lending.

162.    As a direct and proximate result of these Individual Defendants' violations of the non-compete provisions of their Employment Agreements, Nations Lending has suffered irreparable harm and is exposed to the risk of further irreparable harm through loss of business, inability to recapture business, loss of market share and customers, loss of goodwill, and the disclosure and dilution of confidential information and trade secrets, including business methods, customer/client lists, pricing strategies, marketing strategies, and corporate strategies.

163.    The potential harm to Nations Lending greatly outweighs any harm to these Individual Defendants or third parties, should the Court grant Nations Lending's request for injunctive relief.

164.    Public interest is in favor of granting injunctive relief as, in doing so, the Court would be preserving and promoting the integrity and enforceability of the valid, binding Employment Agreement.

165.    Pursuant to the Employment Agreements, Nations Lending is entitled to injunctive relief as prayed for in this Verified Complaint and the accompanying Motion for Temporary Restraining Order and Preliminary Injunction, without the requirement that it post a bond as a precondition to obtaining such relief.  (See Employment Agreement, Sections 5(d) and 10(e).)

166.    Pursuant to the Agreement, Nations Lending is entitled to recovery of all costs, fees, expenses and attorney fees from these Individual Defendants related to this claim.  (See Employment Agreement, Section 5(d).)

26

167.    As a direct and proximate result of the actions of these Individual Defendants in breach of the non-compete provisions of their contracts, Nations Lending has incurred damages in excess of $750,000.00

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nations Lending Corporation respectfully requests that the Court enter judgment in its favor against as follows:

A.  For a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction as follows:

    a.   Against all Defendants and their agents, representatives, related entities, entities doing business as, and all persons acting in aid of, conjunction with, or in concern with them, from directly or indirectly:

        i.  using, disclosing, or otherwise misappropriating Nations Lending's Confidential Information and trade secrets;

        ii.  inducing or attempting to induce the violation of the contractual relationships of Nations Lending; and

        iii.  soliciting or attempting to solicit Nations Lending's customers, prospective customers, and/or employees.

    b.  Against Defendants Leonard Pagan, Joan Pagan, Jessica Brown, Christina Iukea-Alves, Chandee Hooper, and Brooks Onishi, from directly or indirectly:

        i.  Owning, maintaining, operating or engaging in the same or similar business activities as Nations Lending or in any business activity which competes with Nations Lending;

27

    ii.   Serving, advising, managing, consulting with, providing services for, or being employed by any firm, agency, partnership or corporation which engages in the same or similar business activities as Nations Lending or competes with Nations Lending;

    iii.  undertaking any efforts or activities toward forming or incorporating, financing, or commencing any competing business activity which engages in the same or similar business activities as Nations Lending; or

    iv.  advising, serving, or consulting with any person, business, or entity which is or will be undertaking efforts toward incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as Nations Lending.

B.  On the first Claim for Relief, Misappropriation of Trade Secrets (Ohio Law), for injunctive relief as requested above, and for damages in excess of $750,000.00.

C.  On the second Claim for Relief, Misappropriation of Trade Secrets (Federal Law), for injunctive relief as requested above, and for damages in excess of $750,000.00.

D.  On the third Claim for Relief against Defendant Academy and Defendants John Doe 1-5, Tortious Interference, for damages in excess of $750,000.00.

E.  On the fourth Claim for Relief against Individual Defendants, Tortious Interference, for damages in excess of $750,000.00.

F.  On the fifth Claim for Relief against Individual Defendants, Breach of Non-Solicitation Provisions, for injunctive relief as requested above and for damages in excess of $750,000.00.

28

G. On the sixth Claim for Relief against Defendants Leonard Pagan, Joan Pagan, Jessica Brown, Christina Iukea-Alves, Chandee Hooper, and Brooks Onishi, Breach of Non-Compete Provisions, for injunctive relief as requested above and for damages in excess of $750,000.00.

H. For punitive and exemplary damages where and when warranted, plus costs, fees, and attorney fees.

I. For such further relief as this Court may deem just, equitable, and appropriate.

Respectfully submitted,

*/s/  Jeffrey C. Miller*
Jeffrey C. Miller (0068882)
David J. Hearty (0093827)
Stefanik & Iosue
1109 Carnegie Avenue, Floor 2
Cleveland, OH 44115
(216) 651-0451
jmiller@stefanikiosue.com
*Attorneys for Nations Lending Corporation*

## VERIFICATION

STATE OF OHIO                           )
                                        )
COUNTY OF CUYAHOGA                      )

Under penalty of perjury, I, Jeff Goshert, Chief Compliance Officer for Nations Lending Corporation, declare that I am authorized to give this verification on behalf of Nations Lending Corporation. I have read the foregoing Verified Complaint of Nations Lending Corporation, and the facts alleged therein are true and correct. I understand that this verification is to be utilized in the request for injunctive relief on behalf of Nations Lending Corporation. I make this verification based upon my own personal knowledge of the facts involved or based upon the books and records customarily kept and maintained by Nations Lending Corporation.

**NATIONS LENDING CORPORATION**

By: _____
    Jeff Goshert

Its:    Chief Compliance Officer

The foregoing instrument was sworn and subscribed before me this _23rd_ day of _February_ 2024,

by Jeff Goshert who is the Chief Compliance Officer for Plaintiff, on or behalf of such corporation.

_Becky Cutlip_
Notary Public, State of Ohio
My commission expires: 3/10/24

Becky Cutlip
Resident Summit County
Notary Public, State of Ohio
My Commission Expires: 3/10/24

# Nations Lending Corporation
# Employment Agreement

This Employment Agreement ("Agreement") is made between Nations Lending Corporation ("Company") and **Leonard Pagan** ("Employee"). In consideration of the premises in this Agreement, the employment or continued employment of Employee by the Company, and the covenants and agreements of the parties contained herein, and for good and valuable consideration, Employee accepts employment with the Company as hereinafter stated.

1. **EMPLOYMENT.**
    (a) **Contingent Offer.** Company has extended a conditional offer of employment, meaning that Employee must complete all conditions satisfactorily. Execution of this Agreement does not imply or ensure that Employee has satisfied all conditions precedent to commencing employment, including, without limitation: verification of references; satisfactory completion of background checks, verification of professional qualifications or licenses, or other conditions which may be stated in Employee's Offer Letter.

    (B) **Term of Employment.** The period during which the Employee is employed by the Company hereunder is hereinafter referred to as the "Employment Term." The Employment Term will commence on Employee's first actual day of work, regardless of any date contained in an offer letter, as reflected in Company's records, and will continue until Employee, as determined in Company's sole discretion, by reason of physical or mental disability is unable to perform their duties. The end of the Employment Term will be the effective date of any resignation or termination notice given. NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED TO IN ANY WAY ALTER, AMEND, OR MODIFY THE AT-WILL STATUS OF THE EMPLOYMENT RELATIONSHIP BETWEEN THE COMPANY AND THE EMPLOYEE IN WHICH EITHER THE COMPANY OR THE EMPLOYEE MAY TERMINATE THE EMPLOYMENT RELATIONSHIP AT ANY TIME, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE.

    (c) **Position & Duties.** Subject to its ultimate supervision, direction, and control, Company employs Employee during the Employment Term to perform services and duties as are described on the Position Description and Duties Addendum (Supplement A) of this Agreement and under any conditions detailed in such addendum or in the Company's Employee Handbook and adopted policies. The Company reserves the right to modify or amend Employee's duties at any time. In the event Employee's position or title changes with a significant change of duties, Company will provide Employee with a new addendum for execution, which will replace the existing one in its entirety and be effective from the date of such amendment. As employee of a financial institution, Employee is charged with, and owes to Company: (i) a duty of loyalty, fidelity, and trust to Company; (ii) a responsibility to exercise judgment and perform duties in good faith and in the best interest of the Company, (iii) the performance of honest services, and (iv) a promise to use extraordinary care, skill, and diligence in the performance of all duties.

    (d) **Sole Employment.** During the Employment Term, the Employee shall devote substantially all of Employee's business time and attention to the performance of the Employee's duties and will not engage in any other business, profession, or occupation for compensation or otherwise which might conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Company, in accordance with the Company's Dual Employment Policy. Employee's failure to disclose other employment may be grounds for termination.



Employee Initials

DocuSign Envelope ID: B376E747-56FA-4E15-8039-5A5B2E71F521

(e) **Termination.** Employee's employment is at-will, meaning that the Employee or Company may terminate the employment relationship at any time, with or without cause, and with or without notice. Although Employee's duties, title, compensation, and benefits as well as Company's personnel policies and procedures may change from time to time, the 'at will' nature of employment may only be altered by an express agreement signed by an authorized officer of Company. Upon termination or resignation for any reason, Employee's compensation and benefits will end. If Employee is entitled to commissions, trailing payments, bonuses or stock options as part of Employee's compensation, entitlement to all unearned or unvested amounts as of the last date of employment is forfeited by Employee unless stated otherwise in Employee's Compensation Addendum, as further described below.

2. **COMPENSATION.**

   (a) **"Wages".** Employee will be paid for services performed by Employee in accordance with the Company's policies and procedures for payments reflected in the Company's Employee Handbook and related Company policies. The amount of compensation to be received by Employee, whether wages or salary ("Pay"), commissions or bonuses ("Incentive Payments"), or other compensation (collectively, "Pay", "Incentive Payments" and other compensation are "Compensation") is detailed on the Compensation Addendum (Supplement B) of this Agreement, and subject to any conditions in such addendum. Except as may be provided in Employee's Compensation Addendum, Employee's Compensation may be changed at any time by Company upon notice to Employee, and continued employment by Company is subject to such revised terms.

   (b) **Benefits.** During the Employment Term, the Employee shall be entitled to participate in all employee benefit plans, practices, and programs maintained by the Company, as in effect from time to time (collectively, "Employee Benefit Plans"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law. Employee's eligibility for Employee Benefit Plans is detailed on Supplement A.

   (c) **Advances.** Company may advance Incentive Payments or other compensation to Employee before Employee's entitlement to such payments is vested. In the event that such advanced amounts are later determined to have been unearned by employee (e.g., a commission paid on a loan which is later subject to repurchase) then Employee must reimburse the amount advanced to Company and Company is entitled to deduct such advanced amounts from future payments to be made to Employee, including from Employee's final paycheck. Additional details on advances may be contained in Supplement B.

   (d) **Deductions.** In addition to withholdings for tax and other purposes provided by law, Company may subtract authorized deductions from Employee's Compensation payments, including Employee's final paycheck. Deductions may be made for the costs of Benefits elected by Employee, to recover Advances paid to Employee, to recover overpayments, to reimburse Company for expenditures on Employee's behalf or as a result of Employee's actions or failure to immediately return all of Company's property upon termination, and as authorized by Employee. Deductions may also be made for Incentive Payments made to Employee if the conditions under which Employee is entitled to such Incentive Payments are later determined not to have been met, such as where a loan on which commission has previously been paid is found to be ineligible for such commission. Additional details on deductions may be contained in Supplement B.

DS

Employee Initials

DocuSign Envelope ID: B376E747-56FA-4E15-8D39-5A3B2E71F52F

(e) **Effects of Termination on Compensation.** If Employee resigns from employment with Company, Employee agrees to reimburse Company for all outstanding Advances within thirty days of termination, and where Employee fails to do so, Company is entitled to interest on the unpaid amounts at the rate of 10% per twelve-month period, compounded monthly. Where Employee resigns from employment without at least fourteen days advance notice or is terminated for reasons related to the Employee's acts of disloyalty, fraud, theft, forgery or other dishonesty, refusal to work, willful destruction of property, gross insubordination, falsification of records, criminal or unlawful activity, or willful misconduct, Employee forfeits any right to Incentive Payments which Employee would otherwise be entitled to receive following the last day of employment under the terms of Employee's Compensation Addendum.

3. **CONFIDENTIAL INFORMATION.** The Employee understands and acknowledges that during the course of employment by the Company, Employee will have access to and learn about confidential, secret, and proprietary documents, materials, data and other information, in tangible and intangible form, of and relating to the Company and its businesses and existing and prospective customers, suppliers, investors and other associated third parties which is not generally known to the public ("Confidential Information"). The Employee further understands and acknowledges that this Confidential Information and the Company's ability to reserve it for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure of the Confidential Information by the Employee will cause irreparable harm to the Company, for which remedies at law will not be adequate.

(a) **Confidential Information Defined.** For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, documents, operations, services, strategies, techniques, agreements and terms of agreements, transactions, negotiations, know-how, trade secrets, applications, work-in-process, databases, compilations, technologies, records, systems, sources, supplier information, vendor information, financial information, accounting information, marketing information, pricing information, credit information, payroll information, personnel information, employee lists, reports, internal controls, security procedures, customer information or lists, buyer lists, or other information generally considered private and confidential in the industry or by any existing or prospective customer, other associated third party, or of any other person or entity that has entrusted information to the Company in confidence.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

The Employee understands and agrees that Confidential Information developed by Employee in the course of Employee's employment by the Company shall be subject to the terms and conditions of this Agreement as if the Company furnished the same Confidential Information to the Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public, provided that such disclosure to the public is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

(b) **Company Creation and Use of Confidential Information.** The Employee understands and acknowledges that the Company has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of mortgage

Employee Initials

DocuSign Envelope ID: B376E747-56FA-4E15-8039-3A5B2E71F521

lending and financial services. The Employee understands and acknowledges that as a result of these efforts, Company has created and continues to use and create Confidential Information. This Confidential Information provides Company with a competitive advantage over others in the marketplace.

(c) **Disclosure and Use Restrictions.** Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company) not having a need to know and authority to know and to use the Confidential Information in connection with the business of the Company and, in any event, not to anyone outside of the direct employ of the Company except as required in the performance of any of the Employee's authorized employment duties to the Company; (iii) and not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company except as required in the performance of the Employee's authorized employment duties to the Company.

The Employee understands and acknowledges that the Employee's obligations under this Agreement regarding any particular Confidential Information begin immediately when the Employee first has access to Confidential Information (whether before or after commencing employment with Company) and shall continue during and after the Employee's employment by the Company until the Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or a breach by those acting in concert with the Employee or on the Employee's behalf.

(d) **Notice of Immunity Under the Defend Trade Secrets Act of 2016**. Employee acknowledges receipt of Company's Employee Reporting Policy and Company Code of Ethics (available at https://nlcloans.sharepoint.com/sites/Policies) setting forth: (A) Company's reporting policy for a suspected violation of law; and (B) notice of immunity from criminal and civil liability for certain disclosures of trade secrets under 18 U.S.C. § 1833(b).

(e) **Other Permitted Disclosures.** Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company. Nothing in this Agreement prohibits or restricts the Employee (or Employee's attorney) from filing a charge or complaint with the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), the Occupational Safety and Health Administration (OSHA), any other self-regulatory organization, or any other federal or state regulatory authority ("Government Agencies"). The Employee further understands that this Agreement does not limit the Employee's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency without notice to the Company. This Agreement does not limit the Employee's right to receive an award for information provided to any Government Agencies. In addition, nothing in this Agreement in any way prohibits or is intended to restrict or impede the Employee from exercising protected rights under Section 7 of the National Labor Relations Act or otherwise disclosing information as permitted by law.

## 4. **COMPANY'S PROPRIETARY RIGHTS.**

DS

Employee Initials

v.220U National Lending Employee Agreement                4

**(a) Work Product**. The Employee acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas, and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by the Employee individually or jointly with others during the period of employment by the Company and relating in any way to the business or contemplated business, research, or development of the Company (regardless of when or where the Work Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical, and electronic copies, all improvements, rights, and claims related to the foregoing, and other tangible embodiments thereof (collectively, "Work Product"), as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), patents, and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions, and renewals thereof (collectively, "Intellectual Property Rights"), shall be the sole and exclusive property of the Company.

For purposes of this Agreement, Work Product includes, but is not limited to, Company information, including plans, strategies, techniques, agreements, documents, terms of agreements, negotiations, know-how, computer programs, computer applications, web design, work in process, databases, manuals, reports, compilations, graphics, drawings, sketches, market studies, formulae, notes, communications, algorithms, product plans, models, audiovisual programs, ideas, inventions, original works of authorship, customer information, customer lists, manufacturing information, marketing information, advertising information, and sales information. Work Product also means items created in the six-month period following employment as a result of or attributable to work performed during employment or specific work product substantially begun during employment.

**(b) Work Made for Hire; Assignment**. The Employee acknowledges that, by reason of being employed by the Company at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in the Copyright Act of 1976 (17 U.S.C. § 101), and such copyrights are therefore owned by the Company. To the extent that the foregoing does not apply, the Employee hereby irrevocably assigns to the Company, for no additional consideration, the Employee's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company would have had in the absence of this Agreement.

**(c) Further Assurances; Power of Attorney**. During and after employment, the Employee agrees to reasonably cooperate with the Company at the Company's expense to (i) apply for, obtain, perfect, and transfer to the Company the Work Product and Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (ii) maintain, protect, and enforce the same, including, without limitation, executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company. The Employee hereby irrevocably grants the Company power of attorney to execute and deliver any such documents on the Employee's behalf in Employee's name and to do all other lawfully permitted acts to transfer the Work Product to the Company and further the transfer, issuance, prosecution, and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Employee does not promptly cooperate with the Company's request (without limiting the rights the Company shall have in such circumstances by operation of law). The power of attorney is coupled with an interest and shall not be impacted by the Employee's subsequent incapacity.

DS

Employee Initials

(d) **Moral Rights.** To the extent any copyrights are assigned under this Agreement, the Employee hereby irrevocably waives, to the extent permitted by applicable law, any and all claims the Employee may now or hereafter have in any jurisdiction to all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be known as "moral rights" with respect to all Work Product and all Intellectual Property Rights therein.

(e) **No License.** The Employee understands that this Agreement does not, and shall not be construed to, grant the Employee any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to Employee by the Company.

## 5. EMPLOYEE'S RESTRICTIVE COVENANTS.

(a) **Restricted Period.** The Employee agrees that the nature of Employee's position gives the Employee access to and knowledge of Confidential Information and places the Employee in a position of trust and confidence with the Company. The Employee further understands and acknowledges that the Company's ability to reserve use of the Confidential Information for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure by the Employee is likely to result in unfair or unlawful competitive activity. Because of Company's legitimate business interest as described in this Agreement and the good and valuable consideration offered to the Employee, the sufficiency of which is acknowledged, during the term of Employee's employment and for the next twelve months, to run consecutively, beginning on the last day of the Employee's employment with the Company, whether terminated for any reason or no reason, by the Employee or the Company, (the "Restricted Period"), the Employee agrees and covenants not to engage in Prohibited Activity.

(b) **Prohibited Activities.** For purposes of this Agreement, "Prohibited Activity" is where Employee, as an employee, employer, owner, manager, advisor, contractor, agent, partner, officer, volunteer, intern, or any other similar capacity, while engaging in residential mortgage lending on behalf of an entity other than Company, violates one or more of the "Restrictive Covenants" (i-iii) below to which Employee has agreed to accept as a condition of employment. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets, proprietary information, or Confidential Information.

    i.   **Non-Solicitation of Employees.** The Employee understands and acknowledges that the Company has expended and continues to expend significant time and expense in recruiting and training its employees and that the loss of employees would cause significant and irreparable harm to the Company. The Employee agrees and covenants not to directly or indirectly solicit, hire, recruit, or attempt to solicit, hire, or recruit, any employee of the Company or any employee who has been employed by the Company in the six months preceding the last day of Employee's employment (collectively, "Covered Employee"), or induce the termination of employment of any Covered Employee during the Restricted Period. "Covered Employee" does not include an employee of Company that Employee supervised or managed prior to joining Company, who joins Company at approximately the same time as Employee, and who, while they are employed by Company, is supervised or managed by Employee. This non-solicitation provision explicitly covers all forms of oral, written, or electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, Twitter, and any other social media platform, whether or not in existence at the time of entering into this Agreement. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is

Employee Initials

DocuSign Envelope ID: B376E747-56FA-4E15-8039-3A5B2E71F521

prohibited by this section. This Section does not restrict or impede, in any way, and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

**ii.** **Non-Solicitation of Customers.** The Employee understands and acknowledges that because of the Employee's experience with and relationship to the Company, the Employee will have access to and will learn about much or all of the Company's customer information, including, but not limited to, Confidential Information. "Customer Information" includes, but is not limited to, names, phone numbers, addresses, email addresses, transaction history, preferences, financial condition, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to Company's services. The Employee understands and acknowledges that: (i) the Company's relationships with its customers are of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its customer relationships and goodwill; and (iii) the loss of any such customer relationship or goodwill will cause significant and irreparable harm to the Company.

The Employee agrees and covenants, for the duration of the Restricted Period, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this agreement, or meet with the Company's current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section. This Section does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company.

**iii.** **Unfair Competition.** The Employee understands and acknowledges that: (i) the Company's relationships with its customers are of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its partner and customer relationships and goodwill; and (iii) the loss of any such relationship or goodwill will cause significant and irreparable harm to the Company. Because Employee will have access to proprietary information belonging to Company that would provide an unfair advantage to competition, during the period of employment Employee agrees not to, for any person, business, or entity, a) own, maintain, operate, or engage in the same or similar business activities as Company or in any business activity which competes with the Company; b) serve, advise, manage, consult with, provide services for, or be employed by any individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company; c) undertake any efforts or activities toward forming or incorporating, financing, or commencing any competing business activity which engages in the same or similar business activities as the Company; or d) advise, serve, or consult with any person, business, or entity which is or will be undertaking efforts toward incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as the Company. During the Restricted Period, Employee agrees not to divert or refer Company customers or prospective customers to any other

Electronically Filed 02/26/2024 13:20 / / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

Employee Initials

DocuSign Envelope ID: B376E747-56FA-4E15-8039-3A5B2E71F521

individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company. If Employee's job assignment location with Company is within a branch office or retail location, then Employee agrees and covenants not to open or relocate a similar office or location within a five-mile radius of such location (the "Restricted Territory") which would engage in the business of residential mortgage lending for the duration of the Restricted Period. "Relocate" includes Employee joining an existing office location of a competitor if such office was opened at such location within the six-month period before the beginning of the Restricted Period. This Section does not restrict or impede, in any way, Employee from seeking gainful employment in the industry which does not harm Company's vital and legitimate business interests and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

(c) **Reasonableness.** Employee agrees that the restrictions in the Restrictive Covenants will not interfere with or unduly limit his or her ability to obtain suitable alternative employment following termination of employment with the Company. Employee acknowledges that the protections provided to the Company are important, reasonable, and necessary, and Employee's agreement to the Restrictive Covenants and to refrain from Prohibited Activity, has been given freely, voluntarily, and without duress and after due deliberation, and that the Restrictive Covenants will not impose undue hardship on Employee.

(d) **Injunctive Relief.** Employee agrees that any violation or breach of Employee's obligations will result in irreparable injury to the Company for which no adequate remedy at law may be available. Therefore, in addition to any other remedies Company may pursue, Employee consents to the issuance of a temporary restraining order and injunction prohibiting any conduct by the Employee in violation of the Prohibited Activities and waives any requirement of posting a bond as precondition of obtaining such injunction. Employee agrees that the Company shall be entitled to recover its costs and legal fees and expenses incurred in investigating and enforcing the Restrictive Covenants, should Employee engage in Prohibited Activity.

(e) **Tolling.** The restrictions and limitations within this Agreement applicable during the Restricted Period shall be enforceable from the date of the last breach or violation of the applicable restriction(s) up to an equivalent period as if such date were the first day of the Restrictive Period, so that Company may receive the full benefit of Employee's agreement to the Restrictive Covenants.

6. **SECURITY.**

(a) **Security and Access.** The Employee agrees and covenants (i) to comply with all Company security policies and procedures as in force from time to time including without limitation those regarding telephone systems, facilities access, key cards, access codes, Company intranet, internet, social media and instant messaging systems, computer systems, email systems, computer networks, document storage, data security, encryption, passwords, and communication technologies ("Facilities Information Technology and Access Resources"); (ii) not to access or use any Facilities and Information Technology Resources except as authorized by Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Employee's employment by the Company, whether termination is voluntary or involuntary. The Employee agrees to notify the Company promptly in the event he/she learns of any violation of the foregoing by others, or of any other misappropriation, or unauthorized access, use, reproduction or reverse engineering of, or tampering with any Facilities and Information Technology Access Resources or other Company property or materials by others.

Employee Initials

DocuSign Envelope ID: B376E747-56FA-4E15-8039-3A5B2E71F521

**(b) Exit Obligations**. Upon (i) voluntary or involuntary termination of the Employee's employment or (ii) the Company's request at any time during the Employee's employment, the Employee shall (a) provide or return to the Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, network access devices, computers, and computer equipment, manuals, reports, files, compilations, work product, thumb drives, or other removable information storage devices, hard drives, and data and all Company documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Employee, whether they were provided to the Employee by the Company or any of its business associates or created by the Employee in connection with his/her employment by the Company; and (b) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Employee's possession or control, including those stored on any non-Company devices, networks, storage locations, and media in the Employee's possession or control.

7. **PUBLICITY.** Employee hereby consents to any and all uses and displays, by the Company and its agents, of the Employee's name, voice, likeness, image, appearance, and biographical information in, on or in connection with any pictures, photographs, audio, and video recordings, digital images, websites, television programs, and advertising, other advertising, sales, and marketing brochures, books, magazines, other publications, and all other printed and electronic forms and media throughout the world, at any time during or after the Employment Term, for all legitimate business purposes of the Company ("Permitted Uses"). Employee hereby forever releases the Company and its directors, officers, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the Employment Term, in connection with any Permitted Use.

8. **EMPLOYEE REPRESENTATIONS.** The Employee represents and warrants to the Company that:
   (a) Acceptance of employment with the Company and the performance of the duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which the Employee is a party or is otherwise bound.
   (b) Acceptance of employment with the Company and the performance of Employee's duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.
   (c) Employee will not utilize any property belonging to a prior employer in the performance of Employee's duties; including any confidential, proprietary, or trade secret information obtained from a prior employer.
   (d) There are no actions, suits, proceedings, or known investigations, criminal or civil, pending against Employee in any court or before a governmental agency, which have not been disclosed by Employee.
   (e) Employee has the necessary training and knowledge to understand the laws and requirements of any position requiring a license to perform such duties and will maintain such licensure and perform such duties in compliance with all applicable laws and regulations as they are in effect.
   (f) If Employee is charged with a criminal offense, conviction of which could cause the suspension or revocation of any license required for the performance of Employee's duties, may adversely affect the ability of Employee to perform any obligations under this Agreement, or would cause Employee to become insolvent or bankrupt, Employee will notify Company's Human Resources Manager.
   (g) When Employee's employment with the Company terminates, Employee will notify any subsequent employer of the Restrictive Covenants contained in this Agreement before the Employee commences employment with such employer. In addition, the Employee authorizes the Company to provide notice of the Restrictive Covenants of this Agreement to third parties, including but not limited to, the Employee's subsequent, anticipated, or possible future employers.

Employee Initials

DocuSign Envelope ID: B376E747-56FA-4E15-8039-3A5B2E71F521

9. **NOTICES.** All notices, requests, consents, claims, demands, waivers, and other initial communications regarding a dispute involving this Agreement (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth below. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), or certified or registered mail (in each case, return receipt requested, postage pre-paid). Notice is effective upon receipted delivery to the designated address if the party giving the Notice has complied with the requirements of this Section.

    **(a)** Any notice required or permitted to be given to Employee will be delivered to the address shown as Employee's residence as shown on the records of the Company.

    **(b)** Notices addressed to Company must be sent to its registered agent address for the state in which the Employee resides. A copy may be sent to the Company's corporate office address. Notices sent to the principal business address are ineffective as notice unless a copy is also sent to the registered agent's address.

10. **MISCELLANEOUS PROVISIONS.**

    (a) **Entire Agreement.** This Agreement, together with the other documents incorporated by reference and all related supplements and addendums it incorporates, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter, and supersedes all prior and contemporaneous offers, understandings, agreements, or representations, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and other documents, the statements in the body of this Agreement shall control. The parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

    (b) **Modification and Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by the Employee and an authorized representative of the Company. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

    (c) **Captions; Interpretation.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The addendums and exhibits referred to shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

    (d) **Successors and Assigns; Beneficiaries.** The rights of the Company under this Agreement shall inure to the benefit of the successors and assigns of the Company. The rights of Employee are personal to Employee and Employee's heirs or devisees and may not otherwise be transferred or alienated. This Agreement is for the sole benefit of the parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.



Employee Initials

DocuSign Envelope ID: B376E747-56FA-4E15-8039-3A5B2E71F521

(e) **Remedies.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise. Employee acknowledges that a breach or threatened breach of any obligations under this Agreement would give rise to irreparable harm to the Company for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by Employee of any such obligations, Company shall, in addition to any and all other rights and remedies that may be available in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction and any other relief that may be available from a court of competent jurisdiction without any requirement to post bond.

(f) **Survival.** All provisions of this Agreement regarding Confidential Information, Company's Proprietary Rights in intellectual property and work product, and Employee's Restrictive Covenants shall survive Employee's termination of employment, and no dispute regarding Employee's employment, the termination of Employee's employment, or this Agreement shall prevent the operation and enforcement of these obligations.

(g) **Severability.** Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

(h) **Signatures and Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement by facsimile, email in portable document format (.pdf), by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by using an electronic signature compliant with the E-Sign Act has the same effect as delivery of an executed original of this Agreement.

(i) **Governing Law; Jurisdiction and Venue.** This Agreement, for all purposes, to the maximum extent permitted by applicable law, shall be construed in accordance with the laws of Ohio without regard to any conflicts of law principles. Should applicable law specifically prohibit the use of the law of a foreign jurisdiction, then the law of the relevant jurisdiction shall be used. Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in accordance with the arbitration provision contained within this Agreement except that action may be brought in a state or federal court located in the state of Ohio or the state of Employee's primary residence, if different, for the purposes of obtaining a restraining order or injunction against a violation of provisions of this Agreement or to enforce a judgment rendered in accordance with the results of arbitration between the parties. The parties hereby irrevocably submit to the non-exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue. EACH


Employee Initials

DocuSign Envelope ID: B378E747-56FA-4215-8D39-3A5B2E71F521

PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO PARTICIPATE IN A CLASS ACTION OR A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

11. **ARBITRATION.** Any disagreement, dispute, controversy, or claim of any kind ("claims") arising out of or in connection to this Agreement, including any claims related to Employee's hiring, employment or the termination of Employee's employment, and including any claims that may arise between Employee and Company's owners, officers, directors, managers, employees, or agents in their capacity as such, shall be resolved by arbitration under the Federal Arbitration Act, Chapters 1 and 2, to the exclusion of inconsistent state laws, whether such claims are based in tort, contract, statute, equity, or otherwise. Employee agrees to waive all rights to a jury trial and waives the right to pursue any class action, collective action, or representative claims to the maximum extent allowed by law. To the extent a class or collective action or representative claim may not be waived, the Employee agrees to stay any such claims until after all claims subject to arbitration are fully resolved.

(a) **Excluded Claims.** Excluded from this Arbitration provision are those claims which are not arbitrable under state or federal law, including: worker's compensation claims; unemployment compensation claims; the right to file an administrative charge before a governmental agency such as the Equal Employment Opportunity Commission, National Labor Relations Board, or Department of Labor; or other claims which a statute prohibits from being subject to arbitration. Any disputes regarding the applicability of arbitration to a claim or the scope of this arbitration provision will be submitted to a court for determination.

(b) **Arbitrator.** Except for the excluded claims, disputes will be settled by binding arbitration administered by the American Arbitration Association before a qualified individual agreed to by the parties or designated pursuant to its Employment Arbitration Rules and Mediation Procedures (a copy of which may be found online at https://www.adr.org/Rules). The Optional Rules for Emergency Measures of Protection are incorporated by the parties. The standard provisions of the Employment Arbitration Rules shall apply. Claims shall be heard by a single arbitrator, unless the claim amount exceeds $250,000.00, in which case the dispute may be heard by a panel of three arbitrators.

(c) **Arbitration Procedure.** Company will pay the arbitrator fees and arbitration administrative expenses and any other costs unique to the arbitration hearing (recognizing that each side bears its own deposition, witness, expert and attorney's fees and other expenses to the same extent as if the matter were being heard in court). Unless otherwise agreed to by the parties, the place of arbitration shall be Cleveland, Ohio, USA or conducted virtually by telephone or videoconference. Applicable law for purposes of arbitration shall be determined by the Governing Law provision of this Agreement. If the dispute is less than $50,000.01 there shall be no discovery other than the exchange of documents and written questions. If the dispute exceeds $50,000.00, each party's discovery shall include no more than three depositions of four hours each. Where no party's claim exceeds $30,000.00 exclusive of interest, attorneys' fees and arbitration costs, the dispute shall be resolved by submission of documents and there shall be no in-person or oral hearing. The award shall be made within six months of the filing of the notice of intention to arbitrate (demand), and the arbitrator(s) shall agree to comply with this schedule before accepting appointment. However, this time limit may be extended by the arbitrator(s) for good cause shown, or by mutual agreement of the parties.

(d) **Arbitrator Authority.** The arbitrator(s) will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute or for a breach of Sections 3 through 6 of this Agreement. The arbitrator(s) shall not award consequential damages in

Electronically Filed 02/26/2024 13:20 / / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

Employee Initials

DocuSign Envelope ID: B376E747-56FA-4E15-8039-5A5B2E71F521

any arbitration initiated under this provision. The arbitrator(s) may determine how the costs and expenses of the arbitration shall be allocated between the parties, but they shall not award attorneys' fees. If, however, any party prevails on a statutory claim that affords the prevailing party attorneys' fees and costs, then the arbitrator(s) may award reasonable attorneys' fees and costs to the prevailing party. Any dispute as to who a prevailing party is or the reasonableness of any fee or costs shall be resolved by the arbitrator(s).

(e) **Award.** The award shall be accompanied by a reasoned opinion. Judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Except as may be required by law, or as may be required in an action to enforce, modify, or vacate the award, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties.

(f) **Full and Free Consent.** This Agreement to arbitrate is freely negotiated between Employee and Company and is mutually entered into between the parties. Each party fully understands and agrees that they are giving up certain rights otherwise afforded to them by civil court actions, including but not limited to the right to a jury trial.

(g) **Information.** Employee may contact the HR Department at HR@nationslending.com with any questions about the arbitration process.

By initialing here, Employee acknowledges having read this Arbitration section and voluntarily agreed to binding arbitration:

_____
Employee Initials

12. **ACKNOWLEDGEMENT.** THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS RECEIVED A COPY OF THE AGREEMENT INCLUDING ALL SUPPLEMENTS AND ADDENDUMS, HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS HAD SUFFICIENT TIME TO REVIEW AND AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF THE EMPLOYEE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

| Leonard Pagan | *Leonard Pagan* | 7/27/2022 | 1:51 PM PDT |
|---|---|---|---|
| Employee Name | Employee Signature | Date | |

| For Nations Lending Corporation: | *Cheryl Lieber* | 7/27/2022 | 12:04 PM EDT |
|---|---|---|---|
| | Cheryl C. Lieber, Chief Admin. Officer | Date | |

_____
Employee Initials

Electronically Filed 02/26/2024 13:20 / / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

DocuSign Envelope ID: B376E747-56FA-4E15-8D39-3A5B2E71F521

## Supplement A to Employment Agreement
### Position Description and Duties – Full Time

The undersigned Employee is employed by Nations Lending Corporation (the "Company") in the following capacity: **Area Sales Manager**. This employment is as a **full-time,** regular employee. Employee is classified as **exempt** for purposes of determining overtime eligibility.

This Supplement A, Position Description and Duties, identifies the duties and expectations of Employee. The Company reserves the right to modify Employee's duties on a day to day basis. In the event Employee changes position or has a significant change of duties, then the Company will provide a modified Position Description and Duties Supplement for execution, which will replace this one in its entirety.

### Position Description

The Area Sales Manager will strategically plan, organize, lead and control all activities of branch sales within a specific geographic area.

### Position Duties

- Drive sales within the branches of the assigned Area.
- Oversee and manage sales office and originator recruiting pipelines, analyzing trends, monitoring warning signs, implementing performance improvement plans and achieving sales goals.
- Collaborate with key members of leadership team on strategic Area growth and development.
- Collaborate with Marketing, Training, and Technology to implement regular sales training to be delivered to sales managers and originators on various topics to related to increasing productivity anc compliance.
- Collaborate with Finance, Technology, and Capital Markets on addition of new sales offices, projections, re-forecasting and productivity goals.
- Implement streamlined and efficient workflows and processes to aid in enhancement of service levels, to partner, network and increase purchase originations to achieve sales goals.

| Leonard Pagan | Leonard Pagan | 7/27/2022 | 1:51 PM PDT |
|---|---|---|---|
| Employee Name | Employee Signature | Date | |

### Manager Attestation:

*I have reviewed this agreement and found it to be accurate regarding the overall compensation agreed to with the employee.*

| Jon Whittington | Jon Whittington | 7/27/2022 | 3:16 PM EDT |
|---|---|---|---|
| Manager Name | Manager Signature | Date | |

v.2019-04Af Nations Lending       A-1

DocuSign Envelope ID: B378E747-56FA-4E15-8039-5A5B2E71F521

**Supplement B to Employment Agreement**
**Compensation Statement – Sales Manager**

**1. Summary:**

**(a)** Effective Date: _August 1, 2022_

**(b)** Overtime Status: Exempt

**(c)** Wages: $36,000.00 per year.

**(d)** Commission Rate:
Commissions for Loan Production will be compensated according to the following table:

| Lead Type, Source, or Product | Commission Rate | Maximum Commission per Eligible Loan |
|---|---|---|
| Self-Generated Production | 120 bps | $10,000.00 |
| Lead Based Marketing: | 70 bps | $10,0000.00 |
| Manager Referrals: | 70 bps | $10,000.00 |
| Loans Brokered to Others | 70 bps | $10,000.00 |
| NLC-Serviced Customer: (Retention) | 0 bps | N/A |
| Other: | 0 bps | N/A |

**(e)** Additional Commission: **Employee will receive 10 bps on all funded files in the Hilo, HI- 3301 and Kailu Kona, HI- 3302 branches, excluding own production.**

**(f)** Additional Compensation: **Employee is eligible for a hire bonus in the amount of $150,000.00 on August 26, 2022 under terms detailed and provided in separate agreement.**

**(g)** Guaranteed Compensation: **Starting August 1, 2022, Employee shall be compensated on the greater of: (a) Wages $37,500.00 or (b) Commission, if any, until November 30, 2022.**

**\*\*Your area is currently defined as Hawaii County and excludes consumer direct branches in this geography. Future changes to the territory will be defined and granted in agreement with the EVP, National Production.\*\***

Leonard Pagan

_____
Employee Name

_____
Employee Signature

7/27/2022 | 1:51 PM PDT
_____
Date

For Nations Lending Corporation:

_____
Cheryl C. Lieber, Chief Admin. Officer

7/27/2022 | 12:04 PM EDT
_____
Date

**Manager Attestation:** _I have reviewed this agreement and found it to be accurate regarding the overall compensation agreed to with the employee._

DocuSign Envelope ID: 6376E747-56FA-4215-8038-5A5B2E7FF521





---DocuSigned by:

Jon Whittington                Jon Whittington              7/27/2022 | 3:16 PM EDT
                               9FDE56A6B42416...
Manager Name                   Manager Signature            Date

**2.** <u>**Terms of Employee's Compensation Plan:**</u> This Supplement B, Compensation Statement, identifies the compensation the Employee will receive from the Company. In the event Employee's compensation changes due to raise, decrease, modification in calculation, or new position, then the Company will provide a modified Compensation Statement for execution, which will replace this one in its entirety. Compensation shall be paid to Employee at such times and in a manner consistent with Company Policies as may be in effect from time to time.

  **(a)** **Compensation:** For each pay period, Employee shall earn compensation which may be composed of the greater of either (i) Wages; or (ii) Commission; (iii) Additional Commission; and (iv) Additional Compensation, as follows:

    **i.** **Wages.** Salary will be paid in each pay period worked based upon the annualized rate provided in Section 1(c). For exempt employees, salary is intended to pay for all hours worked during each pay period, regardless of scheduled, tracked hours, or actual hours worked.

    **ii.** **Commission.** Employee may be eligible to earn commission compensation for loan production closed in Employee's name according to the provisions of Section 2(b).

    **iii.** **Additional Commission.** In addition to other Commission compensation, Employee may be eligible to earn Additional Commission based upon Production subject to the provisions of Section 2(c).

    **iv.** **Additional Compensation.** Employee will be eligible to earn Additional Compensation based upon designated business units of Company achieving established performance targets ("Bonus"). Additional Compensation is subject to the provisions of Section 2(d).

  For each pay period, the total of Employee's Commission, Additional Commission, and Additional Compensation will be calculated ("Incentive Compensation). If this amount exceeds the Wages amount, Employee will be paid the Incentive Compensation only; Otherwise, Employee will be paid the Wages amount. Wage payments are an Advance against future Incentive Compensation earnings.

  **(b)** **Commission**: For any authorized loan origination activity undertaken, Employee may be paid performance-based incentive compensation ("Commission"), less applicable withholding and deductions owed to the Company, for Eligible Loans, subject to all terms and conditions outlined in this Supplement. Any previous advances on Commission or other offsets will be deducted from Commission before payment. No payment will be advanced, nor Commission paid, on loans that the Employee did not originate, or that were not Funded while under Employee's authorized and direct supervision, or while Employee was not employed with Company. The Commission paid to Employee for every Eligible Loan the Employee originates is calculated as a fixed percentage of the principal amount of the credit extended (the "Commission Rate"), as detailed in table form in Section 1(d). The Commission Rate used to calculate Employee's Commission amount will be fixed for all Eligible Loans originated by Employee which close and fund. The Commission Rate will be determined as basis points (bps) on the total loan volume of funded units. The amount of Commission will be equal to the product of the loan amount times the applicable basis points, and less other deductions as set forth herein.

  **(c)** **Additional Commission:** Employee may be eligible to earn Additional Commission based upon the performance of designated business units of Company ("Overrides"). Additional Commission will be determined according to the rates provided in Section 1(e).

DocuSign Envelope ID: B376E747-56FA-4E15-8039-5A5B2E71F521

(d) **Additional Compensation:** Employee will be eligible to earn Additional Compensation based upon achieving established performance targets ("Bonus"). Additional Compensation will be determined according to the rates or terms provided in Section 1(f) in the pay period following the close of the applicable calculation period (calendar month except if noted otherwise). Additional Compensation, if any, will then be issued in the next regular payroll cycle.

All compensation will be paid as regular wages for services actually performed in accordance with the Company's ordinary payroll practices and schedules detailed in the current Employee Handbook. Employee is not guaranteed any term of employment or amount of compensation. All employment is "At Will" and may be terminated at any time by either party.

3. <u>**Definitions:**</u> Where used in this Supplement, the following terms apply.

   a) **Branch Manager Referral**: Employee may be provided leads that are sourced from a relationship that the Branch Manager has established. These are prospects created by the Manager based on past marketing efforts, relationships the Branch Manager has established with realtors or other referral sources the Branch Manager has established over time.

   b) **Company-Sourced Leads:** Employee may be provided with Company-sourced leads or internally sourced business. These are prospects created by the Company, whether by internal or external marketing efforts, through other marketing efforts of the Company, referred in-house by the Company to Employee, or created by the Company based on its relationships with realtors or other referral sources.

   c) **Early Payment Default:** a residential mortgage loan for which the borrower fails to make one or more timely payments (any payment received 15 days or more after it is due) during the first twelve months following the Origination Date regardless of whether such loan is later brought current.

   d) **Early Payoff:** a residential mortgage loan which has its principal balance paid off or reduced by 50% or more within the first twelve months following the Origination Date.

   e) **Eligible Loan:** a residential mortgage loan that is: (i) originated in accordance with applicable requirements; (ii) under the supervision of an Employee possessing valid licenses and in good standing throughout the origination process; (iii) closed and funded in accordance with applicable requirements in the period in which the Commission is calculated; and (iv) not unfunded, cancelled, rescinded, or disqualified for any reason, or otherwise not Earned as defined in this Supplement. Whether a loan constitutes an Eligible Loan is determined at the sole and absolute discretion of Company.

   f) **Indemnification:** a request by an Investor for Company to issue a guarantee to cover future losses on a defective loan; irrespective of whether Company ultimately is required to make good on such Indemnification at any time; so long as Company executes an indemnification agreement for such loan.

   g) **Investor:** any entity to which a loan subject to this agreement is sold, transferred, or conveyed, in whole or part, whether by sale, securitization, or other operation. Investor also refers to a governmental agency which insures or guarantees any loans, and Ginnie Mae.

   h) **Loans Brokered to Other Lenders:** a loan that is closed with another lender subject to a brokerage arrangement. Brokered loans are typically loan products or bond programs that are not offered by Company, and for which another lender frequently performs the underwriting and approvals.

   i) **Loan Defect:** an error, mistake, falsification, omitted document or information, or miscalculation contained in a loan file or its constituent documents and instruments which violates the guidelines of the applicable Investor to which the loan is sold or to which the loan was intended to be sold to if such defect renders the loan ineligible for such sale and purchase.

   j) **NLC-Serviced Customer:** a loan that is made to an individual who currently has a loan that is being serviced by Company.

DocuSign Envelope ID: B376E747-56FA-4E15-8039-3A5B2E71F521

k) **Origination Date:** the day on which a residential mortgage loan is closed and funded. For transactions where the closing and funding occur on different dates, the Origination Date is the date on which funding actually occurs and not the date scheduled for funding at the time of closing.

l) **Pay Period:** the semi-monthly period established by Company's payroll policies in each month during which Employee renders services. If Employee works less than a full pay period, then Employee's salary for such pay period will be proportionately reduced to correspond to the portion of such period worked.

m) **Reverse Mortgages:** a HECM or similar closed- or open-ended loan in which disbursements are advanced against the borrower's equity in the property over time. Employee is not authorized to originate a Reverse Mortgage or HECM product unless personally approved by Company.

n) **Self-Sourced Production:** Employee may create his/her own relationships and referral sources. These are prospects that are generated by the efforts of the Employee, and not reliant upon Company-generated or sponsored relationships with borrowers or other referral sources. The ability to earn compensation through this category is contingent upon the Employee documenting the bona-fide nature of the self-sourced loan in a manner as designated by the Company.

o) **Transitioned Loan:** a loan where one loan originator accepts the application, but the application is transferred to a different originator prior to the closing and funding of the loan for various reasons. Such loans are compensated in proportion to the amount of work performed by Employee on such loan instead of at the full Commission rate. Retention Loan Referrals as covered under Section 8 are compensated solely on those terms.

p) **Unit:** an individual first-lien mortgage loan, which qualifies as an Eligible Loan, regardless of the loan amount or type. Where used for monthly Commission calculations, the Unit count for the applicable calendar month is used.

4. **Commission Payments to Employee:**

(a) **Commission Advance.** Commission may be advanced when a loan has Funded. A loan is Funded when the loan has gone through settlement, all monies have disbursed, all rescission periods have expired (if applicable), and all proper documentation is filed and prepared in accordance with all State and Federal laws, including TILA and RESPA. Broker loans will be deemed as Funded when all items listed above are complete and the Company has received the check for payment from the institution to which the loan was brokered.

(b) **Earned Commission.** Commission is Earned once the loan has been Funded and sold on the secondary market or to a Government Sponsored Entity (GSE), and the applicable borrower(s) has made the first four (4) payments on the loan in a timely manner. Commission will not be Earned on any loan that 1) is not a Qualified Mortgage as defined by applicable guidelines, unless the loan is part of an approved "Non-QM" program authorized and offered by the Company; or 2) is subject to repurchase, indemnification early payment default, or early pay-off, or is otherwise unsalable. Additionally, Employee may not directly, or indirectly, solicit or commence a prequalification, application, pre-application, or pre-approval for any customer until at least 180 days have passed since the date of the customer's previous loan closing for the same property. Failure to observe this waiting period will result in that loan's applicable Commission to be considered unearned and subject to withholding or repayment to Company at its demand.

(c) **Payment and Acknowledgement of Commission.** Commissions are calculated based on the volume of Funded loans during the monthly Commission period. The payment date of earned Commissions will be determined by the Company's pay policies as may be amended from time to time. Earned compensation will be paid according to the schedules to be set by the Company. The Employee agrees that within 30 days of the receipt of any Commission, she or he will bring to Company's attention, in writing, any and all objections, disputes, or concerns regarding omissions or errors in connection with Commissions paid, whether or not to the Employee's benefit. If no such

DocuSign Envelope ID: B376E747-56FA-4E15-8039-3A5B2E71F521

written dispute is initiated and received, Employee's silence constitutes an acknowledgement that Commissions were properly calculated and paid.

It is the general intent of the Company to advance Commissions once a loan has Funded; however, the Commission is subject to repayment if it is not Earned, in accordance with the provisions of Section 5.

5.  **Compensation Repayments to the Company:**

a)  **Repurchase, Early Payoff Adjustment and Unsalability.** In the event Compensation is advanced, but is later deemed unearned because of any repurchase, indemnification, early payment default, or early pay-off, the Compensation amounts previously advanced will be subtracted from Employee's net Compensation balance in calculating any Compensation not yet paid to Employee. Waiver of this policy is at the Company's discretion and may be applied for situations involving major life events (such as death) and other such unanticipated factors that could not have been known at the time of the loan origination. Waiver in one circumstance will not constitute a waiver in all similar situations and is at the sole discretion of the Company.

   *(In other words, Commissions advanced on a loan may need to be repaid if the loan is unsalable, subject to repurchase or indemnification at any point, or subject to early default or payoff, particularly if the Employee had reason to know of the risk encountered. This determination is made on a case-by-case basis and takes into account whether the Employee had a role in the loan's salability or knew or should have known of issues concerning the loan's ultimate viability.)*

(a)  **Repayment of Advances or Obligations to the Company.** In the event that Employee has an outstanding balance owed to the Company for advances received by the Employee, the Employee hereby authorizes the Company to deduct the outstanding balance owed from his/her compensation. Unless the Company and Employee otherwise agree upon a specific dollar amount or a percentage of commissions, Employee expressly authorizes the Company to deduct from his/her compensation any amount for as long as it takes to resolve the outstanding balance owed to the Company; except that the amount of the deductions will not cause Employee's income to fall below the applicable minimum wage threshold for any applicable pay period. If a balance is owed to Company and Employee has no future compensation payments pending from which such balance may be deducted, Employee for such balance and Employee agrees to satisfy such obligations within 30 days of receiving notice of such deficit from Company.

6.  **Separation from Employment:**

Upon termination of employment for any reason, any rights to any commission or compensation from any loans which are unclosed or unfunded after the last date of employment shall be forfeited by Employee and all income and rights therein shall accrue solely to the Company. Employee will be paid applicable Earned income through the date of termination; however, Employee will not be entitled to receive any Commission advances on loans. Employee's final Commission payment may be paid thirty (30) to ninety (90) calendar days following the termination date for the purpose of reconciling any owed, promised, or outstanding debts, charge backs, unearned commissions, or other repayments due from Employee to Company or to any third parties. Issuance of the final payment does not operate to release Employee from any liability with regards to a later determination that any Commission or other Advance paid was not Earned.

DocuSign Envelope ID: B376E747-56FA-4E15-8038-3A5B2E71F521

7. **Effective Date.** The Employee acknowledges that the terms of this Supplement will be effective on and after the Effective Date until Employee's termination of employment or until this Supplement is replaced with a new agreement that supersedes the current document. The Effective Date may be the date of first employment with Company (Employee's start date) or the first date of the payroll cycle in which the provisions of this Supplement will take effect. If this Supplement is replacing a prior agreement, then the terms of the prior agreement will apply to compensation Earned prior to the Effective Date of this Supplement and this Supplement will apply to compensation Earned thereafter.

8. **Retention Loan Referral Bonus.** Employees currently licensed as loan originators may, from time to time, become aware that an existing Company customer is interested in refinancing a loan currently serviced by the Company, but such employee may not be able to originate a refinance of said loan due to not currently holding the appropriate license.

   In such a situation, the Employee may receive additional commission compensation equal to **37.5 bps** of the principal balance of such loan at time of origination, in the manner and under the conditions applicable to all other commission payments in Supplement B, in exchange for performing the duties of a loan originator assistant to the originator of the loan upon satisfaction of the following conditions:
   1. The consumer has a loan currently serviced by Company which they wish to refinance.
   2. Employee refers such consumer to one of Company's current consumer direct branches and sends such branch a notification of the referral accompanied by contact information to reach said referred consumer.
   3. The consumer submits a loan application to the referred branch as a result of said referral, is approved for financing, and a refinance transaction is originated.
   4. Employee performs the duties and responsibilities of loan originator assistant for such refinance.

   Employee will be entitled to the referral commission for each referred transaction for which Employee was the first person to provide such referral as tracked in Company's systems, which shall be the definitive record for determining all earned amounts.

9. **Guaranteed Compensation.** For the dates specified in this Agreement in Section 1(g), Employee will receive a guaranteed minimum compensation as applicable for each pay period. The payment of all amounts under this Section is subject to the following terms and conditions:
   **(a)** Employee will be eligible for compensation, in the amount of the greater of (1) Earned Compensation; or (2) the Guaranteed Minimum Compensation.
   **(i)** Earned Compensation is the total of nonwage earnings as defined in Sections 2(a) (ii)-(iv).
   **(ii)** The Guaranteed Minimum Compensation shall be the amount shown in Section 1(g).

   For any pay periods covered by this Section (9) for which Earned Compensation is less than the amount of Guaranteed Minimum Compensation, the difference will be considered an Advance, subject to Sections 4 – 6 of this supplement and Sections 2(c)-(e) of the Employment Agreement.

   For payment periods subject to this section, Employee's compensation for the first payroll period of a month will be based upon one-half of the Guaranteed Minimum Compensation. Employee's compensation paid for the second payroll period of a month will be adjusted to reflect the remaining amount of compensation due to Employee in that monthly period.

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

*Exhibit B*

# Nations Lending Corporation
# Employment Agreement

This Employment Agreement ("Agreement") is made between Nations Lending Corporation ("Company") and _____Joan Pagan_____ ("Employee"). In consideration of the premises in this Agreement, the employment or continued employment of Employee by the Company, and the covenants and agreements of the parties contained herein, and for good and valuable consideration, Employee accepts employment with the Company as hereinafter stated.

1. **EMPLOYMENT.**

   (a) **Contingent Offer.** Company has extended a conditional offer of employment, meaning that Employee must complete all conditions satisfactorily. Execution of this Agreement does not imply or ensure that Employee has satisfied all conditions precedent to commencing employment, including, without limitation: verification of references; satisfactory completion of background checks, verification of professional qualifications or licenses, or other conditions which may be stated in Employee's Offer Letter.

   (B) **Term of Employment.** The period during which the Employee is employed by the Company hereunder is hereinafter referred to as the "Employment Term." The Employment Term will commence on Employee's first actual day of work, regardless of any date contained in an offer letter, as reflected in Company's records, and will continue until Employee, as determined in Company's sole discretion, by reason of physical or mental disability is unable to perform their duties. The end of the Employment Term will be the effective date of any resignation or termination notice given. NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED TO IN ANY WAY ALTER, AMEND, OR MODIFY THE AT-WILL STATUS OF THE EMPLOYMENT RELATIONSHIP BETWEEN THE COMPANY AND THE EMPLOYEE IN WHICH EITHER THE COMPANY OR THE EMPLOYEE MAY TERMINATE THE EMPLOYMENT RELATIONSHIP AT ANY TIME, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE.

   (c) **Position & Duties.** Subject to its ultimate supervision, direction, and control, Company employs Employee during the Employment Term to perform services and duties as are described on the Position Description and Duties Addendum (Supplement A) of this Agreement and under any conditions detailed in such addendum or in the Company's Employee Handbook and adopted policies. The Company reserves the right to modify or amend Employee's duties at any time. In the event Employee's position or title changes with a significant change of duties, Company will provide Employee with a new addendum for execution, which will replace the existing one in its entirety and be effective from the date of such amendment. As employee of a financial institution, Employee is charged with, and owes to Company: (i) a duty of loyalty, fidelity, and trust to Company; (ii) a responsibility to exercise judgment and perform duties in good faith and in the best interest of the Company, (iii) the performance of honest services, and (iv) a promise to use extraordinary care, skill, and diligence in the performance of all duties.

   (d) **Sole Employment.** During the Employment Term, the Employee shall devote substantially all of Employee's business time and attention to the performance of the Employee's duties and will not engage in any other business, profession, or occupation for compensation or otherwise which might conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Company, in accordance with the Company's Dual Employment Policy. Employee's failure to disclose other employment may be grounds for termination.



Employee Initials

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

**(e) Termination.** Employee's employment is at-will, meaning that the Employee or Company may terminate the employment relationship at any time, with or without cause, and with or without notice. Although Employee's duties, title, compensation, and benefits as well as Company's personnel policies and procedures may change from time to time, the 'at will' nature of employment may only be altered by an express agreement signed by an authorized officer of Company. Upon termination or resignation for any reason, Employee's compensation and benefits will end. If Employee is entitled to commissions, trailing payments, bonuses or stock options as part of Employee's compensation, entitlement to all unearned or unvested amounts as of the last date of employment is forfeited by Employee unless stated otherwise in Employee's Compensation Addendum, as further described below.

2. **COMPENSATION.**

   **(a) "Wages".** Employee will be paid for services performed by Employee in accordance with the Company's policies and procedures for payments reflected in the Company's Employee Handbook and related Company policies. The amount of compensation to be received by Employee, whether wages or salary ("Pay"), commissions or bonuses ("Incentive Payments"), or other compensation (collectively, "Pay", "Incentive Payments" and other compensation are "Compensation") is detailed on the Compensation Addendum (Supplement B) of this Agreement, and subject to any conditions in such addendum. Except as may be provided in Employee's Compensation Addendum, Employee's Compensation may be changed at any time by Company upon notice to Employee, and continued employment by Company is subject to such revised terms.

   **(b) Benefits.** During the Employment Term, the Employee shall be entitled to participate in all employee benefit plans, practices, and programs maintained by the Company, as in effect from time to time (collectively, "Employee Benefit Plans"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law. Employee's eligibility for Employee Benefit Plans is detailed on Supplement A.

   **(c) Advances.** Company may advance Incentive Payments or other compensation to Employee before Employee's entitlement to such payments is vested. In the event that such advanced amounts are later determined to have been unearned by employee (e.g., a commission paid on a loan which is later subject to repurchase) then Employee must reimburse the amount advanced to Company and Company is entitled to deduct such advanced amounts from future payments to be made to Employee, including from Employee's final paycheck. Additional details on advances may be contained in Supplement B.

   **(d) Deductions.** In addition to withholdings for tax and other purposes provided by law, Company may subtract authorized deductions from Employee's Compensation payments, including Employee's final paycheck. Deductions may be made for the costs of Benefits elected by Employee, to recover Advances paid to Employee, to recover overpayments, to reimburse Company for expenditures on Employee's behalf or as a result of Employee's actions or failure to immediately return all of Company's property upon termination, and as authorized by Employee. Deductions may also be made for Incentive Payments made to Employee if the conditions under which Employee is entitled to such Incentive Payments are later determined not to have been met, such as where a loan on which commission has previously been paid is found to be ineligible for such commission. Additional details on deductions may be contained in Supplement B.



Employee Initials

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

**(e) Effects of Termination on Compensation.** If Employee resigns from employment with Company, Employee agrees to reimburse Company for all outstanding Advances within thirty days of termination, and where Employee fails to do so, Company is entitled to interest on the unpaid amounts at the rate of 10% per twelve-month period, compounded monthly. Where Employee resigns from employment without at least fourteen days advance notice or is terminated for reasons related to the Employee's acts of disloyalty, fraud, theft, forgery or other dishonesty, refusal to work, willful destruction of property, gross insubordination, falsification of records, criminal or unlawful activity, or willful misconduct, Employee forfeits any right to Incentive Payments which Employee would otherwise be entitled to receive following the last day of employment under the terms of Employee's Compensation Addendum.

3. **CONFIDENTIAL INFORMATION.** The Employee understands and acknowledges that during the course of employment by the Company, Employee will have access to and learn about confidential, secret, and proprietary documents, materials, data and other information, in tangible and intangible form, of and relating to the Company and its businesses and existing and prospective customers, suppliers, investors and other associated third parties which is not generally known to the public ("Confidential Information"). The Employee further understands and acknowledges that this Confidential Information and the Company's ability to reserve it for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure of the Confidential Information by the Employee will cause irreparable harm to the Company, for which remedies at law will not be adequate.

   **(a) Confidential Information Defined.** For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, documents, operations, services, strategies, techniques, agreements and terms of agreements, transactions, negotiations, know-how, trade secrets, applications, work-in-process, databases, compilations, technologies, records, systems, sources, supplier information, vendor information, financial information, accounting information, marketing information, pricing information, credit information, payroll information, personnel information, employee lists, reports, internal controls, security procedures, customer infomation or lists, buyer lists, or other information generally considered private and confidential in the industry or by any existing or prospective customer, other associated third party, or of any other person or entity that has entrusted information to the Company in confidence.

   The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

   The Employee understands and agrees that Confidential Information developed by Employee in the course of Employee's employment by the Company shall be subject to the terms and conditions of this Agreement as if the Company furnished the same Confidential Information to the Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public, provided that such disclosure to the public is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

   **(b) Company Creation and Use of Confidential Information.** The Employee understands and acknowledges that the Company has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of mortgage

Employee Initials

lending and financial services. The Employee understands and acknowledges that as a result of these efforts, Company has created and continues to use and create Confidential Information. This Confidential Information provides Company with a competitive advantage over others in the marketplace.

(c) **Disclosure and Use Restrictions.** Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company) not having a need to know and authority to know and to use the Confidential Information in connection with the business of the Company and, in any event, not to anyone outside of the direct employ of the Company except as required in the performance of any of the Employee's authorized employment duties to the Company; (iii) and not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company except as required in the performance of the Employee's authorized employment duties to the Company.

The Employee understands and acknowledges that the Employee's obligations under this Agreement regarding any particular Confidential Information begin immediately when the Employee first has access to Confidential Information (whether before or after commencing employment with Company) and shall continue during and after the Employee's employment by the Company until the Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or a breach by those acting in concert with the Employee or on the Employee's behalf.

(d) **Notice of Immunity Under the Defend Trade Secrets Act of 2016.** Employee acknowledges receipt of Company's Employee Reporting Policy and Company Code of Ethics (available at https://nlcloans.sharepoint.com/sites/Policies) setting forth: (A) Company's reporting policy for a suspected violation of law; and (B) notice of immunity from criminal and civil liability for certain disclosures of trade secrets under 18 U.S.C. § 1833(b).

(e) **Other Permitted Disclosures.** Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company. Nothing in this Agreement prohibits or restricts the Employee (or Employee's attorney) from filing a charge or complaint with the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), the Occupational Safety and Health Administration (OSHA), any other self-regulatory organization, or any other federal or state regulatory authority ("Government Agencies"). The Employee further understands that this Agreement does not limit the Employee's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency without notice to the Company. This Agreement does not limit the Employee's right to receive an award for information provided to any Government Agencies. In addition, nothing in this Agreement in any way prohibits or is intended to restrict or impede the Employee from exercising protected rights under Section 7 of the National Labor Relations Act or otherwise disclosing information as permitted by law.

## 4. COMPANY'S PROPRIETARY RIGHTS.


Employee Initials

**(a) Work Product.** The Employee acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas, and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by the Employee individually or jointly with others during the period of employment by the Company and relating in any way to the business or contemplated business, research, or development of the Company (regardless of when or where the Work Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical, and electronic copies, all improvements, rights, and claims related to the foregoing, and other tangible embodiments thereof (collectively, "Work Product"), as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), patents, and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions, and renewals thereof (collectively, "Intellectual Property Rights"), shall be the sole and exclusive property of the Company.

For purposes of this Agreement, Work Product includes, but is not limited to, Company information, including plans, strategies, techniques, agreements, documents, terms of agreements, negotiations, know-how, computer programs, computer applications, web design, work in process, databases, manuals, reports, compilations, graphics, drawings, sketches, market studies, formulae, notes, communications, algorithms, product plans, models, audiovisual programs, ideas, inventions, original works of authorship, customer information, customer lists, manufacturing information, marketing information, advertising information, and sales information. Work Product also means items created in the six-month period following employment as a result of or attributable to work performed during employment or specific work product substantially begun during employment.

**(b) Work Made for Hire; Assignment.** The Employee acknowledges that, by reason of being employed by the Company at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in the Copyright Act of 1976 (17 U.S.C. § 101), and such copyrights are therefore owned by the Company. To the extent that the foregoing does not apply, the Employee hereby irrevocably assigns to the Company, for no additional consideration, the Employee's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company would have had in the absence of this Agreement.

**(c) Further Assurances; Power of Attorney.** During and after employment, the Employee agrees to reasonably cooperate with the Company at the Company's expense to (i) apply for, obtain, perfect, and transfer to the Company the Work Product and Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (ii) maintain, protect, and enforce the same, including, without limitation, executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company. The Employee hereby irrevocably grants the Company power of attorney to execute and deliver any such documents on the Employee's behalf in Employee's name and to do all other lawfully permitted acts to transfer the Work Product to the Company and further the transfer, issuance, prosecution, and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Employee does not promptly cooperate with the Company's request (without limiting the rights the Company shall have in such circumstances by operation of law). The power of attorney is coupled with an interest and shall not be impacted by the Employee's subsequent incapacity.



Employee Initials

**(d) Moral Rights.** To the extent any copyrights are assigned under this Agreement, the Employee hereby irrevocably waives, to the extent permitted by applicable law, any and all claims the Employee may now or hereafter have in any jurisdiction to all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be known as "moral rights" with respect to all Work Product and all Intellectual Property Rights therein.

**(e) No License.** The Employee understands that this Agreement does not, and shall not be construed to, grant the Employee any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to Employee by the Company.

## 5. EMPLOYEE'S RESTRICTIVE COVENANTS.

**(a) Restricted Period.** The Employee agrees that the nature of Employee's position gives the Employee access to and knowledge of Confidential Information and places the Employee in a position of trust and confidence with the Company. The Employee further understands and acknowledges that the Company's ability to reserve use of the Confidential Information for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure by the Employee is likely to result in unfair or unlawful competitive activity. Because of Company's legitimate business interest as described in this Agreement and the good and valuable consideration offered to the Employee, the sufficiency of which is acknowledged, during the term of Employee's employment and for the next twelve months, to run consecutively, beginning on the last day of the Employee's employment with the Company, whether terminated for any reason or no reason, by the Employee or the Company, (the "Restricted Period"), the Employee agrees and covenants not to engage in Prohibited Activity.

**(b) Prohibited Activities.** For purposes of this Agreement, "Prohibited Activity" is where Employee, as an employee, employer, owner, manager, advisor, contractor, agent, partner, officer, volunteer, intern, or any other similar capacity, while engaging in residential mortgage lending on behalf of an entity other than Company, violates one or more of the "Restrictive Covenants" (i-iii) below to which Employee has agreed to accept as a condition of employment. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets, proprietary information, or Confidential Information.

**i. Non-Solicitation of Employees.** The Employee understands and acknowledges that the Company has expended and continues to expend significant time and expense in recruiting and training its employees and that the loss of employees would cause significant and irreparable harm to the Company. The Employee agrees and covenants not to directly or indirectly solicit, hire, recruit, or attempt to solicit, hire, or recruit, any employee of the Company or any employee who has been employed by the Company in the six months preceding the last day of Employee's employment (collectively, "Covered Employee"), or induce the termination of employment of any Covered Employee during the Restricted Period. "Covered Employee" does not include an employee of Company that Employee supervised or managed prior to joining Company, who joins Company at approximately the same time as Employee, and who, while they are employed by Company, is supervised or managed by Employee. This non-solicitation provision explicitly covers all forms of oral, written, or electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, Twitter, and any other social media platform, whether or not in existence at the time of entering into this Agreement. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is

Employee Initials

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

prohibited by this section. This Section does not restrict or impede, in any way, and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

**ii.**     **Non-Solicitation of Customers.** The Employee understands and acknowledges that because of the Employee's experience with and relationship to the Company, the Employee will have access to and will learn about much or all of the Company's customer information, including, but not limited to, Confidential Information. "Customer Information" includes, but is not limited to, names, phone numbers, addresses, email addresses, transaction history, preferences, financial condition, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to Company's services. The Employee understands and acknowledges that: (i) the Company's relationships with its customers is of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its customer relationships and goodwill; and (iii) the loss of any such customer relationship or goodwill will cause significant and irreparable harm to the Company.

The Employee agrees and covenants, for the duration of the Restricted Period, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this agreement, or meet with the Company's current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section. This Section does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company.

**iii.**     **Unfair Competition.** The Employee understands and acknowledges that: (i) the Company's relationships with its customers are of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its partner and customer relationships and goodwill; and (iii) the loss of any such relationship or goodwill will cause significant and irreparable harm to the Company. Because Employee will have access to proprietary information belonging to Company that would provide an unfair advantage to competition, during the period of employment Employee agrees not to, for any person, business, or entity, a) own, maintain, operate, or engage in the same or similar business activities as Company or in any business activity which competes with the Company; b) serve, advise, manage, consult with, provide services for, or be employed by any individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company; c) undertake any efforts or activities toward forming or incorporating, financing, or commencing any competing business activity which engages in the same or similar business activities as the Company; or d) advise, serve, or consult with any person, business, or entity which is or will be undertaking efforts toward incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as the Company. During the Restricted Period, Employee agrees not to divert or refer Company customers or prospective customers to any other

Employee Initials

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company. If Employee's job assignment location with Company is within a branch office or retail location, then Employee agrees and covenants not to open or relocate a similar office or location within a five-mile radius of such location (the "Restricted Territory") which would engage in the business of residential mortgage lending for the duration of the Restricted Period. "Relocate" includes Employee joining an existing office location of a competitor if such office was opened at such location within the six-month period before the beginning of the Restricted Period.  This Section does not restrict or impede, in any way, Employee from seeking gainful employment in the industry which does not harm Company's vital and legitimate business interests and shall not be interpreted or understood as restricting or impeding the Employee from exercising protected rights that cannot be waived by agreement.

(c) **Reasonableness.** Employee agrees that the restrictions in the Restrictive Covenants will not interfere with or unduly limit his or her ability to obtain suitable alternative employment following termination of employment with the Company.  Employee acknowledges that the protections provided to the Company are important, reasonable, and necessary, and Employee's agreement to the Restrictive Covenants and to refrain from Prohibited Activity, has been given freely, voluntarily, and without duress and after due deliberation, and that the Restrictive Covenants will not impose undue hardship on Employee.

(d) **Injunctive Relief.** Employee agrees that any violation or breach of Employee's obligations will result in irreparable injury to the Company for which no adequate remedy at law may be available. Therefore, in addition to any other remedies Company may pursue, Employee consents to the issuance of a temporary restraining order and injunction prohibiting any conduct by the Employee in violation of the Prohibited Activities and waives any requirement of posting a bond as precondition of obtaining such injunction.  Employee agrees that the Company shall be entitled to recover its costs and legal fees and expenses incurred in investigating and enforcing the Restrictive Covenants, should Employee engage in Prohibited Activity.

(e) **Tolling.** The restrictions and limitations within this Agreement applicable during the Restricted Period shall be enforceable from the date of the last breach or violation of the applicable restriction(s) up to an equivalent period as if such date were the first day of the Restrictive Period, so that Company may receive the full benefit of Employee's agreement to the Restrictive Covenants.

## 6. SECURITY.

(a) **Security and Access.** The Employee agrees and covenants (i) to comply with all Company security policies and procedures as in force from time to time including without limitation those regarding telephone systems, facilities access, key cards, access codes, Company intranet, internet, social media and instant messaging systems, computer systems, email systems, computer networks, document storage, data security, encryption, passwords, and communication technologies ("Facilities Information Technology and Access Resources"); (ii) not to access or use any Facilities and Information Technology Resources except as authorized by Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Employee's employment by the Company, whether termination is voluntary or involuntary. The Employee agrees to notify the Company promptly in the event he/she learns of any violation of the foregoing by others, or of any other misappropriation, or unauthorized access, use, reproduction or reverse engineering of, or tampering with any Facilities and Information Technology Access Resources or other Company property or materials by others.



Employee Initials

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

(b) **Exit Obligations**. Upon (i) voluntary or involuntary termination of the Employee's employment or (ii) the Company's request at any time during the Employee's employment, the Employee shall (a) provide or return to the Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, network access devices, computers, and computer equipment, manuals, reports, files, compilations, work product, thumb drives, or other removable information storage devices, hard drives, and data and all Company documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Employee, whether they were provided to the Employee by the Company or any of its business associates or created by the Employee in connection with his/her employment by the Company; and (b) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Employee's possession or control, including those stored on any non-Company devices, networks, storage locations, and media in the Employee's possession or control.

7. **PUBLICITY.** Employee hereby consents to any and all uses and displays, by the Company and its agents, of the Employee's name, voice, likeness, image, appearance, and biographical information in, on or in connection with any pictures, photographs, audio, and video recordings, digital images, websites, television programs, and advertising, other advertising, sales, and marketing brochures, books, magazines, other publications, and all other printed and electronic forms and media throughout the world, at any time during or after the Employment Term, for all legitimate business purposes of the Company ("Permitted Uses"). Employee hereby forever releases the Company and its directors, officers, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the Employment Term, in connection with any Permitted Use.

8. **EMPLOYEE REPRESENTATIONS.** The Employee represents and warrants to the Company that:
   (a) Acceptance of employment with the Company and the performance of the duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which the Employee is a party or is otherwise bound.
   (b) Acceptance of employment with the Company and the performance of Employee's duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.
   (c) Employee will not utilize any property belonging to a prior employer in the performance of Employee's duties; including any confidential, proprietary, or trade secret information obtained from a prior employer.
   (d) There are no actions, suits, proceedings, or known investigations, criminal or civil, pending against Employee in any court or before a governmental agency, which have not been disclosed by Employee.
   (e) Employee has the necessary training and knowledge to understand the laws and requirements of any position requiring a license to perform such duties and will maintain such licensure and perform such duties in compliance with all applicable laws and regulations as they are in effect.
   (f) If Employee is charged with a criminal offense, conviction of which could cause the suspension or revocation of any license required for the performance of Employee's duties, may adversely affect the ability of Employee to perform any obligations under this Agreement, or would cause Employee to become insolvent or bankrupt, Employee will notify Company's Human Resources Manager.
   (g) When Employee's employment with the Company terminates, Employee will notify any subsequent employer of the Restrictive Covenants contained in this Agreement before the Employee commences employment with such employer. In addition, the Employee authorizes the Company to provide notice of the Restrictive Covenants of this Agreement to third parties, including but not limited to, the Employee's subsequent, anticipated, or possible future employers.

Employee Initials

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

9. **NOTICES.** All notices, requests, consents, claims, demands, waivers, and other initial communications regarding a dispute involving this Agreement (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth below. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), or certified or registered mail (in each case, return receipt requested, postage pre-paid). Notice is effective upon receipted delivery to the designated address if the party giving the Notice has complied with the requirements of this Section.

    **(a)** Any notice required or permitted to be given to Employee will be delivered to the address shown as Employee's residence as shown on the records of the Company.

    **(b)** Notices addressed to Company must be sent to its registered agent address for the state in which the Employee resides. A copy may be sent to the Company's corporate office address. Notices sent to the principal business address are ineffective as notice unless a copy is also sent to the registered agent's address.

10. **MISCELLANEOUS PROVISIONS.**

    (a) **Entire Agreement.** This Agreement, together with the other documents incorporated by reference and all related supplements and addendums it incorporates, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter, and supersedes all prior and contemporaneous offers, understandings, agreements, or representations, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and other documents, the statements in the body of this Agreement shall control. The parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

    (b) **Modification and Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by the Employee and an authorized representative of the Company. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

    (c) **Captions; Interpretation.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The addendums and exhibits referred to shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

    (d) **Successors and Assigns; Beneficiaries.** The rights of the Company under this Agreement shall inure to the benefit of the successors and assigns of the Company. The rights of Employee are personal to Employee and Employee's heirs or devisees and may not otherwise be transferred or alienated. This Agreement is for the sole benefit of the parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.



Employee Initials

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

(e) **Remedies.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise. Employee acknowledges that a breach or threatened breach of any obligations under this Agreement would give rise to irreparable harm to the Company for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by Employee of any such obligations, Company shall, in addition to any and all other rights and remedies that may be available in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction and any other relief that may be available from a court of competent jurisdiction without any requirement to post bond.

(f) **Survival.** All provisions of this Agreement regarding Confidential Information, Company's Proprietary Rights in intellectual property and work product, and Employee's Restrictive Covenants shall survive Employee's termination of employment, and no dispute regarding Employee's employment, the termination of Employee's employment, or this Agreement shall prevent the operation and enforcement of these obligations.

(g) **Severability.** Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

(h) **Signatures and Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement by facsimile, email in portable document format (.pdf), by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by using an electronic signature compliant with the E-Sign Act has the same effect as delivery of an executed original of this Agreement.

(i) **Governing Law; Jurisdiction and Venue.** This Agreement, for all purposes, to the maximum extent permitted by applicable law, shall be construed in accordance with the laws of Ohio without regard to any conflicts of law principles. Should applicable law specifically prohibit the use of the law of a foreign jurisdiction, then the law of the relevant jurisdiction shall be used. Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in accordance with the arbitration provision contained within this Agreement except that action may be brought in a state or federal court located in the state of Ohio or the state of Employee's primary residence, if different, for the purposes of obtaining a restraining order or injunction against a violation of provisions of this Agreement or to enforce a judgment rendered in accordance with the results of arbitration between the parties. The parties hereby irrevocably submit to the non-exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue. EACH

Employee Initials

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO PARTICIPATE IN A CLASS ACTION OR A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

11. **ARBITRATION.** Any disagreement, dispute, controversy, or claim of any kind ("claims") arising out of or in connection to this Agreement, including any claims related to Employee's hiring, employment or the termination of Employee's employment, and including any claims that may arise between Employee and Company's owners, officers, directors, managers, employees, or agents in their capacity as such, shall be resolved by arbitration under the Federal Arbitration Act, Chapters 1 and 2, to the exclusion of inconsistent state laws, whether such claims are based in tort, contract, statute, equity, or otherwise. Employee agrees to waive all rights to a jury trial and waives the right to pursue any class action, collective action, or representative claims to the maximum extent allowed by law. To the extent a class or collective action or representative claim may not be waived, the Employee agrees to stay any such claims until after all claims subject to arbitration are fully resolved.

   (a) **Excluded Claims.** Excluded from this Arbitration provision are those claims which are not arbitrable under state or federal law, including: worker's compensation claims; unemployment compensation claims; the right to file an administrative charge before a governmental agency such as the Equal Employment Opportunity Commission, National Labor Relations Board, or Department of Labor; or other claims which a statute prohibits from being subject to arbitration. Any disputes regarding the applicability of arbitration to a claim or the scope of this arbitration provision will be submitted to a court for determination.

   (b) **Arbitrator.** Except for the excluded claims, disputes will be settled by binding arbitration administered by the American Arbitration Association before a qualified individual agreed to by the parties or designated pursuant to its Employment Arbitration Rules and Mediation Procedures (a copy of which may be found online at https://www.adr.org/Rules). The Optional Rules for Emergency Measures of Protection are incorporated by the parties. The standard provisions of the Employment Arbitration Rules shall apply. Claims shall be heard by a single arbitrator, unless the claim amount exceeds $250,000.00, in which case the dispute may be heard by a panel of three arbitrators.

   (c) **Arbitration Procedure.** Company will pay the arbitrator fees and arbitration administrative expenses and any other costs unique to the arbitration hearing (recognizing that each side bears its own deposition, witness, expert and attorney's fees and other expenses to the same extent as if the matter were being heard in court). Unless otherwise agreed to by the parties, the place of arbitration shall be Cleveland, Ohio, USA or conducted virtually by telephone or videoconference. Applicable law for purposes of arbitration shall be determined by the Governing Law provision of this Agreement. If the dispute is less than $50,000.01 there shall be no discovery other than the exchange of documents and written questions. If the dispute exceeds $50,000.00, each party's discovery shall include no more than three depositions of four hours each. Where no party's claim exceeds $30,000.00 exclusive of interest, attorneys' fees and arbitration costs, the dispute shall be resolved by submission of documents and there shall be no in-person or oral hearing. The award shall be made within six months of the filing of the notice of intention to arbitrate (demand), and the arbitrator(s) shall agree to comply with this schedule before accepting appointment. However, this time limit may be extended by the arbitrator(s) for good cause shown, or by mutual agreement of the parties.

   (d) **Arbitrator Authority.** The arbitrator(s) will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute or for a breach of Sections 3 through 6 of this Agreement. The arbitrator(s) shall not award consequential damages in



Employee Initials

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

any arbitration initiated under this provision. The arbitrator(s) may determine how the costs and expenses of the arbitration shall be allocated between the parties, but they shall not award attorneys' fees. If, however, any party prevails on a statutory claim that affords the prevailing party attorneys' fees and costs, then the arbitrator(s) may award reasonable attorneys' fees and costs to the prevailing party. Any dispute as to who a prevailing party is or the reasonableness of any fee or costs shall be resolved by the arbitrator(s).

(e) **Award.** The award shall be accompanied by a reasoned opinion. Judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Except as may be required by law, or as may be required in an action to enforce, modify, or vacate the award, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties.

(f) **Full and Free Consent.** This Agreement to arbitrate is freely negotiated between Employee and Company and is mutually entered into between the parties. Each party fully understands and agrees that they are giving up certain rights otherwise afforded to them by civil court actions, including but not limited to the right to a jury trial.

(g) **Information.** Employee may contact the HR Department at HR@nationslending.com with any questions about the arbitration process.

By initialing here, Employee acknowledges having read this Arbitration section and voluntarily agreed to binding arbitration:



Employee Initials

12. **ACKNOWLEDGEMENT.** THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS RECEIVED A COPY OF THE AGREEMENT INCLUDING ALL SUPPLEMENTS AND ADDENDUMS, HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS HAD SUFFICIENT TIME TO REVIEW AND AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF THE EMPLOYEE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

| Joan Pagan | _Joan Pagan_ | 7/28/2022 \| 5:18 PM EDT |
|---|---|---|
| Employee Name | Employee Signature | Date |

| For Nations Lending Corporation: | _Cheryl Lieber_ | 7/28/2022 \| 11:55 AM EDT |
|---|---|---|
| | Cheryl C. Lieber, Chief Admin. Officer | Date |

Employee Initials

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

## Supplement A to Employment Agreement
## Position Description and Duties

The undersigned Employee is employed by Nations Lending Corporation (the "Company") in the following capacity: **Personal Mortgage Advisor - Outside**. This employment is as a **part-time**, regular employee working up to the number of hours per week identified in Employee's Compensation Addendum (Supplement B). Employee is classified as **exempt** for purposes of determining overtime eligibility.

This Supplement A, Position Description and Duties, identifies the duties and expectations of Employee. The Company reserves the right to modify Employee's duties on a day to day basis. In the event Employee changes position or has a significant change of duties, then the Company will provide a modified Position Description and Duties Supplement for execution, which will replace this one in its entirety.

A. **Outside Sales Position:** Employee's primary responsibility is to obtain applications for loans away from the employer's places of business, and instead will seek to obtain such applications primarily in the customer's place or places of business. Employee must possess a valid motor vehicle driver's license at all times and shall provide evidence of licensure at time of employment and thereafter at any time requested by the Company. Employee shall be required to complete a quarterly certification as to his/her exempt status.

B. **Position Description – Essential Functions:** Employee will solicit, receive, and originate applications for the extension of credit to purchase and refinance 1-4 unit residential properties, secured by a first-lien mortgage or deed of trust, and provide supporting services to consumer applicants. Loans will conform to the products offerings available from the Company. Employee will ensure exceptional customer experience by overseeing loan processing from origination to closing and providing on-going communication to customers. Employee will maintain all necessary residential Mortgage Loan Originator licenses in the state or states in which the employee is employed to function.

C. **Position Duties:** Subject to the ultimate supervision and control of Company, Employee shall:

1. Know, observe, and comply with all applicable laws and regulations as well as industry standards, company rules, and policies;
2. Maintain all necessary licenses, qualifications, and standards to perform the job functions;
3. Report to the Company any lawsuits, complaints, investigations, or similar actions involving Employee's duties on behalf of the Company or which could potentially adversely affect Employee's licensing status or the Company's ability to maintain its licenses or operate.
4. Contact consumers to establish new business opportunities;
5. Consult with consumers about their current and future needs and goals;
6. Advise and educate consumers about the home purchase or refinance process, and how to better manage their mortgages by discussing loan terms, rates, fees, and other costs;
7. Gather consumer information and apply skill and experience to put clients in the best financial status possible among the most suitable loan products offered by the Company;
8. Take and receive applications for credit in accordance with Company products and pricing;
9. Initiate the loan process and manage applications from file start to closing using various systems;
10. Assist and communicate with consumers throughout the loan process;
11. Confer and meet with customers during various stages of the loan process as needed;
12. Utilize materials, reference tools, and other resources to provide accurate and up-to-date loan information to customers and business partners;

Electronically Filed 02/26/2024 13:20 / / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

13. Provide complete loan applications and support materials to fulfillment center partners; and
14. Promote self and company to grow market share and achieve production goals.

D. **Prohibited Activities:** In no event may Employee do any of the following:

1. Employee shall not utilize a headquarters or other fixed location to perform the Employee's responsibilities for Company;
2. Employee shall not, for any reason, falsify any certification they may be asked to complete concerning their status as an Exempt employee;
3. Employee may not at any time engage in marketing the Company, use the Company's name, or a facsimile of in any marketing, or advertise a product sold by the Company without the Company's prior express written permission;
4. Employee may not make any representations as an employee on any social networking, blog or internet site concerning the Company, or its products and/or services, unless such statements or representations comply with the Company's published guidelines concerning social media and use of the internet; and
5. Employee may not perform similar duties for any other company or individual.

E. **Employee Obligations:** Employee shall follow all policies and procedures concerning the origination of mortgage loans, including the timely submission of loan applications and collecting complete and accurate information in support of applications. In addition, Employee will do the following:

1. Employee shall notify the Company if any circumstances of Employee's employment change at any time to become inconsistent with this position description;
2. Employee shall utilize a cellular phone to contact potential customers, to arrange a time and place to take the prospective customer's loan application at a location convenient to the prospective customer;
3. Employee shall regulate his or her own hours; however, the Company shall require Employee to work a minimum of five (5) hours each week on behalf of the Company. Employee may work as many hours a week as needed to meet Company goals and objectives. Employee shall not receive wages for hours worked. Employee is not eligible to receive overtime for hours worked in excess of 40 hours per week;
4. Employee shall spend time serving as a liaison between Company loan processors and applicants who applied for a loan through Employee, attending sales meetings and training sessions, and providing sales support for other loan officers, processors, and underwriters of the Company, as requested;
5. At least 80% of Employee's time shall be spent (a) contacting and meeting prospective customers to obtain loan applications at locations convenient to the prospective customers, (b) preparation of proposals or promotional material sales reports, or (c) arranging trips, logistics, and similar tasks that support personal meetings with prospective customers; and
6. Employee shall earn commissions for each closed loan according to the current terms of Employee's Compensation Addendum and shall not receive any draw or salary.

Employee acknowledges that in performing his/her primary duties, he/she shall, during each work week, be customarily engaged away from Company's office and shall not be assigned set work hours. Employee shall not establish any home office from which he/she regularly works and/or regularly conduct Company business from his/her home. Employee recognizes the position of Personal Mortgage Advisor - Outside requires Employee to meet and call on clients, referral sources, Realtors™, and business prospects at their homes and places of employment or in other social settings, and these responsibilities may include periodic and non-regular use of Company office space or the Employee's own home.

Electronically Filed 02/26/2024 13:20 / / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

| Joan Pagan | *Joan Pagan* | 7/28/2022 | 5:18 PM EDT |
|---|---|---|---|
| Employee Name | Employee Signature | Date | |

**Manager Attestation:**

*I have reviewed this description and found it to be accurate regarding the overall job duties agreed to with the employee.*

| Jon Whittington | *Jon Whittington* | 7/28/2022 | 12:51 PM EDT |
|---|---|---|---|
| Manager Name | Manager Signature | Date | |

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

Proprietary and Confidential

## Supplement B to Employment Agreement
## Compensation Statement – Outside Loan Originator – Part Time

The Effective Date of this Supplement is:  **August 1, 2022** .

This Supplement B, Compensation Statement, identifies the compensation the Employee will receive from the Company.  In the event Employee's compensation changes due to raise, decrease, modification in calculation, or new position, then the Company will provide a modified Compensation Statement for execution, which will replace this one in its entirety.  Compensation shall be paid to Employee at such times and in a manner consistent with Company Policies as may be in effect from time to time.

1. **Outside Sales Employee Classification**: Per the terms of Employee's Job Description Supplement, Employee is subject to the outside sales wage exemption. As a result, employee is not entitled to minimum wage or overtime. For exempt employees, compensation is intended to pay for all hours worked during each pay period, regardless of scheduled or tracked hours.

2. **Part-Time Status:** Employee is employed for only up to **20** hours per week. If Employee's hours change or increase, Employee will bring such information to the attention of the Employee's manager. Employee is not eligible for benefits under any Company plan because of Employee's work for Company.

3. **Advanced Payments:** Any amounts advanced to Employee to cover licenses, fees, or at the discretion of Company are draws against future compensation earnings and subject to repayment.

4. **Compensation:** All compensation will be paid as regular wages in accordance with the Company's ordinary payroll practices and schedules, as detailed in the current Employee Handbook. Employee is not guaranteed any term of employment or amount of compensation. Employee will not earn or receive a salary as a result of employment. Employee will solely be compensated on Commissions earned, according to the terms identified below.

5. **Commission**: Employee will be paid performance-based incentive compensation ("Commission"), less applicable withholding and deductions owed to the Company, for Employee's new loan production of Eligible Loans, subject to all terms and conditions outlined in this Supplement. Any advance on Commission or other offsets will be deducted from the Commission before payment. No payment will be advanced, nor Commission paid, on loans that the Employee did not originate, or that were not funded while under Employee's authorized and direct supervision, or while Employee is/was not currently employed with Company.

   The Commission paid to Employee for every Eligible Loan the Employee originates is calculated as a fixed percentage of the principal amount of the credit extended (the "Commission Rate"), as provided for in the table below. The Commission Rate used to calculate Employee's Commission amount will be fixed for all Eligible Loans originated by Employee which close and fund.

6. **Commission Rate:** The Commission Rate for each Eligible Loan is as follows:

Electronically Filed 02/26/2024 13:20 / / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

Proprietary and Confidential

| Lead Type, Source, or Product | Commission Rate | Maximum Commission per Eligible Loan |
|---|---|---|
| Self-Generated Production: | See Next Table | $10,000.00 |
| Lead Based Marketing: | 0 bps | $N/A |
| Manager Referrals: | 70 bps | $10,000.00 |
| Brokered/Bond Loans: | 70 bps | $10,000.00 |
| Reverse Mortgage Loan: | 0 bps | $N/A |
| NLC-Serviced Customer: | 0 bps | $N/A |
| Other: | 0 bps | $N/A |

| Self- Generated Production, retro | |
|---|---|
| $0-$999,999.99 | 80 BPS |
| $1,000,000.00- $1,999,999.99 | 90 BPS |
| $2,000,000.00 + | 100 BPS |

The Commission Rate will be determined as basis points (bps) on the total loan volume of funded units. The amount of Commission will be equal to the product of the loan amount times the applicable basis points, and less other fees and deductions as set forth herein.

7. **Additional Commission Earnings:** In addition to Commission on funded units, Employee may be paid Additional Commission as follows:



**N/A**.

8. **Definitions:** Where used in this Supplement, the following terms apply.

**Self-Sourced Production**: The Employee may create his/her own relationships and referral sources. These are prospects that are generated by the efforts of the Employee, and not reliant upon Company-generated or sponsored relationships with borrowers or other referral sources. The ability to earn compensation through this category is contingent upon the Employee documenting the bona-fide nature of the self-sourced loan in a manner as designated by the Company.

**Company-Sourced Leads**: Employee may be provided with Company-sourced leads or internally sourced business. These are prospects created by the Company, whether by internal or external marketing efforts, through other marketing efforts of the Company, referred in-house by the Company to Employee, or created by the Company based on its relationships with realtors or other referral sources.

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

Proprietary and Confidential

**Branch Manager Referral**: The Employee may be provided leads that are sourced from a relationship that the Branch Manager has established. These are prospects are created by the Manager based on past marketing efforts, relationships the Branch Manager has established with realtors or other referral sources the Branch Manager has established over time.

**Loans Brokered to Other Lenders:** a loan that is closed with another lender subject to a brokerage arrangement. Brokered loans are typically loan products or bond programs that are not offered by Company, and for which another lender frequently performs the underwriting and approvals.

**Reverse Mortgages:** A HECM or similar closed- or open-ended loan in which disbursements are advanced against the borrower's equity in the property over time. Employee is not authorized to originate a Reverse Mortgage or HECM product unless personally approved by Company.

**NLC-Serviced Customer:** a loan that is made to an individual who currently has a loan that is being serviced by Company.

**Eligible Loan:** A residential mortgage loan that is: (i) originated in accordance with applicable requirements; (ii) under the supervision of an Employee possessing valid licenses and in good standing throughout the origination process; (iii) closed and funded in accordance with applicable requirements in the period in which the Commission is calculated; and (iv) not unfunded, cancelled, rescinded, or disqualified for any reason, or otherwise not Earned as defined in this Supplement. Whether a loan constitutes an Eligible Loan is determined at the sole and absolute discretion of Company.

**Units:** The number of Eligible Loans that qualify within the applicable period. Where used for monthly Commission calculations, the Unit count for the applicable calendar month is used.

**Transitioned Loan:** a loan where one loan originator accepts the application, but the application is transferred to a different originator prior to the closing and funding of the loan for various reasons.

9. **Commission Payments to Employee:**

**Commission Advance.** Commission may be advanced when a loan has Funded. A loan is Funded when the loan has gone through settlement, all monies have disbursed, all rescission periods have expired (if applicable), and all proper documentation is filed and prepared in accordance with all State and Federal laws, including TILA and RESPA. Broker loans will be deemed as Funded when all items listed above are complete and the Company has received the check for payment from the institution to which the loan was brokered.

**Earned Commission.** Commission is Earned once the loan has been Funded and sold on the secondary market or to a Government Sponsored Entity (GSE), and the applicable borrower(s) has made the first four (4) payments on the loan in a timely manner. Commission will not be Earned on any loan that 1) is not a Qualified Mortgage as defined by applicable guidelines, unless the loan is part of an approved "Non-QM" program authorized and offered by the Company; or 2) is subject to repurchase, early payment default, or early pay-off, or is otherwise unsalable. Additionally, Employee will not directly, or indirectly, solicit or commence a prequalification, application, pre-application, or pre-approval for any customer until at least 180 days have passed since the date of the customer's loan closing. Failure to observe this waiting period will result in a loan's applicable Commission to be considered unearned and subject to repayment to Company at its demand.

**Payment and Acknowledgement of Commission.** Commissions are calculated based on the volume of Funded loans during the monthly Commission period. The payment date of earned Commissions

DocuSign Envelope ID: 21DF78DE-6137-4EE1-BA54-A6311128CF1B

Proprietary and Confidential

will be determined by the Company's pay policies as may be amended from time to time. Earned compensation will be paid according to the schedules to be set by the Company. The Employee agrees that within 30 days of the receipt of any Commission, she or he will bring to Company's attention, in writing, any and all objections, disputes, or concerns regarding omissions or errors in connection with Commissions paid, whether or not to the Employee's benefit. If no such written dispute is initiated and received, Employee's silence constitutes an acknowledgement that Commissions were properly calculated and paid.

It is the general intent of the Company to advance Commissions once a loan has Funded; however, the Commission is subject to repayment if it is not Earned.

10. **Commission Repayments to the Company:**

**Repurchase, Early Payoff Adjustment and Unsalability.** In the event Commission is advanced, but is later deemed unearned because of any repurchase, early payment default, or early pay-off, the Commission amounts previously advanced will be subtracted from Employee's net Commission balance in calculating any Commission not yet paid to Employee. *Waiver of this policy is at the Company's discretion and may be applied for situations involving major life events (such as death) and other such unanticipated factors that could not have been known at the time of the loan origination.* Waiver in one circumstance will not constitute a waiver in all similar situations and is at the sole discretion of the Company. In other words, Commissions advanced on a loan may need to be repaid if the loan is unsalable, subject to repurchase, or subject to early default or payoff if the Employee had reason to know of the risk encountered by the loan. This determination is made on a case by case basis and takes into account whether the Employee had a role in the loan's salability or knew or should have known of issues concerning the loan's ultimate viability.

**Repayment of Draws or Obligations to the Company.** In the event that Employee has an outstanding balance owed to the Company for draws or other advances received by the Employee, the Employee hereby authorizes the Company to deduct the outstanding balance owed from his/her compensation. Unless the Company and Employee otherwise agree upon a specific dollar amount or a percentage of commissions, Employee expressly authorizes the Company to deduct from his/her compensation any amount for as long as it takes to resolve the outstanding balance owed to the Company.

11. **Separation from Employment:** Upon termination of employment for any reason, then any rights to any commission or compensation from any unclosed or unfunded loans shall be forfeited by Employee and all income and rights therein shall accrue solely to the Company. Employee will be paid applicable Earned income through the date of termination; however, Employee will not be entitled to receive any Commission advances on Funded loans. Employee's final commission payment will be paid within thirty (30) calendar days following the termination date for the purpose of reconciling any owed, promised, or outstanding debts, charge backs, or unearned commissions due from Employee to Company or to any third parties. Issuance of the final payment does not operate to release Employee from any liability with regards to a later determination that any Commission paid was not Earned.

12. **Effective Date:** The Employee acknowledges that the terms of this Supplement will be effective on and after the Effective Date until Employee's termination of employment or until this Supplement is replaced with a new agreement that supersedes the current document. The Effective Date may be the date of first employment with Company (Employee's start date) or the first date of the payroll cycle in which the provisions of this Supplement will take effect. If this Supplement is replacing a prior agreement, then the terms of the prior agreement will apply to compensation Earned prior to the Effective Date of this Supplement and this Supplement will apply to compensation Earned thereafter.

DocuSign Envelope ID: 21DF78DE-6137-4EE1-6A54-A6311128CF1B

Proprietary and Confidential

| | | |
|---|---|---|
| Joan Pagan | Joan Pagan | 7/28/2022 \| 5:18 PM EDT |
| Employee Name | Employee Signature | Date |

| | | |
|---|---|---|
| For Nations Lending Corporation: | Cheryl Lieber | 7/28/2022 \| 11:55 AM EDT |
| | Cheryl C. Lieber, Chief Admin. Officer | Date |

**Manager Attestation:**

*I have reviewed this agreement and found it to be accurate regarding the overall compensation agreed to with the employee.*

| | | |
|---|---|---|
| Jon Whittington | Jon Whittington | 7/28/2022 \| 12:51 PM EDT |
| Manager Name | Manager Signature | Date |

Electronically Filed 02/26/2024 13:20 / / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

**DocuSign**

## Certificate Of Completion

Envelope Id: 21DF78DE61374EE1BA54A6311128CF1B
Subject: Please DocuSign: EmpAgr_2022.08.01_Pagan, Joan.pdf
Source Envelope:
Document Pages: 21          Signatures: 7
Certificate Pages: 5        Initials: 14
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-05:00) Eastern Time (US & Canada)

Status: Completed

Envelope Originator:
Barbara Hirsch
3673 Westcenter Dr
Houston, TX 77042
Barbara.Hirsch@nationslending.com
IP Address: 174.73.141.47

## Record Tracking

Status: Original
    7/28/2022 11:35:50 AM

Holder: Barbara Hirsch
    Barbara.Hirsch@nationslending.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Cheryl Lieber<br>cheryl.lieber@nationslending.com<br>Chief Administrative Officer<br>Nations Lending Corporation<br>Security Level: Email, Account Authentication<br>(None) | *Cheryl Lieber*<br>—9EF1AC2D909B466…<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 173.89.99.11 | Sent: 7/28/2022 11:39:44 AM<br>Viewed: 7/28/2022 11:55:12 AM<br>Signed: 7/28/2022 11:55:33 AM |
| **Electronic Record and Signature Disclosure:**<br>    Not Offered via DocuSign | | |
| Jon Whittington<br>Jon.Whittington@nationslending.com<br>Security Level: Email, Account Authentication<br>(None) | *Jon Whittington*<br>—0B4DE56A6B42418…<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 66.8.249.11<br>Signed using mobile | Sent: 7/28/2022 11:55:38 AM<br>Viewed: 7/28/2022 12:50:42 PM<br>Signed: 7/28/2022 12:51:04 PM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 7/28/2022 12:50:42 PM<br>    ID: 5b57a6a5-0852-4bee-a2c7-3a136bfeecf9 | | |
| Joan Pagan<br>jniaukea@hawaii.edu<br>Security Level: Email, Account Authentication<br>(None) | *Joan Pagan*<br>—0102FCF961X0431…<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 72.130.226.158 | Sent: 7/28/2022 12:51:10 PM<br>Viewed: 7/28/2022 5:16:18 PM<br>Signed: 7/28/2022 5:18:00 PM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 7/28/2022 5:16:18 PM<br>    ID: feabf98c-b08a-4109-9814-36ae8bf99575 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Barbara Hirsch<br>barbara.hirsch@nationslending.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 7/28/2022 5:18:06 PM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/28/2022 11:39:44 AM |
| Certified Delivered | Security Checked | 7/28/2022 5:16:18 PM |
| Signing Complete | Security Checked | 7/28/2022 5:18:00 PM |
| Completed | Security Checked | 7/28/2022 5:18:06 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 10/21/2015 5:05:20 PM
Parties agreed to: Jon Whittington, Joan Pagan

From time to time, Nations Lending Corporation (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Nations Lending Corporation:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: solutions@nlcloans.com

**To advise Nations Lending Corporation of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at solutions@nlcloans.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.
**To request paper copies from Nations Lending Corporation**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to solutions@nlcloans.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with Nations Lending Corporation**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:
>   i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
>   ii. send us an e-mail to solutions@nlcloans.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.
**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Nations Lending Corporation as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Nations Lending Corporation during the course of my relationship with you.

*Exhibit C*

# Nations Lending Corporation
# Employment Agreement

This Employment Agreement ("Agreement") is made between Nations Lending Corporation ("Company") and _____Jessica Brown_____ ("Employee"). In consideration of the premises in this Agreement, the employment or continued employment of Employee by the Company, and the covenants and agreements of the parties contained herein, and for good and valuable consideration, Employee accepts employment with the Company as hereinafter stated.

## 1. EMPLOYMENT.

**(a) Contingent Offer.** Company has extended a conditional offer of employment, meaning that Employee must complete all conditions satisfactorily. Execution of this Agreement does not imply or ensure that Employee has satisfied all conditions precedent to commencing employment, including, without limitation: verification of references; satisfactory completion of background checks, verification of professional qualifications or licenses, or other conditions which may be stated in Employee's Offer Letter.

**(B) Term of Employment.** The period during which the Employee is employed by the Company hereunder is hereinafter referred to as the "Employment Term." The Employment Term will commence on Employee's first actual day of work, regardless of any date contained in an offer letter, as reflected in Company's records, and will continue until Employee, as determined in Company's sole discretion, by reason of physical or mental disability is unable to perform their duties. The end of the Employment Term will be the effective date of any resignation or termination notice given. NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED TO IN ANY WAY ALTER, AMEND, OR MODIFY THE AT-WILL STATUS OF THE EMPLOYMENT RELATIONSHIP BETWEEN THE COMPANY AND THE EMPLOYEE IN WHICH EITHER THE COMPANY OR THE EMPLOYEE MAY TERMINATE THE EMPLOYMENT RELATIONSHIP AT ANY TIME, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE.

**(c) Position & Duties.** Subject to its ultimate supervision, direction, and control, Company employs Employee during the Employment Term to perform services and duties as are described on the Position Description and Duties Addendum (Supplement A) of this Agreement and under any conditions detailed in such addendum or in the Company's Employee Handbook and adopted policies. The Company reserves the right to modify or amend Employee's duties at any time. In the event Employee's position or title changes with a significant change of duties, Company will provide Employee with a new addendum for execution, which will replace the existing one in its entirety and be effective from the date of such amendment. As employee of a financial institution, Employee is charged with, and owes to Company: (i) a duty of loyalty, fidelity, and trust to Company; (ii) a responsibility to exercise judgment and perform duties in good faith and in the best interest of the Company, (iii) the performance of honest services, and (iv) a promise to use extraordinary care, skill, and diligence in the performance of all duties.

**(d) Sole Employment.** During the Employment Term, the Employee shall devote substantially all of Employee's business time and attention to the performance of the Employee's duties and will not engage in any other business, profession, or occupation for compensation or otherwise which might conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Company, in accordance with the Company's Dual Employment Policy. Employee's failure to disclose other employment may be grounds for termination.



Employee Initials

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

(e) **Termination.** Employee's employment is at-will, meaning that the Employee or Company may terminate the employment relationship at any time, with or without cause, and with or without notice. Although Employee's duties, title, compensation, and benefits as well as Company's personnel policies and procedures may change from time to time, the 'at will' nature of employment may only be altered by an express agreement signed by an authorized officer of Company. Upon termination or resignation for any reason, Employee's compensation and benefits will end. If Employee is entitled to commissions, trailing payments, bonuses or stock options as part of Employee's compensation, entitlement to all unearned or unvested amounts as of the last date of employment is forfeited by Employee unless stated otherwise in Employee's Compensation Addendum, as further described below.

2. **COMPENSATION.**

(a) **"Wages".** Employee will be paid for services performed by Employee in accordance with the Company's policies and procedures for payments reflected in the Company's Employee Handbook and related Company policies. The amount of compensation to be received by Employee, whether wages or salary ("Pay"), commissions or bonuses ("Incentive Payments"), or other compensation (collectively, "Pay", "Incentive Payments" and other compensation are "Compensation") is detailed on the Compensation Addendum (Supplement B) of this Agreement, and subject to any conditions in such addendum. Except as may be provided in Employee's Compensation Addendum, Employee's Compensation may be changed at any time by Company upon notice to Employee, and continued employment by Company is subject to such revised terms.

(b) **Benefits.** During the Employment Term, the Employee shall be entitled to participate in all employee benefit plans, practices, and programs maintained by the Company, as in effect from time to time (collectively, "Employee Benefit Plans"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law. Employee's eligibility for Employee Benefit Plans is detailed on Supplement A.

(c) **Advances.** Company may advance Incentive Payments or other compensation to Employee before Employee's entitlement to such payments is vested. In the event that such advanced amounts are later determined to have been unearned by employee (e.g., a commission paid on a loan which is later subject to repurchase) then Employee must reimburse the amount advanced to Company and Company is entitled to deduct such advanced amounts from future payments to be made to Employee, including from Employee's final paycheck. Additional details on advances may be contained in Supplement B.

(d) **Deductions.** In addition to withholdings for tax and other purposes provided by law, Company may subtract authorized deductions from Employee's Compensation payments, including Employee's final paycheck. Deductions may be made for the costs of Benefits elected by Employee, to recover Advances paid to Employee, to recover overpayments, to reimburse Company for expenditures on Employee's behalf or as a result of Employee's actions or failure to immediately return all of Company's property upon termination, and as authorized by Employee. Deductions may also be made for Incentive Payments made to Employee if the conditions under which Employee is entitled to such Incentive Payments are later determined not to have been met, such as where a loan on which commission has previously been paid is found to be ineligible for such commission. Additional details on deductions may be contained in Supplement B.



Employee Initials

x 3201 Nations Lending Employee Agreement     2

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

(e) **Effects of Termination on Compensation.** If Employee resigns from employment with Company, Employee agrees to reimburse Company for all outstanding Advances within thirty days of termination, and where Employee fails to do so, Company is entitled to interest on the unpaid amounts at the rate of 10% per twelve-month period, compounded monthly. Where Employee resigns from employment without at least fourteen days advance notice or is terminated for reasons related to the Employee's acts of disloyalty, fraud, theft, forgery or other dishonesty, refusal to work, willful destruction of property, gross insubordination, falsification of records, criminal or unlawful activity, or willful misconduct, Employee forfeits any right to Incentive Payments which Employee would otherwise be entitled to receive following the last day of employment under the terms of Employee's Compensation Addendum.

3. **CONFIDENTIAL INFORMATION.** The Employee understands and acknowledges that during the course of employment by the Company, Employee will have access to and learn about confidential, secret, and proprietary documents, materials, data and other information, in tangible and intangible form, of and relating to the Company and its businesses and existing and prospective customers, suppliers, investors and other associated third parties which is not generally known to the public ("Confidential Information"). The Employee further understands and acknowledges that this Confidential Information and the Company's ability to reserve it for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure of the Confidential Information by the Employee will cause irreparable harm to the Company, for which remedies at law will not be adequate.

(a) **Confidential Information Defined.** For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, documents, operations, services, strategies, techniques, agreements and terms of agreements, transactions, negotiations, know-how, trade secrets, applications, work-in-process, databases, compilations, technologies, records, systems, sources, supplier information, vendor information, financial information, accounting information, marketing information, pricing information, credit information, payroll information, personnel information, employee lists, reports, internal controls, security procedures, customer information or lists, buyer lists, or other information generally considered private and confidential in the industry or by any existing or prospective customer, other associated third party, or of any other person or entity that has entrusted information to the Company in confidence.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

The Employee understands and agrees that Confidential Information developed by Employee in the course of Employee's employment by the Company shall be subject to the terms and conditions of this Agreement as if the Company furnished the same Confidential Information to the Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public, provided that such disclosure to the public is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

(b) **Company Creation and Use of Confidential Information.** The Employee understands and acknowledges that the Company has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of mortgage

Employee Initials

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

lending and financial services. The Employee understands and acknowledges that as a result of these efforts, Company has created and continues to use and create Confidential Information. This Confidential Information provides Company with a competitive advantage over others in the marketplace.

(c) **Disclosure and Use Restrictions.** Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company) not having a need to know and authority to know and to use the Confidential Information in connection with the business of the Company and, in any event, not to anyone outside of the direct employ of the Company except as required in the performance of any of the Employee's authorized employment duties to the Company; (iii) and not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company except as required in the performance of the Employee's authorized employment duties to the Company.

The Employee understands and acknowledges that the Employee's obligations under this Agreement regarding any particular Confidential Information begin immediately when the Employee first has access to Confidential Information (whether before or after commencing employment with Company) and shall continue during and after the Employee's employment by the Company until the Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or a breach by those acting in concert with the Employee or on the Employee's behalf.

(d) **Notice of Immunity Under the Defend Trade Secrets Act of 2016**. Employee acknowledges receipt of Company's Employee Reporting Policy and Company Code of Ethics (available at https://nlcloans.sharepoint.com/sites/Policies) setting forth: (A) Company's reporting policy for a suspected violation of law; and (B) notice of immunity from criminal and civil liability for certain disclosures of trade secrets under 18 U.S.C. § 1833(b).

(e) **Other Permitted Disclosures.** Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company. Nothing in this Agreement prohibits or restricts the Employee (or Employee's attorney) from filing a charge or complaint with the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), the Occupational Safety and Health Administration (OSHA), any other self-regulatory organization, or any other federal or state regulatory authority ("Government Agencies"). The Employee further understands that this Agreement does not limit the Employee's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency without notice to the Company. This Agreement does not limit the Employee's right to receive an award for information provided to any Government Agencies. In addition, nothing in this Agreement in any way prohibits or is intended to restrict or impede the Employee from exercising protected rights under Section 7 of the National Labor Relations Act or otherwise disclosing information as permitted by law.

## 4. COMPANY'S PROPRIETARY RIGHTS.



Employee Initials

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

**(a) Work Product**. The Employee acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas, and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by the Employee individually or jointly with others during the period of employment by the Company and relating in any way to the business or contemplated business, research, or development of the Company (regardless of when or where the Work Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical, and electronic copies, all improvements, rights, and claims related to the foregoing, and other tangible embodiments thereof (collectively, "Work Product"), as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), patents, and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions, and renewals thereof (collectively, "Intellectual Property Rights"), shall be the sole and exclusive property of the Company.

For purposes of this Agreement, Work Product includes, but is not limited to, Company information, including plans, strategies, techniques, agreements, documents, terms of agreements, negotiations, know-how, computer programs, computer applications, web design, work in process, databases, manuals, reports, compilations, graphics, drawings, sketches, market studies, formulae, notes, communications, algorithms. product plans, models, audiovisual programs, ideas, inventions, original works of authorship, customer information, customer lists, manufacturing information, marketing information, advertising information, and sales information. Work Product also means items created in the six-month period following employment as a result of or attributable to work performed during employment or specific work product substantially begun during employment.

**(b) Work Made for Hire; Assignment**. The Employee acknowledges that, by reason of being employed by the Company at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in the Copyright Act of 1976 (17 U.S.C. § 101), and such copyrights are therefore owned by the Company. To the extent that the foregoing does not apply, the Employee hereby irrevocably assigns to the Company, for no additional consideration, the Employee's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company would have had in the absence of this Agreement.

**(c) Further Assurances; Power of Attorney**. During and after employment, the Employee agrees to reasonably cooperate with the Company at the Company's expense to (i) apply for, obtain, perfect, and transfer to the Company the Work Product and Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (ii) maintain, protect, and enforce the same, including, without limitation, executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company. The Employee hereby irrevocably grants the Company power of attorney to execute and deliver any such documents on the Employee's behalf in Employee's name and to do all other lawfully permitted acts to transfer the Work Product to the Company and further the transfer, issuance, prosecution, and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Employee does not promptly cooperate with the Company's request (without limiting the rights the Company shall have in such circumstances by operation of law). The power of attorney is coupled with an interest and shall not be impacted by the Employee's subsequent incapacity.



Employee Initials

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

(d) **Moral Rights.** To the extent any copyrights are assigned under this Agreement, the Employee hereby irrevocably waives, to the extent permitted by applicable law, any and all claims the Employee may now or hereafter have in any jurisdiction to all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be known as "moral rights" with respect to all Work Product and all Intellectual Property Rights therein.

(e) **No License.** The Employee understands that this Agreement does not, and shall not be construed to, grant the Employee any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to Employee by the Company.

5. **EMPLOYEE'S RESTRICTIVE COVENANTS.**

   (a) **Restricted Period.** The Employee agrees that the nature of Employee's position gives the Employee access to and knowledge of Confidential Information and places the Employee in a position of trust and confidence with the Company. The Employee further understands and acknowledges that the Company's ability to reserve use of the Confidential Information for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure by the Employee is likely to result in unfair or unlawful competitive activity. Because of Company's legitimate business interest as described in this Agreement and the good and valuable consideration offered to the Employee, the sufficiency of which is acknowledged, during the term of Employee's employment and for the next twelve months, to run consecutively, beginning on the last day of the Employee's employment with the Company, whether terminated for any reason or no reason, by the Employee or the Company, (the "Restricted Period"), the Employee agrees and covenants not to engage in Prohibited Activity.

   (b) **Prohibited Activities.** For purposes of this Agreement, "Prohibited Activity" is where Employee, as an employee, employer, owner, manager, advisor, contractor, agent, partner, officer, volunteer, intern, or any other similar capacity, while engaging in residential mortgage lending on behalf of an entity other than Company, violates one or more of the "Restrictive Covenants" (i-iii) below to which Employee has agreed to accept as a condition of employment. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets, proprietary information, or Confidential Information.

   i. **Non-Solicitation of Employees.** The Employee understands and acknowledges that the Company has expended and continues to expend significant time and expense in recruiting and training its employees and that the loss of employees would cause significant and irreparable harm to the Company. The Employee agrees and covenants not to directly or indirectly solicit, hire, recruit, or attempt to solicit, hire, or recruit, any employee of the Company or any employee who has been employed by the Company in the six months preceding the last day of Employee's employment (collectively, "Covered Employee"), or induce the termination of employment of any Covered Employee during the Restricted Period. "Covered Employee" does not include an employee of Company that Employee supervised or managed prior to joining Company, who joins Company at approximately the same time as Employee, and who, while they are employed by Company, is supervised or managed by Employee. This non-solicitation provision explicitly covers all forms of oral, written, or electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, Twitter, and any other social media platform, whether or not in existence at the time of entering into this Agreement. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is

Employee Initials

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

prohibited by this section. This Section does not restrict or impede, in any way, and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

**ii.**  **Non-Solicitation of Customers.** The Employee understands and acknowledges that because of the Employee's experience with and relationship to the Company, the Employee will have access to and will learn about much or all of the Company's customer information, including, but not limited to, Confidential Information. "Customer Information" includes, but is not limited to, names, phone numbers, addresses, email addresses, transaction history, preferences, financial condition, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to Company's services. The Employee understands and acknowledges that: (i) the Company's relationships with its customers is of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its customer relationships and goodwill; and (iii) the loss of any such customer relationship or goodwill will cause significant and irreparable harm to the Company.

The Employee agrees and covenants, for the duration of the Restricted Period, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this agreement, or meet with the Company's current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section. This Section does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company.

**iii.**  **Unfair Competition.** The Employee understands and acknowledges that: (i) the Company's relationships with its customers are of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its partner and customer relationships and goodwill; and (iii) the loss of any such relationship or goodwill will cause significant and irreparable harm to the Company. Because Employee will have access to proprietary information belonging to Company that would provide an unfair advantage to competition, during the period of employment Employee agrees not to, for any person, business, or entity, a) own, maintain, operate, or engage in the same or similar business activities as Company or in any business activity which competes with the Company; b) serve, advise, manage, consult with, provide services for, or be employed by any individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company; c) undertake any efforts or activities toward forming or incorporating, financing, or commencing any competing business activity which engages in the same or similar business activities as the Company; or d) advise, serve, or consult with any person, business, or entity which is or will be undertaking efforts toward incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as the Company. During the Restricted Period, Employee agrees not to divert or refer Company customers or prospective customers to any other

Employee Initials

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company. If Employee's job assignment location with Company is within a branch office or retail location, then Employee agrees and covenants not to open or relocate a similar office or location within a five-mile radius of such location (the "Restricted Territory") which would engage in the business of residential mortgage lending for the duration of the Restricted Period. "Relocate" includes Employee joining an existing office location of a competitor if such office was opened at such location within the six-month period before the beginning of the Restricted Period. This Section does not restrict or impede, in any way, Employee from seeking gainful employment in the industry which does not harm Company's vital and legitimate business interests and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

(c) **Reasonableness.** Employee agrees that the restrictions in the Restrictive Covenants will not interfere with or unduly limit his or her ability to obtain suitable alternative employment following termination of employment with the Company.  Employee acknowledges that the protections provided to the Company are important, reasonable, and necessary, and Employee's agreement to the Restrictive Covenants and to refrain from Prohibited Activity, has been given freely, voluntarily, and without duress and after due deliberation, and that the Restrictive Covenants will not impose undue hardship on Employee.

(d) **Injunctive Relief.** Employee agrees that any violation or breach of Employee's obligations will result in irreparable injury to the Company for which no adequate remedy at law may be available. Therefore, in addition to any other remedies Company may pursue, Employee consents to the issuance of a temporary restraining order and injunction prohibiting any conduct by the Employee in violation of the Prohibited Activities and waives any requirement of posting a bond as precondition of obtaining such injunction. Employee agrees that the Company shall be entitled to recover its costs and legal fees and expenses incurred in investigating and enforcing the Restrictive Covenants, should Employee engage in Prohibited Activity.

(e) **Tolling.** The restrictions and limitations within this Agreement applicable during the Restricted Period shall be enforceable from the date of the last breach or violation of the applicable restriction(s) up to an equivalent period as if such date were the first day of the Restrictive Period, so that Company may receive the full benefit of Employee's agreement to the Restrictive Covenants.

6. **SECURITY.**

(a) **Security and Access.** The Employee agrees and covenants (i) to comply with all Company security policies and procedures as in force from time to time including without limitation those regarding telephone systems, facilities access, key cards, access codes, Company intranet, internet, social media and instant messaging systems, computer systems, email systems, computer networks, document storage, data security, encryption, passwords, and communication technologies ("Facilities Information Technology and Access Resources"); (ii) not to access or use any Facilities and Information Technology Resources except as authorized by Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Employee's employment by the Company, whether termination is voluntary or involuntary. The Employee agrees to notify the Company promptly in the event he/she learns of any violation of the foregoing by others, or of any other misappropriation, or unauthorized access, use, reproduction or reverse engineering of, or tampering with any Facilities and Information Technology Access Resources or other Company property or materials by others.



Employee Initials

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

**(b) Exit Obligations.** Upon (i) voluntary or involuntary termination of the Employee's employment or (ii) the Company's request at any time during the Employee's employment, the Employee shall (a) provide or return to the Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, network access devices, computers, and computer equipment, manuals, reports, files, compilations, work product, thumb drives, or other removable information storage devices, hard drives, and data and all Company documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Employee, whether they were provided to the Employee by the Company or any of its business associates or created by the Employee in connection with his/her employment by the Company; and (b) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Employee's possession or control, including those stored on any non-Company devices, networks, storage locations, and media in the Employee's possession or control.

7. **PUBLICITY.** Employee hereby consents to any and all uses and displays, by the Company and its agents, of the Employee's name, voice, likeness, image, appearance, and biographical information in, on or in connection with any pictures, photographs, audio, and video recordings, digital images, websites, television programs, and advertising, other advertising, sales, and marketing brochures, books, magazines, other publications, and all other printed and electronic forms and media throughout the world, at any time during or after the Employment Term, for all legitimate business purposes of the Company ("Permitted Uses"). Employee hereby forever releases the Company and its directors, officers, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the Employment Term, in connection with any Permitted Use.

8. **EMPLOYEE REPRESENTATIONS.** The Employee represents and warrants to the Company that:
   (a) Acceptance of employment with the Company and the performance of the duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which the Employee is a party or is otherwise bound.
   (b) Acceptance of employment with the Company and the performance of Employee's duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.
   (c) Employee will not utilize any property belonging to a prior employer in the performance of Employee's duties; including any confidential, proprietary, or trade secret information obtained from a prior employer.
   (d) There are no actions, suits, proceedings, or known investigations, criminal or civil, pending against Employee in any court or before a governmental agency, which have not been disclosed by Employee.
   (e) Employee has the necessary training and knowledge to understand the laws and requirements of any position requiring a license to perform such duties and will maintain such licensure and perform such duties in compliance with all applicable laws and regulations as they are in effect.
   (f) If Employee is charged with a criminal offense, conviction of which could cause the suspension or revocation of any license required for the performance of Employee's duties, may adversely affect the ability of Employee to perform any obligations under this Agreement, or would cause Employee to become insolvent or bankrupt, Employee will notify Company's Human Resources Manager.
   (g) When Employee's employment with the Company terminates, Employee will notify any subsequent employer of the Restrictive Covenants contained in this Agreement before the Employee commences employment with such employer. In addition, the Employee authorizes the Company to provide notice of the Restrictive Covenants of this Agreement to third parties, including but not limited to, the Employee's subsequent, anticipated, or possible future employers.

Employee Initials

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

9. **NOTICES.** All notices, requests, consents, claims, demands, waivers, and other initial communications regarding a dispute involving this Agreement (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth below. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), or certified or registered mail (in each case, return receipt requested, postage pre-paid). Notice is effective upon receipted delivery to the designated address if the party giving the Notice has complied with the requirements of this Section.

   **(a)** Any notice required or permitted to be given to Employee will be delivered to the address shown as Employee's residence as shown on the records of the Company.

   **(b)** Notices addressed to Company must be sent to its registered agent address for the state in which the Employee resides. A copy may be sent to the Company's corporate office address. Notices sent to the principal business address are ineffective as notice unless a copy is also sent to the registered agent's address.

10. **MISCELLANEOUS PROVISIONS.**

   (a) **Entire Agreement.** This Agreement, together with the other documents incorporated by reference and all related supplements and addendums it incorporates, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter, and supersedes all prior and contemporaneous offers, understandings, agreements, or representations, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and other documents, the statements in the body of this Agreement shall control. The parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

   (b) **Modification and Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by the Employee and an authorized representative of the Company. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

   (c) **Captions; Interpretation.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The addendums and exhibits referred to shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

   (d) **Successors and Assigns; Beneficiaries.** The rights of the Company under this Agreement shall inure to the benefit of the successors and assigns of the Company. The rights of Employee are personal to Employee and Employee's heirs or devisees and may not otherwise be transferred or alienated. This Agreement is for the sole benefit of the parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.



Employee Initials

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

(e) **Remedies.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise. Employee acknowledges that a breach or threatened breach of any obligations under this Agreement would give rise to irreparable harm to the Company for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by Employee of any such obligations, Company shall, in addition to any and all other rights and remedies that may be available in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction and any other relief that may be available from a court of competent jurisdiction without any requirement to post bond.

(f) **Survival.** All provisions of this Agreement regarding Confidential Information, Company's Proprietary Rights in intellectual property and work product, and Employee's Restrictive Covenants shall survive Employee's termination of employment, and no dispute regarding Employee's employment, the termination of Employee's employment, or this Agreement shall prevent the operation and enforcement of these obligations.

(g) **Severability.** Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

(h) **Signatures and Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement by facsimile, email in portable document format (.pdf), by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by using an electronic signature compliant with the E-Sign Act has the same effect as delivery of an executed original of this Agreement.

(i) **Governing Law; Jurisdiction and Venue.** This Agreement, for all purposes, to the maximum extent permitted by applicable law, shall be construed in accordance with the laws of Ohio without regard to any conflicts of law principles. Should applicable law specifically prohibit the use of the law of a foreign jurisdiction, then the law of the relevant jurisdiction shall be used. Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in accordance with the arbitration provision contained within this Agreement except that action may be brought in a state or federal court located in the state of Ohio or the state of Employee's primary residence, if different, for the purposes of obtaining a restraining order or injunction against a violation of provisions of this Agreement or to enforce a judgment rendered in accordance with the results of arbitration between the parties. The parties hereby irrevocably submit to the non-exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue. EACH

Employee Initials

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO PARTICIPATE IN A CLASS ACTION OR A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

**11. ARBITRATION.** Any disagreement, dispute, controversy, or claim of any kind ("claims") arising out of or in connection to this Agreement, including any claims related to Employee's hiring, employment or the termination of Employee's employment, and including any claims that may arise between Employee and Company's owners, officers, directors, managers, employees, or agents in their capacity as such, shall be resolved by arbitration under the Federal Arbitration Act, Chapters 1 and 2, to the exclusion of inconsistent state laws, whether such claims are based in tort, contract, statute, equity, or otherwise. Employee agrees to waive all rights to a jury trial and waives the right to pursue any class action, collective action, or representative claims to the maximum extent allowed by law. To the extent a class or collective action or representative claim may not be waived, the Employee agrees to stay any such claims until after all claims subject to arbitration are fully resolved.

   **(a) Excluded Claims.** Excluded from this Arbitration provision are those claims which are not arbitrable under state or federal law, including: worker's compensation claims; unemployment compensation claims; the right to file an administrative charge before a governmental agency such as the Equal Employment Opportunity Commission, National Labor Relations Board, or Department of Labor; or other claims which a statute prohibits from being subject to arbitration. Any disputes regarding the applicability of arbitration to a claim or the scope of this arbitration provision will be submitted to a court for determination.

   **(b) Arbitrator.** Except for the excluded claims, disputes will be settled by binding arbitration administered by the American Arbitration Association before a qualified individual agreed to by the parties or designated pursuant to its Employment Arbitration Rules and Mediation Procedures (a copy of which may be found online at https://www.adr.org/Rules). The Optional Rules for Emergency Measures of Protection are incorporated by the parties. The standard provisions of the Employment Arbitration Rules shall apply. Claims shall be heard by a single arbitrator, unless the claim amount exceeds $250,000.00, in which case the dispute may be heard by a panel of three arbitrators.

   **(c) Arbitration Procedure.** Company will pay the arbitrator fees and arbitration administrative expenses and any other costs unique to the arbitration hearing (recognizing that each side bears its own deposition, witness, expert and attorney's fees and other expenses to the same extent as if the matter were being heard in court). Unless otherwise agreed to by the parties, the place of arbitration shall be Cleveland, Ohio, USA or conducted virtually by telephone or videoconference. Applicable law for purposes of arbitration shall be determined by the Governing Law provision of this Agreement. If the dispute is less than $50,000.01 there shall be no discovery other than the exchange of documents and written questions. If the dispute exceeds $50,000.00, each party's discovery shall include no more than three depositions of four hours each. Where no party's claim exceeds $30,000.00 exclusive of interest, attorneys' fees and arbitration costs, the dispute shall be resolved by submission of documents and there shall be no in-person or oral hearing. The award shall be made within six months of the filing of the notice of intention to arbitrate (demand), and the arbitrator(s) shall agree to comply with this schedule before accepting appointment. However, this time limit may be extended by the arbitrator(s) for good cause shown, or by mutual agreement of the parties.

   **(d) Arbitrator Authority.** The arbitrator(s) will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute or for a breach of Sections 3 through 6 of this Agreement. The arbitrator(s) shall not award consequential damages in

Employee Initials

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

any arbitration initiated under this provision. The arbitrator(s) may determine how the costs and expenses of the arbitration shall be allocated between the parties, but they shall not award attorneys' fees. If, however, any party prevails on a statutory claim that affords the prevailing party attorneys' fees and costs, then the arbitrator(s) may award reasonable attorneys' fees and costs to the prevailing party. Any dispute as to who a prevailing party is or the reasonableness of any fee or costs shall be resolved by the arbitrator(s).

(e) **Award.** The award shall be accompanied by a reasoned opinion. Judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Except as may be required by law, or as may be required in an action to enforce, modify, or vacate the award, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties.

(f) **Full and Free Consent.** This Agreement to arbitrate is freely negotiated between Employee and Company and is mutually entered into between the parties. Each party fully understands and agrees that they are giving up certain rights otherwise afforded to them by civil court actions, including but not limited to the right to a jury trial.

(g) **Information.** Employee may contact the HR Department at HR@nationslending.com with any questions about the arbitration process.

By initialing here, Employee acknowledges having read this Arbitration section and voluntarily agreed to binding arbitration:


Employee Initials

12. **ACKNOWLEDGEMENT.** THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS RECEIVED A COPY OF THE AGREEMENT INCLUDING ALL SUPPLEMENTS AND ADDENDUMS, HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS HAD SUFFICIENT TIME TO REVIEW AND AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF THE EMPLOYEE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

| Jessica Brown | *Jessica Brown* | 7/27/2022 \| 2:32 PM PDT |
|---|---|---|
| Employee Name | Employee Signature | Date |

| For Nations Lending Corporation: | *Cheryl Lieber* | 7/27/2022 \| 12:06 PM EDT |
|---|---|---|
| | Cheryl C. Lieber, Chief Admin. Officer | Date |


Employee Initials

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

**Supplement A to Employment Agreement**
**Position Description and Duties – Full Time**

The undersigned Employee is employed by Nations Lending Corporation (the "Company") in the following capacity:  __Originator Assistant__. This employment is as a **full-time,** regular employee. Employee is classified as **non-exempt** for purposes of determining overtime eligibility.

This Supplement A, Position Description and Duties, identifies the duties and expectations of Employee. The Company reserves the right to modify Employee's duties on a day to day basis. In the event Employee changes position or has a significant change of duties, then the Company will provide a modified Position Description and Duties Supplement for execution, which will replace this one in its entirety.

**Position Description**

The Originator Assistant will assist the Mortgage Loan Originator with documentation and record maintenance, specifically for loan files.

**Position Duties**

- Place orders to assist Mortgage Loan Originator.
- Maintain records and follows up on outstanding documents.
- Compute, record and review data and other information in loan files to document information to respond to requests.
- Prepare and process documents, such as government or business forms.
- Organize documentation and information for loan files.
- Provide assistance to the Mortgage Loan Originator as needed.
- Provide status updates to the Mortgage Loan Originator and/or other parties.
- Occasionally assist in branch Marketing duties, as assigned.
- Perform other duties as assigned.

| | | |
|---|---|---|
| Jessica Brown | *Jessica Brown* | 7/27/2022 | 2:32 PM PDT |
| Employee Name | Employee Signature | Date |

**Manager Attestation:**

*I have reviewed this agreement and found it to be accurate regarding the overall compensation agreed to with the employee.*

| | | |
|---|---|---|
| Jon Whittington | *Jon Whittington* | 7/27/2022 | 3:15 PM EDT |
| Manager Name | Manager Signature | Date |

v.2019-04Af Nations Lending               A-1

### Supplement B to Employment Agreement
### Hourly Employee

**1.  Summary:**

**(a)** Effective Date:  August 1, 2022

**(b)** Overtime Status: Non-Exempt

**(c)** Wages: $16.50 per hour.

**(d)** Performance Incentives: N/A

**(e)** Additional Compensation: **Employee will receive $50 per funded file that they are the LOA on.**



| Jessica Brown | *Jessica Brown* | 7/27/2022 \| 2:32 PM PDT |
|---|---|---|
| Employee Name | Employee Signature | Date |

| For Nations Lending Corporation: | *Cheryl Lieber* | 7/27/2022 \| 12:06 PM EDT |
|---|---|---|
| | Cheryl C. Lieber, Chief Admin. Officer | Date |

**Manager Attestation:** *I have reviewed this agreement and found it to be accurate regarding the overall compensation agreed to with the employee.*

| Jon Whittington | *Jon Whittington* | 7/27/2022 \| 3:15 PM EDT |
|---|---|---|
| Manager Name | Manager Signature | Date |

**2.  Terms of Employee's Compensation Plan:** This Supplement B, Compensation Statement, identifies the compensation the Employee will receive from the Company.  In the event Employee's compensation changes due to raise, decrease, modification in calculation, or new position, then the Company will provide a modified Compensation Statement for execution, which will replace this one in its entirety.  Compensation shall be paid to Employee at such times and in a manner consistent with Company Policies as may be in effect from time to time.

**(a) Compensation:** For each pay period, Employee shall earn compensation which may be composed of (i) Wages; (ii) Performance Incentives; and (iii) Additional Compensation, as follows:

  **i.  Wages.** Salary will be paid in each pay period worked based upon the hourly or annualized rate provided in Section 1(c). For Exempt employees, salary is intended to pay for all hours worked during each pay period, regardless of scheduled hours, tracked hours, or actual hours worked.

  **ii.  Performance Incentives.** Employee may be eligible to earn Performance Incentives based upon meeting individual performance metrics as specified in Section 1(d).

  **iii.  Additional Compensation.** Employee may be eligible to earn Additional Compensation based upon designated business units of Company achieving established performance targets (Bonus).

DocuSign Envelope ID: 36CF7C5C-A398-4AA4-9698-F0A9D5E21481

Additional Compensation will be measured according to the rates or terms provided in Section 1(e) following the close of the applicable calculation period.

All compensation will be paid as regular wages for services performed in accordance with the Company's ordinary payroll practices and schedules detailed in the current Employee Handbook. Employee is not guaranteed any term of employment or amount of compensation. All employment is "At Will" and may be terminated at any time by either party.

3. **Repayments to the Company:**
   a) **Unearned Compensation.** In the event Performance Incentives or Additional Compensation are advanced but later deemed unearned because of a later determination that the qualifying event was not fulfilled, the amounts previously advanced will be subtracted from Employee's net compensation balance in calculating any compensation not yet paid to Employee. *Waiver of this policy is at the Company's discretion and may be applied for situations involving major life events (such as death).* Waiver in one circumstance will not constitute a waiver in all similar situations and is at the sole discretion of the Company. This determination is made on a case-by-case basis.

   b) **Repayment of Advances or Obligations to the Company.** In the event that Employee has an outstanding balance owed to the Company for advances or unearned compensation received by the Employee, the Employee hereby authorizes the Company to deduct the outstanding balance owed from his/her compensation. Unless the Company and Employee otherwise agree upon a specific dollar amount or a percentage for deductions, Employee expressly authorizes the Company to deduct from his/her compensation any amount for as long as it takes to resolve the outstanding balance owed to the Company; except that the amount of the deductions will not cause Employee's income to fall below the applicable minimum wage threshold for any applicable pay period.

4. **Separation from Employment:** Upon termination of employment for any reason, any rights to any Performance Incentives or Additional Compensation based on any loans which are unclosed or unfunded as of the last day of employment shall be forfeited by Employee and all income and rights therein shall accrue solely to the Company. For any pending calculation periods, the end of the last calculation period shall be the last day of employment. Employee will be paid applicable earned income through the date of termination; however, Employee will not be entitled to receive any advances on compensation. Except where earlier required by statute, Employee's final payment of performance incentives or additional compensation may be paid up to thirty (30) calendar days following the termination date for the purpose of reconciling any outstanding debts, charge backs, unearned performance incentives or additional compensation, unreturned equipment charges, or other repayments due from Employee to Company or to any third parties. Issuance of the final payment does not operate to release Employee from any liability with regards to a later determination that any compensation paid was not earned.

5. **Effective Date:** The Employee acknowledges that the terms of this Supplement will be effective on and after the Effective Date until Employee's termination of employment or until this Supplement is replaced with a new agreement that supersedes the current document. The Effective Date may be the date of first employment with Company (Employee's start date) or the first date in which the provisions of this Supplement will take effect. If this Supplement is replacing a prior agreement, then the terms of the prior agreement will apply to compensation earned prior to the Effective Date of this Supplement and this Supplement will apply to compensation earned thereafter.

**DocuSign**

## Certificate Of Completion

Envelope Id: 36CF7C5CA3984AA49698F0A9D5E21481
Subject: Please DocuSign: EmpAgr_2022.08.01_Brown, Jessica.pdf
Source Envelope:
Document Pages: 16    Signatures: 7
Certificate Pages: 5    Initials: 14
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-05:00) Eastern Time (US & Canada)

Status: Completed

Envelope Originator:
Barbara Hirsch
3673 Westcenter Dr
Houston, TX  77042
Barbara.Hirsch@nationslending.com
IP Address: 174.73.141.47

## Record Tracking

Status: Original
    7/27/2022 12:00:14 PM

Holder: Barbara Hirsch
    Barbara.Hirsch@nationslending.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Cheryl Lieber<br>cheryl.lieber@nationslending.com<br>Chief Administrative Officer<br>Nations Lending Corporation<br>Security Level: Email, Account Authentication<br>(None) | *Cheryl Lieber*<br>—6EF1AC2D50B3456..<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 173.89.99.11 | Sent: 7/27/2022 12:05:22 PM<br>Viewed: 7/27/2022 12:05:59 PM<br>Signed: 7/27/2022 12:06:33 PM |
| **Electronic Record and Signature Disclosure:**<br>  Not Offered via DocuSign | | |
| Jon Whittington<br>Jon.Whittington@nationslending.com<br>Security Level: Email, Account Authentication<br>(None) | *Jon Whittington*<br>—084DE56A5B42416..<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 67.53.196.190 | Sent: 7/27/2022 12:06:39 PM<br>Viewed: 7/27/2022 3:14:55 PM<br>Signed: 7/27/2022 3:15:14 PM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 7/27/2022 3:14:55 PM<br>  ID: 7b56f6de-f673-483b-89cb-a933116a2c0b | | |
| Jessica Brown<br>iaukea@hawaii.edu<br>Security Level: Email, Account Authentication<br>(None) | *Jessica Brown*<br>—04F922E976F5488..<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 24.165.12.161 | Sent: 7/27/2022 3:15:21 PM<br>Viewed: 7/27/2022 5:24:33 PM<br>Signed: 7/27/2022 5:32:42 PM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 7/27/2022 5:24:33 PM<br>  ID: 632ed644-e99d-4bb1-8a61-2b2877c7de8e | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Barbara Hirsch<br>barbara.hirsch@nationslending.com<br>Security Level: Email, Account Authentication<br>(None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | COPIED | Sent: 7/27/2022 5:32:48 PM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/27/2022 12:05:22 PM |
| Certified Delivered | Security Checked | 7/27/2022 5:24:33 PM |
| Signing Complete | Security Checked | 7/27/2022 5:32:42 PM |
| Completed | Security Checked | 7/27/2022 5:32:48 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 10/21/2015 5:05:20 PM
Parties agreed to: Jon Whittington, Jessica Brown

From time to time, Nations Lending Corporation (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Nations Lending Corporation:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: solutions@nlcloans.com

**To advise Nations Lending Corporation of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at solutions@nlcloans.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Nations Lending Corporation**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to solutions@nlcloans.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Nations Lending Corporation**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
ii. send us an e-mail to solutions@nlcloans.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Nations Lending Corporation as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Nations Lending Corporation during the course of my relationship with you.

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

*Exhibit O*

# Nations Lending Corporation
# Employment Agreement

This Employment Agreement ("Agreement") is made between Nations Lending Corporation ("Company") and __Christina Iaukea-Alves__ ("Employee"). In consideration of the premises in this Agreement, the employment or continued employment of Employee by the Company, and the covenants and agreements of the parties contained herein, and for good and valuable consideration, Employee accepts employment with the Company as hereinafter stated.

1. **EMPLOYMENT.**
   (a) **Contingent Offer.** Company has extended a conditional offer of employment, meaning that Employee must complete all conditions satisfactorily. Execution of this Agreement does not imply or ensure that Employee has satisfied all conditions precedent to commencing employment, including, without limitation: verification of references; satisfactory completion of background checks, verification of professional qualifications or licenses, or other conditions which may be stated in Employee's Offer Letter.

   (B) **Term of Employment.** The period during which the Employee is employed by the Company hereunder is hereinafter referred to as the "Employment Term." The Employment Term will commence on Employee's first actual day of work, regardless of any date contained in an offer letter, as reflected in Company's records, and will continue until Employee, as determined in Company's sole discretion, by reason of physical or mental disability is unable to perform their duties. The end of the Employment Term will be the effective date of any resignation or termination notice given. NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED TO IN ANY WAY ALTER, AMEND, OR MODIFY THE AT-WILL STATUS OF THE EMPLOYMENT RELATIONSHIP BETWEEN THE COMPANY AND THE EMPLOYEE IN WHICH EITHER THE COMPANY OR THE EMPLOYEE MAY TERMINATE THE EMPLOYMENT RELATIONSHIP AT ANY TIME, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE.

   (c) **Position & Duties.** Subject to its ultimate supervision, direction, and control, Company employs Employee during the Employment Term to perform services and duties as are described on the Position Description and Duties Addendum (Supplement A) of this Agreement and under any conditions detailed in such addendum or in the Company's Employee Handbook and adopted policies. The Company reserves the right to modify or amend Employee's duties at any time. In the event Employee's position or title changes with a significant change of duties, Company will provide Employee with a new addendum for execution, which will replace the existing one in its entirety and be effective from the date of such amendment. As employee of a financial institution, Employee is charged with, and owes to Company: (i) a duty of loyalty, fidelity, and trust to Company; (ii) a responsibility to exercise judgment and perform duties in good faith and in the best interest of the Company, (iii) the performance of honest services, and (iv) a promise to use extraordinary care, skill, and diligence in the performance of all duties.

   (d) **Sole Employment.** During the Employment Term, the Employee shall devote substantially all of Employee's business time and attention to the performance of the Employee's duties and will not engage in any other business, profession, or occupation for compensation or otherwise which might conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Company, in accordance with the Company's Dual Employment Policy. Employee's failure to disclose other employment may be grounds for termination.



Employee Initials

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

**(e) Termination.** Employee's employment is at-will, meaning that the Employee or Company may terminate the employment relationship at any time, with or without cause, and with or without notice. Although Employee's duties, title, compensation, and benefits as well as Company's personnel policies and procedures may change from time to time, the 'at will' nature of employment may only be altered by an express agreement signed by an authorized officer of Company. Upon termination or resignation for any reason, Employee's compensation and benefits will end. If Employee is entitled to commissions, trailing payments, bonuses or stock options as part of Employee's compensation, entitlement to all unearned or unvested amounts as of the last date of employment is forfeited by Employee unless stated otherwise in Employee's Compensation Addendum, as further described below.

## 2.  COMPENSATION.

**(a) "Wages"**. Employee will be paid for services performed by Employee in accordance with the Company's policies and procedures for payments reflected in the Company's Employee Handbook and related Company policies. The amount of compensation to be received by Employee, whether wages or salary ("Pay"), commissions or bonuses ("Incentive Payments"), or other compensation (collectively, "Pay", "Incentive Payments" and other compensation are "Compensation") is detailed on the Compensation Addendum (Supplement B) of this Agreement, and subject to any conditions in such addendum. Except as may be provided in Employee's Compensation Addendum, Employee's Compensation may be changed at any time by Company upon notice to Employee, and continued employment by Company is subject to such revised terms.

**(b) Benefits.** During the Employment Term, the Employee shall be entitled to participate in all employee benefit plans, practices, and programs maintained by the Company, as in effect from time to time (collectively, "Employee Benefit Plans"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law. Employee's eligibility for Employee Benefit Plans is detailed on Supplement A.

**(c) Advances**. Company may advance Incentive Payments or other compensation to Employee before Employee's entitlement to such payments is vested. In the event that such advanced amounts are later determined to have been unearned by employee (e.g., a commission paid on a loan which is later subject to repurchase) then Employee must reimburse the amount advanced to Company and Company is entitled to deduct such advanced amounts from future payments to be made to Employee, including from Employee's final paycheck. Additional details on advances may be contained in Supplement B.

**(d) Deductions**. In addition to withholdings for tax and other purposes provided by law, Company may subtract authorized deductions from Employee's Compensation payments, including Employee's final paycheck. Deductions may be made for the costs of Benefits elected by Employee, to recover Advances paid to Employee, to recover overpayments, to reimburse Company for expenditures on Employee's behalf or as a result of Employee's actions or failure to immediately return all of Company's property upon termination, and as authorized by Employee. Deductions may also be made for Incentive Payments made to Employee if the conditions under which Employee is entitled to such Incentive Payments are later determined not to have been met, such as where a loan on which commission has previously been paid is found to be ineligible for such commission. Additional details on deductions may be contained in Supplement B.



Employee Initials

**(e) Effects of Termination on Compensation.** If Employee resigns from employment with Company, Employee agrees to reimburse Company for all outstanding Advances within thirty days of termination, and where Employee fails to do so, Company is entitled to interest on the unpaid amounts at the rate of 10% per twelve-month period, compounded monthly. Where Employee resigns from employment without at least fourteen days advance notice or is terminated for reasons related to the Employee's acts of disloyalty, fraud, theft, forgery or other dishonesty, refusal to work, willful destruction of property, gross insubordination, falsification of records, criminal or unlawful activity, or willful misconduct, Employee forfeits any right to Incentive Payments which Employee would otherwise be entitled to receive following the last day of employment under the terms of Employee's Compensation Addendum.

3. **CONFIDENTIAL INFORMATION.** The Employee understands and acknowledges that during the course of employment by the Company, Employee will have access to and learn about confidential, secret, and proprietary documents, materials, data and other information, in tangible and intangible form, of and relating to the Company and its businesses and existing and prospective customers, suppliers, investors and other associated third parties which is not generally known to the public ("Confidential Information"). The Employee further understands and acknowledges that this Confidential Information and the Company's ability to reserve it for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure of the Confidential Information by the Employee will cause irreparable harm to the Company, for which remedies at law will not be adequate.

**(a) Confidential Information Defined.** For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, documents, operations, services, strategies, techniques, agreements and terms of agreements, transactions, negotiations, know-how, trade secrets, applications, work-in-process, databases, compilations, technologies, records, systems, sources, supplier information, vendor information, financial information, accounting information, marketing information, pricing information, credit information, payroll information, personnel information, employee lists, reports, internal controls, security procedures, customer information or lists, buyer lists, or other information generally considered private and confidential in the industry or by any existing or prospective customer, other associated third party, or of any other person or entity that has entrusted information to the Company in confidence.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

The Employee understands and agrees that Confidential Information developed by Employee in the course of Employee's employment by the Company shall be subject to the terms and conditions of this Agreement as if the Company furnished the same Confidential Information to the Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public, provided that such disclosure to the public is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

**(b) Company Creation and Use of Confidential Information.** The Employee understands and acknowledges that the Company has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of mortgage

Employee Initials

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

lending and financial services. The Employee understands and acknowledges that as a result of these efforts, Company has created and continues to use and create Confidential Information. This Confidential Information provides Company with a competitive advantage over others in the marketplace.

**(c) Disclosure and Use Restrictions.** Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company) not having a need to know and authority to know and to use the Confidential Information in connection with the business of the Company and, in any event, not to anyone outside of the direct employ of the Company except as required in the performance of any of the Employee's authorized employment duties to the Company; (iii) and not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company except as required in the performance of the Employee's authorized employment duties to the Company.

The Employee understands and acknowledges that the Employee's obligations under this Agreement regarding any particular Confidential Information begin immediately when the Employee first has access to Confidential Information (whether before or after commencing employment with Company) and shall continue during and after the Employee's employment by the Company until the Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or a breach by those acting in concert with the Employee or on the Employee's behalf.

**(d) Notice of Immunity Under the Defend Trade Secrets Act of 2016.** Employee acknowledges receipt of Company's Employee Reporting Policy and Company Code of Ethics (available at https://nlcloans.sharepoint.com/sites/Policies) setting forth: (A) Company's reporting policy for a suspected violation of law; and (B) notice of immunity from criminal and civil liability for certain disclosures of trade secrets under 18 U.S.C. § 1833(b).

**(e) Other Permitted Disclosures.** Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company. Nothing in this Agreement prohibits or restricts the Employee (or Employee's attorney) from filing a charge or complaint with the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), the Occupational Safety and Health Administration (OSHA), any other self-regulatory organization, or any other federal or state regulatory authority ("Government Agencies"). The Employee further understands that this Agreement does not limit the Employee's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency without notice to the Company. This Agreement does not limit the Employee's right to receive an award for information provided to any Government Agencies. In addition, nothing in this Agreement in any way prohibits or is intended to restrict or impede the Employee from exercising protected rights under Section 7 of the National Labor Relations Act or otherwise disclosing information as permitted by law.

## 4.  COMPANY'S PROPRIETARY RIGHTS.



Employee Initials

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

**(a) Work Product**. The Employee acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas, and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by the Employee individually or jointly with others during the period of employment by the Company and relating in any way to the business or contemplated business, research, or development of the Company (regardless of when or where the Work Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical, and electronic copies, all improvements, rights, and claims related to the foregoing, and other tangible embodiments thereof (collectively, "Work Product"), as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), patents, and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions, and renewals thereof (collectively, "Intellectual Property Rights"), shall be the sole and exclusive property of the Company.

For purposes of this Agreement, Work Product includes, but is not limited to, Company information, including plans, strategies, techniques, agreements, documents, terms of agreements, negotiations, know-how, computer programs, computer applications, web design, work in process, databases, manuals, reports, compilations, graphics, drawings, sketches, market studies, formulae, notes, communications, algorithms, product plans, models, audiovisual programs, ideas, inventions, original works of authorship, customer information, customer lists, manufacturing information, marketing information, advertising information, and sales information. Work Product also means items created in the six-month period following employment as a result of or attributable to work performed during employment or specific work product substantially begun during employment.

**(b) Work Made for Hire; Assignment**. The Employee acknowledges that, by reason of being employed by the Company at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in the Copyright Act of 1976 (17 U.S.C. § 101), and such copyrights are therefore owned by the Company. To the extent that the foregoing does not apply, the Employee hereby irrevocably assigns to the Company, for no additional consideration, the Employee's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company would have had in the absence of this Agreement.

**(c) Further Assurances; Power of Attorney**. During and after employment, the Employee agrees to reasonably cooperate with the Company at the Company's expense to (i) apply for, obtain, perfect, and transfer to the Company the Work Product and Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (ii) maintain, protect, and enforce the same, including, without limitation, executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company. The Employee hereby irrevocably grants the Company power of attorney to execute and deliver any such documents on the Employee's behalf in Employee's name and to do all other lawfully permitted acts to transfer the Work Product to the Company and further the transfer, issuance, prosecution, and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Employee does not promptly cooperate with the Company's request (without limiting the rights the Company shall have in such circumstances by operation of law). The power of attorney is coupled with an interest and shall not be impacted by the Employee's subsequent incapacity.


Employee Initials

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

**(d) Moral Rights.** To the extent any copyrights are assigned under this Agreement, the Employee hereby irrevocably waives, to the extent permitted by applicable law, any and all claims the Employee may now or hereafter have in any jurisdiction to all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be known as "moral rights" with respect to all Work Product and all Intellectual Property Rights therein.

**(e) No License.** The Employee understands that this Agreement does not, and shall not be construed to, grant the Employee any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to Employee by the Company.

5. **EMPLOYEE'S RESTRICTIVE COVENANTS.**

   **(a) Restricted Period.** The Employee agrees that the nature of Employee's position gives the Employee access to and knowledge of Confidential Information and places the Employee in a position of trust and confidence with the Company. The Employee further understands and acknowledges that the Company's ability to reserve use of the Confidential Information for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure by the Employee is likely to result in unfair or unlawful competitive activity. Because of Company's legitimate business interest as described in this Agreement and the good and valuable consideration offered to the Employee, the sufficiency of which is acknowledged, during the term of Employee's employment and for the next twelve months, to run consecutively, beginning on the last day of the Employee's employment with the Company, whether terminated for any reason or no reason, by the Employee or the Company, (the "Restricted Period"), the Employee agrees and covenants not to engage in Prohibited Activity.

   **(b) Prohibited Activities.** For purposes of this Agreement, "Prohibited Activity" is where Employee, as an employee, employer, owner, manager, advisor, contractor, agent, partner, officer, volunteer, intern, or any other similar capacity, while engaging in residential mortgage lending on behalf of an entity other than Company, violates one or more of the "Restrictive Covenants" (i-iii) below to which Employee has agreed to accept as a condition of employment. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets, proprietary information, or Confidential Information.

   i. **Non-Solicitation of Employees.** The Employee understands and acknowledges that the Company has expended and continues to expend significant time and expense in recruiting and training its employees and that the loss of employees would cause significant and irreparable harm to the Company. The Employee agrees and covenants not to directly or indirectly solicit, hire, recruit, or attempt to solicit, hire, or recruit, any employee of the Company or any employee who has been employed by the Company in the six months preceding the last day of Employee's employment (collectively, "Covered Employee"), or induce the termination of employment of any Covered Employee during the Restricted Period. "Covered Employee" does not include an employee of Company that Employee supervised or managed prior to joining Company, who joins Company at approximately the same time as Employee, and who, while they are employed by Company, is supervised or managed by Employee. This non-solicitation provision explicitly covers all forms of oral, written, or electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, Twitter, and any other social media platform, whether or not in existence at the time of entering into this Agreement. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is

Employee Initials

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

prohibited by this section. This Section does not restrict or impede, in any way, and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

**ii.** **Non-Solicitation of Customers.** The Employee understands and acknowledges that because of the Employee's experience with and relationship to the Company, the Employee will have access to and will learn about much or all of the Company's customer information, including, but not limited to, Confidential Information. "Customer Information" includes, but is not limited to, names, phone numbers, addresses, email addresses, transaction history, preferences, financial condition, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to Company's services. The Employee understands and acknowledges that: (i) the Company's relationships with its customers is of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its customer relationships and goodwill; and (iii) the loss of any such customer relationship or goodwill will cause significant and irreparable harm to the Company.

The Employee agrees and covenants, for the duration of the Restricted Period, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this agreement, or meet with the Company's current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section. This Section does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company.

**iii.** **Unfair Competition.** The Employee understands and acknowledges that: (i) the Company's relationships with its customers are of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its partner and customer relationships and goodwill; and (iii) the loss of any such relationship or goodwill will cause significant and irreparable harm to the Company. Because Employee will have access to proprietary information belonging to Company that would provide an unfair advantage to competition, during the period of employment Employee agrees not to, for any person, business, or entity, a) own, maintain, operate, or engage in the same or similar business activities as Company or in any business activity which competes with the Company; b) serve, advise, manage, consult with, provide services for, or be employed by any individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company; c) undertake any efforts or activities toward forming or incorporating, financing, or commencing any competing business activity which engages in the same or similar business activities as the Company; or d) advise, serve, or consult with any person, business, or entity which is or will be undertaking efforts toward incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as the Company. During the Restricted Period, Employee agrees not to divert or refer Company customers or prospective customers to any other

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company. If Employee's job assignment location with Company is within a branch office or retail location, then Employee agrees and covenants not to open or relocate a similar office or location within a five-mile radius of such location (the "Restricted Territory") which would engage in the business of residential mortgage lending for the duration of the Restricted Period. "Relocate" includes Employee joining an existing office location of a competitor if such office was opened at such location within the six-month period before the beginning of the Restricted Period. This Section does not restrict or impede, in any way, Employee from seeking gainful employment in the industry which does not harm Company's vital and legitimate business interests and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

(c) **Reasonableness.** Employee agrees that the restrictions in the Restrictive Covenants will not interfere with or unduly limit his or her ability to obtain suitable alternative employment following termination of employment with the Company. Employee acknowledges that the protections provided to the Company are important, reasonable, and necessary, and Employee's agreement to the Restrictive Covenants and to refrain from Prohibited Activity, has been given freely, voluntarily, and without duress and after due deliberation, and that the Restrictive Covenants will not impose undue hardship on Employee.

(d) **Injunctive Relief.** Employee agrees that any violation or breach of Employee's obligations will result in irreparable injury to the Company for which no adequate remedy at law may be available. Therefore, in addition to any other remedies Company may pursue, Employee consents to the issuance of a temporary restraining order and injunction prohibiting any conduct by the Employee in violation of the Prohibited Activities and waives any requirement of posting a bond as precondition of obtaining such injunction. Employee agrees that the Company shall be entitled to recover its costs and legal fees and expenses incurred in investigating and enforcing the Restrictive Covenants, should Employee engage in Prohibited Activity.

(e) **Tolling.** The restrictions and limitations within this Agreement applicable during the Restricted Period shall be enforceable from the date of the last breach or violation of the applicable restriction(s) up to an equivalent period as if such date were the first day of the Restrictive Period, so that Company may receive the full benefit of Employee's agreement to the Restrictive Covenants.

6. **SECURITY.**

(a) **Security and Access.** The Employee agrees and covenants (i) to comply with all Company security policies and procedures as in force from time to time including without limitation those regarding telephone systems, facilities access, key cards, access codes, Company intranet, internet, social media and instant messaging systems, computer systems, email systems, computer networks, document storage, data security, encryption, passwords, and communication technologies ("Facilities Information Technology and Access Resources"); (ii) not to access or use any Facilities and Information Technology Resources except as authorized by Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Employee's employment by the Company, whether termination is voluntary or involuntary. The Employee agrees to notify the Company promptly in the event he/she learns of any violation of the foregoing by others, or of any other misappropriation, or unauthorized access, use, reproduction or reverse engineering of, or tampering with any Facilities and Information Technology Access Resources or other Company property or materials by others.



Employee Initials

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

**(b) Exit Obligations.** Upon (i) voluntary or involuntary termination of the Employee's employment or (ii) the Company's request at any time during the Employee's employment, the Employee shall (a) provide or return to the Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, network access devices, computers, and computer equipment, manuals, reports, files, compilations, work product, thumb drives, or other removable information storage devices, hard drives, and data and all Company documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Employee, whether they were provided to the Employee by the Company or any of its business associates or created by the Employee in connection with his/her employment by the Company; and (b) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Employee's possession or control, including those stored on any non-Company devices, networks, storage locations, and media in the Employee's possession or control.

7. **PUBLICITY.** Employee hereby consents to any and all uses and displays, by the Company and its agents, of the Employee's name, voice, likeness, image, appearance, and biographical information in, on or in connection with any pictures, photographs, audio, and video recordings, digital images, websites, television programs, and advertising, other advertising, sales, and marketing brochures, books, magazines, other publications, and all other printed and electronic forms and media throughout the world, at any time during or after the Employment Term, for all legitimate business purposes of the Company ("Permitted Uses"). Employee hereby forever releases the Company and its directors, officers, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the Employment Term, in connection with any Permitted Use.

8. **EMPLOYEE REPRESENTATIONS.** The Employee represents and warrants to the Company that:
   (a) Acceptance of employment with the Company and the performance of the duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which the Employee is a party or is otherwise bound.
   (b) Acceptance of employment with the Company and the performance of Employee's duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.
   (c) Employee will not utilize any property belonging to a prior employer in the performance of Employee's duties; including any confidential, proprietary, or trade secret information obtained from a prior employer.
   (d) There are no actions, suits, proceedings, or known investigations, criminal or civil, pending against Employee in any court or before a governmental agency, which have not been disclosed by Employee.
   (e) Employee has the necessary training and knowledge to understand the laws and requirements of any position requiring a license to perform such duties and will maintain such licensure and perform such duties in compliance with all applicable laws and regulations as they are in effect.
   (f) If Employee is charged with a criminal offense, conviction of which could cause the suspension or revocation of any license required for the performance of Employee's duties, may adversely affect the ability of Employee to perform any obligations under this Agreement, or would cause Employee to become insolvent or bankrupt, Employee will notify Company's Human Resources Manager.
   (g) When Employee's employment with the Company terminates, Employee will notify any subsequent employer of the Restrictive Covenants contained in this Agreement before the Employee commences employment with such employer. In addition, the Employee authorizes the Company to provide notice of the Restrictive Covenants of this Agreement to third parties, including but not limited to, the Employee's subsequent, anticipated, or possible future employers.

Employee Initials

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

9. **NOTICES.** All notices, requests, consents, claims, demands, waivers, and other initial communications regarding a dispute involving this Agreement (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth below. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), or certified or registered mail (in each case, return receipt requested, postage pre-paid). Notice is effective upon receipted delivery to the designated address if the party giving the Notice has complied with the requirements of this Section.
  **(a)** Any notice required or permitted to be given to Employee will be delivered to the address shown as Employee's residence as shown on the records of the Company.
  **(b)** Notices addressed to Company must be sent to its registered agent address for the state in which the Employee resides. A copy may be sent to the Company's corporate office address. Notices sent to the principal business address are ineffective as notice unless a copy is also sent to the registered agent's address.

10. **MISCELLANEOUS PROVISIONS.**
  (a) **Entire Agreement.** This Agreement, together with the other documents incorporated by reference and all related supplements and addendums it incorporates, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter, and supersedes all prior and contemporaneous offers, understandings, agreements, or representations, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and other documents, the statements in the body of this Agreement shall control. The parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

  (b) **Modification and Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by the Employee and an authorized representative of the Company. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

  (c) **Captions; Interpretation.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The addendums and exhibits referred to shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

  (d) **Successors and Assigns; Beneficiaries.** The rights of the Company under this Agreement shall inure to the benefit of the successors and assigns of the Company. The rights of Employee are personal to Employee and Employee's heirs or devisees and may not otherwise be transferred or alienated. This Agreement is for the sole benefit of the parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.


Employee Initials

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

(e) **Remedies.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise. Employee acknowledges that a breach or threatened breach of any obligations under this Agreement would give rise to irreparable harm to the Company for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by Employee of any such obligations, Company shall, in addition to any and all other rights and remedies that may be available in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction and any other relief that may be available from a court of competent jurisdiction without any requirement to post bond.

(f) **Survival.** All provisions of this Agreement regarding Confidential Information, Company's Proprietary Rights in intellectual property and work product, and Employee's Restrictive Covenants shall survive Employee's termination of employment, and no dispute regarding Employee's employment, the termination of Employee's employment, or this Agreement shall prevent the operation and enforcement of these obligations.

(g) **Severability.** Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

(h) **Signatures and Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement by facsimile, email in portable document format (.pdf), by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by using an electronic signature compliant with the E-Sign Act has the same effect as delivery of an executed original of this Agreement.

(i) **Governing Law; Jurisdiction and Venue.** This Agreement, for all purposes, to the maximum extent permitted by applicable law, shall be construed in accordance with the laws of Ohio without regard to any conflicts of law principles. Should applicable law specifically prohibit the use of the law of a foreign jurisdiction, then the law of the relevant jurisdiction shall be used. Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in accordance with the arbitration provision contained within this Agreement except that action may be brought in a state or federal court located in the state of Ohio or the state of Employee's primary residence, if different, for the purposes of obtaining a restraining order or injunction against a violation of provisions of this Agreement or to enforce a judgment rendered in accordance with the results of arbitration between the parties. The parties hereby irrevocably submit to the non-exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue. EACH

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO PARTICIPATE IN A CLASS ACTION OR A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

11. **ARBITRATION.** Any disagreement, dispute, controversy, or claim of any kind ("claims") arising out of or in connection to this Agreement, including any claims related to Employee's hiring, employment or the termination of Employee's employment, and including any claims that may arise between Employee and Company's owners, officers, directors, managers, employees, or agents in their capacity as such, **shall be resolved by arbitration under the Federal Arbitration Act, Chapters 1 and 2, to the exclusion of inconsistent state laws, whether such claims are based in tort, contract, statute, equity, or otherwise. Employee agrees to waive all rights to a jury trial and waives the right to pursue any class action, collective action, or representative claims to the maximum extent allowed by law. To the extent a class or collective action or representative claim may not be waived, the Employee agrees to stay any such claims until after all claims subject to arbitration are fully resolved.**

(a) **Excluded Claims**. Excluded from this Arbitration provision are those claims which are not arbitrable under state or federal law, including: worker's compensation claims; unemployment compensation claims; the right to file an administrative charge before a governmental agency such as the Equal Employment Opportunity Commission, National Labor Relations Board, or Department of Labor; or other claims which a statute prohibits from being subject to arbitration. Any disputes regarding the applicability of arbitration to a claim or the scope of this arbitration provision will be submitted to a court for determination.

(b) **Arbitrator.** Except for the excluded claims, disputes will be settled by binding arbitration administered by the American Arbitration Association before a qualified individual agreed to by the parties or designated pursuant to its Employment Arbitration Rules and Mediation Procedures (a copy of which may be found online at https://www.adr.org/Rules). The Optional Rules for Emergency Measures of Protection are incorporated by the parties. The standard provisions of the Employment Arbitration Rules shall apply. Claims shall be heard by a single arbitrator, unless the claim amount exceeds $250,000.00, in which case the dispute may be heard by a panel of three arbitrators.

(c) **Arbitration Procedure**. Company will pay the arbitrator fees and arbitration administrative expenses and any other costs unique to the arbitration hearing (recognizing that each side bears its own deposition, witness, expert and attorney's fees and other expenses to the same extent as if the matter were being heard in court). Unless otherwise agreed to by the parties, the place of arbitration shall be Cleveland, Ohio, USA or conducted virtually by telephone or videoconference. Applicable law for purposes of arbitration shall be determined by the Governing Law provision of this Agreement. If the dispute is less than $50,000.01 there shall be no discovery other than the exchange of documents and written questions. If the dispute exceeds $50,000.00, each party's discovery shall include no more than three depositions of four hours each. Where no party's claim exceeds $30,000.00 exclusive of interest, attorneys' fees and arbitration costs, the dispute shall be resolved by submission of documents and there shall be no in-person or oral hearing. The award shall be made within six months of the filing of the notice of intention to arbitrate (demand), and the arbitrator(s) shall agree to comply with this schedule before accepting appointment. However, this time limit may be extended by the arbitrator(s) for good cause shown, or by mutual agreement of the parties.

(d) **Arbitrator Authority.** The arbitrator(s) will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute or for a breach of Sections 3 through 6 of this Agreement. The arbitrator(s) shall not award consequential damages in

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

any arbitration initiated under this provision. The arbitrator(s) may determine how the costs and expenses of the arbitration shall be allocated between the parties, but they shall not award attorneys' fees. If, however, any party prevails on a statutory claim that affords the prevailing party attorneys' fees and costs, then the arbitrator(s) may award reasonable attorneys' fees and costs to the prevailing party. Any dispute as to who a prevailing party is or the reasonableness of any fee or costs shall be resolved by the arbitrator(s).

(e) **Award.** The award shall be accompanied by a reasoned opinion. Judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Except as may be required by law, or as may be required in an action to enforce, modify, or vacate the award, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties.

(f) **Full and Free Consent.** This Agreement to arbitrate is freely negotiated between Employee and Company and is mutually entered into between the parties. Each party fully understands and agrees that they are giving up certain rights otherwise afforded to them by civil court actions, including but not limited to the right to a jury trial.

(g) **Information.** Employee may contact the HR Department at HR@nationslending.com with any questions about the arbitration process.

By initialing here, Employee acknowledges having read this Arbitration section and voluntarily agreed to binding arbitration:

Employee Initials

12. **ACKNOWLEDGEMENT.** THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS RECEIVED A COPY OF THE AGREEMENT INCLUDING ALL SUPPLEMENTS AND ADDENDUMS, HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS HAD SUFFICIENT TIME TO REVIEW AND AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF THE EMPLOYEE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

| Christina Iaukea-Alves | Christina Iaukea-Alves | 7/27/2022 | 4:47 PM EDT |
| Employee Name | Employee Signature | Date |

| For Nations Lending Corporation: | Cheryl Lieber | 7/27/2022 | 12:46 PM EDT |
| | Cheryl C. Lieber, Chief Admin. Officer | Date |

Employee Initials

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

## Supplement A to Employment Agreement
## Position Description and Duties – Full Time

The undersigned Employee is employed by Nations Lending Corporation (the "Company") in the following capacity:   **Sales Manager**   . This employment is as a **full-time,** regular employee. Employee is classified as **exempt** for purposes of determining overtime eligibility.

This Supplement A, Position Description and Duties, identifies the duties and expectations of Employee.  The Company reserves the right to modify Employee's duties on a day to day basis.  In the event Employee changes position or has a significant change of duties, then the Company will provide a modified Position Description and Duties Supplement for execution, which will replace this one in its entirety.

### Position Description

A Sales Manager strategically manages their sales team (a segment of the Corporate Sales Department), with oversight from sales department leadership, in most instances the Vice President of Sales. This role specializes in developing and coaching current and future Personal Mortgage Advisors while closing loans and producing revenues for the company.

### Position Duties

· Strategically manages a team of 8-12 personal mortgage advisors (PMA) to ensure compliance with departmental policies, procedures and defined internal controls.
· Ensures accountability and maintains departmental standards and objectives.
· Sets goals for weekly calls (leads) taken for team.
· Oversees/Coaches team, individuals and their work on a daily/weekly/monthly basis.
· Reviews loan applications for quality and completion (LAC).
· Structures guidelines for prospects interested in applying for a loan.
· Completes submittal milestone (PAC/Submission).
· Pipeline channel management - reviews team pipeline regularly to monitor progress of loans to next milestone, also assists team in locking loans, ordering appraisals, adverse or withdrawn prospects, proper disclosures per all
compliance guidelines.
· Creates, implements, and manages team contests and incentives per instruction by the VP of Sales.
· Proactively reviews teams over-all work and review areas where an employee or team can improve. Coaches,
maintains and (when necessary) helps to improve struggling employees with the use of meetings, review sessions,
sparring or role playing; implementing sales techniques and other results driven training strategies.
· Creates team schedules.

| | | |
|---|---|---|
| Christina Iaukea-Alves | *DocuSigned by:*<br>Christina Iaukea-Alves<br>E50A5A4DB18CB48B... | 7/27/2022 &#124; 4:47 PM EDT |
| Employee Name | Employee Signature | Date |

Electronically Filed 02/26/2024 13:20 /  / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

**Manager Attestation:**

*I have reviewed this agreement and found it to be accurate regarding the overall compensation agreed to with the employee.*





7/27/2022 | 3:14 PM EDT

| | | |
|---|---|---|
| Jon Whittington | Manager Signature | Date |
| Manager Name | | |

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

### Supplement B to Employment Agreement
### Compensation Statement – Sales Manager

**1. Summary:**

**(a)** Effective Date:  August 1, 2022 .

**(b)** Overtime Status: Exempt

**(c)** Wages: $36,000.00 per year. This will be an advance against future earnings.

   **Advance against future earnings begin December 1, 2022.**

**(d)** Commission Rate:
   Commissions for Loan Production will be compensated according to the following table:

| Lead Type, Source, or Product | Commission Rate | Maximum Commission per Eligible Loan |
|---|---|---|
| Self-Generated Production | 100 bps | $10,000.00 |
| Lead Based Marketing: | 70 bps | $10,000.00 |
| Manager Referrals: | 70 bps | $10,000.00 |
| Loans Brokered to Others | 70 bps | $10,000.00 |
| NLC-Serviced Customer: (Retention) | 0 bps | N/A |
| Other: | 0 bps | N/A |

**(e)** Additional Commission: N/A

**(f)** Additional Compensation: **N/A**

**(g)** Guaranteed Compensation: **From August 1, 2022 –November 30,2022, you are guaranteed to receive at least $12,500 in total compensation each month, which includes salary and guarantee. Employee's guaranteed compensation payments are a recoverable advance which must be repaid if Employee leaves employment for any reason.**

Christina Iaukea-Alves

Employee Name

*Christina Iaukea-Alves*

Employee Signature

7/27/2022 | 4:47 PM EDT

Date

For Nations Lending Corporation:

*Cheryl Lieber*

Cheryl C. Lieber, Chief Admin. Officer

7/27/2022 | 12:46 PM EDT

Date

**Manager Attestation:** *I have reviewed this agreement and found it to be accurate regarding the overall compensation agreed to with the employee.*

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35



 3:14 PM EDT

Manager Name                    Manager Signature                    Date

2. **Terms of Employee's Compensation Plan:** This Supplement B, Compensation Statement, identifies the compensation the Employee will receive from the Company. In the event Employee's compensation changes due to raise, decrease, modification in calculation, or new position, then the Company will provide a modified Compensation Statement for execution, which will replace this one in its entirety. Compensation shall be paid to Employee at such times and in a manner consistent with Company Policies as may be in effect from time to time.

   (a) **Compensation:** For each pay period, Employee shall earn compensation which may be composed of the greater of either (i) Wages; or (ii) Commission; (iii) Additional Commission; and (iv) Additional Compensation, as follows:

     i. **Wages.** Salary will be paid in each pay period worked based upon the annualized rate provided in Section 1(c). For exempt employees, salary is intended to pay for all hours worked during each pay period, regardless of scheduled, tracked hours, or actual hours worked.

     ii. **Commission.** Employee may be eligible to earn commission compensation for loan production closed in Employee's name according to the provisions of Section 2(b).

     iii. **Additional Commission.** In addition to other Commission compensation, Employee may be eligible to earn Additional Commission based upon Production subject to the provisions of Section 2(c).

     iv. **Additional Compensation.** Employee will be eligible to earn Additional Compensation based upon designated business units of Company achieving established performance targets ("Bonus"). Additional Compensation is subject to the provisions of Section 2(d).

   For each pay period, the total of Employee's Commission, Additional Commission, and Additional Compensation will be calculated ("Incentive Compensation). If this amount exceeds the Wages amount, Employee will be paid the Incentive Compensation only; Otherwise, Employee will be paid the Wages amount. Wage payments are an Advance against future Incentive Compensation earnings.

   (b) **Commission:** For any authorized loan origination activity undertaken, Employee may be paid performance-based incentive compensation ("Commission"), less applicable withholding and deductions owed to the Company, for Eligible Loans, subject to all terms and conditions outlined in this Supplement. Any previous advances on Commission or other offsets will be deducted from Commission before payment. No payment will be advanced, nor Commission paid, on loans that the Employee did not originate, or that were not Funded while under Employee's authorized and direct supervision, or while Employee was not employed with Company. The Commission paid to Employee for every Eligible Loan the Employee originates is calculated as a fixed percentage of the principal amount of the credit extended (the "Commission Rate"), as detailed in table form in Section 1(d). The Commission Rate used to calculate Employee's Commission amount will be fixed for all Eligible Loans originated by Employee which close and fund. The Commission Rate will be determined as basis points (bps) on the total loan volume of funded units. The amount of Commission will be equal to the product of the loan amount times the applicable basis points, and less other deductions as set forth herein.

   (c) **Additional Commission:** Employee may be eligible to earn Additional Commission based upon the performance of designated business units of Company ("Overrides"). Additional Commission will be determined according to the rates provided in Section 1(e).

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

(d) **Additional Compensation:** Employee will be eligible to earn Additional Compensation based upon achieving established performance targets ("Bonus"). Additional Compensation will be determined according to the rates or terms provided in Section 1(f) in the pay period following the close of the applicable calculation period (calendar month except if noted otherwise). Additional Compensation, if any, will then be issued in the next regular payroll cycle.

All compensation will be paid as regular wages for services actually performed in accordance with the Company's ordinary payroll practices and schedules detailed in the current Employee Handbook. Employee is not guaranteed any term of employment or amount of compensation. All employment is "At Will" and may be terminated at any time by either party.

3. **Definitions:** Where used in this Supplement, the following terms apply.

   a) **Branch Manager Referral:** Employee may be provided leads that are sourced from a relationship that the Branch Manager has established. These are prospects created by the Manager based on past marketing efforts, relationships the Branch Manager has established with realtors or other referral sources the Branch Manager has established over time.
   b) **Company-Sourced Leads:** Employee may be provided with Company-sourced leads or internally sourced business. These are prospects created by the Company, whether by internal or external marketing efforts, through other marketing efforts of the Company, referred in-house by the Company to Employee, or created by the Company based on its relationships with realtors or other referral sources.
   c) **Early Payment Default:** a residential mortgage loan for which the borrower fails to make one or more timely payments (any payment received 15 days or more after it is due) during the first twelve months following the Origination Date regardless of whether such loan is later brought current.
   d) **Early Payoff:** a residential mortgage loan which has its principal balance paid off or reduced by 50% or more within the first twelve months following the Origination Date.
   e) **Eligible Loan:** a residential mortgage loan that is: (i) originated in accordance with applicable requirements; (ii) under the supervision of an Employee possessing valid licenses and in good standing throughout the origination process; (iii) closed and funded in accordance with applicable requirements in the period in which the Commission is calculated; and (iv) not unfunded, cancelled, rescinded, or disqualified for any reason, or otherwise not Earned as defined in this Supplement. Whether a loan constitutes an Eligible Loan is determined at the sole and absolute discretion of Company.
   f) **Indemnification:** a request by an Investor for Company to issue a guarantee to cover future losses on a defective loan; irrespective of whether Company ultimately is required to make good on such Indemnification at any time; so long as Company executes an indemnification agreement for such loan.
   g) **Investor:** any entity to which a loan subject to this agreement is sold, transferred, or conveyed, in whole or part, whether by sale, securitization, or other operation. Investor also refers to a governmental agency which insures or guarantees any loans, and Ginnie Mae.
   h) **Loans Brokered to Other Lenders:** a loan that is closed with another lender subject to a brokerage arrangement. Brokered loans are typically loan products or bond programs that are not offered by Company, and for which another lender frequently performs the underwriting and approvals.
   i) **Loan Defect:** an error, mistake, falsification, omitted document or information, or miscalculation contained in a loan file or its constituent documents and instruments which violates the guidelines of the applicable Investor to which the loan is sold or to which the loan was intended to be sold to if such defect renders the loan ineligible for such sale and purchase.
   j) **NLC-Serviced Customer:** a loan that is made to an individual who currently has a loan that is being serviced by Company.

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

    **k) Origination Date:** the day on which a residential mortgage loan is closed and funded. For transactions where the closing and funding occur on different dates, the Origination Date is the date on which funding actually occurs and not the date scheduled for funding at the time of closing.

    **l) Pay Period:** the semi-monthly period established by Company's payroll policies in each month during which Employee renders services. If Employee works less than a full pay period, then Employee's salary for such pay period will be proportionately reduced to correspond to the portion of such period worked.

    **m) Reverse Mortgages:** a HECM or similar closed- or open-ended loan in which disbursements are advanced against the borrower's equity in the property over time. Employee is not authorized to originate a Reverse Mortgage or HECM product unless personally approved by Company.

    **n) Self-Sourced Production:** Employee may create his/her own relationships and referral sources. These are prospects that are generated by the efforts of the Employee, and not reliant upon Company-generated or sponsored relationships with borrowers or other referral sources. The ability to earn compensation through this category is contingent upon the Employee documenting the bona-fide nature of the self-sourced loan in a manner as designated by the Company.

    **o) Transitioned Loan:** a loan where one loan originator accepts the application, but the application is transferred to a different originator prior to the closing and funding of the loan for various reasons. Such loans are compensated in proportion to the amount of work performed by Employee on such loan instead of at the full Commission rate. Retention Loan Referrals as covered under Section 8 are compensated solely on those terms.

    **p) Unit:** an individual first-lien mortgage loan, which qualifies as an Eligible Loan, regardless of the loan amount or type. Where used for monthly Commission calculations, the Unit count for the applicable calendar month is used.

**4. Commission Payments to Employee:**

    **(a) Commission Advance.** Commission may be advanced when a loan has Funded. A loan is Funded when the loan has gone through settlement, all monies have disbursed, all rescission periods have expired (if applicable), and all proper documentation is filed and prepared in accordance with all State and Federal laws, including TILA and RESPA. Broker loans will be deemed as Funded when all items listed above are complete and the Company has received the check for payment from the institution to which the loan was brokered.

    **(b) Earned Commission.** Commission is Earned once the loan has been Funded and sold on the secondary market or to a Government Sponsored Entity (GSE), and the applicable borrower(s) has made the first four (4) payments on the loan in a timely manner. Commission will not be Earned on any loan that 1) is not a Qualified Mortgage as defined by applicable guidelines, unless the loan is part of an approved "Non-QM" program authorized and offered by the Company; or 2) is subject to repurchase, indemnification early payment default, or early pay-off, or is otherwise unsalable. Additionally, Employee may not directly, or indirectly, solicit or commence a prequalification, application, pre-application, or pre-approval for any customer until at least 180 days have passed since the date of the customer's previous loan closing for the same property. Failure to observe this waiting period will result in that loan's applicable Commission to be considered unearned and subject to withholding or repayment to Company at its demand.

    **(c) Payment and Acknowledgement of Commission.** Commissions are calculated based on the volume of Funded loans during the monthly Commission period. The payment date of earned Commissions will be determined by the Company's pay policies as may be amended from time to time. Earned compensation will be paid according to the schedules to be set by the Company. The Employee agrees that within 30 days of the receipt of any Commission, she or he will bring to Company's attention, in writing, any and all objections, disputes, or concerns regarding omissions or errors in connection with Commissions paid, whether or not to the Employee's benefit. If no such

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

written dispute is initiated and received, Employee's silence constitutes an acknowledgement that Commissions were properly calculated and paid.

It is the general intent of the Company to advance Commissions once a loan has Funded; however, the Commission is subject to repayment if it is not Earned, in accordance with the provisions of Section 5.

5. **Compensation Repayments to the Company:**

   a) **Repurchase, Early Payoff Adjustment and Unsalability.** In the event Compensation is advanced, but is later deemed unearned because of any repurchase, indemnification, early payment default, or early pay-off, the Compensation amounts previously advanced will be subtracted from Employee's net Compensation balance in calculating any Compensation not yet paid to Employee. Waiver of this policy is at the Company's discretion and may be applied for situations involving major life events (such as death) and other such unanticipated factors that could not have been known at the time of the loan origination. Waiver in one circumstance will not constitute a waiver in all similar situations and is at the sole discretion of the Company.

   *(In other words, Commissions advanced on a loan may need to be repaid if the loan is unsalable, subject to repurchase or indemnification at any point, or subject to early default or payoff, particularly if the Employee had reason to know of the risk encountered. This determination is made on a case-by-case basis and takes into account whether the Employee had a role in the loan's salability or knew or should have known of issues concerning the loan's ultimate viability.)*

   (a) **Repayment of Advances or Obligations to the Company.** In the event that Employee has an outstanding balance owed to the Company for advances received by the Employee, the Employee hereby authorizes the Company to deduct the outstanding balance owed from his/her compensation. Unless the Company and Employee otherwise agree upon a specific dollar amount or a percentage of commissions, Employee expressly authorizes the Company to deduct from his/her compensation any amount for as long as it takes to resolve the outstanding balance owed to the Company; except that the amount of the deductions will not cause Employee's income to fall below the applicable minimum wage threshold for any applicable pay period. If a balance is owed to Company and Employee has no future compensation payments pending from which such balance may be deducted, Employee for such balance and Employee agrees to satisfy such obligations within 30 days of receiving notice of such deficit from Company.

6. **Separation from Employment:**

   Upon termination of employment for any reason, any rights to any commission or compensation from any loans which are unclosed or unfunded after the last date of employment shall be forfeited by Employee and all income and rights therein shall accrue solely to the Company. Employee will be paid applicable Earned income through the date of termination; however, Employee will not be entitled to receive any Commission advances on loans. Employee's final Commission payment may be paid thirty (30) to ninety (90) calendar days following the termination date for the purpose of reconciling any owed, promised, or outstanding debts, charge backs, unearned commissions, or other repayments due from Employee to Company or to any third parties. Issuance of the final payment does not operate to release Employee from any liability with regards to a later determination that any Commission or other Advance paid was not Earned.

DocuSign Envelope ID: 17313CDC-2285-4BCD-92B3-B081CE889A35

7. **Effective Date.**  The Employee acknowledges that the terms of this Supplement will be effective on and after the Effective Date until Employee's termination of employment or until this Supplement is replaced with a new agreement that supersedes the current document. The Effective Date may be the date of first employment with Company (Employee's start date) or the first date of the payroll cycle in which the provisions of this Supplement will take effect. If this Supplement is replacing a prior agreement, then the terms of the prior agreement will apply to compensation Earned prior to the Effective Date of this Supplement and this Supplement will apply to compensation Earned thereafter.

8. **Retention Loan Referral Bonus.** Employees currently licensed as loan originators may, from time to time, become aware that an existing Company customer is interested in refinancing a loan currently serviced by the Company, but such employee may not be able to originate a refinance of said loan due to not currently holding the appropriate license.

   In such a situation, the Employee may receive additional commission compensation equal to **37.5 bps** of the principal balance of such loan at time of origination, in the manner and under the conditions applicable to all other commission payments in Supplement B, in exchange for performing the duties of a loan originator assistant to the originator of the loan upon satisfaction of the following conditions:
   1. The consumer has a loan currently serviced by Company which they wish to refinance.
   2. Employee refers such consumer to one of Company's current consumer direct branches and sends such branch a notification of the referral accompanied by contact information to reach said referred consumer.
   3. The consumer submits a loan application to the referred branch as a result of said referral, is approved for financing, and a refinance transaction is originated.
   4. Employee performs the duties and responsibilities of loan originator assistant for such refinance.

   Employee will be entitled to the referral commission for each referred transaction for which Employee was the first person to provide such referral as tracked in Company's systems, which shall be the definitive record for determining all earned amounts.

9. **Guaranteed Compensation.** For the dates specified in this Agreement in Section 1(g), Employee will receive a guaranteed minimum compensation as applicable for each pay period. The payment of all amounts under this Section is subject to the following terms and conditions:
   **(a)** Employee will be eligible for compensation, in the amount of the greater of (1) Earned Compensation; or (2) the Guaranteed Minimum Compensation.
      **(i)** Earned Compensation is the total of nonwage earnings as defined in Sections 2(a) (ii)-(iv).
      **(ii)** The Guaranteed Minimum Compensation shall be the amount shown in Section 1(g).

   For any pay periods covered by this Section (9) for which Earned Compensation is less than the amount of Guaranteed Minimum Compensation, the difference will be considered an Advance, subject to Sections 4 – 6 of this supplement and Sections 2(c)-(e) of the Employment Agreement.

   For payment periods subject to this section, Employee's compensation for the first payroll period of a month will be based upon one-half of the Guaranteed Minimum Compensation. Employee's compensation paid for the second payroll period of a month will be adjusted to reflect the remaining amount of compensation due to Employee in that monthly period.

**DocuSign**

## Certificate Of Completion

Envelope Id: 17313CDC22854BCD92B3B081CE889A35                                      Status: Completed
Subject: Please DocuSign: EmpAgr_2022.08.01_IaukeaAlves, Christina.pdf
Source Envelope:
Document Pages: 21                        Signatures: 7                          Envelope Originator:
Certificate Pages: 5                      Initials: 14                           Barbara Hirsch
AutoNav: Enabled                                                                 3673 Westcenter Dr
EnvelopeId Stamping: Enabled                                                     Houston, TX  77042
Time Zone: (UTC-05:00) Eastern Time (US & Canada)                                Barbara.Hirsch@nationslending.com
                                                                                 IP Address: 174.73.141.47

### Record Tracking

Status: Original                          Holder: Barbara Hirsch                 Location: DocuSign
        7/27/2022 12:17:47 PM                     Barbara.Hirsch@nationslending.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Cheryl Lieber<br>cheryl.lieber@nationslending.com<br>Chief Administrative Officer<br>Nations Lending Corporation<br>Security Level: Email, Account Authentication<br>(None) | *Cheryl Lieber*<br>6EF1AC2D60B5456...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 173.89.99.11 | Sent: 7/27/2022 12:31:17 PM<br>Viewed: 7/27/2022 12:45:50 PM<br>Signed: 7/27/2022 12:46:22 PM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |
| Jon Whittington<br>Jon.Whittington@nationslending.com<br>Security Level: Email, Account Authentication<br>(None) | *Jon Whittington*<br>064DE56A6B42416...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 67.53.196.190 | Sent: 7/27/2022 12:46:28 PM<br>Viewed: 7/27/2022 3:12:59 PM<br>Signed: 7/27/2022 3:14:07 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 7/27/2022 3:12:59 PM<br>ID: 54dfa872-c7d6-4ffc-acbf-72355d775d5e | | |
| Christina Iaukea-Alves<br>cpiaukea@gmail.com<br>Security Level: Email, Account Authentication<br>(None) | *Christina Iaukea-Alves*<br>25A0419D18CB48B...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 76.173.13.133<br>Signed using mobile | Sent: 7/27/2022 3:14:15 PM<br>Viewed: 7/27/2022 4:40:08 PM<br>Signed: 7/27/2022 4:47:26 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 7/27/2022 4:40:08 PM<br>ID: f6c7d4ba-d0f7-4182-bd8c-44edf51a674b | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| **Carbon Copy Events** | **Status** | **Timestamp** |
|---|---|---|
| Barbara Hirsch | | Sent: 7/27/2022 4:47:34 PM |
| barbara.hirsch@nationslending.com | COPIED | |
| Security Level: Email, Account Authentication (None) | | |
| **Electronic Record and Signature Disclosure:** Not Offered via DocuSign | | |

| **Witness Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Notary Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Envelope Summary Events** | **Status** | **Timestamps** |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/27/2022 12:31:17 PM |
| Certified Delivered | Security Checked | 7/27/2022 4:40:08 PM |
| Signing Complete | Security Checked | 7/27/2022 4:47:26 PM |
| Completed | Security Checked | 7/27/2022 4:47:34 PM |

| **Payment Events** | **Status** | **Timestamps** |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 10/21/2015 5:05:20 PM
Parties agreed to: Jon Whittington, Christina Iaukea-Alves

From time to time, Nations Lending Corporation (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Nations Lending Corporation:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

To contact us by email send messages to: solutions@nlcloans.com

**To advise Nations Lending Corporation of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at solutions@nlcloans.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Nations Lending Corporation**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to solutions@nlcloans.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Nations Lending Corporation**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to solutions@nlcloans.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Nations Lending Corporation as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Nations Lending Corporation during the course of my relationship with you.

# Nations Lending Corporation
# Employment Agreement

This Employment Agreement ("Agreement") is made between Nations Lending Corporation ("Company") and _____Chandee Hooper_____ ("Employee"). In consideration of the premises in this Agreement, the employment or continued employment of Employee by the Company, and the covenants and agreements of the parties contained herein, and for good and valuable consideration, Employee accepts employment with the Company as hereinafter stated.

1. **EMPLOYMENT.**

    (a) **Contingent Offer.** Company has extended a conditional offer of employment, meaning that Employee must complete all conditions satisfactorily. Execution of this Agreement does not imply or ensure that Employee has satisfied all conditions precedent to commencing employment, including, without limitation: verification of references; satisfactory completion of background checks, verification of professional qualifications or licenses, or other conditions which may be stated in Employee's Offer Letter.

    (B) **Term of Employment.** The period during which the Employee is employed by the Company hereunder is hereinafter referred to as the "Employment Term." The Employment Term will commence on Employee's first actual day of work, regardless of any date contained in an offer letter, as reflected in Company's records, and will continue until Employee, as determined in Company's sole discretion, by reason of physical or mental disability is unable to perform their duties. The end of the Employment Term will be the effective date of any resignation or termination notice given. NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED TO IN ANY WAY ALTER, AMEND, OR MODIFY THE AT-WILL STATUS OF THE EMPLOYMENT RELATIONSHIP BETWEEN THE COMPANY AND THE EMPLOYEE IN WHICH EITHER THE COMPANY OR THE EMPLOYEE MAY TERMINATE THE EMPLOYMENT RELATIONSHIP AT ANY TIME, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE.

    (c) **Position & Duties.** Subject to its ultimate supervision, direction, and control, Company employs Employee during the Employment Term to perform services and duties as are described on the Position Description and Duties Addendum (Supplement A) of this Agreement and under any conditions detailed in such addendum or in the Company's Employee Handbook and adopted policies. The Company reserves the right to modify or amend Employee's duties at any time.  In the event Employee's position or title changes with a significant change of duties, Company will provide Employee with a new addendum for execution, which will replace the existing one in its entirety and be effective from the date of such amendment. As employee of a financial institution, Employee is charged with, and owes to Company: (i) a duty of loyalty, fidelity, and trust to Company; (ii) a responsibility to exercise judgment and perform duties in good faith and in the best interest of the Company, (iii) the performance of honest services, and (iv) a promise to use extraordinary care, skill, and diligence in the performance of all duties.

    (d) **Sole Employment.** During the Employment Term, the Employee shall devote substantially all of Employee's business time and attention to the performance of the Employee's duties and will not engage in any other business, profession, or occupation for compensation or otherwise which might conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Company, in accordance with the Company's Dual Employment Policy. Employee's failure to disclose other employment may be grounds for termination.



Employee Initials

DocuSign Envelope ID: 64A6CD58-2A51-4147-9F50-1A5FB3700708

(e) **Termination.** Employee's employment is at-will, meaning that the Employee or Company may terminate the employment relationship at any time, with or without cause, and with or without notice. Although Employee's duties, title, compensation, and benefits as well as Company's personnel policies and procedures may change from time to time, the 'at will' nature of employment may only be altered by an express agreement signed by an authorized officer of Company. Upon termination or resignation for any reason, Employee's compensation and benefits will end. If Employee is entitled to commissions, trailing payments, bonuses or stock options as part of Employee's compensation, entitlement to all unearned or unvested amounts as of the last date of employment is forfeited by Employee unless stated otherwise in Employee's Compensation Addendum, as further described below.

2. **COMPENSATION.**

   (a) **"Wages".** Employee will be paid for services performed by Employee in accordance with the Company's policies and procedures for payments reflected in the Company's Employee Handbook and related Company policies. The amount of compensation to be received by Employee, whether wages or salary ("Pay"), commissions or bonuses ("Incentive Payments"), or other compensation (collectively, "Pay", "Incentive Payments" and other compensation are "Compensation") is detailed on the Compensation Addendum (Supplement B) of this Agreement, and subject to any conditions in such addendum. Except as may be provided in Employee's Compensation Addendum, Employee's Compensation may be changed at any time by Company upon notice to Employee, and continued employment by Company is subject to such revised terms.

   (b) **Benefits.** During the Employment Term, the Employee shall be entitled to participate in all employee benefit plans, practices, and programs maintained by the Company, as in effect from time to time (collectively, "Employee Benefit Plans"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law. Employee's eligibility for Employee Benefit Plans is detailed on Supplement A.

   (c) **Advances.** Company may advance Incentive Payments or other compensation to Employee before Employee's entitlement to such payments is vested. In the event that such advanced amounts are later determined to have been unearned by employee (e.g., a commission paid on a loan which is later subject to repurchase) then Employee must reimburse the amount advanced to Company and Company is entitled to deduct such advanced amounts from future payments to be made to Employee, including from Employee's final paycheck. Additional details on advances may be contained in Supplement B.

   (d) **Deductions.** In addition to withholdings for tax and other purposes provided by law, Company may subtract authorized deductions from Employee's Compensation payments, including Employee's final paycheck. Deductions may be made for the costs of Benefits elected by Employee, to recover Advances paid to Employee, to recover overpayments, to reimburse Company for expenditures on Employee's behalf or as a result of Employee's actions or failure to immediately return all of Company's property upon termination, and as authorized by Employee. Deductions may also be made for Incentive Payments made to Employee if the conditions under which Employee is entitled to such Incentive Payments are later determined not to have been met, such as where a loan on which commission has previously been paid is found to be ineligible for such commission. Additional details on deductions may be contained in Supplement B.



Employee Initials

DocuSign Envelope ID: 64A6GD58-2A51-4147-9E50-1A5FEB700708

(e) **Effects of Termination on Compensation.** If Employee resigns from employment with Company, Employee agrees to reimburse Company for all outstanding Advances within thirty days of termination, and where Employee fails to do so, Company is entitled to interest on the unpaid amounts at the rate of 10% per twelve-month period, compounded monthly. Where Employee resigns from employment without at least fourteen days advance notice or is terminated for reasons related to the Employee's acts of disloyalty, fraud, theft, forgery or other dishonesty, refusal to work, willful destruction of property, gross insubordination, falsification of records, criminal or unlawful activity, or willful misconduct, Employee forfeits any right to Incentive Payments which Employee would otherwise be entitled to receive following the last day of employment under the terms of Employee's Compensation Addendum.

3. **CONFIDENTIAL INFORMATION**. The Employee understands and acknowledges that during the course of employment by the Company, Employee will have access to and learn about confidential, secret, and proprietary documents, materials, data and other information, in tangible and intangible form, of and relating to the Company and its businesses and existing and prospective customers, suppliers, investors and other associated third parties which is not generally known to the public ("Confidential Information"). The Employee further understands and acknowledges that this Confidential Information and the Company's ability to reserve it for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure of the Confidential Information by the Employee will cause irreparable harm to the Company, for which remedies at law will not be adequate.

(a) **Confidential Information Defined.** For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, documents, operations, services, strategies, techniques, agreements and terms of agreements, transactions, negotiations, know-how, trade secrets, applications, work-in-process, databases, compilations, technologies, records, systems, sources, supplier information, vendor information, financial information, accounting information, marketing information, pricing information, credit information, payroll information, personnel information, employee lists, reports, internal controls, security procedures, customer information or lists, buyer lists, or other information generally considered private and confidential in the industry or by any existing or prospective customer, other associated third party, or of any other person or entity that has entrusted information to the Company in confidence.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

The Employee understands and agrees that Confidential Information developed by Employee in the course of Employee's employment by the Company shall be subject to the terms and conditions of this Agreement as if the Company furnished the same Confidential Information to the Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public, provided that such disclosure to the public is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

(b) **Company Creation and Use of Confidential Information.** The Employee understands and acknowledges that the Company has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of mortgage

lending and financial services. The Employee understands and acknowledges that as a result of these efforts, Company has created and continues to use and create Confidential Information. This Confidential Information provides Company with a competitive advantage over others in the marketplace.

**(c)   Disclosure and Use Restrictions.** Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company) not having a need to know and authority to know and to use the Confidential Information in connection with the business of the Company and, in any event, not to anyone outside of the direct employ of the Company except as required in the performance of any of the Employee's authorized employment duties to the Company; (iii) and not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company except as required in the performance of the Employee's authorized employment duties to the Company.

The Employee understands and acknowledges that the Employee's obligations under this Agreement regarding any particular Confidential Information begin immediately when the Employee first has access to Confidential Information (whether before or after commencing employment with Company) and shall continue during and after the Employee's employment by the Company until the Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or a breach by those acting in concert with the Employee or on the Employee's behalf.

**(d)   Notice of Immunity Under the Defend Trade Secrets Act of 2016.** Employee acknowledges receipt of Company's Employee Reporting Policy and Company Code of Ethics (available at https://nlcloans.sharepoint.com/sites/Policies) setting forth: (A) Company's reporting policy for a suspected violation of law; and (B) notice of immunity from criminal and civil liability for certain disclosures of trade secrets under 18 U.S.C. § 1833(b).

**(e)   Other Permitted Disclosures.** Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company. Nothing in this Agreement prohibits or restricts the Employee (or Employee's attorney) from filing a charge or complaint with the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), the Occupational Safety and Health Administration (OSHA), any other self-regulatory organization, or any other federal or state regulatory authority ("Government Agencies"). The Employee further understands that this Agreement does not limit the Employee's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency without notice to the Company. This Agreement does not limit the Employee's right to receive an award for information provided to any Government Agencies. In addition, nothing in this Agreement in any way prohibits or is intended to restrict or impede the Employee from exercising protected rights under Section 7 of the National Labor Relations Act or otherwise disclosing information as permitted by law.

**4.   COMPANY'S PROPRIETARY RIGHTS.**



Employee Initials

DocuSign Envelope ID: 64A66D58-2A51-4147-8F50-1A5FEB700708

**(a) Work Product**. The Employee acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas, and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by the Employee individually or jointly with others during the period of employment by the Company and relating in any way to the business or contemplated business, research, or development of the Company (regardless of when or where the Work Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical, and electronic copies, all improvements, rights, and claims related to the foregoing, and other tangible embodiments thereof (collectively, "Work Product"), as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), patents, and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions, and renewals thereof (collectively, "Intellectual Property Rights"), shall be the sole and exclusive property of the Company.

For purposes of this Agreement, Work Product includes, but is not limited to, Company information, including plans, strategies, techniques, agreements, documents, terms of agreements, negotiations, know-how, computer programs, computer applications, web design, work in process, databases, manuals, reports, compilations, graphics, drawings, sketches, market studies, formulae, notes, communications, algorithms, product plans, models, audiovisual programs, ideas, inventions, original works of authorship, customer information, customer lists, manufacturing information, marketing information, advertising information, and sales information. Work Product also means items created in the six-month period following employment as a result of or attributable to work performed during employment or specific work product substantially begun during employment.

**(b) Work Made for Hire; Assignment**. The Employee acknowledges that, by reason of being employed by the Company at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in the Copyright Act of 1976 (17 U.S.C. § 101), and such copyrights are therefore owned by the Company. To the extent that the foregoing does not apply, the Employee hereby irrevocably assigns to the Company, for no additional consideration, the Employee's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company would have had in the absence of this Agreement.

**(c) Further Assurances; Power of Attorney**. During and after employment, the Employee agrees to reasonably cooperate with the Company at the Company's expense to (i) apply for, obtain, perfect, and transfer to the Company the Work Product and Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (ii) maintain, protect, and enforce the same, including, without limitation, executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company. The Employee hereby irrevocably grants the Company power of attorney to execute and deliver any such documents on the Employee's behalf in Employee's name and to do all other lawfully permitted acts to transfer the Work Product to the Company and further the transfer, issuance, prosecution, and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Employee does not promptly cooperate with the Company's request (without limiting the rights the Company shall have in such circumstances by operation of law). The power of attorney is coupled with an interest and shall not be impacted by the Employee's subsequent incapacity.



Employee Initials

DocuSign Envelope ID: 64A6CD58-2A51-4147-9F50-1A5FB3700708

(d) **Moral Rights.** To the extent any copyrights are assigned under this Agreement, the Employee hereby irrevocably waives, to the extent permitted by applicable law, any and all claims the Employee may now or hereafter have in any jurisdiction to all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be known as "moral rights" with respect to all Work Product and all Intellectual Property Rights therein.

(e) **No License.** The Employee understands that this Agreement does not, and shall not be construed to, grant the Employee any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to Employee by the Company.

## 5. EMPLOYEE'S RESTRICTIVE COVENANTS.

(a) **Restricted Period.** The Employee agrees that the nature of Employee's position gives the Employee access to and knowledge of Confidential Information and places the Employee in a position of trust and confidence with the Company. The Employee further understands and acknowledges that the Company's ability to reserve use of the Confidential Information for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure by the Employee is likely to result in unfair or unlawful competitive activity. Because of Company's legitimate business interest as described in this Agreement and the good and valuable consideration offered to the Employee, the sufficiency of which is acknowledged, during the term of Employee's employment and for the next twelve months, to run consecutively, beginning on the last day of the Employee's employment with the Company, whether terminated for any reason or no reason, by the Employee or the Company, (the "Restricted Period"), the Employee agrees and covenants not to engage in Prohibited Activity.

(b) **Prohibited Activities.** For purposes of this Agreement, "Prohibited Activity" is where Employee, as an employee, employer, owner, manager, advisor, contractor, agent, partner, officer, volunteer, intern, or any other similar capacity, while engaging in residential mortgage lending on behalf of an entity other than Company, violates one or more of the "Restrictive Covenants" (i-iii) below to which Employee has agreed to accept as a condition of employment. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets, proprietary information, or Confidential Information.

i. **Non-Solicitation of Employees.** The Employee understands and acknowledges that the Company has expended and continues to expend significant time and expense in recruiting and training its employees and that the loss of employees would cause significant and irreparable harm to the Company. The Employee agrees and covenants not to directly or indirectly solicit, hire, recruit, or attempt to solicit, hire, or recruit, any employee of the Company or any employee who has been employed by the Company in the six months preceding the last day of Employee's employment (collectively, "Covered Employee"), or induce the termination of employment of any Covered Employee during the Restricted Period. "Covered Employee" does not include an employee of Company that Employee supervised or managed prior to joining Company, who joins Company at approximately the same time as Employee, and who, while they are employed by Company, is supervised or managed by Employee. This non-solicitation provision explicitly covers all forms of oral, written, or electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, Twitter, and any other social media platform, whether or not in existence at the time of entering into this Agreement. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is

prohibited by this section. This Section does not restrict or impede, in any way, and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

ii.   **Non-Solicitation of Customers.** The Employee understands and acknowledges that because of the Employee's experience with and relationship to the Company, the Employee will have access to and will learn about much or all of the Company's customer information, including, but not limited to, Confidential Information. "Customer Information" includes, but is not limited to, names, phone numbers, addresses, email addresses, transaction history, preferences, financial condition, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to Company's services. The Employee understands and acknowledges that: (i) the Company's relationships with its customers is of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its customer relationships and goodwill; and (iii) the loss of any such customer relationship or goodwill will cause significant and irreparable harm to the Company.

The Employee agrees and covenants, for the duration of the Restricted Period, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this agreement, or meet with the Company's current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section. This Section does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company.

iii.   **Unfair Competition.** The Employee understands and acknowledges that: (i) the Company's relationships with its customers are of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its partner and customer relationships and goodwill; and (iii) the loss of any such relationship or goodwill will cause significant and irreparable harm to the Company. Because Employee will have access to proprietary information belonging to Company that would provide an unfair advantage to competition, during the period of employment Employee agrees not to, for any person, business, or entity, a) own, maintain, operate, or engage in the same or similar business activities as Company or in any business activity which competes with the Company; b) serve, advise, manage, consult with, provide services for, or be employed by any individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company; c) undertake any efforts or activities toward forming or incorporating, financing, or commencing any competing business activity which engages in the same or similar business activities as the Company; or d) advise, serve, or consult with any person, business, or entity which is or will be undertaking efforts toward incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as the Company. During the Restricted Period, Employee agrees not to divert or refer Company customers or prospective customers to any other

individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company. If Employee's job assignment location with Company is within a branch office or retail location, then Employee agrees and covenants not to open or relocate a similar office or location within a five-mile radius of such location (the "Restricted Territory") which would engage in the business of residential mortgage lending for the duration of the Restricted Period. "Relocate" includes Employee joining an existing office location of a competitor if such office was opened at such location within the six-month period before the beginning of the Restricted Period. This Section does not restrict or impede, in any way, Employee from seeking gainful employment in the industry which does not harm Company's vital and legitimate business interests and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

(c) **Reasonableness.** Employee agrees that the restrictions in the Restrictive Covenants will not interfere with or unduly limit his or her ability to obtain suitable alternative employment following termination of employment with the Company. Employee acknowledges that the protections provided to the Company are important, reasonable, and necessary, and Employee's agreement to the Restrictive Covenants and to refrain from Prohibited Activity, has been given freely, voluntarily, and without duress and after due deliberation, and that the Restrictive Covenants will not impose undue hardship on Employee.

(d) **Injunctive Relief.** Employee agrees that any violation or breach of Employee's obligations will result in irreparable injury to the Company for which no adequate remedy at law may be available. Therefore, in addition to any other remedies Company may pursue, Employee consents to the issuance of a temporary restraining order and injunction prohibiting any conduct by the Employee in violation of the Prohibited Activities and waives any requirement of posting a bond as precondition of obtaining such injunction. Employee agrees that the Company shall be entitled to recover its costs and legal fees and expenses incurred in investigating and enforcing the Restrictive Covenants, should Employee engage in Prohibited Activity.

(e) **Tolling.** The restrictions and limitations within this Agreement applicable during the Restricted Period shall be enforceable from the date of the last breach or violation of the applicable restriction(s) up to an equivalent period as if such date were the first day of the Restrictive Period, so that Company may receive the full benefit of Employee's agreement to the Restrictive Covenants.

6. **SECURITY.**

(a) **Security and Access.** The Employee agrees and covenants (i) to comply with all Company security policies and procedures as in force from time to time including without limitation those regarding telephone systems, facilities access, key cards, access codes, Company intranet, internet, social media and instant messaging systems, computer systems, email systems, computer networks, document storage, data security, encryption, passwords, and communication technologies ("Facilities Information Technology and Access Resources"); (ii) not to access or use any Facilities and Information Technology Resources except as authorized by Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Employee's employment by the Company, whether termination is voluntary or involuntary. The Employee agrees to notify the Company promptly in the event he/she learns of any violation of the foregoing by others, or of any other misappropriation, or unauthorized access, use, reproduction or reverse engineering of, or tampering with any Facilities and Information Technology Access Resources or other Company property or materials by others.


Employee Initials

DocuSign Envelope ID: 64A6CD58-2A51-4147-9E50-1A5FFB3700708

**(b) Exit Obligations**. Upon (i) voluntary or involuntary termination of the Employee's employment or (ii) the Company's request at any time during the Employee's employment, the Employee shall (a) provide or return to the Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, network access devices, computers, and computer equipment, manuals, reports, files, compilations, work product, thumb drives, or other removable information storage devices, hard drives, and data and all Company documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Employee, whether they were provided to the Employee by the Company or any of its business associates or created by the Employee in connection with his/her employment by the Company; and (b) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Employee's possession or control, including those stored on any non-Company devices, networks, storage locations, and media in the Employee's possession or control.

7. **PUBLICITY.** Employee hereby consents to any and all uses and displays, by the Company and its agents, of the Employee's name, voice, likeness, image, appearance, and biographical information in, on or in connection with any pictures, photographs, audio, and video recordings, digital images, websites, television programs, and advertising, other advertising, sales, and marketing brochures, books, magazines, other publications, and all other printed and electronic forms and media throughout the world, at any time during or after the Employment Term, for all legitimate business purposes of the Company ("Permitted Uses"). Employee hereby forever releases the Company and its directors, officers, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the Employment Term, in connection with any Permitted Use.

8. **EMPLOYEE REPRESENTATIONS.** The Employee represents and warrants to the Company that:
   **(a)** Acceptance of employment with the Company and the performance of the duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which the Employee is a party or is otherwise bound.
   **(b)** Acceptance of employment with the Company and the performance of Employee's duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.
   **(c)** Employee will not utilize any property belonging to a prior employer in the performance of Employee's duties; including any confidential, proprietary, or trade secret information obtained from a prior employer.
   **(d)** There are no actions, suits, proceedings, or known investigations, criminal or civil, pending against Employee in any court or before a governmental agency, which have not been disclosed by Employee.
   **(e)** Employee has the necessary training and knowledge to understand the laws and requirements of any position requiring a license to perform such duties and will maintain such licensure and perform such duties in compliance with all applicable laws and regulations as they are in effect.
   **(f)** If Employee is charged with a criminal offense, conviction of which could cause the suspension or revocation of any license required for the performance of Employee's duties, may adversely affect the ability of Employee to perform any obligations under this Agreement, or would cause Employee to become insolvent or bankrupt, Employee will notify Company's Human Resources Manager.
   **(g)** When Employee's employment with the Company terminates, Employee will notify any subsequent employer of the Restrictive Covenants contained in this Agreement before the Employee commences employment with such employer. In addition, the Employee authorizes the Company to provide notice of the Restrictive Covenants of this Agreement to third parties, including but not limited to, the Employee's subsequent, anticipated, or possible future employers.

DocuSign Envelope ID: 64A6CD58-2A51-4147-8E50-1A5FB2700708

9. **NOTICES.** All notices, requests, consents, claims, demands, waivers, and other initial communications regarding a dispute involving this Agreement (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth below. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), or certified or registered mail (in each case, return receipt requested, postage pre-paid). Notice is effective upon receipted delivery to the designated address if the party giving the Notice has complied with the requirements of this Section.

**(a)** Any notice required or permitted to be given to Employee will be delivered to the address shown as Employee's residence as shown on the records of the Company.

**(b)** Notices addressed to Company must be sent to its registered agent address for the state in which the Employee resides. A copy may be sent to the Company's corporate office address. Notices sent to the principal business address are ineffective as notice unless a copy is also sent to the registered agent's address.

10. **MISCELLANEOUS PROVISIONS.**

(a) **Entire Agreement.** This Agreement, together with the other documents incorporated by reference and all related supplements and addendums it incorporates, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter, and supersedes all prior and contemporaneous offers, understandings, agreements, or representations, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and other documents, the statements in the body of this Agreement shall control. The parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

(b) **Modification and Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by the Employee and an authorized representative of the Company. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

(c) **Captions; Interpretation.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The addendums and exhibits referred to shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

(d) **Successors and Assigns; Beneficiaries.** The rights of the Company under this Agreement shall inure to the benefit of the successors and assigns of the Company. The rights of Employee are personal to Employee and Employee's heirs or devisees and may not otherwise be transferred or alienated. This Agreement is for the sole benefit of the parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.



Employee Initials

(e) **Remedies.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise. Employee acknowledges that a breach or threatened breach of any obligations under this Agreement would give rise to irreparable harm to the Company for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by Employee of any such obligations, Company shall, in addition to any and all other rights and remedies that may be available in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction and any other relief that may be available from a court of competent jurisdiction without any requirement to post bond.

(f) **Survival.** All provisions of this Agreement regarding Confidential Information, Company's Proprietary Rights in intellectual property and work product, and Employee's Restrictive Covenants shall survive Employee's termination of employment, and no dispute regarding Employee's employment, the termination of Employee's employment, or this Agreement shall prevent the operation and enforcement of these obligations.

(g) **Severability.** Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

(h) **Signatures and Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement by facsimile, email in portable document format (.pdf), by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by using an electronic signature compliant with the E-Sign Act has the same effect as delivery of an executed original of this Agreement.

(i) **Governing Law; Jurisdiction and Venue.** This Agreement, for all purposes, to the maximum extent permitted by applicable law, shall be construed in accordance with the laws of Ohio without regard to any conflicts of law principles. Should applicable law specifically prohibit the use of the law of a foreign jurisdiction, then the law of the relevant jurisdiction shall be used. Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in accordance with the arbitration provision contained within this Agreement except that action may be brought in a state or federal court located in the state of Ohio or the state of Employee's primary residence, if different, for the purposes of obtaining a restraining order or injunction against a violation of provisions of this Agreement or to enforce a judgment rendered in accordance with the results of arbitration between the parties. The parties hereby irrevocably submit to the non-exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue. EACH

DocuSign Envelope ID: 64A6GD58-2A51-4147-9E50-1A5FFB700708

PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO PARTICIPATE IN A CLASS ACTION OR A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

**11. ARBITRATION.** Any disagreement, dispute, controversy, or claim of any kind ("claims") arising out of or in connection to this Agreement, including any claims related to Employee's hiring, employment or the termination of Employee's employment, and including any claims that may arise between Employee and Company's owners, officers, directors, managers, employees, or agents in their capacity as such, shall be resolved by arbitration under the Federal Arbitration Act, Chapters 1 and 2, to the exclusion of inconsistent state laws, whether such claims are based in tort, contract, statute, equity, or otherwise. Employee agrees to waive all rights to a jury trial and waives the right to pursue any class action, collective action, or representative claims to the maximum extent allowed by law. To the extent a class or collective action or representative claim may not be waived, the Employee agrees to stay any such claims until after all claims subject to arbitration are fully resolved.

(a) **Excluded Claims**. Excluded from this Arbitration provision are those claims which are not arbitrable under state or federal law, including: worker's compensation claims; unemployment compensation claims; the right to file an administrative charge before a governmental agency such as the Equal Employment Opportunity Commission, National Labor Relations Board, or Department of Labor; or other claims which a statute prohibits from being subject to arbitration. Any disputes regarding the applicability of arbitration to a claim or the scope of this arbitration provision will be submitted to a court for determination.

(b) **Arbitrator.** Except for the excluded claims, disputes will be settled by binding arbitration administered by the American Arbitration Association before a qualified individual agreed to by the parties or designated pursuant to its Employment Arbitration Rules and Mediation Procedures (a copy of which may be found online at https://www.adr.org/Rules). The Optional Rules for Emergency Measures of Protection are incorporated by the parties. The standard provisions of the Employment Arbitration Rules shall apply. Claims shall be heard by a single arbitrator, unless the claim amount exceeds $250,000.00, in which case the dispute may be heard by a panel of three arbitrators.

(c) **Arbitration Procedure**. Company will pay the arbitrator fees and arbitration administrative expenses and any other costs unique to the arbitration hearing (recognizing that each side bears its own deposition, witness, expert and attorney's fees and other expenses to the same extent as if the matter were being heard in court). Unless otherwise agreed to by the parties, the place of arbitration shall be Cleveland, Ohio, USA or conducted virtually by telephone or videoconference. Applicable law for purposes of arbitration shall be determined by the Governing Law provision of this Agreement. If the dispute is less than $50,000.01 there shall be no discovery other than the exchange of documents and written questions.  If the dispute exceeds $50,000.00, each party's discovery shall include no more than three depositions of four hours each. Where no party's claim exceeds $30,000.00 exclusive of interest, attorneys' fees and arbitration costs, the dispute shall be resolved by submission of documents and there shall be no in-person or oral hearing. The award shall be made within six months of the filing of the notice of intention to arbitrate (demand), and the arbitrator(s) shall agree to comply with this schedule before accepting appointment. However, this time limit may be extended by the arbitrator(s) for good cause shown, or by mutual agreement of the parties.

(d) **Arbitrator Authority.** The arbitrator(s) will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute or for a breach of Sections 3 through 6 of this Agreement. The arbitrator(s) shall not award consequential damages in

any arbitration initiated under this provision. The arbitrator(s) may determine how the costs and expenses of the arbitration shall be allocated between the parties, but they shall not award attorneys' fees. If, however, any party prevails on a statutory claim that affords the prevailing party attorneys' fees and costs, then the arbitrator(s) may award reasonable attorneys' fees and costs to the prevailing party. Any dispute as to who a prevailing party is or the reasonableness of any fee or costs shall be resolved by the arbitrator(s).

(e) **Award.** The award shall be accompanied by a reasoned opinion. Judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Except as may be required by law, or as may be required in an action to enforce, modify, or vacate the award, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties.

(f) **Full and Free Consent.** This Agreement to arbitrate is freely negotiated between Employee and Company and is mutually entered into between the parties. Each party fully understands and agrees that they are giving up certain rights otherwise afforded to them by civil court actions, including but not limited to the right to a jury trial.

(g) **Information**. Employee may contact the HR Department at HR@nationslending.com with any questions about the arbitration process.

By initialing here, Employee acknowledges having read this Arbitration section and voluntarily agreed to binding arbitration:



Employee Initials

12. **ACKNOWLEDGEMENT.** THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS RECEIVED A COPY OF THE AGREEMENT INCLUDING ALL SUPPLEMENTS AND ADDENDUMS, HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS HAD SUFFICIENT TIME TO REVIEW AND AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF THE EMPLOYEE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

| Kawai Hooper | *Kawai Hooper* (DocuSigned by) | 5/27/2023 \| 1:56 PM EDT |
|---|---|---|
| Employee Name | Employee Signature | Date |

| For Nations Lending Corporation: | *Cheryl Lieber* (DocuSigned by) | 5/26/2023 \| 3:35 PM EDT |
|---|---|---|
| | Cheryl C. Lieber, Chief Admin. Officer | Date |

# Supplement A to Employment Agreement
## Position Description and Duties

The undersigned Employee is employed by Nations Lending Corporation (the "Company") in the following capacity: **Personal Mortgage Advisor - Outside**.  This employment is as a **part-time**, regular employee working up to the number of hours per week identified in Employee's Compensation Addendum (Supplement B).  Employee is classified as **exempt** for purposes of determining overtime eligibility.

This Supplement A, Position Description and Duties, identifies the duties and expectations of Employee.  The Company reserves the right to modify Employee's duties on a day to day basis.  In the event Employee changes position or has a significant change of duties, then the Company will provide a modified Position Description and Duties Supplement for execution, which will replace this one in its entirety.

A.  **Outside Sales Position:** Employee's primary responsibility is to obtain applications for loans away from the employer's places of business, and instead will seek to obtain such applications primarily in the customer's place or places of business. Employee must possess a valid motor vehicle driver's license at all times and shall provide evidence of licensure at time of employment and thereafter at any time requested by the Company.  Employee shall be required to complete a quarterly certification as to his/her exempt status.

B.  **Position Description – Essential Functions:** Employee will solicit, receive, and originate applications for the extension of credit to purchase and refinance 1-4 unit residential properties, secured by a first-lien mortgage or deed of trust, and provide supporting services to consumer applicants. Loans will conform to the products offerings available from the Company. Employee will ensure exceptional customer experience by overseeing loan processing from origination to closing and providing on-going communication to customers. Employee will maintain all necessary residential Mortgage Loan Originator licenses in the state or states in which the employee is employed to function.

C.  **Position Duties:** Subject to the ultimate supervision and control of Company, Employee shall:

1.  Know, observe, and comply with all applicable laws and regulations as well as industry standards, company rules, and policies;
2.  Maintain all necessary licenses, qualifications, and standards to perform the job functions;
3.  Report to the Company any lawsuits, complaints, investigations, or similar actions involving Employee's duties on behalf of the Company or which could potentially adversely affect Employee's licensing status or the Company's ability to maintain its licenses or operate.
4.  Contact consumers to establish new business opportunities;
5.  Consult with consumers about their current and future needs and goals;
6.  Advise and educate consumers about the home purchase or refinance process, and how to better manage their mortgages by discussing loan terms, rates, fees, and other costs;
7.  Gather consumer information and apply skill and experience to put clients in the best financial status possible among the most suitable loan products offered by the Company;
8.  Take and receive applications for credit in accordance with Company products and pricing;
9.  Initiate the loan process and manage applications from file start to closing using various systems;
10. Assist and communicate with consumers throughout the loan process;
11. Confer and meet with customers during various stages of the loan process as needed;
12. Utilize materials, reference tools, and other resources to provide accurate and up-to-date loan information to customers and business partners;

DocuSign Envelope ID: 64A6GD58-2A51-4147-8F50-1A5FB3700708

13. Provide complete loan applications and support materials to fulfillment center partners; and
14. Promote self and company to grow market share and achieve production goals.

D.  **Prohibited Activities:** In no event may Employee do any of the following:

1. Employee shall not utilize a headquarters or other fixed location to perform the Employee's responsibilities for Company;
2. Employee shall not, for any reason, falsify any certification they may be asked to complete concerning their status as an Exempt employee;
3. Employee may not at any time engage in marketing the Company, use the Company's name, or a facsimile of in any marketing, or advertise a product sold by the Company without the Company's prior express written permission;
4. Employee may not make any representations as an employee on any social networking, blog or internet site concerning the Company, or its products and/or services, unless such statements or representations comply with the Company's published guidelines concerning social media and use of the internet; and
5. Employee may not perform similar duties for any other company or individual.

E.  **Employee Obligations:** Employee shall follow all policies and procedures concerning the origination of mortgage loans, including the timely submission of loan applications and collecting complete and accurate information in support of applications. In addition, Employee will do the following:

1. Employee shall notify the Company if any circumstances of Employee's employment change at any time to become inconsistent with this position description;
2. Employee shall utilize a cellular phone to contact potential customers, to arrange a time and place to take the prospective customer's loan application at a location convenient to the prospective customer;
3. Employee shall regulate his or her own hours; however, the Company shall require Employee to work a minimum of five (5) hours each week on behalf of the Company. Employee may work as many hours a week as needed to meet Company goals and objectives. Employee shall not receive wages for hours worked. Employee is not eligible to receive overtime for hours worked in excess of 40 hours per week;
4. Employee shall spend time serving as a liaison between Company loan processors and applicants who applied for a loan through Employee, attending sales meetings and training sessions, and providing sales support for other loan officers, processors, and underwriters of the Company, as requested;
5. At least 80% of Employee's time shall be spent (a) contacting and meeting prospective customers to obtain loan applications at locations convenient to the prospective customers, (b) preparation of proposals or promotional material sales reports, or (c) arranging trips, logistics, and similar tasks that support personal meetings with prospective customers; and
6. Employee shall earn commissions for each closed loan according to the current terms of Employee's Compensation Addendum and shall not receive any draw or salary.

Employee acknowledges that in performing his/her primary duties, he/she shall, during each work week, be customarily engaged away from Company's office and shall not be assigned set work hours. Employee shall not establish any home office from which he/she regularly works and/or regularly conduct Company business from his/her home. Employee recognizes the position of Personal Mortgage Advisor - Outside requires Employee to meet and call on clients, referral sources, Realtors™, and business prospects at their homes and places of employment or in other social settings, and these responsibilities may include periodic and non-regular use of Company office space or the Employee's own home.

DocuSign Envelope ID: 64A6CD58-2A51-4147-9E60-1A5FB2700708

| Kawai Hooper | _Kawai Hooper_ | 5/27/2023 \| 1:56 PM EDT |
|---|---|---|
| Employee Name | Employee Signature | Date |

**Manager Attestation:**

*I have reviewed this description and found it to be accurate regarding the overall job duties agreed to with the employee.*

| Leonard Pagan | _Leonard Pagan_ | 5/26/2023 \| 3:39 PM EDT |
|---|---|---|
| Manager Name | Manager Signature | Date |

DocuSign Envelope ID: 64A6CD58-2A51-41A7-9E60-1A5FB3700708

**Supplement B to Employment Agreement**
**Compensation Statement – Outside Loan Originator: Part Time**

## 1. <u>Summary:</u>

**(a)** Effective Date: ___May 30, 2023___.

**(b)** Overtime Status: Employee is exempt from overtime compensation.

**(c)** Wages: Employee is compensated on commission only.

**(d)** Commission Rate:
Commissions for funded Loan Production will be compensated according to the following table:

| Lead Type, Source, or Product | Commission Rate | Maximum Commission per Eligible Loan |
|---|---|---|
| Self-Generated Production | See Table Below | $10,000 |
| Company-Sourced Leads | 0 bps | N/A |
| Manager Referrals | 70 bps | $5,833 |
| Bond/Brokered Loan | 70 bps | $10,000 |
| Reverse Loans | 0 bps | N/A |
| NLC-Serviced Customer (Retention) | 0 bps | N/A |
| Other: | 0 bps | N/A |

| Funded Volume – Retroactive | BPS |
|---|---|
| $0 - $999,999.99 | 80 |
| $1,000,000.00 - $1,999,999.99 | 90 |
| $2,000,000.00 + | 100 |

**(e)** Additional Commission: N/A

**(f)** Additional Compensation: N/A

**(g)** Guaranteed Compensation: N/A

The parties signing below agree to all terms and conditions of this Supplement:

Kawai Hooper

Employee Name

_DocuSigned by:_
*Kawai Hooper*
Employee Signature

5/27/2023 | 1:56 PM EDT

Date

For Nations Lending Corporation:

_DocuSigned by:_
*Cheryl Lieber*
Cheryl C. Lieber, Chief Admin. Officer

5/26/2023 | 3:35 PM EDT

Date

DocuSign Envelope ID: 64A6CD58-2A51-41A7-9F50-1A5FB3700708

**Manager Attestation:** *I have reviewed this agreement and found it to be accurate regarding the overall compensation agreed to with the employee.*

| | | |
|---|---|---|
| Leonard Pagan | *Leonard Pagan* | 5/26/2023 \| 3:39 PM EDT |
| Manager Name | Manager Signature | Date |

## 2. __Employee Classification:__

(a) **Exempt Status**. Per the terms of Employee's Job Description Supplement, Employee is subject to the outside sales employee exemption. As a result, employee is not entitled to minimum wage or overtime. For exempt employees, compensation is intended to pay for all hours worked during each pay period.

(b) **Part Time Employment.** Employee is employed for less than **30** hours per week. If Employee's hours change or increase, Employee will bring such information to the attention of the Employee's manager. Employee is not eligible for benefits under any Company plan because of Employee's work for Company.

(c) **Advanced Payments.** Any amounts advanced to Employee to cover licenses, fees, or at the discretion of Company are draws against future compensation earnings and subject to repayment.

## 3. __Terms of Employee's Compensation Plan:__

This Supplement B, Compensation Statement, identifies the compensation the Employee will receive from the Company. In the event Employee's compensation changes due to raise, decrease, modification in calculation, or new position, then the Company will provide a modified Compensation Statement for execution, which will replace this one in its entirety. Compensation shall be paid to Employee at such times and in a manner consistent with Company Policies as may be in effect from time to time.

(a) **Compensation.** For each pay period, Employee shall earn compensation which may be composed of (i) Wages; (ii) Commission; Additional Commission; and (iv) Additional Compensation, as follows:

   i. **Wages.** Per Section 1(c), Employee is compensated on commission only and does not receive a salary or hourly wage.

   ii. **Commission.** Employee may be eligible to earn commission compensation for loan production closed in Employee's name according to the provisions of Section 2(b).

   iii. **Additional Commission.** In addition to other Commission compensation, Employee may be eligible to earn Additional Commission based upon meeting individual performance metrics subject to the provisions of Section 2(c).

   iv. **Additional Compensation.** Employee may be eligible to earn Additional Compensation based upon designated business units of Company achieving established performance targets ("Bonus"). Additional Compensation is subject to the provisions of Section 2(d).

(b) **Commission**. For any authorized loan origination activity undertaken, Employee may be paid performance-based incentive compensation ("Commission"), less applicable withholding and deductions owed to the Company, for Eligible Loans, subject to all terms and conditions outlined in this Supplement. Any previous advances on Commission or other offsets will be deducted from Commission before payment. No payment will be advanced, nor Commission paid, on loans that the Employee did not originate, or that were not Funded while under Employee's authorized and direct supervision, or while Employee was not employed with Company. The Commission paid to Employee for every Eligible Loan the Employee originates is calculated as a fixed percentage of the principal amount of the credit extended (the "Commission Rate"), as detailed in table form in Section 1(d). The Commission Rate used to calculate Employee's Commission amount will be fixed for all

Eligible Loans originated by Employee which close and fund. The Commission Rate will be determined as basis points (bps) on the total loan volume of funded units. The amount of Commission will be equal to the product of the loan amount times the applicable basis points, and less other fees and deductions as set forth herein.

(c) **Additional Commission.** Employee may be eligible to earn Additional Commission based upon the performance of designated business units of Company ("Overrides"). Additional Commission will be determined according to the rates provided in Section 1(e).

(d) **Additional Compensation.** Employee will be eligible to earn Additional Compensation based upon achieving established performance targets. Additional Compensation will be determined according to the rates or terms provided in Section 1(f). in the pay period following the close of the applicable calculation period (calendar month except if noted otherwise). Additional Compensation, if any, will then be issued in the next regular payroll cycle.

Compensation is intended to pay for all hours worked during each pay period, regardless of scheduled hours, tracked hours, or actual hours performed in accordance with the Company's ordinary payroll practices and schedules detailed in the current Employee Handbook. Employee is not guaranteed any term of employment or amount of compensation. All employment is "At Will" and may be terminated at any time by either party.

4. **Definitions:** Where used in this Supplement, the following terms apply.

   a) **Branch Manager Referral**:  Employee may be provided leads that are sourced from a relationship that the Branch Manager has established.  These are prospects created by the Manager based on past marketing efforts or relationships with realtors or other referral sources the Branch Manager has established over time.

   b) **Company-Sourced Leads**: Employee may be provided with Company-sourced leads or internally sourced business.  These are prospects created by the Company, whether by internal or external marketing efforts, through other marketing efforts of the Company, referred in-house by the Company to Employee, or created by the Company based on its relationships with realtors or other referral sources.

   c) **Early Payment Default:** a residential mortgage loan for which the borrower fails to make one or more timely payments (any payment received 15 days or more after it is due) during the first twelve months following the Origination Date regardless of whether such loan is later brought current.

   d) **Early Payoff:** a residential mortgage loan which has its principal balance paid off or reduced by 50% or more within the first twelve months following the Origination Date.

   e) **Eligible Loan:** a residential mortgage loan that is: (i) originated in accordance with applicable requirements; (ii) under the supervision of an Employee possessing valid licenses and in good standing throughout the origination process; (iii) closed and funded in accordance with applicable requirements in the period in which the Commission is calculated; and (iv) not unfunded, cancelled, rescinded, or disqualified for any reason, or otherwise not earned as defined in this Supplement. Whether a loan constitutes an Eligible Loan is determined at the sole and absolute discretion of Company.

   f) **Indemnification:** a request by an Investor for Company to issue a guarantee to cover future losses on a defective loan; irrespective of whether Company ultimately is required to make good on such Indemnification at any time; so long as Company executes an indemnification agreement for such loan.

   g) **Investor:** any entity to which a loan subject to this agreement is sold, transferred, or conveyed, in whole or part, whether by sale, securitization, or other operation. Investor also refers to a governmental agency which insures or guarantees any loans, and Ginnie Mae.

DocuSign Envelope ID: 64A6GD58-2A51-4147-9E50-1A5FB3700708

h) **Loans Brokered to Other Lenders:** a loan that is closed with another lender subject to a brokerage arrangement. Brokered loans are typically loan products or bond programs that are not offered by Company, and for which another lender frequently performs the underwriting and approvals.

i) **Loan Defect:** an error, mistake, falsification, omitted document or information, or miscalculation contained in a loan file or its constituent documents and instruments which violates the guidelines of the applicable Investor to which the loan is sold or to which the loan was intended to be sold to if such defect renders the loan ineligible for such sale and purchase.

j) **NLC-Serviced Customer:** a loan that is made to an individual who currently has a loan that is being serviced by Company.

k) **Origination Date:** the day on which a residential mortgage loan is closed and funded. For transactions where the closing and funding occur on different dates, the Origination Date is the date on which funding actually occurs and not the date scheduled for funding at the time of closing.

l) **Pay Period:** the semi-monthly period established by Company's payroll policies in each month during which Employee renders services. If Employee works less than a full pay period, then Employee's salary for such pay period will be proportionately reduced to correspond to the portion of such period worked.

m) **Reverse Mortgages:** a HECM or similar closed- or open-ended loan in which disbursements are advanced against the borrower's equity in the property over time. Employee is not authorized to originate a Reverse Mortgage or HECM product unless personally approved by Company.

n) **Self-Sourced Production**: Employee may create his/her own relationships and referral sources. These are prospects that are generated by the efforts of the Employee, and not reliant upon Company-generated or sponsored relationships with borrowers or other referral sources. The ability to earn compensation through this category is contingent upon the Employee documenting the bona-fide nature of the self-sourced loan in a manner as designated by the Company.

o) **Transitioned Loan:** a loan where one loan originator accepts the application, but the application is transferred to a different originator prior to the closing and funding of the loan for various reasons. Such loans are compensated in proportion to the amount of work performed by Employee on such loan instead of at the full Commission rate. Retention Loan Referrals as covered under Section 8 are compensated solely on those terms.

p) **Unit:** an individual first-lien mortgage loan, which qualifies as an Eligible Loan, regardless of the loan amount or type. Where used for monthly Commission calculations, the Unit count for the applicable calendar month is used.

5. **Commission Payments to Employee:**

(a) **Commission Advance.** Commission may be advanced when a loan has funded. A loan is funded when the loan has gone through settlement, all monies have disbursed, all rescission periods have expired (if applicable), and all proper documentation is filed and prepared in accordance with all State and Federal laws, including TILA and RESPA. Brokered Loans will be deemed as funded when all items listed above are complete and the Company has received the check for payment from the institution to which the loan was brokered.

(b) **Earned Commission.** Commission is earned once the loan has been funded and sold on the secondary market or to a Government Sponsored Entity (GSE), and the applicable borrower(s) make the first four (4) payments on the loan in a timely manner. Commission will not be earned on any loan that 1) is not a Qualified Mortgage as defined by applicable guidelines, unless the loan is part of an approved "Non-QM" program authorized and offered by the Company; or 2) is subject to repurchase, indemnification early payment default, or early pay-off, or is otherwise unsalable. Additionally, Employee may not directly, or indirectly, solicit or commence a prequalification, application, pre-application, or pre-approval for any customer until at least 180 days have passed since the date of the customer's previous loan closing for the same property. Failure to observe this

waiting period will result in that loan's applicable Commission to be considered unearned and subject to withholding or repayment to Company at its demand.

**(c) Payment and Acknowledgement of Commission.** Commissions are calculated based on the volume of funded loans during the monthly Commission period. The payment date of earned Commissions will be determined by the Company's pay policies as may be amended from time to time. Earned compensation will be paid according to the schedules to be set by the Company.  The Employee agrees that within 30 days of the receipt of any Commission, she or he will bring to Company's attention, in writing, any and all objections, disputes, or concerns regarding omissions or errors in connection with Commissions paid, whether or not to the Employee's benefit. If no such written dispute is initiated and received, Employee's silence constitutes an acknowledgement that Commissions were properly calculated and paid.

It is the general intent of the Company to advance Commissions once a loan has funded; however, Commissions are subject to repayment if it is not earned, in accordance with the provisions of Section 6.

**6.** **Commission Repayments to the Company:**

a) **Repurchase, Early Payoff Adjustment and Unsalability.** In the event compensation is advanced, but is later deemed unearned because of any repurchase, indemnification, early payment default, or early pay-off, the compensation amounts previously advanced will be subtracted from Employee's net compensation balance in calculating any compensation not yet paid to Employee. Waiver of this policy is at the Company's discretion and may be applied for situations involving major life events (such as death) and other such unanticipated factors that could not have been known at the time of the loan origination.  Waiver in one circumstance will not constitute a waiver in all similar situations and is at the sole discretion of the Company.

*(In other words, Commissions advanced on a loan may need to be repaid if the loan is unsalable, subject to repurchase or indemnification at any point, or subject to early default or payoff, particularly if the Employee had reason to know of the risk encountered.  This determination is made on a case-by-case basis and takes into account whether the Employee had a role in the loan's salability or knew or should have known of issues concerning the loan's ultimate viability.)*

b) **Repayment of Advances or Obligations to the Company.** In the event that Employee has an outstanding balance owed to the Company for advances received by the Employee, the Employee hereby authorizes the Company to deduct the outstanding balance owed from his/her compensation. Unless the Company and Employee otherwise agree upon a specific dollar amount or a percentage of commissions, Employee expressly authorizes the Company to deduct from his/her compensation any amount for as long as it takes to resolve the outstanding balance owed to the Company; except that the amount of the deductions will not cause Employee's income to fall below the applicable minimum wage threshold for any applicable pay period. If a balance is owed to Company and Employee has no compensation payments pending from which such balance may be deducted, Company may demand Employee repay the obligation in full and Employee agrees to satisfy such obligation within 30 days of receiving notice of such deficit from Company.

7. **Separation from Employment:** Upon termination of employment for any reason, any rights to any commission or compensation from any loans which are unclosed or unfunded as of the last date of employment shall be forfeited by Employee and all income and rights therein shall accrue solely to the Company. Employee will be paid applicable earned income through the date of termination; however, Employee will not be entitled to receive any Commission advances on loans. Employee's final Commission payment may be paid up to ninety (90) calendar days following the termination date for the purpose of reconciling any outstanding debts, charge backs, unearned commissions, unreturned equipment charges, or other repayments due from Employee to Company or to any third parties. Issuance of the final payment does not operate to release Employee from any liability with regards to a later determination that any Commission or other advance paid was not earned.

8. **Effective Date:** The Employee acknowledges that the terms of this Supplement will be effective on and after the Effective Date until Employee's termination of employment or until this Supplement is replaced with a new agreement that supersedes the current document. The Effective Date may be the date of first employment with Company (Employee's start date) or the first date of the payroll cycle in which the provisions of this Supplement will take effect. If this Supplement is replacing a prior agreement, then the terms of the prior agreement will apply to compensation Earned prior to the Effective Date of this Supplement and this Supplement will apply to compensation Earned thereafter.

9. **Retention Loan Referral Bonus:** Employees currently licensed and authorized as loan originators may, from time to time, become aware that an existing Company customer is interested in refinancing a loan currently serviced by the Company, but such employee may not be able to originate a refinance of said loan due to not currently holding an appropriate license.

In such a situation, the Employee may receive Additional Commission compensation equal to **37.5 bps** of the principal balance of such loan at time of origination, in the manner and under the conditions applicable to all other Commission payments in Supplement B, in exchange for performing the duties of a loan originator assistant to the originator of the loan in satisfaction of the following conditions:
   1. The consumer has a loan currently serviced by Company which they wish to refinance.
   2. Employee refers such consumer to one of Company's current consumer direct branches and sends such branch a notification of the referral accompanied by contact information to reach said referred consumer.
   3. The consumer submits a loan application to the referred branch as a result of said referral, is approved for financing, and a refinance transaction is originated.
   4. Employee performs the duties and responsibilities of loan originator assistant for such refinance.

Employee will be entitled to the referral commission for each referred transaction for which Employee was the first person to provide such referral as tracked in Company's systems, which shall be the definitive record for determining all earned amounts.

10. **Guaranteed Compensation:** When applicable, for the dates specified in this Agreement in Section 1(g), Employee will receive a guaranteed minimum compensation as identified for each pay period. The payment of all amounts under this Section is subject to the following terms and conditions:
   **(a)** Employee will be eligible for compensation, in the amount of the greater of (1) Earned Compensation; or (2) the Guaranteed Minimum Compensation.
   **(i)** Earned Compensation is the total of nonwage earnings as defined in Sections 3(a) (ii)-(iv).
   **(ii)** The Guaranteed Minimum Compensation shall be the amount shown in Section 1(g).

For any pay periods covered by this Section (10) for which Earned Compensation is less than the amount of Guaranteed Minimum Compensation, the difference will be considered an Advance, subject to Sections 4 – 6 of this supplement and Sections 3(c)-(e) of the Employment Agreement.

For payment periods subject to this section, Employee's compensation for the first payroll period of a month will be based upon one-half of the Guaranteed Minimum Compensation. Employee's compensation paid for the second payroll period of a month will be adjusted to reflect the remaining amount of compensation due to Employee in that monthly period.

# DocuSign

## Certificate Of Completion

Envelope Id: 64A6CDF82A5141479F501A5FB3700708
Subject: Complete with DocuSign: EmpAgr_2023.05.30_Hooper,Chandee
Source Envelope:
Document Pages: 23                     Signatures: 7
Certificate Pages: 5                   Initials: 14
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-05:00) Eastern Time (US & Canada)

Status: Completed

Envelope Originator:
Sarah Link
3673 Westcenter Dr
Houston, TX  77042
Sarah.Link@nationslending.com
IP Address: 184.103.186.156

## Record Tracking

Status: Original
      5/26/2023 3:32:18 PM

Holder: Sarah Link
      Sarah.Link@nationslending.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Cheryl Lieber<br>Cheryl.Lieber@nationslending.com<br>Chief Administrative Officer<br>Nations Lending Corporation<br>Security Level: Email, Account Authentication (None) | *Cheryl Lieber*<br>—6EF1AC2D5DB5458...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 107.122.157.104<br>Signed using mobile | Sent: 5/26/2023 3:33:55 PM<br>Viewed: 5/26/2023 3:34:45 PM<br>Signed: 5/26/2023 3:35:30 PM |
| **Electronic Record and Signature Disclosure:**<br>   Not Offered via DocuSign | | |
| Leonard Pagan<br>Leonard.Pagan@nationslending.com<br>Security Level: Email, Account Authentication (None) | *Leonard Pagan*<br>—8FCE9DE79544415...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 72.130.226.158 | Sent: 5/26/2023 3:35:33 PM<br>Viewed: 5/26/2023 3:39:42 PM<br>Signed: 5/26/2023 3:39:55 PM |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 5/26/2023 3:39:42 PM<br>   ID: 24653826-892c-45e7-a80e-9a1f8249821c | | |
| Kawai Hooper<br>kawai.hooper@gmail.com<br>Security Level: Email, Account Authentication (None) | *Kawai Hooper*<br>—B1D8235A1600457...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 76.173.2.103 | Sent: 5/26/2023 3:40:00 PM<br>Viewed: 5/27/2023 1:48:48 PM<br>Signed: 5/27/2023 1:56:20 PM |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 5/27/2023 1:48:48 PM<br>   ID: 06a65f29-786b-4ae7-bf0e-0a6abeb5152c | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

**Carbon Copy Events**     **Status**     **Timestamp**

Zachary Johns

Zachary.Johns@nationslending.com

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
     Not Offered via DocuSign

COPIED     Sent: 5/27/2023 1:56:24 PM

Justin Kelley

justin.kelley@nationslending.com

Employee Onboarding - Team Lead

Nations Lending Corporation

Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
     Not Offered via DocuSign

COPIED     Sent: 5/27/2023 1:56:25 PM

**Witness Events**     **Signature**     **Timestamp**

**Notary Events**     **Signature**     **Timestamp**

**Envelope Summary Events**     **Status**     **Timestamps**

| | | |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/26/2023 3:33:55 PM |
| Certified Delivered | Security Checked | 5/27/2023 1:48:48 PM |
| Signing Complete | Security Checked | 5/27/2023 1:56:20 PM |
| Completed | Security Checked | 5/27/2023 1:56:25 PM |

**Payment Events**     **Status**     **Timestamps**

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 10/31/2015 5:05:20 PM
Parties agreed to: Leonard Pagan, Kawai Hooper

Case: 1:24-cv-00446-JEG  Doc #: 1-2  Filed: 03/08/24  185 of 328.  PageID #: 197

From time to time, Nations Lending Corporation (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Nations Lending Corporation:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: solutions@nlcloans.com

**To advise Nations Lending Corporation of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at solutions@nlcloans.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Nations Lending Corporation**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to solutions@nlcloans.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Nations Lending Corporation**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to solutions@nlcloans.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.
**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Nations Lending Corporation as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Nations Lending Corporation during the course of my relationship with you.

DocuSign Envelope ID: 316CC991-E640-4417-B1B8-74E6991C34AB

# Nations Lending Corporation
# Employment Agreement

This Employment Agreement ("Agreement") is made between Nations Lending Corporation ("Company") and _____ Brooks Onishi _____ ("Employee"). In consideration of the premises in this Agreement, the employment or continued employment of Employee by the Company, and the covenants and agreements of the parties contained herein, and for good and valuable consideration, Employee accepts employment with the Company as hereinafter stated.

1. **EMPLOYMENT.**

    **(a) Contingent Offer.** Company has extended a conditional offer of employment, meaning that Employee must complete all conditions satisfactorily. Execution of this Agreement does not imply or ensure that Employee has satisfied all conditions precedent to commencing employment, including, without limitation: verification of references; satisfactory completion of background checks, verification of professional qualifications or licenses, or other conditions which may be stated in Employee's Offer Letter.

    **(B) Term of Employment.** The period during which the Employee is employed by the Company hereunder is hereinafter referred to as the "Employment Term." The Employment Term will commence on Employee's first actual day of work, regardless of any date contained in an offer letter, as reflected in Company's records, and will continue until Employee, as determined in Company's sole discretion, by reason of physical or mental disability is unable to perform their duties. The end of the Employment Term will be the effective date of any resignation or termination notice given. NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED TO IN ANY WAY ALTER, AMEND, OR MODIFY THE AT-WILL STATUS OF THE EMPLOYMENT RELATIONSHIP BETWEEN THE COMPANY AND THE EMPLOYEE IN WHICH EITHER THE COMPANY OR THE EMPLOYEE MAY TERMINATE THE EMPLOYMENT RELATIONSHIP AT ANY TIME, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE.

    **(c) Position & Duties.** Subject to its ultimate supervision, direction, and control, Company employs Employee during the Employment Term to perform services and duties as are described on the Position Description and Duties Addendum (Supplement A) of this Agreement and under any conditions detailed in such addendum or in the Company's Employee Handbook and adopted policies. The Company reserves the right to modify or amend Employee's duties at any time.  In the event Employee's position or title changes with a significant change of duties, Company will provide Employee with a new addendum for execution, which will replace the existing one in its entirety and be effective from the date of such amendment. As employee of a financial institution, Employee is charged with, and owes to Company: (i) a duty of loyalty, fidelity, and trust to Company; (ii) a responsibility to exercise judgment and perform duties in good faith and in the best interest of the Company, (iii) the performance of honest services, and (iv) a promise to use extraordinary care, skill, and diligence in the performance of all duties.

    **(d) Sole Employment.** During the Employment Term, the Employee shall devote substantially all of Employee's business time and attention to the performance of the Employee's duties and will not engage in any other business, profession, or occupation for compensation or otherwise which might conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Company, in accordance with the Company's Dual Employment Policy. Employee's failure to disclose other employment may be grounds for termination.



Employee Initials

DocuSign Envelope ID: 316CC991-E640-4417-B1B8-74C6991C34AB

**(e) Termination.** Employee's employment is at-will, meaning that the Employee or Company may terminate the employment relationship at any time, with or without cause, and with or without notice. Although Employee's duties, title, compensation, and benefits as well as Company's personnel policies and procedures may change from time to time, the 'at will' nature of employment may only be altered by an express agreement signed by an authorized officer of Company. Upon termination or resignation for any reason, Employee's compensation and benefits will end. If Employee is entitled to commissions, trailing payments, bonuses or stock options as part of Employee's compensation, entitlement to all unearned or unvested amounts as of the last date of employment is forfeited by Employee unless stated otherwise in Employee's Compensation Addendum, as further described below.

## 2. COMPENSATION.

**(a) "Wages".** Employee will be paid for services performed by Employee in accordance with the Company's policies and procedures for payments reflected in the Company's Employee Handbook and related Company policies. The amount of compensation to be received by Employee, whether wages or salary ("Pay"), commissions or bonuses ("Incentive Payments"), or other compensation (collectively, "Pay", "Incentive Payments" and other compensation are "Compensation") is detailed on the Compensation Addendum (Supplement B) of this Agreement, and subject to any conditions in such addendum. Except as may be provided in Employee's Compensation Addendum, Employee's Compensation may be changed at any time by Company upon notice to Employee, and continued employment by Company is subject to such revised terms.

**(b) Benefits.** During the Employment Term, the Employee shall be entitled to participate in employee benefit plans, practices, and programs maintained by the Company, as in effect from time to time (collectively, "Employee Benefit Plans"), to the extent consistent with applicable law, Company policies, and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law. Employee's eligibility for Employee Benefit Plans is determined by their position and regular hours worked.

**(c) Advances**. Company may advance Incentive Payments or other compensation to Employee before Employee's entitlement to such payments is vested. In the event that such advanced amounts are later determined to have been unearned by employee (e.g., a commission paid on a loan which is later subject to repurchase) then Employee must reimburse the amount advanced to Company and Company is entitled to deduct such advanced amounts from future payments to be made to Employee, including from Employee's final paycheck. Additional details on advances may be contained in Supplement B.

**(d) Deductions**. In addition to withholdings for tax and other purposes provided by law, Company may subtract authorized deductions from Employee's Compensation payments, including Employee's final paycheck. Deductions may be made for the costs of Benefits elected by Employee, to recover Advances paid to Employee, to recover overpayments, to reimburse Company for expenditures on Employee's behalf or as a result of Employee's actions or failure to immediately return all of Company's property upon termination, and as authorized by Employee. Deductions may also be made for Incentive Payments made to Employee if the conditions under which Employee is entitled to such Incentive Payments are later determined not to have been met, such as where a loan on which commission has previously been paid is found to be ineligible for such commission. Additional details on deductions may be contained in Supplement B.



Employee Initials

DocuSign Envelope ID: 316CC991-E640-4417-B1B8-74E6991C34AB

(e) **Effects of Termination on Compensation.** If Employee resigns from employment with Company, Employee agrees to reimburse Company for all outstanding Advances within thirty days of termination, and where Employee fails to do so, Company is entitled to interest on the unpaid amounts at the rate of 10%, compounded monthly. Where Employee resigns from employment without at least fourteen days advance notice or is terminated for reasons related to the Employee's acts of disloyalty, fraud, theft, forgery or other dishonesty, refusal to work, willful destruction of property, gross insubordination, falsification of records, criminal or unlawful activity, or willful misconduct, Employee forfeits any right to Incentive Payments which Employee would otherwise be entitled to receive following the last day of employment under the terms of Employee's Compensation Addendum.

3. **CONFIDENTIAL INFORMATION**. The Employee understands and acknowledges that during the course of employment by the Company, Employee will have access to and learn about confidential, secret, and proprietary documents, materials, data and other information, in tangible and intangible form, of and relating to the Company and its businesses and existing and prospective customers, suppliers, investors and other associated third parties which is not generally known to the public ("Confidential Information"). The Employee further understands and acknowledges that this Confidential Information and the Company's ability to reserve it for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure of the Confidential Information by the Employee will cause irreparable harm to the Company, for which remedies at law will not be adequate.

(a) **Confidential Information Defined.** For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, documents, operations, services, strategies, techniques, agreements and terms of agreements, transactions, negotiations, know-how, trade secrets, applications, work-in-process, databases, compilations, technologies, records, systems, sources, supplier information, vendor information, financial information, accounting information, marketing information, pricing information, credit information, payroll information, personnel information, employee lists, reports, internal controls, security procedures, customer information or lists, buyer lists, or other information generally considered private and confidential in the industry or by any existing or prospective customer, other associated third party, or of any other person or entity that has entrusted information to the Company in confidence.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

The Employee understands and agrees that Confidential Information developed by Employee in the course of Employee's employment by the Company shall be subject to the terms and conditions of this Agreement as if the Company furnished the same Confidential Information to the Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public, provided that such disclosure to the public is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

(b) **Company Creation and Use of Confidential Information.** The Employee understands and acknowledges that the Company has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of mortgage

DocuSign Envelope ID: 316CC991-E640-4417-B1B8-74C6991C34AB

lending and financial services. The Employee understands and acknowledges that as a result of these efforts, Company has created and continues to use and create Confidential Information. This Confidential Information provides Company with a competitive advantage over others in the marketplace.

**(c) Disclosure and Use Restrictions.** Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company) not having a need to know and authority to know and to use the Confidential Information in connection with the business of the Company and, in any event, not to anyone outside of the direct employ of the Company except as required in the performance of any of the Employee's authorized employment duties to the Company; (iii) and not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company except as required in the performance of the Employee's authorized employment duties to the Company.

The Employee understands and acknowledges that the Employee's obligations under this Agreement regarding any particular Confidential Information begin immediately when the Employee first has access to Confidential Information (whether before or after commencing employment with Company) and shall continue during and after the Employee's employment by the Company until the Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or a breach by those acting in concert with the Employee or on the Employee's behalf.

**(d) Notice of Immunity Under the Defend Trade Secrets Act of 2016**. Employee acknowledges receipt of Company's Employee Reporting Policy and Company Code of Ethics (available at https://nlcloans.sharepoint.com/sites/Policies) setting forth: (A) Company's reporting policy for a suspected violation of law; and (B) notice of immunity from criminal and civil liability for certain disclosures of trade secrets under 18 U.S.C. § 1833(b).

**(e) Other Permitted Disclosures.** Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company. Nothing in this Agreement prohibits or restricts the Employee (or Employee's attorney) from filing a charge or complaint with the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), the Occupational Safety and Health Administration (OSHA), any other self-regulatory organization, or any other federal or state regulatory authority ("Government Agencies"). The Employee further understands that this Agreement does not limit the Employee's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency without notice to the Company. This Agreement does not limit the Employee's right to receive an award for information provided to any Government Agencies. In addition, nothing in this Agreement in any way prohibits or is intended to restrict or impede the Employee from exercising protected rights under Section 7 of the National Labor Relations Act or otherwise disclosing information as permitted by law.



Employee Initials

DocuSign Envelope ID: 316CC991-E640-4474-B1B8-74E6991C34AB

## 4. COMPANY'S PROPRIETARY RIGHTS.

**(a) Work Product**. The Employee acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas, and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by the Employee individually or jointly with others during the period of employment by the Company and relating in any way to the business or contemplated business, research, or development of the Company (regardless of when or where the Work Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical, and electronic copies, all improvements, rights, and claims related to the foregoing, and other tangible embodiments thereof (collectively, "Work Product"), as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), patents, and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions, and renewals thereof (collectively, "Intellectual Property Rights"), shall be the sole and exclusive property of the Company.

For purposes of this Agreement, Work Product includes, but is not limited to, Company information, including plans, strategies, techniques, agreements, documents, terms of agreements, negotiations, know-how, computer programs, computer applications,  web design, work in process, databases, manuals, reports, compilations, graphics, drawings, sketches, market studies, formulae, notes, communications, algorithms, product plans, models, audiovisual programs, ideas, inventions, original works of authorship, customer information, customer lists, manufacturing information, marketing information, advertising information, and sales information. Work Product also means items created in the six-month period following employment as a result of or attributable to work performed during employment or specific work product substantially begun during employment.

**(b) Work Made for Hire; Assignment**. The Employee acknowledges that, by reason of being employed by the Company at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in the Copyright Act of 1976 (17 U.S.C. § 101), and such copyrights are therefore owned by the Company. To the extent that the foregoing does not apply, the Employee hereby irrevocably assigns to the Company, for no additional consideration, the Employee's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company would have had in the absence of this Agreement.

**(c) Further Assurances; Power of Attorney**. During and after employment, the Employee agrees to reasonably cooperate with the Company at the Company's expense to (i) apply for, obtain, perfect, and transfer to the Company the Work Product and Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (ii) maintain, protect, and enforce the same, including, without limitation, executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company. The Employee hereby irrevocably grants the Company power of attorney to execute and deliver any such documents on the Employee's behalf in Employee's name and to do all other lawfully permitted acts to transfer the Work Product to the Company and further the transfer, issuance, prosecution, and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Employee does not promptly cooperate with the Company's request (without limiting the rights the

DocuSign Envelope ID: 316CC991-E640-4417-B1B8-74E6991C34AB

Company shall have in such circumstances by operation of law). The power of attorney is coupled with an interest and shall not be impacted by the Employee's subsequent incapacity.

**(d) Moral Rights.** To the extent any copyrights are assigned under this Agreement, the Employee hereby irrevocably waives, to the extent permitted by applicable law, any and all claims the Employee may now or hereafter have in any jurisdiction to all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be known as "moral rights" with respect to all Work Product and all Intellectual Property Rights therein.

**(e) No License.** The Employee understands that this Agreement does not, and shall not be construed to, grant the Employee any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to Employee by the Company.

## 5. EMPLOYEE'S RESTRICTIVE COVENANTS.

**(a) Restricted Period.** The Employee agrees that the nature of Employee's position gives the Employee access to and knowledge of Confidential Information and places the Employee in a position of trust and confidence with the Company. The Employee further understands and acknowledges that the Company's ability to reserve use of the Confidential Information for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure by the Employee is likely to result in unfair or unlawful competitive activity. Because of Company's legitimate business interest as described in this Agreement and the good and valuable consideration offered to the Employee, the sufficiency of which is acknowledged, during the term of Employee's employment and for the next twelve months, to run consecutively, beginning on the last day of the Employee's employment with the Company, whether terminated for any reason or no reason, by the Employee or the Company, (the "Restricted Period"), the Employee agrees and covenants not to engage in Prohibited Activity.

**(b) Prohibited Activities.** For purposes of this Agreement, "Prohibited Activity" is where Employee, as an employee, employer, owner, manager, advisor, contractor, agent, partner, officer, volunteer, intern, or any other similar capacity, while engaging in residential mortgage lending on behalf of an entity other than Company, violates one or more of the "Restrictive Covenants" (i-iii) below to which Employee has agreed to accept as a condition of employment. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets, proprietary information, or Confidential Information.

**i.     Non-Solicitation of Employees.** The Employee understands and acknowledges that the Company has expended and continues to expend significant time and expense in recruiting and training its employees and that the loss of employees would cause significant and irreparable harm to the Company. The Employee agrees and covenants not to directly or indirectly solicit, hire, recruit, or attempt to solicit, hire, or recruit, any employee of the Company or any employee who has been employed by the Company in the six months preceding the last day of Employee's employment (collectively, "Covered Employee"), or induce the termination of employment of any Covered Employee during the Restricted Period. "Covered Employee" does not include an employee of Company that Employee supervised or managed prior to joining Company, who joins Company at approximately the same time as Employee, and who, while they are employed by Company, is supervised or managed by Employee. This non-solicitation provision explicitly covers all forms of oral, written, or electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, Twitter, and any other social media platform, whether

DocuSign Envelope ID: 316CC991-E640-4474-B1B8-74C6991C34AB

or not in existence at the time of entering into this Agreement. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section. This Section does not restrict or impede, in any way, and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

ii.   **Non-Solicitation of Customers.** The Employee understands and acknowledges that because of the Employee's experience with and relationship to the Company, the Employee will have access to and will learn about much or all of the Company's customer information, including, but not limited to, Confidential Information. "Customer Information" includes, but is not limited to, names, phone numbers, addresses, email addresses, transaction history, preferences, financial condition, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to Company's services. The Employee understands and acknowledges that: (i) the Company's relationships with its customers is of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its customer relationships and goodwill; and (iii) the loss of any such customer relationship or goodwill will cause significant and irreparable harm to the Company.

The Employee agrees and covenants, for the duration of the Restricted Period, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this agreement, or meet with the Company's current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section. This Section does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company.

iii.  **Unfair Competition.** The Employee understands and acknowledges that: (i) the Company's relationships with its customers are of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its partner and customer relationships and goodwill; and (iii) the loss of any such relationship or goodwill will cause significant and irreparable harm to the Company. Because Employee will have access to proprietary information belonging to Company that would provide an unfair advantage to competition, during the period of employment Employee agrees not to, for any person, business, or entity, a) own, maintain, operate, or engage in the same or similar business activities as Company or in any business activity which competes with the Company; b) serve, advise, manage, consult with, provide services for, or be employed by any individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company; c) undertake any efforts or activities toward forming or incorporating, financing, or commencing any competing business activity which engages in the same or similar business activities as the Company; or d) advise, serve, or consult with any person, business, or entity which is or will be undertaking efforts toward

DocuSign Envelope ID: 316CC991-E640-4A17-B1B8-74C6991C34AB

incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as the Company. During the Restricted Period, Employee agrees not to divert or refer Company customers or prospective customers to any other individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company. If Employee's job assignment location with Company is within a branch office or retail location, then Employee agrees and covenants not to open or relocate a similar office or location within a five-mile radius of such location (the "Restricted Territory") which would engage in the business of residential mortgage lending for the duration of the Restricted Period. "Relocate" includes Employee joining an existing office location of a competitor if such office was opened at such location within the six-month period before the beginning of the Restricted Period.  This Section does not restrict or impede, in any way, Employee from seeking gainful employment in the industry which does not harm Company's vital and legitimate business interests and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

(c) **Reasonableness.** Employee agrees that the restrictions in the Restrictive Covenants will not interfere with or unduly limit his or her ability to obtain suitable alternative employment following termination of employment with the Company.  Employee acknowledges that the protections provided to the Company are important, reasonable, and necessary, and Employee's agreement to the Restrictive Covenants and to refrain from Prohibited Activity, has been given freely, voluntarily, and without duress and after due deliberation, and that the Restrictive Covenants will not impose undue hardship on Employee.

(d) **Injunctive Relief.** Employee agrees that any violation or breach of Employee's obligations will result in irreparable injury to the Company for which no adequate remedy at law may be available.  Therefore, in addition to any other remedies Company may pursue, Employee consents to the issuance of a temporary restraining order and injunction prohibiting any conduct by the Employee in violation of the Prohibited Activities and waives any requirement of posting a bond as precondition of obtaining such injunction.  Employee agrees that the Company shall be entitled to recover its costs and legal fees and expenses incurred in investigating and enforcing the Restrictive Covenants, should Employee engage in Prohibited Activity.

(e) **Tolling.** The restrictions and limitations within this Agreement applicable during the Restricted Period shall be enforceable from the date of the last breach or violation of the applicable restriction(s) up to an equivalent period as if such date were the first day of the Restrictive Period, so that Company may receive the full benefit of Employee's agreement to the Restrictive Covenants.

## 6.  SECURITY.

(a) **Security and Access.** The Employee agrees and covenants (i) to comply with all Company security policies and procedures as in force from time to time including without limitation those regarding telephone systems, facilities access, key cards, access codes, Company intranet, internet, social media and instant messaging systems, computer systems, email systems, computer networks, document storage, data security, encryption, passwords, and communication technologies ("Facilities Information Technology and Access Resources"); (ii) not to access or use any Facilities and Information Technology Resources except as authorized by Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Employee's employment by the Company, whether termination is voluntary or involuntary. The Employee agrees to notify the Company promptly in the event he/she learns of any violation of the foregoing by others,

DocuSign Envelope ID: 316CC901-E640-4417-B1B8-74E6991C34AB

or of any other misappropriation, or unauthorized access, use, reproduction or reverse engineering of, or tampering with any Facilities and Information Technology Access Resources or other Company property or materials by others.

**(b)** **Exit Obligations**. Upon (i) voluntary or involuntary termination of the Employee's employment or (ii) the Company's request at any time during the Employee's employment, the Employee shall (a) provide or return to the Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, network access devices, computers, and computer equipment, manuals, reports, files, compilations, work product, thumb drives, or other removable information storage devices, hard drives, and data and all Company documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Employee, whether they were provided to the Employee by the Company or any of its business associates or created by the Employee in connection with his/her employment by the Company; and (b) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Employee's possession or control, including those stored on any non-Company devices, networks, storage locations, and media in the Employee's possession or control.

7. **PUBLICITY.** Employee hereby consents to any and all uses and displays, by the Company and its agents, of the Employee's name, voice, likeness, image, appearance, and biographical information in, on or in connection with any pictures, photographs, audio, and video recordings, digital images, websites, television programs, and advertising, other advertising, sales, and marketing brochures, books, magazines, other publications, and all other printed and electronic forms and media throughout the world, at any time during or after the Employment Term, for all legitimate business purposes of the Company ("Permitted Uses"). Employee hereby forever releases the Company and its directors, officers, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the Employment Term, in connection with any Permitted Use.

8. **EMPLOYEE REPRESENTATIONS.** The Employee represents and warrants to the Company that:
   **(a)** Acceptance of employment with the Company and the performance of the duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which the Employee is a party or is otherwise bound.
   **(b)** Acceptance of employment with the Company and the performance of Employee's duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.
   **(c)** Employee will not utilize any property belonging to a prior employer in the performance of Employee's duties; including any confidential, proprietary, or trade secret information obtained from a prior employer.
   **(d)** There are no actions, suits, proceedings, or known investigations, criminal or civil, pending against Employee in any court or before a governmental agency, which have not been disclosed by Employee.
   **(e)** Employee has the necessary training and knowledge to understand the laws and requirements of any position requiring a license to perform such duties and will maintain such licensure and perform such duties in compliance with all applicable laws and regulations as they are in effect.
   **(f)** If Employee is charged with a criminal offense, conviction of which could cause the suspension or revocation of any license required for the performance of Employee's duties, may adversely affect the ability of Employee to perform any obligations under this Agreement, or would cause Employee to become insolvent or bankrupt, Employee will notify Company's Human Resources Manager.



Employee Initials

DocuSign Envelope ID: 316CC991-E640-4417-B1B8-74E6991C34AB

**(g)** When Employee's employment with the Company terminates, Employee will notify any subsequent employer of the Restrictive Covenants contained in this Agreement before the Employee commences employment with such employer. In addition, the Employee authorizes the Company to provide notice of the Restrictive Covenants of this Agreement to third parties, including but not limited to, the Employee's subsequent, anticipated, or possible future employers.

9. **NOTICES.** All notices, requests, consents, claims, demands, waivers, and other initial communications regarding a dispute involving this Agreement (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth below. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), or certified or registered mail (in each case, return receipt requested, postage pre-paid). Notice is effective upon receipted delivery to the designated address if the party giving the Notice has complied with the requirements of this Section.

**(a)** Any notice required or permitted to be given to Employee will be delivered to the address shown as Employee's residence as shown on the records of the Company.

**(b)** Notices addressed to Company must be sent to its registered agent address for the state in which the Employee resides. A copy may be sent to the Company's corporate office address. Notices sent to the principal business address are ineffective as notice unless a copy is also sent to the registered agent's address.

10. **MISCELLANEOUS PROVISIONS.**

(a) **Entire Agreement.** This Agreement, together with the other documents incorporated by reference and all related supplements and addendums it incorporates, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter, and supersedes all prior and contemporaneous offers, understandings, agreements, or representations, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and other documents, the statements in the body of this Agreement shall control. The parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

(b) **Modification and Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by the Employee and an authorized representative of the Company. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

(c) **Captions; Interpretation.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The addendums and exhibits referred to shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

(d) **Successors and Assigns; Beneficiaries.** The rights of the Company under this Agreement shall inure to the benefit of the successors and assigns of the Company. The rights of Employee are personal to Employee and Employee's heirs or devisees and may not otherwise be transferred or alienated. This

DocuSign Envelope ID: 316CC991-E640-4A17-B1B8-74E6991C34AB

Agreement is for the sole benefit of the parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

(e) **Remedies.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise. Employee acknowledges that a breach or threatened breach of any obligations under this Agreement would give rise to irreparable harm to the Company for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by Employee of any such obligations, Company shall, in addition to any and all other rights and remedies that may be available in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction and any other relief that may be available from a court of competent jurisdiction without any requirement to post bond.

(f) **Survival.** All provisions of this Agreement regarding Confidential Information, Company's Proprietary Rights in intellectual property and work product, and Employee's Restrictive Covenants shall survive Employee's termination of employment, and no dispute regarding Employee's employment, the termination of Employee's employment, or this Agreement shall prevent the operation and enforcement of these obligations.

(g) **Severability.** Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

(h) **Signatures and Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement by facsimile, email in portable document format (.pdf), by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by using an electronic signature compliant with the E-Sign Act has the same effect as delivery of an executed original of this Agreement.

(i) **Governing Law; Jurisdiction and Venue.** This Agreement, for all purposes, to the maximum extent permitted by applicable law, shall be construed in accordance with the laws of Ohio without regard to any conflicts of law principles. Should applicable law specifically prohibit the use of the law of a foreign jurisdiction, then the law of the relevant jurisdiction shall be used. Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in accordance with the arbitration provision contained within this Agreement except that action may be brought in a state or federal court

located in the state of Ohio or the state of Employee's primary residence, if different, for the purposes of obtaining a restraining order or injunction against a violation of provisions of this Agreement or to enforce a judgment rendered in accordance with the results of arbitration between the parties. The parties hereby irrevocably submit to the non-exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO PARTICIPATE IN A CLASS ACTION OR A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

11. **ARBITRATION.** Any disagreement, dispute, controversy, or claim of any kind ("claims") arising out of or in connection to this Agreement, including any claims related to Employee's hiring, employment or the termination of Employee's employment, and including any claims that may arise between Employee and Company's owners, officers, directors, managers, employees, or agents in their capacity as such, shall be resolved by arbitration under the Federal Arbitration Act, Chapters 1 and 2, to the exclusion of inconsistent state laws, whether such claims are based in tort, contract, statute, equity, or otherwise. Employee agrees to waive all rights to a jury trial and waives the right to pursue any class action, collective action, or representative claims to the maximum extent allowed by law. To the extent a class or collective action or representative claim may not be waived, the Employee agrees to stay any such claims until after all claims subject to arbitration are fully resolved.

(a) **Excluded Claims**. Excluded from this Arbitration provision are those claims which are not arbitrable under state or federal law, including: worker's compensation claims; unemployment compensation claims; the right to file an administrative charge before a governmental agency such as the Equal Employment Opportunity Commission, National Labor Relations Board, or Department of Labor; or other claims which a statute prohibits from being subject to arbitration. Any disputes regarding the applicability of arbitration to a claim or the scope of this arbitration provision will be submitted to a court for determination.

(b) **Arbitrator.** Except for the excluded claims, disputes will be settled by binding arbitration administered by the American Arbitration Association before a qualified individual agreed to by the parties or designated pursuant to its Employment Arbitration Rules and Mediation Procedures (a copy of which may be found online at https://www.adr.org/Rules). The Optional Rules for Emergency Measures of Protection are incorporated by the parties. The standard provisions of the Employment Arbitration Rules shall apply. Claims shall be heard by a single arbitrator, unless the claim amount exceeds $250,000.00, in which case the dispute may be heard by a panel of three arbitrators.

(c) **Arbitration Procedure**. Company will pay the arbitrator fees and arbitration administrative expenses and any other costs unique to the arbitration hearing (recognizing that each side bears its own deposition, witness, expert and attorney's fees and other expenses to the same extent as if the matter were being heard in court). Unless otherwise agreed to by the parties, the place of arbitration shall be Cleveland, Ohio, USA or conducted virtually by telephone or videoconference. Applicable law for purposes of arbitration shall be determined by the Governing Law provision of this Agreement. If the dispute is less than $50,000.01 there shall be no discovery other than the exchange of documents and written questions.  If the dispute exceeds $50,000.00, each party's discovery shall include no more than three depositions of four hours each. Where no party's claim exceeds $30,000.00 exclusive of interest, attorneys' fees and arbitration costs, the dispute shall be resolved by submission of documents and there shall be no in-person or oral hearing. The award shall be made within six months of the filing of the notice of intention to arbitrate (demand), and the arbitrator(s) shall agree to comply with this schedule



Employee Initials

DocuSign Envelope ID: 316CC961-E640-4417-B1B8-74C6991C34AB

before accepting appointment. However, this time limit may be extended by the arbitrator(s) for good cause shown, or by mutual agreement of the parties.

(d) **Arbitrator Authority.** The arbitrator(s) will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute or for a breach of Sections 3 through 6 of this Agreement. The arbitrator(s) shall not award consequential damages in any arbitration initiated under this provision. The arbitrator(s) may determine how the costs and expenses of the arbitration shall be allocated between the parties, but they shall not award attorneys' fees. If, however, any party prevails on a statutory claim that affords the prevailing party attorneys' fees and costs, then the arbitrator(s) may award reasonable attorneys' fees and costs to the prevailing party. Any dispute as to who a prevailing party is or the reasonableness of any fee or costs shall be resolved by the arbitrator(s).

(e) **Award.** The award shall be accompanied by a reasoned opinion. Judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Except as may be required by law, or as may be required in an action to enforce, modify, or vacate the award, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties.

(f) **Full and Free Consent.** This Agreement to arbitrate is freely negotiated between Employee and Company and is mutually entered into between the parties. Each party fully understands and agrees that they are giving up certain rights otherwise afforded to them by civil court actions, including but not limited to the right to a jury trial.

(g) **Information**. Employee may contact the HR Department at HR@nationslending.com with any questions about the arbitration process.

By initialing here, Employee acknowledges having read this Arbitration section and voluntarily agreed to binding arbitration:



Employee Initials

12. **ACKNOWLEDGEMENT.** THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS RECEIVED A COPY OF THE AGREEMENT INCLUDING ALL SUPPLEMENTS AND ADDENDUMS, HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS HAD SUFFICIENT TIME TO REVIEW AND AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF THE EMPLOYEE'S CHOICE BEFORE SIGNING THIS AGREEMENT.



| Brooks Onishi | _Brooks Onishi_ | 8/29/2023 \| 10:39 AM PDT |
|---|---|---|
| Employee Name | Employee Signature | Date |

| For Nations Lending Corporation: "Company" | _Cheryl Lieber_ Cheryl C. Lieber, ......... n. Officer | 8/28/2023 \| 12:42 PM EDT Date |

Employee Initials

## Supplement A to Employment Agreement
## Position Description and Duties

The undersigned Employee is employed by Nations Lending Corporation (the "Company") in the following capacity: **Personal Mortgage Advisor - Outside**. This employment is as a **full-time**, regular employee. Employee is classified as **exempt** for purposes of determining overtime eligibility.

This Supplement A, Position Description and Duties, identifies the duties and expectations of Employee. The Company reserves the right to modify Employee's duties on a day to day basis. In the event Employee changes position or has a significant change of duties, then the Company will provide a modified Position Description and Duties Supplement for execution, which will replace this one in its entirety.

A. **Outside Sales Position:** Employee's primary responsibility is to obtain applications for loans away from the employer's places of business, and instead will seek to obtain such applications primarily in the customer's place or places of business. Employee must possess a valid motor vehicle driver's license at all times and shall provide evidence of licensure at time of employment and thereafter at any time requested by the Company. Employee shall be required to complete a quarterly certification as to his/her exempt status. Employee will be required to track all hours worked and will be paid a fixed salary as an advance against future commissions earned.

B. **Position Description – Essential Functions:** Employee will solicit, receive, and originate applications for the extension of credit to purchase and refinance 1-4 unit residential properties, secured by a first-lien mortgage or deed of trust, and provide supporting services to consumer applicants. Loans will conform to the products offerings available from the Company. Employee will ensure exceptional customer experience by overseeing loan processing from origination to closing and providing on-going communication to customers. Employee will maintain all necessary residential Mortgage Loan Originator licenses in the state or states in which the employee is employed to function.

C. **Position Duties:** Subject to the ultimate supervision and control of Company, Employee shall:

1. Know, observe, and comply with all applicable laws and regulations as well as industry standards, company rules, and policies;
2. Maintain all necessary licenses, qualifications, and standards to perform the job functions;
3. Report to the Company any lawsuits, complaints, investigations, or similar actions involving Employee's duties on behalf of the Company or which could potentially adversely affect Employee's licensing status or the Company's ability to maintain its licenses or operate.
4. Contact consumers to establish new business opportunities;
5. Consult with consumers about their current and future needs and goals;
6. Advise and educate consumers about the home purchase or refinance process, and how to better manage their mortgages by discussing loan terms, rates, fees, and other costs;
7. Gather consumer information and apply skill and experience to put clients in the best financial status possible among the most suitable loan products offered by the Company;
8. Take and receive applications for credit in accordance with Company products and pricing;
9. Initiate the loan process and manage applications from file start to closing using various systems;
10. Assist and communicate with consumers throughout the loan process;
11. Confer and meet with customers during various stages of the loan process as needed;
12. Utilize materials, reference tools, and other resources to provide accurate and up-to-date loan information to customers and business partners;
13. Provide complete loan applications and support materials to fulfillment center partners; and

DocuSign Envelope ID: 316CC991-E640-4A17-B1B8-74C6991C34AB

14. Promote self and company to grow market share and achieve production goals.

D. **Prohibited Activities:** In no event may Employee do any of the following:

1. Employee shall not utilize a headquarters or other fixed location to perform the Employee's responsibilities for Company;
2. Employee shall not, for any reason, falsify a time sheet or submit an inaccurate time sheet, nor shall employee falsify any certification they may be asked to complete concerning their status as an Exempt employee;
3. Employee may not at any time engage in marketing the Company, use the Company's name, or a facsimile of in any marketing, or advertise a product sold by the Company without the Company's prior express written permission;
4. Employee may not make any representations as an employee on any social networking, blog or internet site concerning the Company, or its products and/or services, unless such statements or representations comply with the Company's published guidelines concerning social media and use of the internet; and
5. Employee may not perform similar duties for any other company or individual.

E. **Employee Obligations:** Employee shall follow all policies and procedures concerning the origination of mortgage loans, including the timely submission of loan applications and collecting complete and accurate information in support of applications. In addition, Employee will do the following:

1. Employee shall notify the Company if any circumstances of Employee's employment change at any time to become inconsistent with this position description;
2. Employee shall utilize a cellular phone to contact potential customers, to arrange a time and place to take the prospective customer's loan application at a location convenient to the prospective customer;
3. Employee shall track his or her own hours. Employee is expected to work a regular full-time schedule performing Employee's duties. Employee may work as many hours a week as needed to meet Company goals and objectives, however Employee is not eligible to receive overtime for hours worked in excess of 40 hours per week;
4. Employee shall spend time serving as a liaison between Company loan processors and applicants who applied for a loan through Employee, attending sales meetings and training sessions, and providing sales support for other loan officers, processors, and underwriters of the Company, as requested;
5. At least 80% of Employee's time shall be spent (a) contacting and meeting prospective customers to obtain loan applications at locations convenient to the prospective customers, (b) preparation of proposals or promotional material sales reports, or (c) arranging trips, logistics, and similar tasks that support personal meetings with prospective customers; and
6. Employee shall earn salary and commissions for each closed loan according to the current terms of Employee's Compensation Addendum.


Employee acknowledges that in performing his/her primary duties, he/she shall, during each work week, be customarily engaged away from Company's office. Employee shall not establish any home office from which he/she regularly works and/or regularly conduct Company business from his/her home. Employee recognizes the position of Personal Mortgage Advisor - Outside requires Employee to meet and call on clients, referral sources, Realtors™, and business prospects at their homes and places of employment or in other social settings, and these responsibilities may only be discharged with periodic and non-regular use of Company office space or the Employee's own home.

| Brooks Onishi | *Brooks Onishi* | 8/29/2023 | 10:39 AM PDT |
|---|---|---|---|
| Employee Name | Employee Signature | Date | |

**Manager Attestation:**

*I have reviewed this description and found it to be accurate regarding the overall job duties agreed to with the employee.*

| Len Pagan | *Len Pagan* | 8/29/2023 | 11:53 AM EDT |
|---|---|---|---|
| Manager Name | Manager Signature | Date | |

DocuSign Envelope ID: 316CC991-E640-4417-B1B8-74C6991C34AB

### Supplement B to Employment Agreement
### Compensation Statement – Outside Loan Originator: Full Time

1. **Summary:**

**(a)** Effective Date:  __August 30, 2023__ .

**(b)** Overtime Status: Exempt from overtime compensation.

**(c)** Wages: Employee is compensated on commission only.

**(d)** Commission Rate:
    Commissions for funded Loan Production will be compensated according to the following table:

| Lead Type, Source, or Product | Commission Rate | Maximum Commission per Eligible Loan |
|---|---|---|
| Self-Generated Production | 100 bps | $10,000 |
| Company-Sourced Leads | 70 bps | $5,833 |
| Manager Referrals | 70 bps | $5,833 |
| Bond/Brokered Loan | 0 bps | N/A |
| Reverse Loans | 0 bps | N/A |
| NLC-Serviced Customer (Retention) | 0 bps | N/A |
| Other: | 0 bps | N/A |

**(e)** Additional Commission: N/A

**(f)** Additional Compensation: N/A

**(g)** Guaranteed Compensation: N/A

The parties signing below agree to all terms and conditions of this Supplement:

| | | |
|---|---|---|
| Brooks Onishi | Brooks Onishi | 8/29/2023 \| 10:39 AM PDT |
| Employee Name | Employee | Date |

_____ ons Lending Corporation:

| | | |
|---|---|---|
| | Cheryl Lieber | 8/28/2023 \| 12:42 PM EDT |
| | Cheryl C. _____ _____ ain. Officer | Date |

**Manager Attestation:** *I have reviewed this agreement and found it to be accurate regarding the overall compensation agreed to with the employee.*

| | | |
|---|---|---|
| Len Pagan | Len Pagan | 8/29/2023 \| 11:53 AM EDT |
| Manager Name | Manager S _____ | Date |

DocuSign Envelope ID: 316CC991-E640-4417-B1B8-74C6991C34AB

2. **Employee Classification:**

    **(a) Exempt Status**. Per the terms of Employee's Job Description Supplement, Employee is subject to the outside sales employee exemption. As a result, employee is not entitled to minimum wage or overtime. For exempt employees, compensation is intended to pay for all hours worked during each pay period.

    **(b) Full Time Employment.** Employee is employed for more than 30 hours per week. If Employee's hours change or increase, Employee will bring such information to the attention of the Employee's manager. Where required by law because of Employee's work for Company, Employee is eligible for benefits under the Company's plan in accordance with Company's policies.

    **(c) Advanced Payments.** Any amounts advanced to Employee to cover licenses, fees, or at the discretion of Company are draws against future compensation earnings and subject to repayment.

3. **Terms of Employee's Compensation Plan:**  This Supplement B, Compensation Statement, identifies the compensation the Employee will receive from the Company.  In the event Employee's compensation changes due to raise, decrease, modification in calculation, or new position, then the Company will provide a modified Compensation Statement for execution, which will replace this one in its entirety.  Compensation shall be paid to Employee at such times and in a manner consistent with Company Policies as may be in effect from time to time.

    **(a) Compensation.** For each pay period, Employee shall earn compensation which may be composed of (i) Wages; (ii) Commission; Additional Commission; and (iv) Additional Compensation, as follows:

        **i. Wages.** Per Section 1(c), Employee is compensated on commission only and does not receive a salary or hourly wage.

        **ii. Commission.** Employee may be eligible to earn commission compensation for loan production closed in Employee's name according to the provisions of Section 2(b).

        **iii. Additional Commission.** In addition to other Commission compensation, Employee may be eligible to earn Additional Commission based upon meeting individual performance metrics subject to the provisions of Section 2(c).

        **iv. Additional Compensation.** Employee may be eligible to earn Additional Compensation based upon designated business units of Company achieving established performance targets ("Bonus"). Additional Compensation is subject to the provisions of Section 2(d).

    **(b) Commission**. For any authorized loan origination activity undertaken, Employee may be paid performance-based incentive compensation ("Commission"), less applicable withholding and deductions owed to the Company, for Eligible Loans, subject to all terms and conditions outlined in this Supplement. Any previous advances on Commission or other offsets will be deducted from Commission before payment. No payment will be advanced, nor Commission paid, on loans that the Employee did not originate, or that were not Funded while under Employee's authorized and direct supervision, or while Employee was not employed with Company. The Commission paid to Employee for every Eligible Loan the Employee originates is calculated as a fixed percentage of the principal amount of the credit extended (the "Commission Rate"), as detailed in table form in Section 1(d). The Commission Rate used to calculate Employee's Commission amount will be fixed for all Eligible Loans originated by Employee which close and fund. The Commission Rate will be determined as basis points (bps) on the total loan volume of funded units.  The amount of Commission will be equal to the product of the loan amount times the applicable basis points, and less other fees and deductions as set forth herein.

    **(c) Additional Commission.** Employee may be eligible to earn Additional Commission based upon the performance of designated business units of Company ("Overrides"). Additional Commission will be determined according to the rates provided in Section 1(e).

DocuSign Envelope ID: 316CC991-E640-4117-B1B8-74C6991C34AB

(d) **Additional Compensation.** Employee will be eligible to earn Additional Compensation based upon achieving established performance targets. Additional Compensation will be determined according to the rates or terms provided in Section 1(f). in the pay period following the close of the applicable calculation period (calendar month except if noted otherwise). Additional Compensation, if any, will then be issued in the next regular payroll cycle.

Compensation is intended to pay for all hours worked during each pay period, regardless of scheduled hours, tracked hours, or actual hours performed in accordance with the Company's ordinary payroll practices and schedules detailed in the current Employee Handbook. Employee is not guaranteed any term of employment or amount of compensation. All employment is "At Will" and may be terminated at any time by either party.

4. **Definitions:** Where used in this Supplement, the following terms apply.

   a) **Branch Manager Referral**:  Employee may be provided leads that are sourced from a relationship that the Branch Manager has established.  These are prospects created by the Manager based on past marketing efforts or relationships with realtors or other referral sources the Branch Manager has established over time.

   b) **Company-Sourced Leads**: Employee may be provided with Company-sourced leads or internally sourced business.  These are prospects created by the Company, whether by internal or external marketing efforts, through other marketing efforts of the Company, referred in-house by the Company to Employee, or created by the Company based on its relationships with realtors or other referral sources.

   c) **Early Payment Default:** a residential mortgage loan for which the borrower fails to make one or more timely payments (any payment received 15 days or more after it is due) during the first twelve months following the Origination Date regardless of whether such loan is later brought current.

   d) **Early Payoff:** a residential mortgage loan which has its principal balance paid off or reduced by 50% or more within the first twelve months following the Origination Date.

   e) **Eligible Loan:** a residential mortgage loan that is: (i) originated in accordance with applicable requirements; (ii) under the supervision of an Employee possessing valid licenses and in good standing throughout the origination process; (iii) closed and funded in accordance with applicable requirements in the period in which the Commission is calculated; and (iv) not unfunded, cancelled, rescinded, or disqualified for any reason, or otherwise not earned as defined in this Supplement. Whether a loan constitutes an Eligible Loan is determined at the sole and absolute discretion of Company.

   f) **Indemnification:** a request by an Investor for Company to issue a guarantee to cover future losses on a defective loan; irrespective of whether Company ultimately is required to make good on such Indemnification at any time; so long as Company executes an indemnification agreement for such loan.

   g) **Investor:** any entity to which a loan subject to this agreement is sold, transferred, or conveyed, in whole or part, whether by sale, securitization, or other operation. Investor also refers to a governmental agency which insures or guarantees any loans, and Ginnie Mae.

   h) **Loans Brokered to Other Lenders:** a loan that is closed with another lender subject to a brokerage arrangement. Brokered loans are typically loan products or bond programs that are not offered by Company, and for which another lender frequently performs the underwriting and approvals.

   i) **Loan Defect:** an error, mistake, falsification, omitted document or information, or miscalculation contained in a loan file or its constituent documents and instruments which violates the guidelines of the applicable Investor to which the loan is sold or to which the loan was intended to be sold to if such defect renders the loan ineligible for such sale and purchase.

   j) **NLC-Serviced Customer:** a loan that is made to an individual who currently has a loan that is being serviced by Company.

DocuSign Envelope ID: 316CC991-E640-4474-B1B8-74E6991C34AB

k) **Origination Date:** the day on which a residential mortgage loan is closed and funded. For transactions where the closing and funding occur on different dates, the Origination Date is the date on which funding actually occurs and not the date scheduled for funding at the time of closing.

l) **Pay Period:** the semi-monthly period established by Company's payroll policies in each month during which Employee renders services. If Employee works less than a full pay period, then Employee's salary for such pay period will be proportionately reduced to correspond to the portion of such period worked.

m) **Reverse Mortgages:** a HECM or similar closed- or open-ended loan in which disbursements are advanced against the borrower's equity in the property over time. Employee is not authorized to originate a Reverse Mortgage or HECM product unless personally approved by Company.

n) **Self-Sourced Production:** Employee may create his/her own relationships and referral sources. These are prospects that are generated by the efforts of the Employee, and not reliant upon Company-generated or sponsored relationships with borrowers or other referral sources.  The ability to earn compensation through this category is contingent upon the Employee documenting the bona-fide nature of the self-sourced loan in a manner as designated by the Company.

o) **Transitioned Loan:** a loan where one loan originator accepts the application, but the application is transferred to a different originator prior to the closing and funding of the loan for various reasons. Such loans are compensated in proportion to the amount of work performed by Employee on such loan instead of at the full Commission rate. Retention Loan Referrals as covered under Section 8 are compensated solely on those terms.

p) **Unit:** an individual first-lien mortgage loan, which qualifies as an Eligible Loan, regardless of the loan amount or type. Where used for monthly Commission calculations, the Unit count for the applicable calendar month is used.

5. **Commission Payments to Employee:**

(a) **Commission Advance.** Commission may be advanced when a loan has funded.  A loan is funded when the loan has gone through settlement, all monies have disbursed, all rescission periods have expired (if applicable), and all proper documentation is filed and prepared in accordance with all State and Federal laws, including TILA and RESPA. Brokered Loans will be deemed as funded when all items listed above are complete and the Company has received the check for payment from the institution to which the loan was brokered.

(b) **Earned Commission.**  Commission is earned once the loan has been funded and sold on the secondary market or to a Government Sponsored Entity (GSE), and the applicable borrower(s) make the first four (4) payments on the loan in a timely manner.   Commission will not be earned on any loan that 1) is not a Qualified Mortgage as defined by applicable guidelines, unless the loan is part of an approved "Non-QM" program authorized and offered by the Company; or 2) is subject to repurchase, indemnification early payment default, or early pay-off, or is otherwise unsalable. Additionally, Employee may not directly, or indirectly, solicit or commence a prequalification, application, pre-application, or pre-approval for any customer until at least 180 days have passed since the date of the customer's previous loan closing for the same property.  Failure to observe this waiting period will result in that loan's applicable Commission to be considered unearned and subject to withholding or repayment to Company at its demand.

(c) **Payment and Acknowledgement of Commission.** Commissions are calculated based on the volume of funded loans during the monthly Commission period. The payment date of earned Commissions will be determined by the Company's pay policies as may be amended from time to time. Earned compensation will be paid according to the schedules to be set by the Company.  The Employee agrees that within 30 days of the receipt of any Commission, she or he will bring to Company's attention, in writing, any and all objections, disputes, or concerns regarding omissions or errors in connection with Commissions paid, whether or not to the Employee's benefit. If no such

written dispute is initiated and received, Employee's silence constitutes an acknowledgement that Commissions were properly calculated and paid.

It is the general intent of the Company to advance Commissions once a loan has funded; however, Commissions are subject to repayment if it is not earned, in accordance with the provisions of Section 6.

**6. Commission Repayments to the Company:**

a) **Repurchase, Early Payoff Adjustment and Unsalability.** In the event compensation is advanced, but is later deemed unearned because of any repurchase, indemnification, early payment default, or early pay-off, the compensation amounts previously advanced will be subtracted from Employee's net compensation balance in calculating any compensation not yet paid to Employee. Waiver of this policy is at the Company's discretion and may be applied for situations involving major life events (such as death) and other such unanticipated factors that could not have been known at the time of the loan origination. Waiver in one circumstance will not constitute a waiver in all similar situations and is at the sole discretion of the Company.

*(In other words, Commissions advanced on a loan may need to be repaid if the loan is unsalable, subject to repurchase or indemnification at any point, or subject to early default or payoff, particularly if the Employee had reason to know of the risk encountered. This determination is made on a case-by-case basis and takes into account whether the Employee had a role in the loan's salability or knew or should have known of issues concerning the loan's ultimate viability.)*

b) **Repayment of Advances or Obligations to the Company.** In the event that Employee has an outstanding balance owed to the Company for advances received by the Employee, the Employee hereby authorizes the Company to deduct the outstanding balance owed from his/her compensation. Unless the Company and Employee otherwise agree upon a specific dollar amount or a percentage of commissions, Employee expressly authorizes the Company to deduct from his/her compensation any amount for as long as it takes to resolve the outstanding balance owed to the Company; except that the amount of the deductions will not cause Employee's income to fall below the applicable minimum wage threshold for any applicable pay period. If a balance is owed to Company and Employee has no compensation payments pending from which such balance may be deducted, Company may demand Employee repay the obligation in full and Employee agrees to satisfy such obligation within 30 days of receiving notice of such deficit from Company.

DocuSign Envelope ID: 316CC991-E640-4417-B1B8-74C6991C34AB

7. **Separation from Employment:** Upon termination of employment for any reason, any rights to any commission or compensation from any loans which are unclosed or unfunded as of the last date of employment shall be forfeited by Employee and all income and rights therein shall accrue solely to the Company.  Employee will be paid applicable earned income through the date of termination; however, Employee will not be entitled to receive any Commission advances on loans. Employee's final Commission payment may be paid up to ninety (90) calendar days following the termination date for the purpose of reconciling any outstanding debts, charge backs, unearned commissions, unreturned equipment charges, or other repayments due from Employee to Company or to any third parties. Issuance of the final payment does not operate to release Employee from any liability with regards to a later determination that any Commission or other advance paid was not earned.

8. **Effective Date:** The Employee acknowledges that the terms of this Supplement will be effective on and after the Effective Date until Employee's termination of employment or until this Supplement is replaced with a new agreement that supersedes the current document. The Effective Date may be the date of first employment with Company (Employee's start date) or the first date of the payroll cycle in which the provisions of this Supplement will take effect. If this Supplement is replacing a prior agreement, then the terms of the prior agreement will apply to compensation Earned prior to the Effective Date of this Supplement and this Supplement will apply to compensation Earned thereafter.

9. **Retention Loan Referral Bonus:** Employees currently licensed and authorized as loan originators may, from time to time, become aware that an existing Company customer is interested in refinancing a loan currently serviced by the Company, but such employee may not be able to originate a refinance of said loan due to not currently holding an appropriate license.

In such a situation, the Employee may receive Additional Commission compensation equal to **37.5 bps** of the principal balance of such loan at time of origination, in the manner and under the conditions applicable to all other Commission payments in Supplement B, in exchange for performing the duties of a loan originator assistant to the originator of the loan in satisfaction of the following conditions:
1. The consumer has a loan currently serviced by Company which they wish to refinance.
2. Employee refers such consumer to one of Company's current consumer direct branches and sends such branch a notification of the referral accompanied by contact information to reach said referred consumer.
3. The consumer submits a loan application to the referred branch as a result of said referral, is approved for financing, and a refinance transaction is originated.
4. Employee performs the duties and responsibilities of loan originator assistant for such refinance.

Employee will be entitled to the referral commission for each referred transaction for which Employee was the first person to provide such referral as tracked in Company's systems, which shall be the definitive record for determining all earned amounts.

10. **Guaranteed Compensation:** When applicable, for the dates specified in this Agreement in Section 1(g), Employee will receive a guaranteed minimum compensation as identified for each pay period. The payment of all amounts under this Section is subject to the following terms and conditions:
**(a)** Employee will be eligible for compensation, in the amount of the greater of (1) Earned Compensation; or (2) the Guaranteed Minimum Compensation.
   **(i)** Earned Compensation is the total of nonwage earnings as defined in Sections 3(a) (ii)-(iv).
   **(ii)** The Guaranteed Minimum Compensation shall be the amount shown in Section 1(g).

For any pay periods covered by this Section (10) for which Earned Compensation is less than the amount of Guaranteed Minimum Compensation, the difference will be considered an Advance, subject to Sections 4 – 6 of this supplement and Sections 3(c)-(e) of the Employment Agreement.

For payment periods subject to this section, Employee's compensation for the first payroll period of a month will be based upon one-half of the Guaranteed Minimum Compensation. Employee's compensation paid for the second payroll period of a month will be adjusted to reflect the remaining amount of compensation due to Employee in that monthly period.

**DocuSign**

## Certificate Of Completion

Envelope Id: 316CC901E6404417B1B874C6991C34AB                              Status: Completed
Subject: Complete with DocuSign: EmpAgr_2023_8.30_Onishi, Brooks
Source Envelope:
Document Pages: 23                    Signatures: 7                        Envelope Originator:
Certificate Pages: 5                  Initials: 15                         Justin Kelley
AutoNav: Enabled                                                           3673 Westcenter Dr
EnvelopeId Stamping: Enabled                                               Houston, TX  77042
Time Zone: (UTC-05:00) Eastern Time (US & Canada)                         Justin.Kelley@nationslending.com
                                                                          IP Address: 24.29.198.74

## Record Tracking

Status: Original                      Holder: Justin Kelley               Location: DocuSign
        8/28/2023 10:44:38 AM                Justin.Kelley@nationslending.com

## Signer Events                      ## Signature                        ## Timestamp

Cheryl Lieber                         *[signature: Cheryl Lieber]*         Sent: 8/28/2023 10:50:30 AM
cheryl.lieber@nationslending.com      6EF1AC2D5065458...                   Viewed: 8/28/2023 12:41:34 PM
118                                                                        Signed: 8/28/2023 12:42:04 PM
Nations Lending Corporation           Signature Adoption: Pre-selected Style
Security Level: Email, Account Authentication    Using IP Address: 24.29.207.85
(None)

Electronic Record and Signature Disclosure:
    Not Offered via DocuSign

R. Christopher Baker                  *[signature: F.B.-RCB]*              Sent: 8/28/2023 12:42:06 PM
chris.baker@nationslending.com        DS                                  Viewed: 8/28/2023 1:45:05 PM
2423                                                                      Signed: 8/28/2023 1:45:15 PM
Nations Lending Corporation           Signature Adoption: Pre-selected Style
Security Level: Email, Account Authentication    Using IP Address: 12.144.206.133
(None)

Electronic Record and Signature Disclosure:
    Accepted: 8/28/2023 1:45:05 PM
    ID: e09bc406-24a3-42e2-91d9-612e7745e9e5

Len Pagan                             *[signature: Len Pagan]*            Sent: 8/28/2023 1:45:18 PM
len.pagan@nationslending.com          E0F3A201E8C648D...                  Resent: 8/29/2023 9:39:56 AM
Security Level: Email, Account Authentication                            Viewed: 8/29/2023 11:37:00 AM
(None)                                                                    Signed: 8/29/2023 11:53:02 AM
                                      Signature Adoption: Pre-selected Style
                                      Using IP Address: 72.130.232.41

Electronic Record and Signature Disclosure:
    Accepted: 8/29/2023 11:37:00 AM
    ID: e4437164-1ef0-46f3-96ac-aada21d9efe7

Brooks Onishi                         *[signature: Brooks Onishi]*        Sent: 8/29/2023 11:53:05 AM
bonishi@me.com                        149DF41503CB462...                  Viewed: 8/29/2023 1:34:01 PM
Security Level: Email, Account Authentication                            Signed: 8/29/2023 1:39:47 PM
(None)
                                      Signature Adoption: Pre-selected Style
                                      Using IP Address: 98.150.202.173
                                      Signed using mobile

Electronic Record and Signature Disclosure:
    Accepted: 8/29/2023 1:34:01 PM
    ID: 782f1fb8-b7f4-4d36-8c08-795a40d08093

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

sarah link
sarah.link@nationslending.com
4900
Security Level: Email, Account Authentication
(None)

**COPIED**

Sent: 8/29/2023 1:39:50 PM

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

Zach Johns
Zachary.Johns@nationslending.com
Security Level: Email, Account Authentication
(None)

**COPIED**

Sent: 8/29/2023 1:39:51 PM

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/28/2023 10:50:30 AM |
| Certified Delivered | Security Checked | 8/29/2023 1:34:01 PM |
| Signing Complete | Security Checked | 8/29/2023 1:39:47 PM |
| Completed | Security Checked | 8/29/2023 1:39:51 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 10/31/2015 5:05:20 PM
Parties agreed to: R. Christopher Baker, Len Pagan, Brooks Onishi

Case: 1:24-cv-00446-JEG  Doc #: 1-2  Filed: 03/08/24  213 of 328.  PageID #: 225

From time to time, Nations Lending Corporation (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Nations Lending Corporation:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: solutions@nlcloans.com

**To advise Nations Lending Corporation of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at solutions@nlcloans.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We do not require any other information from you to change your email address..
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Nations Lending Corporation**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to solutions@nlcloans.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Nations Lending Corporation**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to solutions@nlcloans.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Nations Lending Corporation as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Nations Lending Corporation during the course of my relationship with you.

DocuSign Envelope ID: 7E680F6D-66CC-4FF2-B8B8-E4B9C5035F6C

# Nations Lending Corporation
# Employment Agreement

This Employment Agreement ("Agreement") is made between Nations Lending Corporation ("Company") and _____Ilda Gonzalez_____ ("Employee"). In consideration of the premises in this Agreement, the employment or continued employment of Employee by the Company, and the covenants and agreements of the parties contained herein, and for good and valuable consideration, Employee accepts employment with the Company as hereinafter stated.

1. **EMPLOYMENT.**

   (a) **Contingent Offer.** Company has extended a conditional offer of employment, meaning that Employee must complete all conditions satisfactorily. Execution of this Agreement does not imply or ensure that Employee has satisfied all conditions precedent to commencing employment, including, without limitation: verification of references; satisfactory completion of background checks, verification of professional qualifications or licenses, or other conditions which may be stated in Employee's Offer Letter.

   (B) **Term of Employment.** The period during which the Employee is employed by the Company hereunder is hereinafter referred to as the "Employment Term." The Employment Term will commence on Employee's first actual day of work, regardless of any date contained in an offer letter, as reflected in Company's records, and will continue until Employee, as determined in Company's sole discretion, by reason of physical or mental disability is unable to perform their duties. The end of the Employment Term will be the effective date of any resignation or termination notice given. NOTHING IN THIS AGREEMENT SHALL BE CONSTRUED TO IN ANY WAY ALTER, AMEND, OR MODIFY THE AT-WILL STATUS OF THE EMPLOYMENT RELATIONSHIP BETWEEN THE COMPANY AND THE EMPLOYEE IN WHICH EITHER THE COMPANY OR THE EMPLOYEE MAY TERMINATE THE EMPLOYMENT RELATIONSHIP AT ANY TIME, WITH OR WITHOUT CAUSE, AND WITH OR WITHOUT NOTICE.

   (c) **Position & Duties.** Subject to its ultimate supervision, direction, and control, Company employs Employee during the Employment Term to perform services and duties as are described on the Position Description and Duties Addendum (Supplement A) of this Agreement and under any conditions detailed in such addendum or in the Company's Employee Handbook and adopted policies. The Company reserves the right to modify or amend Employee's duties at any time.  In the event Employee's position or title changes with a significant change of duties, Company will provide Employee with a new addendum for execution, which will replace the existing one in its entirety and be effective from the date of such amendment. As employee of a financial institution, Employee is charged with, and owes to Company: (i) a duty of loyalty, fidelity, and trust to Company; (ii) a responsibility to exercise judgment and perform duties in good faith and in the best interest of the Company, (iii) the performance of honest services, and (iv) a promise to use extraordinary care, skill, and diligence in the performance of all duties.

   (d) **Sole Employment.** During the Employment Term, the Employee shall devote substantially all of Employee's business time and attention to the performance of the Employee's duties and will not engage in any other business, profession, or occupation for compensation or otherwise which might conflict or interfere with the performance of such services either directly or indirectly without the prior written consent of the Company, in accordance with the Company's Dual Employment Policy. Employee's failure to disclose other employment may be grounds for termination.



Employee Initials

**(e) Termination.** Employee's employment is at-will, meaning that the Employee or Company may terminate the employment relationship at any time, with or without cause, and with or without notice. Although Employee's duties, title, compensation, and benefits as well as Company's personnel policies and procedures may change from time to time, the 'at will' nature of employment may only be altered by an express agreement signed by an authorized officer of Company. Upon termination or resignation for any reason, Employee's compensation and benefits will end. If Employee is entitled to commissions, trailing payments, bonuses or stock options as part of Employee's compensation, entitlement to all unearned or unvested amounts as of the last date of employment is forfeited by Employee unless stated otherwise in Employee's Compensation Addendum, as further described below.

## 2. COMPENSATION.

**(a) "Wages"**. Employee will be paid for services performed by Employee in accordance with the Company's policies and procedures for payments reflected in the Company's Employee Handbook and related Company policies. The amount of compensation to be received by Employee, whether wages or salary ("Pay"), commissions or bonuses ("Incentive Payments"), or other compensation (collectively, "Pay", "Incentive Payments" and other compensation are "Compensation") is detailed on the Compensation Addendum (Supplement B) of this Agreement, and subject to any conditions in such addendum. Except as may be provided in Employee's Compensation Addendum, Employee's Compensation may be changed at any time by Company upon notice to Employee, and continued employment by Company is subject to such revised terms.

**(b) Benefits.** During the Employment Term, the Employee shall be entitled to participate in all employee benefit plans, practices, and programs maintained by the Company, as in effect from time to time (collectively, "Employee Benefit Plans"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law. Employee's eligibility for Employee Benefit Plans is detailed on Supplement A.

**(c) Advances.** Company may advance Incentive Payments or other compensation to Employee before Employee's entitlement to such payments is vested. In the event that such advanced amounts are later determined to have been unearned by employee (e.g., a commission paid on a loan which is later subject to repurchase) then Employee must reimburse the amount advanced to Company and Company is entitled to deduct such advanced amounts from future payments to be made to Employee, including from Employee's final paycheck. Additional details on advances may be contained in Supplement B.

**(d) Deductions.** In addition to withholdings for tax and other purposes provided by law, Company may subtract authorized deductions from Employee's Compensation payments, including Employee's final paycheck. Deductions may be made for the costs of Benefits elected by Employee, to recover Advances paid to Employee, to recover overpayments, to reimburse Company for expenditures on Employee's behalf or as a result of Employee's actions or failure to immediately return all of Company's property upon termination, and as authorized by Employee. Deductions may also be made for Incentive Payments made to Employee if the conditions under which Employee is entitled to such Incentive Payments are later determined not to have been met, such as where a loan on which commission has previously been paid is found to be ineligible for such commission. Additional details on deductions may be contained in Supplement B.


Employee Initials

**(e) Effects of Termination on Compensation.** If Employee resigns from employment with Company, Employee agrees to reimburse Company for all outstanding Advances within thirty days of termination, and where Employee fails to do so, Company is entitled to interest on the unpaid amounts at the rate of 10% per twelve-month period, compounded monthly. Where Employee resigns from employment without at least fourteen days advance notice or is terminated for reasons related to the Employee's acts of disloyalty, fraud, theft, forgery or other dishonesty, refusal to work, willful destruction of property, gross insubordination, falsification of records, criminal or unlawful activity, or willful misconduct, Employee forfeits any right to Incentive Payments which Employee would otherwise be entitled to receive following the last day of employment under the terms of Employee's Compensation Addendum.

3. **CONFIDENTIAL INFORMATION.** The Employee understands and acknowledges that during the course of employment by the Company, Employee will have access to and learn about confidential, secret, and proprietary documents, materials, data and other information, in tangible and intangible form, of and relating to the Company and its businesses and existing and prospective customers, suppliers, investors and other associated third parties which is not generally known to the public ("Confidential Information"). The Employee further understands and acknowledges that this Confidential Information and the Company's ability to reserve it for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure of the Confidential Information by the Employee will cause irreparable harm to the Company, for which remedies at law will not be adequate.

**(a) Confidential Information Defined.** For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, documents, operations, services, strategies, techniques, agreements and terms of agreements, transactions, negotiations, know-how, trade secrets, applications, work-in-process, databases, compilations, technologies, records, systems, sources, supplier information, vendor information, financial information, accounting information, marketing information, pricing information, credit information, payroll information, personnel information, employee lists, reports, internal controls, security procedures, customer information or lists, buyer lists, or other information generally considered private and confidential in the industry or by any existing or prospective customer, other associated third party, or of any other person or entity that has entrusted information to the Company in confidence.

The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

The Employee understands and agrees that Confidential Information developed by Employee in the course of Employee's employment by the Company shall be subject to the terms and conditions of this Agreement as if the Company furnished the same Confidential Information to the Employee in the first instance. Confidential Information shall not include information that is generally available to and known by the public, provided that such disclosure to the public is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

**(b) Company Creation and Use of Confidential Information.** The Employee understands and acknowledges that the Company has invested, and continues to invest, substantial time, money, and specialized knowledge into developing its resources, creating a customer base, generating customer and potential customer lists, training its employees, and improving its offerings in the field of mortgage

lending and financial services. The Employee understands and acknowledges that as a result of these efforts, Company has created and continues to use and create Confidential Information. This Confidential Information provides Company with a competitive advantage over others in the marketplace.

**(c)  Disclosure and Use Restrictions.** Employee agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company) not having a need to know and authority to know and to use the Confidential Information in connection with the business of the Company and, in any event, not to anyone outside of the direct employ of the Company except as required in the performance of any of the Employee's authorized employment duties to the Company; (iii) and not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company except as required in the performance of the Employee's authorized employment duties to the Company.

The Employee understands and acknowledges that the Employee's obligations under this Agreement regarding any particular Confidential Information begin immediately when the Employee first has access to Confidential Information (whether before or after commencing employment with Company) and shall continue during and after the Employee's employment by the Company until the Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or a breach by those acting in concert with the Employee or on the Employee's behalf.

**(d)  Notice of Immunity Under the Defend Trade Secrets Act of 2016**. Employee acknowledges receipt of Company's Employee Reporting Policy and Company Code of Ethics (available at https://nlcloans.sharepoint.com/sites/Policies) setting forth: (A) Company's reporting policy for a suspected violation of law; and (B) notice of immunity from criminal and civil liability for certain disclosures of trade secrets under 18 U.S.C. § 1833(b).

**(e)  Other Permitted Disclosures.** Nothing in this Agreement shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company. Nothing in this Agreement prohibits or restricts the Employee (or Employee's attorney) from filing a charge or complaint with the Securities and Exchange Commission (SEC), the Financial Industry Regulatory Authority (FINRA), the Occupational Safety and Health Administration (OSHA), any other self-regulatory organization, or any other federal or state regulatory authority ("Government Agencies"). The Employee further understands that this Agreement does not limit the Employee's ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency without notice to the Company. This Agreement does not limit the Employee's right to receive an award for information provided to any Government Agencies. In addition, nothing in this Agreement in any way prohibits or is intended to restrict or impede the Employee from exercising protected rights under Section 7 of the National Labor Relations Act or otherwise disclosing information as permitted by law.

## 4.  COMPANY'S PROPRIETARY RIGHTS.



Employee Initials

**(a) Work Product**. The Employee acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas, and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by the Employee individually or jointly with others during the period of employment by the Company and relating in any way to the business or contemplated business, research, or development of the Company (regardless of when or where the Work Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical, and electronic copies, all improvements, rights, and claims related to the foregoing, and other tangible embodiments thereof (collectively, "Work Product"), as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), patents, and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefor, and continuations, divisions, continuations-in-part, reissues, extensions, and renewals thereof (collectively, "Intellectual Property Rights"), shall be the sole and exclusive property of the Company.

For purposes of this Agreement, Work Product includes, but is not limited to, Company information, including plans, strategies, techniques, agreements, documents, terms of agreements, negotiations, know-how, computer programs, computer applications,  web design, work in process, databases, manuals, reports, compilations, graphics, drawings, sketches, market studies, formulae, notes, communications, algorithms, product plans, models, audiovisual programs, ideas, inventions, original works of authorship, customer information, customer lists, manufacturing information, marketing information, advertising information, and sales information. Work Product also means items created in the six-month period following employment as a result of or attributable to work performed during employment or specific work product substantially begun during employment.

**(b) Work Made for Hire; Assignment**. The Employee acknowledges that, by reason of being employed by the Company at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in the Copyright Act of 1976 (17 U.S.C. § 101), and such copyrights are therefore owned by the Company. To the extent that the foregoing does not apply, the Employee hereby irrevocably assigns to the Company, for no additional consideration, the Employee's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company would have had in the absence of this Agreement.

**(c) Further Assurances; Power of Attorney**. During and after employment, the Employee agrees to reasonably cooperate with the Company at the Company's expense to (i) apply for, obtain, perfect, and transfer to the Company the Work Product and Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (ii) maintain, protect, and enforce the same, including, without limitation, executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company. The Employee hereby irrevocably grants the Company power of attorney to execute and deliver any such documents on the Employee's behalf in Employee's name and to do all other lawfully permitted acts to transfer the Work Product to the Company and further the transfer, issuance, prosecution, and maintenance of all Intellectual Property Rights therein, to the full extent permitted by law, if the Employee does not promptly cooperate with the Company's request (without limiting the rights the Company shall have in such circumstances by operation of law). The power of attorney is coupled with an interest and shall not be impacted by the Employee's subsequent incapacity.



Employee Initials

**(d) Moral Rights.** To the extent any copyrights are assigned under this Agreement, the Employee hereby irrevocably waives, to the extent permitted by applicable law, any and all claims the Employee may now or hereafter have in any jurisdiction to all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be known as "moral rights" with respect to all Work Product and all Intellectual Property Rights therein.

**(e) No License.** The Employee understands that this Agreement does not, and shall not be construed to, grant the Employee any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to Employee by the Company.

## 5. EMPLOYEE'S RESTRICTIVE COVENANTS.

**(a) Restricted Period.** The Employee agrees that the nature of Employee's position gives the Employee access to and knowledge of Confidential Information and places the Employee in a position of trust and confidence with the Company. The Employee further understands and acknowledges that the Company's ability to reserve use of the Confidential Information for the exclusive knowledge and use of the Company is of great competitive importance and commercial value to the Company, and that improper use or disclosure by the Employee is likely to result in unfair or unlawful competitive activity. Because of Company's legitimate business interest as described in this Agreement and the good and valuable consideration offered to the Employee, the sufficiency of which is acknowledged, during the term of Employee's employment and for the next twelve months, to run consecutively, beginning on the last day of the Employee's employment with the Company, whether terminated for any reason or no reason, by the Employee or the Company, (the "Restricted Period"), the Employee agrees and covenants not to engage in Prohibited Activity.

**(b) Prohibited Activities.** For purposes of this Agreement, "Prohibited Activity" is where Employee, as an employee, employer, owner, manager, advisor, contractor, agent, partner, officer, volunteer, intern, or any other similar capacity, while engaging in residential mortgage lending on behalf of an entity other than Company, violates one or more of the "Restrictive Covenants" (i-iii) below to which Employee has agreed to accept as a condition of employment. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets, proprietary information, or Confidential Information.

   **i. Non-Solicitation of Employees.** The Employee understands and acknowledges that the Company has expended and continues to expend significant time and expense in recruiting and training its employees and that the loss of employees would cause significant and irreparable harm to the Company. The Employee agrees and covenants not to directly or indirectly solicit, hire, recruit, or attempt to solicit, hire, or recruit, any employee of the Company or any employee who has been employed by the Company in the six months preceding the last day of Employee's employment (collectively, "Covered Employee"), or induce the termination of employment of any Covered Employee during the Restricted Period. "Covered Employee" does not include an employee of Company that Employee supervised or managed prior to joining Company, who joins Company at approximately the same time as Employee, and who, while they are employed by Company, is supervised or managed by Employee. This non-solicitation provision explicitly covers all forms of oral, written, or electronic communication, including, but not limited to, communications by email, regular mail, express mail, telephone, fax, instant message, and social media, including, but not limited to, Facebook, LinkedIn, Instagram, Twitter, and any other social media platform, whether or not in existence at the time of entering into this Agreement. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is

prohibited by this section. This Section does not restrict or impede, in any way, and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

**ii.**     **Non-Solicitation of Customers.** The Employee understands and acknowledges that because of the Employee's experience with and relationship to the Company, the Employee will have access to and will learn about much or all of the Company's customer information, including, but not limited to, Confidential Information. "Customer Information" includes, but is not limited to, names, phone numbers, addresses, email addresses, transaction history, preferences, financial condition, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to the Company's services. The Employee understands and acknowledges that: (i) the Company's relationships with its customers is of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its customer relationships and goodwill; and (iii) the loss of any such customer relationship or goodwill will cause significant and irreparable harm to the Company.

The Employee agrees and covenants, for the duration of the Restricted Period, not to directly or indirectly solicit, contact, or attempt to solicit or contact, using any other form of oral, written, or electronic communication, including, but not limited to, email, regular mail, express mail, telephone, fax, instant message, or social media, including but not limited to Facebook, LinkedIn, Instagram or Twitter, or any other social media platform, whether or not in existence at the time of entering into this agreement, or meet with the Company's current, former, or prospective customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company. However, it will not be deemed a violation of this Agreement if the Employee merely updates the Employee's employment status without engaging in any other substantive communication, by social media or otherwise, that is prohibited by this section. This Section does not, in any way, restrict or impede the Employee from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. The Employee shall promptly provide written notice of any such order to the General Counsel of the Company.

**iii.**     **Unfair Competition.** The Employee understands and acknowledges that: (i) the Company's relationships with its customers are of great competitive value; (ii) the Company has invested and continues to invest substantial resources in developing and preserving its partner and customer relationships and goodwill; and (iii) the loss of any such relationship or goodwill will cause significant and irreparable harm to the Company. Because Employee will have access to proprietary information belonging to Company that would provide an unfair advantage to competition, during the period of employment Employee agrees not to, for any person, business, or entity, a) own, maintain, operate, or engage in the same or similar business activities as Company or in any business activity which competes with the Company; b) serve, advise, manage, consult with, provide services for, or be employed by any individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company; c) undertake any efforts or activities toward forming or incorporating, financing, or commencing any competing business activity which engages in the same or similar business activities as the Company; or d) advise, serve, or consult with any person, business, or entity which is or will be undertaking efforts toward incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as the Company. During the Restricted Period, Employee agrees not to divert or refer Company customers or prospective customers to any other

individual, firm, agency, partnership venture or corporation (including any pre-incorporated association) which engages in the same or similar business activities as the Company or competes with Company. If Employee's job assignment location with Company is within a branch office or retail location, then Employee agrees and covenants not to open or relocate a similar office or location within a five-mile radius of such location (the "Restricted Territory") which would engage in the business of residential mortgage lending for the duration of the Restricted Period. "Relocate" includes Employee joining an existing office location of a competitor if such office was opened at such location within the six-month period before the beginning of the Restricted Period. This Section does not restrict or impede, in any way, Employee from seeking gainful employment in the industry which does not harm Company's vital and legitimate business interests and shall not be interpreted or understood as restricting or impeding, the Employee from exercising protected rights that cannot be waived by agreement.

(c) **Reasonableness.** Employee agrees that the restrictions in the Restrictive Covenants will not interfere with or unduly limit his or her ability to obtain suitable alternative employment following termination of employment with the Company. Employee acknowledges that the protections provided to the Company are important, reasonable, and necessary, and Employee's agreement to the Restrictive Covenants and to refrain from Prohibited Activity, has been given freely, voluntarily, and without duress and after due deliberation, and that the Restrictive Covenants will not impose undue hardship on Employee.

(d) **Injunctive Relief.** Employee agrees that any violation or breach of Employee's obligations will result in irreparable injury to the Company for which no adequate remedy at law may be available. Therefore, in addition to any other remedies Company may pursue, Employee consents to the issuance of a temporary restraining order and injunction prohibiting any conduct by the Employee in violation of the Prohibited Activities and waives any requirement of posting a bond as precondition of obtaining such injunction. Employee agrees that the Company shall be entitled to recover its costs and legal fees and expenses incurred in investigating and enforcing the Restrictive Covenants, should Employee engage in Prohibited Activity.

(e) **Tolling.** The restrictions and limitations within this Agreement applicable during the Restricted Period shall be enforceable from the date of the last breach or violation of the applicable restriction(s) up to an equivalent period as if such date were the first day of the Restrictive Period, so that Company may receive the full benefit of Employee's agreement to the Restrictive Covenants.

6. **SECURITY.**

(a) **Security and Access.** The Employee agrees and covenants (i) to comply with all Company security policies and procedures as in force from time to time including without limitation those regarding telephone systems, facilities access, key cards, access codes, Company intranet, internet, social media and instant messaging systems, computer systems, email systems, computer networks, document storage, data security, encryption, passwords, and communication technologies ("Facilities Information Technology and Access Resources"); (ii) not to access or use any Facilities and Information Technology Resources except as authorized by Company; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of the Employee's employment by the Company, whether termination is voluntary or involuntary. The Employee agrees to notify the Company promptly in the event he/she learns of any violation of the foregoing by others, or of any other misappropriation, or unauthorized access, use, reproduction or reverse engineering of, or tampering with any Facilities and Information Technology Access Resources or other Company property or materials by others.



Employee Initials

**(b) Exit Obligations**. Upon (i) voluntary or involuntary termination of the Employee's employment or (ii) the Company's request at any time during the Employee's employment, the Employee shall (a) provide or return to the Company any and all Company property, including keys, key cards, access cards, identification cards, security devices, network access devices, computers, and computer equipment, manuals, reports, files, compilations, work product, thumb drives, or other removable information storage devices, hard drives, and data and all Company documents and materials belonging to the Company and stored in any fashion, including but not limited to those that constitute or contain any Confidential Information or Work Product, that are in the possession or control of the Employee, whether they were provided to the Employee by the Company or any of its business associates or created by the Employee in connection with his/her employment by the Company; and (b) delete or destroy all copies of any such documents and materials not returned to the Company that remain in the Employee's possession or control, including those stored on any non-Company devices, networks, storage locations, and media in the Employee's possession or control.

7. **PUBLICITY.** Employee hereby consents to any and all uses and displays, by the Company and its agents, of the Employee's name, voice, likeness, image, appearance, and biographical information in, on or in connection with any pictures, photographs, audio, and video recordings, digital images, websites, television programs, and advertising, other advertising, sales, and marketing brochures, books, magazines, other publications, and all other printed and electronic forms and media throughout the world, at any time during or after the Employment Term, for all legitimate business purposes of the Company ("Permitted Uses"). Employee hereby forever releases the Company and its directors, officers, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, and liability of any kind, arising under any legal or equitable theory whatsoever at any time during or after the Employment Term, in connection with any Permitted Use.

8. **EMPLOYEE REPRESENTATIONS.** The Employee represents and warrants to the Company that:
   **(a)** Acceptance of employment with the Company and the performance of the duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which the Employee is a party or is otherwise bound.
   **(b)** Acceptance of employment with the Company and the performance of Employee's duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.
   **(c)** Employee will not utilize any property belonging to a prior employer in the performance of Employee's duties; including any confidential, proprietary, or trade secret information obtained from a prior employer.
   **(d)** There are no actions, suits, proceedings, or known investigations, criminal or civil, pending against Employee in any court or before a governmental agency, which have not been disclosed by Employee.
   **(e)** Employee has the necessary training and knowledge to understand the laws and requirements of any position requiring a license to perform such duties and will maintain such licensure and perform such duties in compliance with all applicable laws and regulations as they are in effect.
   **(f)** If Employee is charged with a criminal offense, conviction of which could cause the suspension or revocation of any license required for the performance of Employee's duties, may adversely affect the ability of Employee to perform any obligations under this Agreement, or would cause Employee to become insolvent or bankrupt, Employee will notify Company's Human Resources Manager.
   **(g)** When Employee's employment with the Company terminates, Employee will notify any subsequent employer of the Restrictive Covenants contained in this Agreement before the Employee commences employment with such employer. In addition, the Employee authorizes the Company to provide notice of the Restrictive Covenants of this Agreement to third parties, including but not limited to, the Employee's subsequent, anticipated, or possible future employers.

DocuSign Envelope ID: 7E680F6D-66CC-45F2-B8B8-E4B9CF035F6C

9. **NOTICES.** All notices, requests, consents, claims, demands, waivers, and other initial communications regarding a dispute involving this Agreement (each, a "Notice") shall be in writing and addressed to the parties at the addresses set forth below. All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), or certified or registered mail (in each case, return receipt requested, postage pre-paid). Notice is effective upon receipted delivery to the designated address if the party giving the Notice has complied with the requirements of this Section.

**(a)** Any notice required or permitted to be given to Employee will be delivered to the address shown as Employee's residence as shown on the records of the Company.

**(b)** Notices addressed to Company must be sent to its registered agent address for the state in which the Employee resides. A copy may be sent to the Company's corporate office address. Notices sent to the principal business address are ineffective as notice unless a copy is also sent to the registered agent's address.

10. **MISCELLANEOUS PROVISIONS.**

(a) **Entire Agreement.** This Agreement, together with the other documents incorporated by reference and all related supplements and addendums it incorporates, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter, and supersedes all prior and contemporaneous offers, understandings, agreements, or representations, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and other documents, the statements in the body of this Agreement shall control. The parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

(b) **Modification and Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by the Employee and an authorized representative of the Company. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

(c) **Captions; Interpretation.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The addendums and exhibits referred to shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

(d) **Successors and Assigns; Beneficiaries.** The rights of the Company under this Agreement shall inure to the benefit of the successors and assigns of the Company. The rights of Employee are personal to Employee and Employee's heirs or devisees and may not otherwise be transferred or alienated. This Agreement is for the sole benefit of the parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.



Employee Initials

DocuSign Envelope ID: 7E680F6D-66CC-4FE2-B8B8-E4B9CF035F6C

(e) **Remedies.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise. Employee acknowledges that a breach or threatened breach of any obligations under this Agreement would give rise to irreparable harm to the Company for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by Employee of any such obligations, Company shall, in addition to any and all other rights and remedies that may be available in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction and any other relief that may be available from a court of competent jurisdiction without any requirement to post bond.

(f) **Survival.** All provisions of this Agreement regarding Confidential Information, Company's Proprietary Rights in intellectual property and work product, and Employee's Restrictive Covenants shall survive Employee's termination of employment, and no dispute regarding Employee's employment, the termination of Employee's employment, or this Agreement shall prevent the operation and enforcement of these obligations.

(g) **Severability.** Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement. The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law. The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

(h) **Signatures and Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Delivery of an executed counterpart's signature page of this Agreement by facsimile, email in portable document format (.pdf), by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by using an electronic signature compliant with the E-Sign Act has the same effect as delivery of an executed original of this Agreement.

(i) **Governing Law; Jurisdiction and Venue.** This Agreement, for all purposes, to the maximum extent permitted by applicable law, shall be construed in accordance with the laws of Ohio without regard to any conflicts of law principles. Should applicable law specifically prohibit the use of the law of a foreign jurisdiction, then the law of the relevant jurisdiction shall be used. Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in accordance with the arbitration provision contained within this Agreement except that action may be brought in a state or federal court located in the state of Ohio or the state of Employee's primary residence, if different, for the purposes of obtaining a restraining order or injunction against a violation of provisions of this Agreement or to enforce a judgment rendered in accordance with the results of arbitration between the parties. The parties hereby irrevocably submit to the non-exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue. EACH

PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO PARTICIPATE IN A CLASS ACTION OR A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

**11. ARBITRATION.** Any disagreement, dispute, controversy, or claim of any kind ("claims") arising out of or in connection to this Agreement, including any claims related to Employee's hiring, employment or the termination of Employee's employment, and including any claims that may arise between Employee and Company's owners, officers, directors, managers, employees, or agents in their capacity as such, shall be resolved by arbitration under the Federal Arbitration Act, Chapters 1 and 2, to the exclusion of inconsistent state laws, whether such claims are based in tort, contract, statute, equity, or otherwise. Employee agrees to waive all rights to a jury trial and waives the right to pursue any class action, collective action, or representative claims to the maximum extent allowed by law. To the extent a class or collective action or representative claim may not be waived, the Employee agrees to stay any such claims until after all claims subject to arbitration are fully resolved.

(a) **Excluded Claims**. Excluded from this Arbitration provision are those claims which are not arbitrable under state or federal law, including: worker's compensation claims; unemployment compensation claims; the right to file an administrative charge before a governmental agency such as the Equal Employment Opportunity Commission, National Labor Relations Board, or Department of Labor; or other claims which a statute prohibits from being subject to arbitration. Any disputes regarding the applicability of arbitration to a claim or the scope of this arbitration provision will be submitted to a court for determination.

(b) **Arbitrator.** Except for the excluded claims, disputes will be settled by binding arbitration administered by the American Arbitration Association before a qualified individual agreed to by the parties or designated pursuant to its Employment Arbitration Rules and Mediation Procedures (a copy of which may be found online at https://www.adr.org/Rules). The Optional Rules for Emergency Measures of Protection are incorporated by the parties. The standard provisions of the Employment Arbitration Rules shall apply. Claims shall be heard by a single arbitrator, unless the claim amount exceeds $250,000.00, in which case the dispute may be heard by a panel of three arbitrators.

(c) **Arbitration Procedure**. Company will pay the arbitrator fees and arbitration administrative expenses and any other costs unique to the arbitration hearing (recognizing that each side bears its own deposition, witness, expert and attorney's fees and other expenses to the same extent as if the matter were being heard in court). Unless otherwise agreed to by the parties, the place of arbitration shall be Cleveland, Ohio, USA or conducted virtually by telephone or videoconference. Applicable law for purposes of arbitration shall be determined by the Governing Law provision of this Agreement. If the dispute is less than $50,000.01 there shall be no discovery other than the exchange of documents and written questions. If the dispute exceeds $50,000.00, each party's discovery shall include no more than three depositions of four hours each. Where no party's claim exceeds $30,000.00 exclusive of interest, attorneys' fees and arbitration costs, the dispute shall be resolved by submission of documents and there shall be no in-person or oral hearing. The award shall be made within six months of the filing of the notice of intention to arbitrate (demand), and the arbitrator(s) shall agree to comply with this schedule before accepting appointment. However, this time limit may be extended by the arbitrator(s) for good cause shown, or by mutual agreement of the parties.

(d) **Arbitrator Authority.** The arbitrator(s) will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute or for a breach of Sections 3 through 6 of this Agreement. The arbitrator(s) shall not award consequential damages in

any arbitration initiated under this provision. The arbitrator(s) may determine how the costs and expenses of the arbitration shall be allocated between the parties, but they shall not award attorneys' fees. If, however, any party prevails on a statutory claim that affords the prevailing party attorneys' fees and costs, then the arbitrator(s) may award reasonable attorneys' fees and costs to the prevailing party. Any dispute as to who a prevailing party is or the reasonableness of any fee or costs shall be resolved by the arbitrator(s).

**(e) Award.** The award shall be accompanied by a reasoned opinion. Judgment upon any award rendered by the arbitrator(s) may be entered in any court having jurisdiction. Except as may be required by law, or as may be required in an action to enforce, modify, or vacate the award, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of all parties.

**(f) Full and Free Consent.** This Agreement to arbitrate is freely negotiated between Employee and Company and is mutually entered into between the parties. Each party fully understands and agrees that they are giving up certain rights otherwise afforded to them by civil court actions, including but not limited to the right to a jury trial.

**(g) Information.** Employee may contact the HR Department at HR@nationslending.com with any questions about the arbitration process.

By initialing here, Employee acknowledges having read this Arbitration section and voluntarily agreed to binding arbitration:



Employee Initials

**12. ACKNOWLEDGEMENT.** THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS RECEIVED A COPY OF THE AGREEMENT INCLUDING ALL SUPPLEMENTS AND ADDENDUMS, HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. THE EMPLOYEE ACKNOWLEDGES AND AGREES THAT THE EMPLOYEE HAS HAD SUFFICIENT TIME TO REVIEW AND AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF THE EMPLOYEE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

| Ilda Gonzalez | *Ilda Gonzalez* | 10/12/2022 |
|---|---|---|
| Employee Name | Employee Signature | Date |

| For Nations Lending Corporation: | *Cheryl Lieber* | 10/12/2022 |
|---|---|---|
| | Cheryl C. Lieber, Chief Admin. Officer | Date |

Employee Initials

**Supplement A to Employment Agreement**
**Position Description and Duties – Full Time**

The undersigned Employee is employed by Nations Lending Corporation (the "Company") in the following capacity: <u>Processor.</u> This employment is as a **full-time,** regular employee. Employee is classified as **non-exempt** for purposes of determining overtime eligibility.

This Supplement A, Position Description and Duties, identifies the duties and expectations of Employee. The Company reserves the right to modify Employee's duties on a day to day basis. In the event Employee changes position or has a significant change of duties, then the Company will provide a modified Position Description and Duties Supplement for execution, which will replace this one in its entirety.

**Position Description**

The Processor will verify and process information for mortgage loan approval by reviewing a loan application file and submitting the completed file for settlement.

**Position Duties**

- Verifies, compiles, and types application information for mortgage loans: Reviews residential loan application file to verify that application data is complete and meets establishment standards, including type and amount of mortgage, borrower assets, liabilities, and length of employment.
- Recommends that loans not meeting standards be denied.
- Calls or writes credit bureau and employer to verify accuracy of information.
- Prepares loan application forms, using computer.
- Calls specified companies to obtain property abstract, survey, and appraisal.
- Informs supervisor of discrepancies in title or survey.
- Submits mortgage loan application file for underwriting approval.
- Types and mails approval and denial letters to applicants.
- Submits approved mortgage loan file to mortgage loan closer for settlement.
- Records data on status of loans, including number of new applications and loans approved, canceled, or denied, using computer.

| | | |
|---|---|---|
| Ilda Gonzalez | *Ilda Gonzalez* | 10/12/2022 |
| Employee Name | Employee Signature | Date |

**Manager Attestation:**

*I have reviewed this agreement and found it to be accurate regarding the overall compensation agreed to with the employee.*

| | | |
|---|---|---|
| Jon Whittington | *Jon Whittington* | 10/12/2022 |
| Manager Name | Manager Signature | Date |

DocuSign Envelope ID: 7E680F6D466CC-45F2-B8B8-E4B9G5035F6C

## Supplement B to Employment Agreement
## Hourly Employee

### 1. Summary:

**(a)** Effective Date: ___October 17, 2022___.

**(b)** Overtime Status: NONEXEMPT

**(c)** Wages: $30.00 per hour

**(d)** Performance Incentives:

**(e)** Additional Compensation:

**Employee will receive the following monthly bonus structure on funded files they are listed as the Processor, incremental:**

| Funded Files | Bonus |
|--------------|-------|
| 0-5 | $0 |
| 6-10 | $75 |
| 11-15 | $100 |
| 16-20 | $200 |
| 21 + | $225 |

| | | |
|---|---|---|
| Ilda Gonzalez | *Ilda Gonzalez* | 10/12/2022 |
| Employee Name | Employee Signature | Date |
| | | |
| For Nations Lending Corporation: | *Cheryl Lieber* | 10/12/2022 |
| | Cheryl C. Lieber, Chief Admin. Officer | Date |

**Manager Attestation:** *I have reviewed this agreement and found it to be accurate regarding the overall compensation agreed to with the employee.*

| | | |
|---|---|---|
| Jon Whittington | *Jon Whittington* | 10/12/2022 |
| Manager Name | Manager Signature | Date |

DocuSign Envelope ID: 7E680F6D-66CC-45F2-B8B8-E4B9CF035F6C

2.  **Terms of Employee's Compensation Plan:** This Supplement B, Compensation Statement, identifies the compensation the Employee will receive from the Company.  In the event Employee's compensation changes due to raise, decrease, modification in calculation, or new position, then the Company will provide a modified Compensation Statement for execution, which will replace this one in its entirety.  Compensation shall be paid to Employee at such times and in a manner consistent with Company Policies as may be in effect from time to time.

(a) **Compensation:** For each pay period, Employee shall earn compensation which may be composed of (i) Wages; (ii) Performance Incentives; and (iii) Additional Compensation, as follows:

    **i.**  **Wages**. Salary will be paid in each pay period worked based upon the hourly or annualized rate provided in Section 1(c). For Exempt employees, salary is intended to pay for all hours worked during each pay period, regardless of scheduled hours, tracked hours, or actual hours worked.

    **ii.**  **Performance Incentives.** Employee may be eligible to earn Performance Incentives based upon meeting individual performance metrics as specified in Section 1(d).

    **iii.**  **Additional Compensation.**  Employee may be eligible to earn Additional Compensation based upon designated business units of Company achieving established performance targets (Bonus).  Additional Compensation will be measured according to the rates or terms provided in Section 1(e) following the close of the applicable calculation period.

All compensation will be paid as regular wages for services performed in accordance with the Company's ordinary payroll practices and schedules detailed in the current Employee Handbook.  Employee is not guaranteed any term of employment or amount of compensation. All employment is "At Will" and may be terminated at any time by either party.

3.  **Repayments to the Company:**

a)  **Unearned Compensation.** In the event Performance Incentives or Additional Compensation are advanced but later deemed unearned because of a later determination that the qualifying event was not fulfilled, the amounts previously advanced will be subtracted from Employee's net compensation balance in calculating any compensation not yet paid to Employee.  *Waiver of this policy is at the Company's discretion and may be applied for situations involving major life events (such as death).* Waiver in one circumstance will not constitute a waiver in all similar situations and is at the sole discretion of the Company.  This determination is made on a case-by-case basis.

b)  **Repayment of Advances or Obligations to the Company.** In the event that Employee has an outstanding balance owed to the Company for advances or unearned compensation received by the Employee, the Employee hereby authorizes the Company to deduct the outstanding balance owed from his/her compensation.  Unless the Company and Employee otherwise agree upon a specific dollar amount or a percentage for deductions, Employee expressly authorizes the Company to deduct from his/her compensation any amount for as long as it takes to resolve the outstanding balance owed to the Company; except that the amount of the deductions will not cause Employee's income to fall below the applicable minimum wage threshold for any applicable pay period.

4.   **Separation from Employment:**  Upon termination of employment for any reason, any rights to any Performance Incentives or Additional Compensation based on any loans which are unclosed or unfunded as of the last day of employment shall be forfeited by Employee and all income and rights therein shall accrue solely to the Company.  For any pending calculation periods, the end of the last calculation period shall be the last day of employment. Employee will be paid applicable earned income through the date of termination; however, Employee will not be entitled to receive any advances on compensation. Except where earlier required by statute, Employee's final payment of performance incentives or additional compensation may be paid up to thirty (30) calendar days following the termination date for the purpose of reconciling any outstanding debts, charge backs, unearned performance incentives or additional compensation, unreturned equipment charges, or other repayments due from Employee to Company or to any third parties. Issuance of the final payment does not operate to release Employee from any liability with regards to a later determination that any compensation paid was not earned.

5.   **Effective Date:** The Employee acknowledges that the terms of this Supplement will be effective on and after the Effective Date until Employee's termination of employment or until this Supplement is replaced with a new agreement that supersedes the current document. The Effective Date may be the date of first employment with Company (Employee's start date) or the first date in which the provisions of this Supplement will take effect. If this Supplement is replacing a prior agreement, then the terms of the prior agreement will apply to compensation earned prior to the Effective Date of this Supplement and this Supplement will apply to compensation earned thereafter.

Exhibit H

January 02, 2024

To Whom It May Concern:

We have decided to originate our mortgage loan with Academy Mortgage. The reason for this is we like and trust Kawai Hooper and want to continue working with her as our loan officer.

Sincerely,

Deannah Che Preston (Jan 2, 2024 16:25 HST)

**Deannah Che Preston**
borrower

Cody-Austin Raymond (Jan 2, 2024 16:25 HST)

**Cody-Austin Raymond**
coborrower

# Letter (Preston)

**Final Audit Report** 2024-01-03

| | |
|---|---|
| Created: | 2024-01-03 |
| By: | Jessica Brown (jessica.brown@nationslending.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAYveYJTyGPLgQGDjc9a6heN_vxvi-fAt7 |

## "Letter (Preston)" History

Document created by Jessica Brown (jessica.brown@nationslending.com)
2024-01-03 - 1:38:11 AM GMT

Document emailed to deannahchepreston4@gmail.com for signature
2024-01-03 - 1:39:20 AM GMT

Document emailed to dcnmp@hawaii.edu for signature
2024-01-03 - 1:39:20 AM GMT

Email viewed by deannahchepreston4@gmail.com
2024-01-03 - 2:24:54 AM GMT

Signer deannahchepreston4@gmail.com entered name at signing as Deannah Che Preston
2024-01-03 - 2:25:24 AM GMT

Document e-signed by Deannah Che Preston (deannahchepreston4@gmail.com)
Signature Date: 2024-01-03 - 2:25:26 AM GMT - Time Source: server

Email viewed by dcnmp@hawaii.edu
2024-01-03 - 2:25:39 AM GMT

Signer dcnmp@hawaii.edu entered name at signing as Cody-Austin Raymond
2024-01-03 - 2:25:56 AM GMT

Document e-signed by Cody-Austin Raymond (dcnmp@hawaii.edu)
Signature Date: 2024-01-03 - 2:25:58 AM GMT - Time Source: server

Agreement completed.
2024-01-03 - 2:25:58 AM GMT

**Adobe Acrobat Sign**

**RE: Yang Pricing and Rates**

Matt Keyes <matt.keyes@academymortgage.com>

Tue 1/9/2024 8:13 AM

To:len pagan <lenpagan@hotmail.com>;Jimmy MacPherson <Jimmy.MacPherson@academymortgage.com>;iaukea@hawaii.edu <iaukea@hawaii.edu>

Len,

The pricing that I sent you yesterday is based on LTV of 67.742 ($100k down). Here it is for today. Do you want me to change the down payment amount?

| Conventional 30 Year Fixed (●●0) | | | 8.500 | 0.400 | 99.625 | 0.375% ($788) | 30 | $1,615 | ✖ | Hide |
|---|---|---|---|---|---|---|---|---|---|---|

View Pricing for lock period: 15 **30** 45 60 90 120 150 180 | Expiration: **02/08/24**

Pricing Last Updated: 01/09/24 8:00 AM
Search Timestamp: 01/09/24 11:11 AM

| Rate | Price | LockPeriod | Discount/Rebate($/%) | P&I | Select |
|---|---|---|---|---|---|
| 5.500 | 94.000 | 30 | 6.000% ($12600) | $1192 | |
| 5.625 | 94.500 | 30 | 5.500% ($11550) | $1209 | |
| 5.750 | 94.875 | 30 | 5.125% ($10762) | $1226 | |
| 5.875 | 95.375 | 30 | 4.625% ($9712) | $1242 | |
| 6.000 | 95.875 | 30 | 4.125% ($8662) | $1259 | |
| 6.125 | 96.375 | 30 | 3.625% ($7612) | $1276 | |
| 6.250 | 96.500 | 30 | 3.500% ($7350) | $1293 | |
| 6.375 | 96.875 | 30 | 3.125% ($6562) | $1310 | |
| 6.500 | 97.375 | 30 | 2.625% ($5512) | $1327 | |
| 6.625 | 97.625 | 30 | 2.375% ($4988) | $1345 | |
| 6.750 | 97.500 | 30 | 2.500% ($5250) | $1362 | |
| 6.875 | 97.875 | 30 | 2.125% ($4462) | $1380 | |
| 7.000 | 98.250 | 30 | 1.750% ($3675) | $1397 | |
| 7.125 | 98.500 | 30 | 1.500% ($3150) | $1415 | |
| 7.250 | 98.500 | 30 | 1.500% ($3150) | $1433 | |
| 7.375 | 98.750 | 30 | 1.250% ($2625) | $1450 | |
| 7.500 | 99.125 | 30 | 0.875% ($1838) | $1468 | |
| 7.625 | 99.250 | 30 | 0.750% ($1575) | $1486 | |
| 7.750 | 99.250 | 30 | 0.750% ($1575) | $1504 | |
| 7.875 | 99.375 | 30 | 0.625% ($1312) | $1523 | |
| 8.000 | 99.500 | 30 | 0.500% ($1050) | $1541 | |
| 8.125 | 99.750 | 30 | 0.250% ($525) | $1559 | |
| 8.250 | 99.125 | 30 | 0.875% ($1838) | $1578 | |
| 8.375 | 99.250 | 30 | 0.750% ($1575) | $1596 | |
| 8.500 | 99.625 | 30 | 0.375% ($788) | $1615 | |
| 8.625 | 99.750 | 30 | 0.250% ($525) | $1633 | |

The following loan level adjustments have already been applied to pricing.

Thank you,



**Matt Keyes**

Loan Officer | LO NMLS #398768
Academy Mortgage Corporation

# ACADEMY
**MORTGAGE CORPORATION™**
Scan/Click code for full
licensing information or to
Apply Now!

Exhibit J

Shawn Gates
15-807 Kahakai Blvd
Pahoa, HI 96778

January 9, 2024

Nations Lending Corp.
4 Summit Park Drive, Suite 200
Independence, OH 44131

RE: Appraisal Transfer Request

Dear Nations Lending,

Please transfer my appraisal report for 15-807 Kahakai Blvd, Pahoa HI 96778 to Academy Mortgage Corporation. My loan number at Nations Lending is 40812312791422.

Thank you for your timely assistance with this request.

Sincerely,

*Shawn gates*

Shawn gates (Jan 9, 2024 12:47 HST)

Shawn Gates

# Appraisal Transfer Request Letter

**Final Audit Report**        2024-01-09

| | |
|---|---|
| Created: | 2024-01-09 |
| By: | Jessica Brown (jessica.brown@nationslending.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAWxp_4Bu94CFQxm9HMIOiHLGSknO1iBFr |

# "Appraisal Transfer Request Letter" History

- Document created by Jessica Brown (jessica.brown@nationslending.com)
  2024-01-09 - 8:26:39 PM GMT

- Document emailed to sgates1673@yahoo.com for signature
  2024-01-09 - 8:27:03 PM GMT

- Email viewed by sgates1673@yahoo.com
  2024-01-09 - 10:46:03 PM GMT

- Signer sgates1673@yahoo.com entered name at signing as Shawn gates
  2024-01-09 - 10:47:06 PM GMT

- Document e-signed by Shawn gates (sgates1673@yahoo.com)
  Signature Date: 2024-01-09 - 10:47:08 PM GMT - Time Source: server

- Agreement completed.
  2024-01-09 - 10:47:08 PM GMT

**Adobe Acrobat Sign**

*EX 12*



Date Prepared: January 12, 2024
Borrower: Shawn Thomas Gates & Keely Moani Ke Ala Gates
Address: 15-807 Kahakai Blvd, Pahoa, HI, 96778
Loan Number: 6215738

To whom it may concern,

The purpose of this letter is to request the appraisal transfer on the above-mentioned transaction.

Are you able to assist me with the following?

- **XML Version of the Appraisal**
- **PDF Copy**
- **SSR's.**
- Invoice
- **Transfer letter: must explicitly state the following two items on the Appraisal Transfer Form.**
    1. **The appraisal was requested in compliance with AIR regulations. The appraisal report was requested and completed in accordance with Appraiser Independence Requirements (AIR).**
    2. **That the other Lender is a Correspondent Lender.**

**Matt Keyes**

Loan Officer | LO NMLS #398768
Academy Mortgage Corporation
Phone: 801- 673-1068
Email: matt.keyes@academymortgage.com
339 West 13490 South
Draper, Utah 84020

ACADEMY
MORTGAGE CORPORATION
*Inspiring Hope - Delivering Dreams - Building Prosperity*

Corp NMLS #3113 Equal Housing Lender



*Ex. L*

January 16, 2024

*via overnight delivery service*

James Mac Pherson
Academy Mortgage Corporation
339 West 13490 South
Draper, UT 84020

**RE: Cease and Desist Warning - Former Nations Lending Employees violation of proprietary information and restrictive covenants/diversion of business**

Mr. Mac Pherson:

Nations Lending Corporation is contacting you to notify Academy Mortgage Corporation that former employees of Nations Lending currently in the employ of Academy have violated provisions of employment agreements they entered into with Nations Lending and engaged in conduct harmful to Nations Lending's interests. Nations Lending demands that Academy instruct its employees to honor their prior agreements and cease interference with Nations Lending's customer relationships. Nations Lending further demands Academy's cooperation with the immediate return of all proceeds and proprietary information belonging to Nations Lending.

Joan Pagan resigned from Nations Lending on January 2, 2024. Ms. Pagan is currently employed by Academy as a mortgage originator in Hilo, Hawaii. Nations Lending has identified multiple instances of customer diversion and misappropriation of data related to the office where Ms. Pagan was formerly employed. These actions operated to the detriment of Nations Lending and for the benefit of Academy.

John Owens is a former employee of Nations Lending, currently employed by Academy as Director of Growth. Nations Lending reasonably believes that Mr. Owen's position with Academy involves the recruitment of new employees. In light of the recent mass departure of Nations Lending employees to Academy following Mr. Owens joining that company, Nations Lending believes that Mr. Owens has been a factor in the recruitment of Nations Lending employees.

In addition to these individuals, Nations Lending is placing Academy on notice that Jessica Brown, and Leonard Pagan, spouse of Academy employee Joan Pagan, both of whom resigned from Nations Lending on January 16, 2024, and other Nations Lending employees are the subjects of an investigation regarding the misappropriation of proprietary information belonging to Nations Lending; interference with its prospective customer relationships; contractual breaches of the terms and conditions of their employment by solicitation, diversion of customers and business, and theft of proprietary information and trade secrets; and breach of their common-law duties of loyalty as Nations Lending employees. The acts have operated for the benefit of Academy.

4 Summit Park Drive, Suite 200, Independence, OH 44131
877-816-1220 I www.nationslending.com I nmls#32416

Let this letter serve as notice to Academy that all the aforementioned Nations Lending employees entered into non-solicitation and confidentiality agreements as part of their employment with Nations Lending under which the employees agreed to honor those restrictive covenants for a period of one year following the end of their employment. Despite those promises, Nations Lending has identified patterns and communications showing that these covenants have been violated.

Nations Lending intends to pursue every and all available legal remedies against those individuals who have committed tortious acts and those operating in concert with them. Our investigation is ongoing, but we have already identified known instances where Nations Lending transactions were diverted for Academy's benefit. In that context, let this letter serve as a notice to Academy of its obligations to preserve all relevant information and evidence regarding these individuals; their recruitment, hiring, and onboarding; communications regarding them or other Nations Lending employees; transactions pertaining to such individuals or referred by them, and other relevant information whatever its form, source, or manner of storage.

Notices are being sent directly to these individuals reminding them of their existing obligations and also, for those individuals whose misconduct has already been identified, demanding the immediate cessation of such violations and immediate restitution for their unlawful acts. Nations Lending reserves the right to take any actions necessary to enforce its contractual rights, obtain compensation for previous violations of those rights, and to seek relief to protect it from future violation. Nations Lending will also aggressively pursue any parties who tortiously aid others in violating such contractual agreements.

Nations Lending demands that all customer transactions unlawfully diverted from Nations Lending to Academy be immediately returned, and Academy refrain from aiding any former Nations Lending employees from any further acts in violation of their contractual and other obligations. Nations Lending further demands that all information and records pertaining to the customer transactions lawfully belonging to it be returned and any copies remaining in Academy's possession be immediately destroyed. Nations Lending finally demands that all profits and proceeds obtained by Academy resulting from these improper transactions, and pertinent records thereof, be promptly remitted to Nations Lending as the proper owner.

Respectfully,

R. Christopher Baker
General Counsel

(216) 393-6901
christopher.baker@nationslending.com



January 16, 2024


*via overnight delivery service*


Leonard Pagan
1469 Kuleana Place
Hilo, HI 96720


**RE: Reminder of Restrictive Covenants - Cease and Desist/Preservation Demand**


Mr. Pagan:

Allow this correspondence to serve as a reminder that in conjunction with your employment with Nations Lending Corporation, you entered into an employment agreement containing confidentiality and non-solicitation provisions on or about July 27, 2022, (together with any amendments or addendums thereto, known as the "Employment Agreement").

I am writing to remind you specifically that the Employment Agreement contains specific provisions regarding Nations Lending's ownership of information and work product related to your employment ("Proprietary Information"), and non-solicitation of Nations Lending employees. A copy of relevant portions of the Employment Agreement is provided for your reference.

While your employment with Nations Lending ended on January 16, 2024, the obligations contained within the Employment Agreement continue in force and effect. You are specifically prohibited from any form of solicitation of Nations Lending employees or customers for a period of twelve months, including aiding or assisting others with such solicitations. You will be held personally liable for any violations of any terms of your Employment Agreement, so you are encouraged to scrupulously follow all restrictions.

Unfortunately, information arising in connection with your resignation from employment indicates that while you were still a Nations Lending employee, you participated in the active diversion of customers and business interests, which constitute property belonging to Nations Lending, to another mortgage company, Academy Mortgage Corporation. This constitutes tortious theft as well as breach of contract entitling Nations Lending to damages from your actions. Nations Lending demands you immediately **cease and desist** from further violations of your Employment Agreement and promptly return all misappropriated property and information wrongfully taken up to this point.

Nations Lending intends to pursue every and all available legal remedies against individuals who have committed tortious acts and those operating in concert with them. It intends to exercise its lawful rights to recover just compensation for the damage resulting from your actions.

Consequently, you are also directed to retain and preserve all writings and communications in your possession, whether email, text, voice message, or physical notes, and copies of any versions of the foregoing, which relate to your employment with either Nations Lending or Academy Mortgage Corporation and interactions with any customers of either entity regarding loan transactions or prospective transactions. This demand extends to all personal devices as well and any that you use for work purposes which are provided by an employer. You are advised that our investigation is ongoing and that the failure to preserve relevant information to such an investigation may be inferred as an admission that the lost material was incriminating to yourself or others, and may give rise to additional damages for spoliation of evidence.

If you are represented by legal counsel, please direct this communication to their attention and request they contact me so that our future correspondence can be directed to the appropriate recipeient.

Cordially,

R. Christopher Baker
General Counsel

christopher.baker@nationslending.com
(216) 393-6901


Attach:



Exhibit N

January 26, 2024

*Sent via FedEx*

R. Christopher Baker
Nations Lending
4 Summit Park Drive, Suite 200
Independence, OH 44131

RE: Reply to Cease and Desist Warning

Dear Mr. Baker,

I am writing in response to your correspondence to Kristi Pickering dated January 16, 2024, regarding allegations of misconduct by former employees of Nations Lending currently employed by Academy Mortgage. We take these allegations seriously and are committed to addressing them in a fair and transparent manner.

Before proceeding further, we kindly request that you provide detailed documentation or evidence supporting the allegations raised against the individuals named in your letter. It is imperative for us to thoroughly review the specifics of these claims to understand the nature and extent of the alleged violations. This will enable us to conduct a comprehensive investigation and take appropriate actions in accordance with our internal policies.

Once we receive the requested documentation, we will initiate an internal review to assess the situation and we will communicate our findings and proposed course of action in a timely manner.

Sincerely,

Mike Huber
EVP, General Counsel



ORIGIN ID:SLCA       (801) 233-3700
ABBY RUESCH
ACADEMY MORTGAGE CORPORATION
339 W. 13490 S.

DRAPER, UT 84020
UNITED STATES US

SHIP DATE: 29JAN24
ACTWGT: 0.50 LB
CAD: 105064199/INET4535

BILL SENDER

TO  R. CHRISTOPHER BAKER
    NATIONS LENDING
    4 SUMMIT PARK DRIVE, SUITE 200

    INDEPENDENCE OH 44131
    (877) 816-1220          REF: 10038
    INV:
    PO:                     DEPT: 10038



RECEIVED
JAN 30 2024
BY:_____





FedEx
Express

E

TUE - 30 JAN 10:30A
PRIORITY OVERNIGHT

TRK#
0201  7749 8462 1507

XN CLEA                    44131
              OH-US   CLE





Exhibit O

February 14, 2024

Mike Huber
Academy Mortgage Corporation
339 West 13490 South
Draper, UT 84020

**RE: Loan diversion by Leonard Pagan's Hawaii office**

Mr. Huber:

I'm writing in response to your letter requesting documentation of the offenses committed by former Nations Lending employees Leonard Pagan, Joan Pagan, Christina Alves, Chandee Hooper, and Jessica Brown (along with other unidentified individual Nations Lending employees, hereafter referenced  collectively as the "Pagan Employees"), undertaken for their personal benefit as well as the benefit of Academy Mortgage Corporation ("Academy"), and accomplished with the assistance of other Academy employees.

To the extent that the full damages suffered by Nations Lending are still being ascertained and may not be capable of determination until we have fully examined files and records in possession of Academy, our investigation will continue to be ongoing. While we are unwilling to extensively share confidential information with you at this time, I will disclose a limited outline of the scheme we have uncovered along with a representative sampling of the documents that we have uncovered to date to demonstrate that Nations Lending has the capacity to prove its allegations.

Nations Lending has determined that Mr. Pagan and the other employees under his supervision engaged in a systemic pattern of misappropriation of Nations Lending data and diversion of business to Academy beginning several weeks prior to their resignations from Nations Lending in January of this year. This process was undertaken in coordination with Academy Mortgage employees and officers who were aware that Mr. Pagan and the others were Nations Lending employees and yet collaborated with them to transfer loan transactions and other data to Academy. This plan was conceived and implemented some time before Joan Pagan resigned from Nations Lending on January 2. Contemporaneous to her resignation, other employees in the Kailua Kona office, still employed by Nations Lending, began discussing Academy Mortgage with current customers of Nations Lending and drafting letters to provide those consumers to sign requesting transfer of their loans to Academy. The employees attempted to deceive Nations Lending into believing that these customers were initiating these changes on their own accord and concealed their involvement in the transferred transactions by placing them under the name of an Academy loan originator. During this period, these employees also downloaded lists of contacts and customers of Nations Lending and other information to use in competition against Nations Lending. The individuals attempted to conceal their activity by using private email accounts to communicate and discussing their activities in chat applications. Finally, in the final phase of their plan, on January 16, 2024, after they had completed their diversion efforts, the employees resigned from Nations Lending *en masse*. The coordinated departure of this office without advance warning

Electronically Filed 02/26/2024 13:20 / 8/CV 24 992402 / Confirmation Nbr. 3097347 / CLAJB

resulted in further losses to Nations Lending in consequence.

To illustrate some of the evidence of these activities which Nations Lending has so far uncovered, I have included with this letter as Exhibit A an excerpt copy of an email communication dated January 9, 2024, when Mr. Pagan was still a Nations Lending employee, from Matt Keyes to Mr. Pagan's Hotmail account. In this email, Mr. Keyes updates pricing for one of Nations Lending's customer transactions in response to an earlier exchange. Mr. Keyes is a loan originator listed as located at Academy's Utah corporate headquarters office and the messages are sent from his company email account. Also copied on this message is Jimmy MacPherson, another Academy originator, and the referenced consumer is Nations Lending customer Yujia Yang.

This was not an isolated instance, rather only one of many Nations Lending customers who were improperly solicited and diverted by the Pagan Employees and Academy. For another example I will direct your attention to the included document labeled Exhibit B which is a copy of a consumer transfer request letter prepared by the Pagan Employees using Nations Lending's systems. As you will see from the incorporated digital certificate, Jessica Brown, who was a Nations Lending employee until January 16, 2024, created and sent the document to the consumers on January 3, 2024. The letter requests the transfer to Academy of a consumer loan transaction then pending at Nations Lending in order that the consumers could continue to work the loan originator, Kawaii (Chandee) Hooper. Ms. Hooper was at that time was also still a Nations Lending employee and continued so until January 16 when she resigned along with the other Pagan Employees as part of their coordinated plan.

Furthermore, Nations Lending has uncovered the close coordination between Academy and the Pagan Employees. In relevant point, Exhibit C is a copy of an appraisal transfer request for the loan transaction of Shawn Gates that was created and processed by Ms. Brown late on January 9 as part of the diversion of that transaction to Academy. Following the fabrication of this allegedly consumer-initiated transfer, Nations Lending received a request from Matt Keyes to transfer the Gates appraisal. The letter from Mr. Keyes, dated January 12, is included as Exhibit D.

Nations Lending has recovered a number of loan transfer letters, virtually identical to the one provided as Exhibit B. The repetitive format of these requests asking for the transfer of loans being originated by Ms. Alves, Ms. Hooper, and Mr. Pagan would be alone suspicious, even if one discounts that they all are dated weeks before the individuals supposedly began working at Academy. There is no disputing that Academy should have been aware of multiple red flags concerning these transactions and its willful blindness, at a minimum, is no less excusable than the outright culpability of its employees in sanctioning and aiding the unlawful diversion of Nations Lending transactions or facilitating the unlawful activities of the Pagan Employees.

As previously stated, our investigation efforts continue, but the examples already uncovered reflect efforts exceeding three million dollars of consumer loan transactions, not counting files which the Pagan Employees evidently attempted to conceal from Nations Lending entirely. Furthermore, the apparent download of information containing more than 1,200 customer records by the Pagan Employees is a matter of grave concern to Nations Lending. Nations Lending justifiably believes that Academy has incorporated this proprietary data into its systems and is using that information to market to Nations Lending's customers and unfairly compete with it.

Huber – Academy Mortgage                                        February 14, 2024

My previous communication to you placed Academy on notice that the Pagan Employees and Academy employees had engaged in concerning activities. This letter should serve as warning that all of the transactions connected with the Pagan Employees as part of their transition to Academy are fairly attributable to the proprietary property of Nations Lending. Academy must exercise best efforts, in line with our previous communication, to preserve all information and evidence in its possession in expectation of forthcoming litigation. To further aid you in understanding Nations Lending's specific claims, we identify the following individuals, known or suspected to be in Academy's employment who have been identified as involved with or having knowledge relevant to this matter:

| Pagan Employees | Academy Employees |
|---|---|
| Leonard Pagan | Matthew Keyes |
| Joan Pagan | James MacPherson |
| Christina Alves | Adam Buniger |
| Chandee (Kawaii) Hooper | |
| Jessica Brown | |
| Ilda Gonzalez | |

This list is under ongoing investigation and subject to supplementation and does not waive any preservation obligations with respect to any unidentified individuals.

Nations Lending is contemplating legal action against the listed individuals and those acting in concert with them for various tortious activities and contractual violations. With respect to the Pagan Employees, except for Ilda Gonzales, each was provided with a reminder of their contractual obligations to Nations Lending following the end of their employment. Where Nations Lending had already identified their involvement in loan diversion, Nations Lending issued demands to cease and desist from further violations. To date, none of the recipients has responded. Nations Lending is supplying Academy with copies of the employee agreements with Nations Lending for those individuals which contain the restrictive covenants each agreed to when they began employment (Exhibit E). As a summary, each individual agreed that Nations Lending was the sole owner of all work product and other information generated during their employment and pledged to preserve the confidentiality of such data. All employees agreed that during their employment they would not perform loan origination duties for competitors of Nations Lending. Each employee further agreed not to not to solicit Nations Lending customers or employees for a term of twelve months after leaving employment.

Academy is also advised, that in addition to the consumer transactions for Yang, Gates, and Preston specifically referenced in this letter, Nations Lending has identified a dozen loan transactions in which improper transfer requests were initiated by the Pagan Employees in violation of their contractual obligations to Nations Lending. Nations Lending will seek to recover all proprietary information and data constituting its property and also asserts a claim on all proceeds of transactions closed by or with the assistance of the Pagan Employees. At this time, Nations Lending will disclose the following additional consumer names to aid Academy in its due diligence:

Huber – Academy Mortgage                                      February 14, 2024

        Aiu-Horie
        Bowdle
        Hatch
        Kanakanui-Bishaw
        Neva
        Sceppe
        Tagaca

Additional consumers have been identified but we are withholding further disclosure while our inquiry continues.

Against the Pagan Employees, Nations Lending asserts claims of interference in prospective business relationships, misappropriation of intellectual property and confidential trade secrets and information, violation of contractual restrictions on the misappropriation of information and confidential trade secrets, violation of contractual restrictions on the solicitation of Nations Lending customers, violation of contractual restrictions on the solicitation of Nations Lending employees, civil conspiracy, violations of their duties as an employee of Nations Lending as provided by contract, and violations of fiduciary duties to Nations Lending.

Against Academy, through the acts of its employees, Nations Lending asserts claims of interference in prospective business relationships, misappropriation of intellectual property and confidential trade secrets and information, and civil conspiracy.

The claims asserted above are not exhaustive and Nations Lending does not waive any rights or causes of action thereby, asserting instead that its investigation is ongoing and its claims against any party are subject to amendment and supplementation as further facts come to light.

The information provided in this letter should be adequate as a threshold offering of proof for Academy to initiate its own investigation and undertake its own inquiries into these matters. While Nations Lending is not presenting a detailed complaint or inventory of each transaction it believes to have been diverted, at a minimum Nations Lending asserts a property interest in transactions originated in the name of any individual listed in this letter since December 26, 2023.

Nations Lending intends to complete its investigation in order to come to a clearer assessment of the extent of financial compensation it intends to demand from the Pagan Employees or those acting in concert with them. Nations Lending also expects Academy to conduct a due inquiry with its employees and to admonish them against committing further violations of their obligations to Nations Lending. Nations Lending further reserves its right to seek all appropriate relief if we are unable to obtain satisfactory assurances that the property rights and interests of Nations Lending have been adequately protected from further infringement. At this stage, Nations Lending anticipates that its damages will exceed $200,000.00 from loan diversion alone.

Once you have reviewed this information, I would appreciate your response indicating how Academy proposes to resolve this dispute in lieu of litigation. Also, should you wish to discuss any aspect of this matter further, I may be contacted at any time.

Huber – Academy Mortgage                                February 14, 2024

R. Christopher Baker
General Counsel

(216) 393-6901
christopher.baker@nationslending.com

Attach:



CV24993402          175813366

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

**FILED**

| | | |
|---|---|---|
| NATIONS LENDING CORPORATION | ) | CASE NO. CV-24-993402 |
| | ) | |
| *Plaintiff,* | ) | JUDGE JOHN J. RUSSO |
| | ) | |
| v. | ) | **MAGISTRATE'S DECISION** |
| | ) | **REGARDING** |
| ACADEMY MORTGAGE | ) | **TEMPORARY RESTRAINING ORDER** |
| CORPORATION, et al., | ) | |
| | ) | |
| *Defendants.* | | |

2024 FEB 26 ⊃ 4: 06

CLERK OF COURTS
CUYAHOGA COUNTY

This matter came before the Magistrate on Plaintiff, Nations Lending Corporation's ("Nations Lending" or "Plaintiff") Motion for Temporary Restraining Order and Preliminary Injunction. The magistrate finds that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or his attorney can be heard in opposition. Based upon the Plaintiff's Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction, and upon good cause shown, the Court makes the following orders:

A. For a Temporary Restraining Order against Defendants Academy Mortgage Corporation, Leonard Pagan, Joan Pagan, Jessica Brown, Christina Alves, Kawai "Chandee" Hooper, Brooks Onishi, and Ilda Gonzalez and their agents, representatives, related entities, entities doing business as, and all persons acting in aid of, conjunction with, or in concern with them, from directly or indirectly:
   i. using, disclosing, or otherwise misappropriating Nations Lending's Confidential Information and trade secrets;
   ii. inducing or attempting to induce the violation of the contractual relationships of Nations Lending; and
   iii. soliciting or attempting to solicit Nations Lending's customers, prospective customers, and/or employees.

B. For a Temporary Restraining Order against Defendants Leonard Pagan, Joan Pagan, Jessica Brown, Christina Alves, Kawai "Chandee" Hooper, and Brooks Onishi and their agents, representatives, related entities, entities doing business as, and all persons acting in aid of, conjunction with, or in concern with them, from directly or indirectly:
   a. Owning, maintaining, operating or engaging in the same or similar business activities as Nations Lending or in any business activity which competes with Nations Lending;
   b. Serving, advising, managing, consulting with, providing services for, or being employed by any firm, agency, partnership or corporation which engages in the same or similar business activities as Nations Lending or competes with Nations Lending;

1

  c. undertaking any efforts or activities toward forming or incorporating, financing, or commencing any competing business activity which engages in the same or similar business activities as Nations Lending; or

  d. advising, serving, or consulting with any person, business, or entity which is or will be undertaking efforts toward incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as Nations Lending.

C. This Court further orders that a bond is unnecessary, and its requirement has been waived by the parties.

D. This matter shall come for a hearing on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction on _____ ,2024, at _____.

**IT IS SO ORDERED**

STEPHEN M. BUCHA III, MAGISTRATE

**--NOTICE--**

A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ. R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ. R. 53(D)(3)(b).

## Certificate of Service

A copy of the foregoing Magistrate's Decision has been sent by the Clerk of Courts by regular U.S. Mail to the following:

David Hearty, Esq. and Jeffrey Miller
1109 Carnegie Ave., Second Floor
Cleveland, Ohio 44115


Academy Mortgage Corp.
339 West 13490 South
Drpaer, UT 84020

Leonard Pagan
1469 Kuleana Place
Hilo, HI 96720

Joan Pagan
1469 Kuleana Place
Hilo, HI 96720

Christina Iukea-Alves
75-6203 Piena Place
Kailua Kona, HI 96740

Kaeai Hooper
74-5158 Puuolokaa Place
Kailua Kona, HI 96740

Brooks Onishi
46-1058 Emepela Way #10C
Kaneohe, HI 96744

Ilda Gonzalez
3270 Flemming Street
Riverside, CA 92509

COPIES MAILED BY THE CLERK

_Wayma deputy_
Clerk of Courts

_2/27/2024_
Date



175814758

# IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

**FILED**

NATIONS LENDING CORPORATION
    Plaintiff

Case No: CV-24-993402

Judge: JOHN J RUSSO

2024 FEB 27  A 10: 13

CLERK OF COURTS
CUYAHOGA COUNTY

ACADEMY MORTGAGE CORPORATION, ET AL.
    Defendant

## JOURNAL ENTRY

THE COURT ADOPTS THE MAGISTRATE'S DECISION DATED 2-26-24 AND ATTACHED HERETO.  PLAINTIFF'S MOTION FOR TRO IS GRANTED.  A    TEMPORARY RESTRAINING ORDER IS GRANTED AGAINST DEFENDANTS ACADEMY MORTGAGE CORPORATION, LEONARD PAGAN, JOAN PAGAN, JESSICA BROWN, CHRISTINA ALVES, KAWAI "CHANDEE" HOOPER, BROOKS ONISHI, AND ILDA GONZALEZ AND THEIR AGENTS, REPRESENTATIVES, RELATED ENTITIES, ENTITIES DOING BUSINESS AS, AND ALL PERSONS ACTING IN AID OF, CONJUNCTION WITH, OR IN CONCERN WITH THEM, FROM DIRECTLY OR INDIRECTLY:

I.     USING, DISCLOSING, OR OTHERWISE MISAPPROPRIATING NATIONS LENDING'S CONFIDENTIAL INFORMATION AND TRADE SECRETS;

II.     INDUCING OR ATTEMPTING TO INDUCE THE VIOLATION OF THE CONTRACTUAL RELATIONSHIPS OF NATIONS LENDING; AND

III.     SOLICITING OR ATTEMPTING TO SOLICIT NATIONS LENDING'S CUSTOMERS, PROSPECTIVE CUSTOMERS, AND/OR EMPLOYEES.

A TEMPORARY RESTRAINING ORDER IS GRANTED AGAINST DEFENDANTS LEONARD PAGAN, JOAN PAGAN, JESSICA BROWN, CHRISTINA ALVES, KAWAI "CHANDEE" HOOPER, AND BROOKS ONISHI AND THEIR AGENTS, REPRESENTATIVES, RELATED ENTITIES, ENTITIES DOING BUSINESS AS, AND ALL PERSONS ACTING IN AID OF, CONJUNCTION WITH, OR IN CONCERN WITH THEM, FROM DIRECTLY OR INDIRECTLY:

A.     OWNING, MAINTAINING, OPERATING OR ENGAGING IN THE SAME OR SIMILAR BUSINESS ACTIVITIES AS NATIONS LENDING OR IN ANY BUSINESS ACTIVITY WHICH COMPETES WITH NATIONS LENDING;

B.     SERVING, ADVISING, MANAGING, CONSULTING WITH, PROVIDING SERVICES FOR, OR BEING EMPLOYED BY ANY FIRM, AGENCY, PARTNERSHIP OR CORPORATION WHICH ENGAGES IN THE SAME OR SIMILAR BUSINESS ACTIVITIES AS NATIONS LENDING OR COMPETES WITH NATIONS LENDING;

C.     UNDERTAKING ANY EFFORTS OR ACTIVITIES TOWARD FORMING OR INCORPORATING, FINANCING, OR COMMENCING ANY COMPETING BUSINESS ACTIVITY WHICH ENGAGES IN THE SAME OR SIMILAR BUSINESS ACTIVITIES AS NATIONS LENDING; OR

D.     ADVISING, SERVING, OR CONSULTING WITH ANY PERSON, BUSINESS, OR ENTITY WHICH IS OR WILL BE UNDERTAKING EFFORTS TOWARD INCORPORATING, FINANCING, FORMING, OR COMMENCING ANY COMPETING BUSINESS OR ACTIVITY WHICH ENGAGES IN THE SAME OR SIMILAR BUSINESS ACTIVITIES AS NATIONS LENDING.

A BOND IS UNNECESSARY, AND ITS REQUIREMENT HAS BEEN WAIVED BY THE PARTIES.

02/26/2024



175814758

DESPITE THIS ADOPTION, THE PARTIES MAY OBJECT TO THE MAGISTRATE'S DECISION AS PROVIDED IN CIV.R. 53(D)(4)((E)(II).

PURSUANT TO CIV.R. 58(B), THE CLERK OF COURTS MUST SERVE, IN A MANNER PRESCRIBED BY CIV.R. 5(B), ALL PARTIES NOT IN DEFAULT FOR FAILURE TO APPEAR NOTICE OF THIS JUDGMENT AND ITS DATE OF ENTRY UPON THE JOURNAL AND MUST NOTE THE SERVICE ON THE APPEARANCE DOCKET.   PURSUANT TO CIV.R. 58(B), THE CLERK OF COURTS MUST SERVE, IN A MANNER PRESCRIBED BY CIV.R. 5(B) ALL PARTIES NOT IN DEFAULT FOR FAILURE TO APPEAR NOTICE OF THIS JUDGMENT AND ITS DATE OF ENTRY UPON THE JOURNAL AND MUST NOTE THE SERVICE ON THE APPEARANCE DOCKET.

_____       2/27/24
Judge Signature                                      Date
                                                                  CPSB1

02/26/2024



CV24993402          175813366

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

**FILED**

| | | |
|---|---|---|
| NATIONS LENDING CORPORATION | ) | CASE NO. CV-24-993402 |
| | ) | |
| *Plaintiff,* | ) | JUDGE JOHN J. RUSSO |
| | ) | |
| v. | ) | **MAGISTRATE'S DECISION** |
| | ) | **REGARDING** |
| ACADEMY MORTGAGE | ) | **TEMPORARY RESTRAINING ORDER** |
| CORPORATION, et al., | ) | |
| | ) | |
| *Defendants.* | | |

2024 FEB 26 ⊃ 4: 06

CLERK OF COURTS
CUYAHOGA COUNTY

This matter came before the Magistrate on Plaintiff, Nations Lending Corporation's ("Nations Lending" or "Plaintiff') Motion for Temporary Restraining Order and Preliminary Injunction. The magistrate finds that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or his attorney can be heard in opposition. Based upon the Plaintiff's Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction, and upon good cause shown, the Court makes the following orders:

A. For a Temporary Restraining Order against Defendants Academy Mortgage Corporation, Leonard Pagan, Joan Pagan, Jessica Brown, Christina Alves, Kawai "Chandee" Hooper, Brooks Onishi, and Ilda Gonzalez and their agents, representatives, related entities, entities doing business as, and all persons acting in aid of, conjunction with, or in concern with them, from directly or indirectly:

    i. using, disclosing, or otherwise misappropriating Nations Lending's Confidential Information and trade secrets;

    ii. inducing or attempting to induce the violation of the contractual relationships of Nations Lending; and

    iii. soliciting or attempting to solicit Nations Lending's customers, prospective customers, and/or employees.

B. For a Temporary Restraining Order against Defendants Leonard Pagan, Joan Pagan, Jessica Brown, Christina Alves, Kawai "Chandee" Hooper, and Brooks Onishi and their agents, representatives, related entities, entities doing business as, and all persons acting in aid of, conjunction with, or in concern with them, from directly or indirectly:

    a. Owning, maintaining, operating or engaging in the same or similar business activities as Nations Lending or in any business activity which competes with Nations Lending;

    b. Serving, advising, managing, consulting with, providing services for, or being employed by any firm, agency, partnership or corporation which engages in the same or similar business activities as Nations Lending or competes with Nations Lending;

1

    c. undertaking any efforts or activities toward forming or incorporating, financing, or commencing any competing business activity which engages in the same or similar business activities as Nations Lending; or

    d. advising, serving, or consulting with any person, business, or entity which is or will be undertaking efforts toward incorporating, financing, forming, or commencing any competing business or activity which engages in the same or similar business activities as Nations Lending.

C. This Court further orders that a bond is unnecessary, and its requirement has been waived by the parties.

D. This matter shall come for a hearing on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction on _____ ,2024, at _____.

**IT IS SO ORDERED**

_____

STEPHEN M. BUCHA III, MAGISTRATE

**--NOTICE--**

A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ. R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ. R. 53(D)(3)(b).

## Certificate of Service

A copy of the foregoing Magistrate's Decision has been sent by the Clerk of Courts by regular U.S. Mail to the following:

David Hearty, Esq. and Jeffrey Miller
1109 Carnegie Ave., Second Floor
Cleveland, Ohio 44115


Academy Mortgage Corp.
339 West 13490 South
Drpaer, UT 84020

Leonard Pagan
1469 Kuleana Place
Hilo, HI 96720

Joan Pagan
1469 Kuleana Place
Hilo, HI 96720

Christina Iukea-Alves
75-6203 Piena Place
Kailua Kona, HI 96740

Kaeai Hooper
74-5158 Puuolokaa Place
Kailua Kona, HI 96740

Brooks Onishi
46-1058 Emepela Way #10C
Kaneohe, HI 96744

Ilda Gonzalez
3270 Flemming Street
Riverside, CA 92509

COPIES MAILED BY THE CLERK

_Deyma deputy_
Clerk of Courts

_2/27/2024_
Date



175814476

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

NATIONS LENDING CORPORATION
    Plaintiff

Case No: CV-24-993402

Judge: JOHN J RUSSO
Magistrate: STEPHEN M BUCHA III

ACADEMY MORTGAGE CORPORATION, ET AL.
    Defendant

## __MAGISTRATE'S ORDER__

HEARING HELD BY MAGISTRATE ON PLAINTIFF'S MOTION FOR TRO.  SAID MOTION IS GRANTED.  THE
MAGISTRATE WILL ISSUE A MAGISTRATE'S DECISON MAKING SPECIFIC FINDINGS.

_____

Magistrate Signature            02/27/2024
                               CPSB1

02/26/2024



175921054

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

NATIONS LENDING CORPORATION
    Plaintiff

Case No: CV-24-993402

Judge: JOHN J RUSSO

ACADEMY MORTGAGE CORPORATION, ET AL.
    Defendant

## JOURNAL ENTRY

PURSUANT TO THE MAGISTRATE'S 02/26/2024 DECISION GRANTING IN PART THE REQUESTED TEMPORARY RESTRAINING ORDER AT ISSUE, A PRELIMINARY INJUNCTION HEARING IS SCHEDULED AS FOLLOWS:

HEARING SET FOR 03/11/2024 AT 01:30 PM.  COURTROOM 16-B.  PLEASE CONTACT THE COURT'S STAFF ATTORNEY, BRANDILYN COOK, AT 216-443-8588 SHOULD ANY ISSUE(S) ARISE.

_____
Judge Signature             02/27/2024

02/27/2024



175921054

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

NATIONS LENDING CORPORATION
    Plaintiff

ACADEMY MORTGAGE CORPORATION, ET AL.
    Defendant

Case No: CV-24-993402

Judge: JOHN J RUSSO

## JOURNAL ENTRY

PURSUANT TO THE MAGISTRATE'S 02/26/2024 DECISION GRANTING IN PART THE REQUESTED TEMPORARY RESTRAINING ORDER AT ISSUE, A PRELIMINARY INJUNCTION HEARING IS SCHEDULED AS FOLLOWS:

HEARING SET FOR 03/11/2024 AT 01:30 PM. COURTROOM 16-B. PLEASE CONTACT THE COURT'S STAFF ATTORNEY, BRANDILYN COOK, AT 216-443-8588 SHOULD ANY ISSUE(S) ARISE.

_J. J. Russo_

Judge Signature         02/27/2024

02/27/2024

## THE COURT OF COMMON PLEAS, CIVIL DIVISION
## CUYAHOGA COUNTY, OHIO

Clerk of Courts | The Justice Center | 1200 Ontario Street 1st Floor, Cleveland, Ohio 44113

NATIONS LENDING CORPORATION
**Plaintiff**

V.

ACADEMY MORTGAGE CORPORATION, ET
AL.
**Defendant**

**CASE NO.** CV24993402

**JUDGE** JOHN J RUSSO

# SUMMONS    SUMC  CM

**Notice ID:** 53167763



| From: | NATIONS LENDING CORPORATION<br>4 SUMMIT PARK DRIVE SUITE 200<br>INDEPENDENCE OH 44131 | P1 |

| Atty.: | JEFFREY C MILLER<br>1109 CARNEGIE AVENUE<br>FLOOR 2<br>CLEVELAND, OH 44115 |

| To: | LEONARD PAGAN<br>1469 KULEANA PLACE<br>HILO HI 96720 | D2 |

**NOTICE TO THE DEFENDANT:**

The Plaintiff has filed a lawsuit against you in this Court. You are named as a defendant. A copy of the **Complaint** is attached.

If you wish to respond to the Complaint, you must deliver a written **Answer** to the Plaintiff's attorney (or the Plaintiff if not represented by an attorney) at the above address *within 28 days* after receiving this Summons (not counting the day you received it). A letter or a phone call will not protect you. Civil Rule 5 explains the ways that you may deliver the **Answer** (http://www.supremecourt.ohio.gov/LegalResources/Rules/civil/CivilProcedure.pdf)

You must also file a copy of your **Answer** with this Court within 3 days *after* you serve it on the Plaintiff.  You can file your **Answer** with the Clerk of Courts by one of the following methods: 1) In-person or by mail at the above address or 2) electronically through the online e-Filing system. For more information on using the e-Filing system, visit http://coc.cuyahogacounty.us/en-US/efiling.aspx.

If you fail to serve *and* file your **Answer**, you will lose valuable rights. The Court will decide the case in favor of the Plaintiff and grant the relief requested in the **Complaint** by entering a default judgment against you.

You may wish to hire an attorney to represent you. Because this is a civil lawsuit, the Court cannot appoint an attorney for you. If you need help finding a lawyer, contact a local bar association and request assistance.



**Nailah K. Byrd**
**Clerk of Court of Common Pleas**
**216-443-7950**

By_____
**Deputy**

**Date Sent:** 02/28/2024

CMSN130

## THE COURT OF COMMON PLEAS, CIVIL DIVISION
## CUYAHOGA COUNTY, OHIO

Clerk of Courts | The Justice Center | 1200 Ontario Street 1st Floor, Cleveland, Ohio 44113

NATIONS LENDING CORPORATION
**Plaintiff**

**V.**

ACADEMY MORTGAGE CORPORATION, ET AL.
**Defendant**

**CASE NO.**  CV24993402

**JUDGE**  JOHN J RUSSO

# SUMMONS  SUMC  CM

**Notice ID:**  53167764



| | | |
|---|---|---|
| From: | NATIONS LENDING CORPORATION<br>4 SUMMIT PARK DRIVE SUITE 200<br>INDEPENDENCE OH 44131 | P1 |

| | | |
|---|---|---|
| Atty.: | JEFFREY C MILLER<br>1109 CARNEGIE AVENUE<br>FLOOR 2<br>CLEVELAND, OH 44115 | |

| | | |
|---|---|---|
| To: | JOAN PAGAN<br>1469 KULEANA PLACE<br>HILO HI 96720 | D3 |

### NOTICE TO THE DEFENDANT:

The Plaintiff has filed a lawsuit against you in this Court. You are named as a defendant. A copy of the **Complaint** is attached.

If you wish to respond to the Complaint, you must deliver a written **Answer** to the Plaintiff's attorney (or the Plaintiff if not represented by an attorney) at the above address *within 28 days* after receiving this Summons (not counting the day you received it). A letter or a phone call will not protect you. Civil Rule 5 explains the ways that you may deliver the **Answer** (http://www.supremecourt.ohio.gov/LegalResources/Rules/civil/CivilProcedure.pdf)

You must also file a copy of your **Answer** with this Court within 3 days *after* you serve it on the Plaintiff.  You can file your **Answer** with the Clerk of Courts by one of the following methods: 1) In-person or by mail at the above address or 2) electronically through the online e-Filing system. For more information on using the e-Filing system, visit http://coc.cuyahogacounty.us/en-US/efiling.aspx.

If you fail to serve *and* file your **Answer**, you will lose valuable rights. The Court will decide the case in favor of the Plaintiff and grant the relief requested in the **Complaint** by entering a default judgment against you.

You may wish to hire an attorney to represent you. Because this is a civil lawsuit, the Court cannot appoint an attorney for you. If you need help finding a lawyer, contact a local bar association and request assistance.



**Nailah K. Byrd**
**Clerk of Court of Common Pleas**
**216-443-7950**

**Date Sent:** 02/28/2024

**By**_____
**Deputy**

CMSN130

## THE COURT OF COMMON PLEAS, CIVIL DIVISION
## CUYAHOGA COUNTY, OHIO

Clerk of Courts | The Justice Center | 1200 Ontario Street 1st Floor, Cleveland, Ohio 44113

NATIONS LENDING CORPORATION
**Plaintiff**

V.

ACADEMY MORTGAGE CORPORATION, ET AL.
**Defendant**

**CASE NO.**  CV24993402

**JUDGE**  JOHN J RUSSO

# SUMMONS  SUMC  CM

**Notice ID:**  53167765



| From: | NATIONS LENDING CORPORATION<br>4 SUMMIT PARK DRIVE SUITE 200<br>INDEPENDENCE OH 44131 | P1 |
|---|---|---|

| Atty.: | JEFFREY C MILLER<br>1109 CARNEGIE AVENUE<br>FLOOR 2<br>CLEVELAND, OH 44115 | |
|---|---|---|

| To: | JESSICA BROWN<br>322 AINAKO AVENUE<br>HILO HI 96720 | D4 |
|---|---|---|

### NOTICE TO THE DEFENDANT:

The Plaintiff has filed a lawsuit against you in this Court. You are named as a defendant. A copy of the **Complaint** is attached.

If you wish to respond to the Complaint, you must deliver a written **Answer** to the Plaintiff's attorney (or the Plaintiff if not represented by an attorney) at the above address *within 28 days* after receiving this Summons (not counting the day you received it). A letter or a phone call will not protect you. Civil Rule 5 explains the ways that you may deliver the **Answer** (http://www.supremecourt.ohio.gov/LegalResources/Rules/civil/CivilProcedure.pdf)

You must also file a copy of your **Answer** with this Court within 3 days *after* you serve it on the Plaintiff.  You can file your **Answer** with the Clerk of Courts by one of the following methods: 1) In-person or by mail at the above address or 2) electronically through the online e-Filing system. For more information on using the e-Filing system, visit http://coc.cuyahogacounty.us/en-US/efiling.aspx.

If you fail to serve *and* file your **Answer**, you will lose valuable rights. The Court will decide the case in favor of the Plaintiff and grant the relief requested in the **Complaint** by entering a default judgment against you.

You may wish to hire an attorney to represent you. Because this is a civil lawsuit, the Court cannot appoint an attorney for you. If you need help finding a lawyer, contact a local bar association and request assistance.



**Nailah K. Byrd**
**Clerk of Court of Common Pleas**
**216-443-7950**

Date Sent: <u>02/28/2024</u>

By_____
**Deputy**

CMSN130

## THE COURT OF COMMON PLEAS, CIVIL DIVISION
## CUYAHOGA COUNTY, OHIO

Clerk of Courts | The Justice Center | 1200 Ontario Street 1st Floor, Cleveland, Ohio 44113

NATIONS LENDING CORPORATION
**Plaintiff**

**V.**

ACADEMY MORTGAGE CORPORATION, ET AL.
**Defendant**

**CASE NO.** CV24993402

**JUDGE** JOHN J RUSSO

# SUMMONS  SUMC  CM

**Notice ID:** 53167766



| From: | NATIONS LENDING CORPORATION | P1 |
| | 4 SUMMIT PARK DRIVE SUITE 200 | |
| | INDEPENDENCE OH 44131 | |

| Atty.: | JEFFREY C MILLER |
| | 1109 CARNEGIE AVENUE |
| | FLOOR 2 |
| | CLEVELAND, OH 44115 |

| To: | CHRISTINA IUKEA-ALVES | D5 |
| | 75-6203 PIENA PLACE | |
| | KAILUA KONA HI 96740 | |

### NOTICE TO THE DEFENDANT:

The Plaintiff has filed a lawsuit against you in this Court. You are named as a defendant. A copy of the **Complaint** is attached.

If you wish to respond to the Complaint, you must deliver a written **Answer** to the Plaintiff's attorney (or the Plaintiff if not represented by an attorney) at the above address *within 28 days* after receiving this Summons (not counting the day you received it). A letter or a phone call will not protect you. Civil Rule 5 explains the ways that you may deliver the **Answer** (http://www.supremecourt.ohio.gov/LegalResources/Rules/civil/CivilProcedure.pdf)

You must also file a copy of your **Answer** with this Court within 3 days *after* you serve it on the Plaintiff.  You can file your **Answer** with the Clerk of Courts by one of the following methods: 1) In-person or by mail at the above address or 2) electronically through the online e-Filing system. For more information on using the e-Filing system, visit http://coc.cuyahogacounty.us/en-US/efiling.aspx.

If you fail to serve *and* file your **Answer**, you will lose valuable rights. The Court will decide the case in favor of the Plaintiff and grant the relief requested in the **Complaint** by entering a default judgment against you.

You may wish to hire an attorney to represent you. Because this is a civil lawsuit, the Court cannot appoint an attorney for you. If you need help finding a lawyer, contact a local bar association and request assistance.



**Nailah K. Byrd**
**Clerk of Court of Common Pleas**
**216-443-7950**

**Date Sent:** 02/28/2024

**By** _____

**Deputy**

CMSN130

## THE COURT OF COMMON PLEAS, CIVIL DIVISION
## CUYAHOGA COUNTY, OHIO

Clerk of Courts | The Justice Center | 1200 Ontario Street 1st Floor, Cleveland, Ohio 44113

NATIONS LENDING CORPORATION
**Plaintiff**

V.

ACADEMY MORTGAGE CORPORATION, ET AL.
**Defendant**

**CASE NO.** CV24993402

**JUDGE** JOHN J RUSSO

# SUMMONS  SUMC  CM

**Notice ID:** 53167767



| From: | NATIONS LENDING CORPORATION | P1 |
| | 4 SUMMIT PARK DRIVE SUITE 200 | |
| | INDEPENDENCE OH 44131 | |

| Atty.: | JEFFREY C MILLER |
| | 1109 CARNEGIE AVENUE |
| | FLOOR 2 |
| | CLEVELAND, OH 44115 |

| To: | KAWAI CHANDEE HOOPER | D6 |
| | 74-5158 PUUOLOKAA PLACE | |
| | KAILUA KONA HI 96740 | |

### NOTICE TO THE DEFENDANT:

The Plaintiff has filed a lawsuit against you in this Court. You are named as a defendant. A copy of the **Complaint** is attached.

If you wish to respond to the Complaint, you must deliver a written **Answer** to the Plaintiff's attorney (or the Plaintiff if not represented by an attorney) at the above address *within 28 days* after receiving this Summons (not counting the day you received it). A letter or a phone call will not protect you. Civil Rule 5 explains the ways that you may deliver the **Answer** (http://www.supremecourt.ohio.gov/LegalResources/Rules/civil/CivilProcedure.pdf)

You must also file a copy of your **Answer** with this Court within 3 days *after* you serve it on the Plaintiff.  You can file your **Answer** with the Clerk of Courts by one of the following methods: 1) In-person or by mail at the above address or 2) electronically through the online e-Filing system. For more information on using the e-Filing system, visit http://coc.cuyahogacounty.us/en-US/efiling.aspx.

If you fail to serve *and* file your **Answer**, you will lose valuable rights. The Court will decide the case in favor of the Plaintiff and grant the relief requested in the **Complaint** by entering a default judgment against you.

You may wish to hire an attorney to represent you. Because this is a civil lawsuit, the Court cannot appoint an attorney for you. If you need help finding a lawyer, contact a local bar association and request assistance.



**Nailah K. Byrd**
**Clerk of Court of Common Pleas**
**216-443-7950**

Date Sent: 02/28/2024

By_____
**Deputy**

CMSN130

## THE COURT OF COMMON PLEAS, CIVIL DIVISION
## CUYAHOGA COUNTY, OHIO

Clerk of Courts | The Justice Center | 1200 Ontario Street 1st Floor, Cleveland, Ohio 44113

<u>NATIONS LENDING CORPORATION</u>
**Plaintiff**

**V.**

<u>ACADEMY MORTGAGE CORPORATION, ET AL.</u>
**Defendant**

**CASE NO.**  CV24993402

**JUDGE**  JOHN J RUSSO

# SUMMONS  SUMC  CM

**Notice ID:**  53167768



| From: | NATIONS LENDING CORPORATION | P1 |
|---|---|---|
| | 4 SUMMIT PARK DRIVE SUITE 200 | |
| | INDEPENDENCE OH 44131 | |

| Atty.: | JEFFREY C MILLER |
|---|---|
| | 1109 CARNEGIE AVENUE |
| | FLOOR 2 |
| | CLEVELAND, OH 44115 |

| To: | BROOKS ONISHI | D7 |
|---|---|---|
| | 46-1058 EMEPELA WAY #10C | |
| | KANEOHE HI 96744 | |

### NOTICE TO THE DEFENDANT:

The Plaintiff has filed a lawsuit against you in this Court. You are named as a defendant. A copy of the **Complaint** is attached.

If you wish to respond to the Complaint, you must deliver a written **Answer** to the Plaintiff's attorney (or the Plaintiff if not represented by an attorney) at the above address *within 28 days* after receiving this Summons (not counting the day you received it). A letter or a phone call will not protect you. Civil Rule 5 explains the ways that you may deliver the **Answer** (http://www.supremecourt.ohio.gov/LegalResources/Rules/civil/CivilProcedure.pdf)

You must also file a copy of your **Answer** with this Court within 3 days *after* you serve it on the Plaintiff.  You can file your **Answer** with the Clerk of Courts by one of the following methods: 1) In-person or by mail at the above address or 2) electronically through the online e-Filing system. For more information on using the e-Filing system, visit http://coc.cuyahogacounty.us/en-US/efiling.aspx.

If you fail to serve *and* file your **Answer**, you will lose valuable rights. The Court will decide the case in favor of the Plaintiff and grant the relief requested in the **Complaint** by entering a default judgment against you.

You may wish to hire an attorney to represent you. Because this is a civil lawsuit, the Court cannot appoint an attorney for you. If you need help finding a lawyer, contact a local bar association and request assistance.



**Nailah K. Byrd**
**Clerk of Court of Common Pleas**
**216-443-7950**

**Date Sent:** <u>02/28/2024</u>

By_____
                    *Tanisha Sawick*
                    **Deputy**

CMSN130

## THE COURT OF COMMON PLEAS, CIVIL DIVISION
## CUYAHOGA COUNTY, OHIO

Clerk of Courts | The Justice Center | 1200 Ontario Street 1st Floor, Cleveland, Ohio 44113

NATIONS LENDING CORPORATION
**Plaintiff**

**V.**

ACADEMY MORTGAGE CORPORATION, ET AL.
**Defendant**

**CASE NO.**  CV24993402

**JUDGE**  JOHN J RUSSO

# SUMMONS  SUMC  CM

**Notice ID:**  53167769



| From: | NATIONS LENDING CORPORATION | P1 |
| | 4 SUMMIT PARK DRIVE SUITE 200 | |
| | INDEPENDENCE OH 44131 | |

| Atty.: | JEFFREY C MILLER |
| | 1109 CARNEGIE AVENUE |
| | FLOOR 2 |
| | CLEVELAND, OH 44115 |

| To: | ILDA GONZALEZ | D8 |
| | 3270 FLEMING STREET | |
| | RIVERSIDE CA 92509 | |

### NOTICE TO THE DEFENDANT:

The Plaintiff has filed a lawsuit against you in this Court. You are named as a defendant. A copy of the **Complaint** is attached.

If you wish to respond to the Complaint, you must deliver a written **Answer** to the Plaintiff's attorney (or the Plaintiff if not represented by an attorney) at the above address *within 28 days* after receiving this Summons (not counting the day you received it). A letter or a phone call will not protect you. Civil Rule 5 explains the ways that you may deliver the **Answer** (http://www.supremecourt.ohio.gov/LegalResources/Rules/civil/CivilProcedure.pdf)

You must also file a copy of your **Answer** with this Court within 3 days *after* you serve it on the Plaintiff.  You can file your **Answer** with the Clerk of Courts by one of the following methods: 1) In-person or by mail at the above address or 2) electronically through the online e-Filing system. For more information on using the e-Filing system, visit http://coc.cuyahogacounty.us/en-US/efiling.aspx.

If you fail to serve *and* file your **Answer**, you will lose valuable rights. The Court will decide the case in favor of the Plaintiff and grant the relief requested in the **Complaint** by entering a default judgment against you.

You may wish to hire an attorney to represent you. Because this is a civil lawsuit, the Court cannot appoint an attorney for you. If you need help finding a lawyer, contact a local bar association and request assistance.



**Nailah K. Byrd**
**Clerk of Court of Common Pleas**
**216-443-7950**

**Date Sent:** 02/28/2024

**By**_____
**Deputy**

CMSN130



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**NOTICE OF APPEARANCE**
**February 29, 2024 16:07**

By: CAITLIN THOMAS 0093857

Confirmation Nbr. 3101804

NATIONS LENDING CORPORATION

vs.

ACADEMY MORTGAGE CORPORATION, ET AL.

CV 24 993402

**Judge:**  JOHN J. RUSSO

**Pages Filed:**  2

# IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| NATIONS LENDING CORPORATION | ) | CASE NO. CV-24-993402 |
| | ) | |
| Plaintiff, | ) | HONORABLE JOHN J. RUSSO |
| | ) | |
| v. | ) | **NOTICE OF APPEARANCE** |
| | ) | |
| ACADEMY MORTGAGE | ) | |
| CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | | |

Please take notice that Mark R. Butscha, Jr. and Caitlin R. Thomas, Thompson Hine LLP,

3900 Key Center, 127 Public Square, Cleveland, Ohio 44114, hereby enter their appearance as

counsel of record for Defendant Academy Mortgage Corporation.

Respectfully submitted,

*/s/ Caitlin R. Thomas*
Mark R. Butscha, Jr. (0088854)
*Mark.Butscha@ThompsonHine.com*
Caitlin R. Thomas (0093857)
*Caitlin.Thomas@ThompsonHine.com*
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114
T: (216) 566-5500
Fax: (216) 566-5800

*Counsel for Defendant Academy Mortgage
Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 29, 2024, a copy of the foregoing was filed via the Clerk

of Court's electronic filing system, which will send notice to all parties of record.

I further certify that a copy of the forgoing was sent by regular U.S. Mail to the
following:

Leonard Pagan
1469 Kuleana Place
Hilo, HI 96720

Joan Pagan
1469 Kuleana Place
Hilo, HI 96720

Christina Fukea-Alves
75-6203 Piena Place
Kailua Kona, HI 96740

Kaeai Hooper
74-5158 Puuolokaa Place
Kailua Kona, HI 96740

Brooks Onishi
46-1058 Emepela Way # IOC
Kaneohe, HI 96744

Lida Gonzalez
3270 Flemming Street
Riverside, CA 92509

                                        /s/ Caitlin R. Thomas
                                        One of the attorneys for Academy
                                        Mortgage Corporation

<b>Motion No.</b>  <u>5153394</u>



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
**1200 Ontario Street**
**Cleveland, Ohio 44113**

## Court of Common Pleas

**MOTION TO...**
**February 29, 2024 16:11**

By: CAITLIN THOMAS 0093857

Confirmation Nbr. 3101820

NATIONS LENDING CORPORATION                    CV 24 993402

      vs.

ACADEMY MORTGAGE CORPORATION, ET AL.      **Judge:**  JOHN J. RUSSO

**Pages Filed:**  33

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | | |
|---|---|---|
| NATIONS LENDING CORPORATION | ) | CASE NO. CV-24-993402 |
| | ) | |
| Plaintiff, | ) | HONORABLE JOHN J. RUSSO |
| | ) | |
| v. | ) | |
| | ) | |
| ACADEMY MORTGAGE | ) | |
| CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | | |

### ACADEMY MORTGAGE CORPORATION'S EMERGENCY MOTION TO DISSOLVE EX PARTE TEMPORARY RESTRAINING ORDER & OBJECTIONS TO MAGISTRATE'S DECISION

Defendant Academy Mortgage Corporation ("Academy"), making a *limited special appearance* due to this Court's lack of personal jurisdiction over Academy,[1] hereby files this Emergency Motion to Dissolve Ex Parte Temporary Restraining Order ("TRO") and further files its Objections to the Magistrate's Decision, filed on February 26, 2024, and adopted by this Court on February 27, 2024.

**I.      Nations Lending Corporation ("NLC") Improperly Obtained an Ex Parte TRO Against Defendants in Violation of Several of Civ. R. 65's Requirements.**

On February 26, NLC proceeded to a hearing before this Court and improperly convinced this Court to issue an ex parte TRO with no notice to Defendants. Had Academy[2] been afforded the opportunity to be heard by this Court as it should have been, the TRO would never have been granted, for the reasons detailed herein (including, *inter alia*, that this Court lacks personal jurisdiction over Academy and the individual Defendants, as this action was required to be brought in Hawaii).

It is even more troubling that NLC requested and proceeded with an ex parte hearing, given

---

[1] By filing this motion, Academy does not waive any defense as to the lack of personal jurisdiction and reserves all rights to file a motion to dismiss for lack of personal jurisdiction.
[2] At this time, undersigned counsel only represents Academy and not any of the other Defendants. Nonetheless, the arguments advanced by Academy herein require the dissolution of the TRO as to *all* Defendants.

that it chose (properly) to provide notice to all Defendants that it had filed its Verified Complaint and a Motion for Temporary Restraining Order and Preliminary Injunction on Monday, February 26, along with copies of the filings. A true and accurate copy of the email from NLC's counsel is attached as Exhibit 1 to the Declaration of Leonard Pagan ("Pagan Dec."), which is attached hereto as Exhibit A. The email represents that: "A hearing on the Temporary Restraining Order will likely occur within the next 14 days. I will provide additional follow up as warranted." *Id.* Notably, NLC's counsel never mentioned in this email that it was seeking or may seek an ex parte hearing and relief.

In reliance on these representations, counsel for Academy began immediately preparing to defend Academy in a forthcoming TRO hearing and trusted that NLC would provide Academy with prior notice of any TRO hearing, which NLC's counsel had represented would "occur within the next 14 days," and thereby provide Academy with the opportunity to present its valid defenses. Instead, in stark contrast to the impression created by this email, NLC immediately rushed to court the very same day as this email, with no notice to Defendants, to present a one-sided, incomplete, and misleading record and, on that basis, obtained relief to which it was not entitled.

To be clear, there was no need for ex parte relief. These individuals have already left NLC's employ. There are no imminent acts that NLC might fear would occur if injunctive relief were not in place pending a prompt TRO hearing. NLC manufactured an emergency out of Academy's re-hiring of a group of loan officers that NLC had previously poached from Academy just one-and-a-half years prior. NLC omitted these material facts from its Complaint and Motion for TRO.

Indeed, if it was so urgent to immediately stop irreparable harm from occurring, one would certainly expect that NLC would have provided immediate notice to Defendants of the entry of this Court's TRO. As of the filing of this motion, three days later, NLC has provided no notice to Defendants of the TRO, though Exhibit 1 establishes that NLC knows how to do so. Academy only learned of the TRO when it checked the Court's docket on February 28 to determine if a TRO hearing had been scheduled yet (and was shocked to learn that an ex parte TRO had already been entered). The fact that NLC has now waited three days and still has not provided notice of the TRO

to Defendants fatally undermines its claim of a need for relief that was so urgent Defendants could not even be given an hour's prior notice of the hearing.

Perhaps more importantly, NLC failed to comply with the requirements of Ohio Civ. R. 65 that are necessary in order for a TRO to be issued without notice. Rule 65(A) specifically provides that:

> A temporary restraining order may be granted without written or oral notice to the adverse party or his attorney *only if* (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss or damage will result to the applicant *before the adverse party or his attorney can be heard in opposition*, and (2) the applicant's attorney certifies to the court *in writing* the efforts, if any, which have been made *to give notice and the reasons supporting his claim that notice should not be required*.

(emphasis added). Academy doubts that NLC "clearly" established that immediate and irreparable injury, loss, or damage would result to NLC before Defendants could even be heard (meaning, in this case's circumstances, in the brief period of time between the filing of this action on Monday, February 26 and the hearing later that same day, a period of only a few hours). The Magistrate's Decision provides no basis for such a finding. For this reason, the TRO violates Rule 65(A) and must be dissolved.

Second, it does not appear that NLC's attorney fulfilled Rule 65(A)'s requirement that he certify to this Court in writing both his efforts to give notice to Defendants and the reasons that notice to Defendants should not be required. Neither the TRO Motion nor the Verified Complaint provide the required certification. Unless NLC filed something else with the Court certifying in writing both its efforts to notify Defendants of the TRO hearing and the reasons that notice should not be required (which it clearly did not), NLC violated Rule 65(A) and the TRO must be dissolved as improperly granted for this additional reason.

As a third procedural defect in the issuance of the TRO, Rule 65(C) expressly requires that:

> **(C) Security.** No temporary restraining order or preliminary injunction is operative until the party obtaining it *gives a bond executed by sufficient surety*, approved by the clerk of the court granting the order or injunction, in an amount fixed by the court or judge allowing it, to secure to the party enjoined the damages he may sustain, if it is finally decided that the order or injunction should not have been granted.

No TRO can be issued until the party obtaining it posts a bond. Yet, no bond has been posted here,

and therefore the TRO is not operative, by rule. The bond must "secure to the party enjoined the damages he may sustain, if it is finally decided that the order or injunction should not have been granted." Although the Court has discretion to waive the bond requirement, in this case, waiver was based on a contract provision (Verified Complaint, Exhibit ("Exh.") A at 8, ¶ 5(d)) in a contract to which Academy is not a party, and thus that purported waiver of the bond requirement does not apply to Academy. At the very least, a bond should have been posted as to the TRO against Academy.

Further, as to the individual Defendants, a bond should have been required due to NLC's request for expedited ex parte injunctive relief in order to allow Defendants to be compensated for the damages that they have suffered due to NLC's improperly obtaining of an ex parte TRO without providing Defendants an opportunity to be heard.

NLC failed to fulfill each of the foregoing procedural prerequisites for obtaining a TRO. Any one of these procedural failures would require dissolution of the TRO as procedurally improper. Given that there are at least three separate violations of Civ. R. 65(A) established above, the TRO must be dissolved.

## II.     **This Court Lacks Jurisdiction Over Academy and the Individual Defendants to Enter the TRO and the Relief Contained Therein.**

This Court indisputably lacks personal jurisdiction, either general or specific, over Academy. NLC has the burden to establish that this Court has proper jurisdiction over the parties before it. *Columbus City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 152 Ohio St.3d 134, 2017-Ohio-8844, 93 N.E.3d 958, ¶ 14. It has failed to do so. Academy is headquartered and has its principal place of business in Utah. This Court therefore lacks general jurisdiction over Academy. As the Supreme Court has made clear, with respect to what a party must establish in order to establish general jurisdiction:

> *Goodyear* made clear that only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there … With respect to a corporation, the place of incorporation and principal place of business are "paradig[m] ... bases for general jurisdiction." Those affiliations have the virtue of being unique—that is, each ordinarily indicates oNLCy one place—as well as easily ascertainable. *Cf. Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) ("Simple

jurisdictional rules ... promote greater predictability."). These bases afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims.

*Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). NLC has failed to meet its burden to establish that this Court has general jurisdiction over Academy.

Further, NLC has not alleged that specific jurisdiction exists under any provision of the Ohio long-arm statute. NLC has failed to provide a single example of any action, let alone sufficient contacts, wherein this Court could assert specific jurisdiction over Academy. The acts that give rise to this suit occurred exclusively in Hawaii. There is not a single allegation of an act by Academy at issue in this suit that occurred in or was directed to Ohio. Therefore, NLC has failed to establish that Academy is subject to the specific jurisdiction of this Court.

Further, Academy does not consent to this Court's jurisdiction.[3] As a result, the TRO must be dissolved as to Academy for lack of personal jurisdiction over Academy. Indeed, Academy must be dismissed from this suit altogether (along with Count 3, which is brought only against Academy).

Moreover, this Court also lacks personal jurisdiction over the individual Defendants. They are all residents of Hawaii[4], and there is no general jurisdiction over these individuals. There is not one single act alleged to have occurred in Ohio (even the relevant contracts were signed in Hawaii), and therefore no specific jurisdiction over them. As to the forum selection clause relied upon by NLC, that provision requires that any action for injunctive relief to enforce the Employment Agreements be brought in Hawaii. The relevant language provides:

> Any action or proceeding by either of the parties to enforce this Agreement shall be brought only in accordance with the arbitration provision contained within this Agreement except that action may be brought in a state or federal court located in the state of Ohio **or the state of Employee's primary residence, if different** …

*See* Verified Complaint, Exh. A at 11, ¶ 10(i) (emphasis added).

This language expressly contemplates (and acknowledges) that an injunction is properly

---

[3] Academy reiterates that this filing is a **limited special appearance** by Academy, does not subject Academy to this Court's jurisdiction, and that Academy reserves all rights to dismiss all claims against it via a motion to dismiss for lack of personal jurisdiction.

[4] With the exception of Ilda Gonzalez, who resides in California.

5

sought in the state of the Employee's residency, which is Hawaii in this case. To the extent the clause is disjunctive, it is, at best, ambiguous on this point. And that ambiguity must be construed against the drafter, NLC. *Keller & Kehoe, LLP v. Smart Media of Del., Inc.*, 8th Dist. Cuyahoga No. 103607, 2016-Ohio-5409, ¶ 39 (citing *Control Realty Co. v. Clutter*, 62 Ohio St.2d 411, 413, 406 N.E.2d 515 (1980)).

      The process that led to the entry of this TRO exemplifies why this Court is not the proper jurisdiction. Here, NLC applied in its home court system for a TRO and obtained the TRO the very same day with no notice to a foreign corporation over whom this Court entirely lacks jurisdiction and to seven individuals over whom this Court lacks personal jurisdiction. The TRO, which was entered without the opportunity for Defendants to defendant against it, puts these individuals, who reside over 4,000 miles away, out of their jobs and livelihoods while it is in effect. Surely, when the issues at stake are the actions and livelihoods of seven Hawaii residents, taken in Hawaii while servicing the Hawaiian community at a Hawaii-based mortgage branch, due process and jurisdictional principles dictate that a Hawaii court with personal jurisdiction over Defendants should hear the dispute and determine whether or not a TRO is proper.

      Because the Court lacks personal jurisdiction over Defendants, the TRO must be dissolved.

## III.   NLC Failed to Meet the Elements for Entitlement to the Ex Parte TRO and It Must Be Dissolved.

      The Ohio Supreme Court has held that an "injunction is an extraordinary remedy equitable in nature, and that its issuance may not be demanded as a matter of strict right." *Perkins v. Quaker City*, 165 Ohio St. 120, 125 (1956). Thus, "the right to an injunction must be clear and the proof thereof clear and convincing …" *Freeman Indus. Prods., LLC v. Armor Metal Group Acquisitions, Inc.*, 193 Ohio App.3d 438, 444, ¶ 14 (12th Dist.) (internal quotation marks and citation omitted).

      The elements necessary for a TRO are identical to those required for a preliminary injunction. Civ. R. 65(A). Thus, in considering whether to grant injunctive relief, the Court should examine the following factors:

    (1)   whether the movant has a substantial likelihood of success on the merits;

(2)  whether the movant will suffer irreparable harm without the injunction;

(3)  whether issuance of an injunction would cause substantial harm to others; and

(4)  whether the public interest would be served by issuance of an injunction.

*Corbett v. Ohio Bldg. Auth.,* 86 Ohio App.3d 44, 49 619 N.E.2d 1145 (10th Dist.1993). Plaintiffs have failed to meet this burden and the TRO must be vacated.

**A. NLC Has Failed to Establish a Likelihood of Success on the Merits.**

NLC likely chose to proceed with the TRO hearing without notice to Defendants, because, if Defendants had been given the opportunity to present their side to the Court, they would have shared information – information that NLC chose not to share with this Court in its Verified Complaint and TRO Motion – that would have established that NLC has not met its burden to establish, by clear and convincing evidence, a substantial likelihood of success on the merits. *Corbett,* 86 Ohio App.3d at 49.

NLC failed to share with this Court that the vast majority of the individual Defendants were initially hired away from Academy by NLC in 2022, and in a manner that was far more improper egregious than NLC alleges with respect to Academy's re-hiring of this group of employees. NLC approached Defendant Leonard Pagan, induced him to leave Academy to join NLC, and aided and encouraged him to unlawfully solicit and coordinate the departure of his team to NLC in violation of their contractual duties to Academy. Pagan Dec. ¶ 6. Much worse, for purposes of the TRO and this lawsuit's claims that the individual Defendants' customer lists are NLC's own confidential information and trade secrets, not only did NLC expressly encourage and assist the individual Defendants to export their customer databases from Academy's systems to their own, it directly assisted and facilitated that action. Indeed, there is documented evidence confirming NLC's unlawful conduct in this process. *See* Pagan Dec., Ex. 2. At the direction and with the knowledge of NLC's Chief Marketing Officer, NLC's Field Marketing Manager, Austin Jacks, connected Leonard Pagan, while he was still an Academy employee, with NLC's CRM manager to help export Pagan's customer databases, and specifically encouraged him to "provide the URL for your login, username and password so we could assist" with downloading those databases from

Academy's servers to NLC's servers. *Id.*

This was not just an unlawful proposal by NLC – NLC executed its unlawful scheme and obtained and uploaded the same customer database information it now complains was unlawfully taken by Defendants when they left. Genevieve Howard, NLC's Field Marketing Manager, followed up and set a Zoom meeting with Pagan "regarding getting your data pulled from Surefire" (Academy's customer or CRM database). *See* Pagan Dec., Ex. 3. At NLC's direction and with its assistance, Pagan provided his contacts on July 26, 2022, prior to beginning employment with NLC. *See* Pagan Dec., Ex. 4 at 1 ("Here are my contacts."). Ms. Howard responded, that same day:

> Wonderful, Len – thanks for sending this over to us and getting it completed so quickly!
>
> Gideon and his team will start working on ***scrubbing this data*** so we can ***send our correspondence*** to your contacts ***once you officially onboard next week***.
>
> As I mentioned, next week we'll reach out ***when you officially join Nations*** to schedule your marketing onboarding call.

*Id.* (emphasis added). As this exchange makes clear, NLC was fully aware that it had facilitated the transfer of this information while Pagan and other individual Defendants were still Academy employees. The very information that NLC now claims is unlawfully "misappropriated trade secret information" is information that NLC itself unlawfully, by its own legal theory, took from Academy. From a merits perspective, the foregoing establishes that the majority of the information in dispute[5] is not NLC's property at all, let alone its trade secrets. By NLC's own legal theory, this information is Academy's property and trade secrets. Given this preliminary record – a record that NLC failed to share with this Court and which Defendants would have presented had they been given the opportunity at the TRO hearing – NLC has failed to establish, by clear and convincing evidence, that it will succeed on the merits of its claims.

---

[5] Leonard Pagan estimates that over 90% of the contacts in his customer database preexisted his employment with NLC and were exported onto NLC's systems from Academy as part of this process. Pagan Dec. ¶ 7. This directly contradicts NLC's verified assertion that, "The Individual Defendants acquired Nations' Lending's Confidential Information pursuant to a confidential relationship with Nations Lending …" Verified Complaint at ¶ 99; TRO Motion at 15. In truth, the individual Defendants acquired the disputed information long before they were employed by NLC.

Further, in order to establish a likelihood of success on the merits, NLC must prove that it has undertaken reasonable efforts to maintain the secrecy of this information in order to maintain trade secret status. R.C. § 1333.61(D). NLC claims its "customer information" is a trade secret and that it keeps such information secret in compliance with R.C. § 1333.61(D). TRO Motion at 14. Yet, NLC has chosen to file its own customer information, including borrower names, loan values, mailing addresses, loan numbers and more, in unredacted form in a public filing with this Court. *See* Verified Complaint at ¶¶ 65-73 and Exhs. H – K. While NLC has represented to this Court that it undertakes reasonable efforts to maintain the secrecy of its customer information, NLC's filing with this Court prove otherwise. Thus, it is established that NLC does not treat customer information as confidential, and NLC has forfeited any trade secret status in such information.

Moreover, NLC concedes that customer lists are only trade secrets, "So long as the customer lists are not 'readily ascertainable through ordinary business channels or through classified business or trade directories' …" TRO Motion at 14. This customer information can be obtained through ordinary business channels, such as mortgage loan documents publicly filed by mortgage companies and through third parties that sell necessary borrower information from publicly available files. This information is simply not NLC trade secret information.

**B.     The Employment Agreements ("EAs") are unenforceable and void.**

NLC represents to the Court that the EAs at issue are binding and enforceable (TRO Motion at 18), but there is ample reason to doubt the enforceability of the EAs. These contracts were presented to the individual Defendants and signed without negotiation as a condition of employment with NLC. The EAs are permeated by overreaching restrictive covenants. As NLC concedes, a restrictive covenant is only enforceable if "the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." TRO Motion at 18 (citing *Raimonde v. Van Vlerah*, 42 Ohio St. 21 (1975)). But the restraints in the EAs are far greater than is required to protect NLC's protectable interests.

First, the restraints have no geographic restriction of any kind; they are nation-wide/world-wide in scope. The EAs prohibit the individual Defendants from being loan producers anywhere

in the world. Second, the non-compete covenant prohibits the individual from becoming "employed by any … corporation … which engages in the same or similar business activities as the Company or competes with Company." *See* Verified Complaint, Ex. A at 7, ¶ 5(b)(iii). In other words, they prohibit any employment by a competitor in any capacity, even if entirely different than one's prior role at NLC. One cannot even become employed as a janitor at a competitor pursuant to this provision. Courts routinely find such provisions overbroad and unenforceable.

The non-compete provision in this case is similar to the one that the United States District Court for the Northern District of Ohio refused to enforce via injunction in *PolyOne Corp. v. Kutka*, 67 F.Supp.3d 863 (N.D. Ohio 2014). In that case, the covenant included a "one-year restriction[]" and "a total ban on any employment in any capacity with a competitor in any location in the country …" *Id.* at 872. Here, there is also a one-year total ban on employment in any capacity with any company that competes with NLC, and that restriction is nation-wide (or world-wide). *See* Verified Complaint, Ex. A at 6-7, ¶ 5. The *Kutka* court held that "the total ban on any employment in any position with any competitor is not a ban on unfair competition, but a total ban on competition itself, producing a disproportionate benefit to the employer to the employee's detriment." *Id.* That reasoning applies equally here. Ultimately, the court held that PolyOne "has not met its burden of showing that a restriction precluding Kutka from any kind of employment with any competitor at any location in the country is reasonable, and so has not shown a likelihood of success on that claim." *Id.* at 873. The court refused to enforce the restrictive covenant. This Court should reach the same conclusion.

There are a number of other overreaching provisions in the EAs that NLC imposed upon the individual Defendants:

- The Confidential Information definition (¶ 3) is incredibly overbroad as written, vague, and appears to encompass a plethora of non-confidential and public information (such as "documents", "services", "marketing information", and "pricing information" all of which is routinely shared with the public and particularly potential borrowers); "personnel information" (which would encompass compensation information, which constitutes a clear violation of Section 7 of the National Labor Relations Act, which protects employees' right to discuss wages with other employees and prohibits employers declaring such compensation information to be "confidential"; "personnel information" is also widely available via LinkedIn, NMLS and other publicly-available

resources);

- The non-solicitation provision (¶ 5(b)(i)) prohibits hiring, and thus constitutes an unlawful no-hire provision;

- The "Customer Information" definition (¶ 5(b)(ii)) is not only overbroad, but encompasses the customer information brought by the employee to NLC and purports to transmute that information into NLC's own property, even where, as here, it was obtained illegally by NLC and NLC thus has no property rights to that illicitly obtained customer information;

- The Injunctive Relief paragraph (¶ 5(d)) improperly provides that the Employee "consents to the issuance of temporary restraining order," which violates public policy, Civ.R. 65, and Ohio law that establishes what NLC must show in order to be entitled to a TRO;

- That same paragraph unlawfully provides Civ.R. 65(c)'s requirement to post a bond in order to obtain a TRO;

- The Interpretation provision (¶10(c)) provides that the agreement shall not be construed against NLC, the drafter, even though binding Ohio caselaw provides otherwise.

This is just a sampling of the overreach and one-sided nature of the EAs that NLC attempts to enforce before this Court. The presence of such unreasonable provisions throughout the EAs renders them substantively unconscionable and the contract unenforceable. "Substantive unconscionability goes to the unfairness or unreasonableness of the contractual terms." *Featherstone v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 822 N.E.2d 841, ¶ 13 (9th Dist.). When a contractual term is "so one-sided as to oppress or unfairly surprise a party, the contractual term is said to be substantively unconscionable." *Thomas v. Hyundai*, 154 N.E.3d 701, 709 (8th Dist. 2020) (citation omitted).

Finally, there is yet another compelling reason not to enforce the EAs in NLC's favor: they contain a contractual representation and warranty that NLC not only knew to be false at the time it presented each EA for signature, but that NLC itself aided and induced each EA to violate. Specifically, NLC drafted and included the following representation and warranty and required each individual Defendant to agree to it:

**(c)** Employee will not utilize any property belonging to a prior employer in the performance of Employee's duties; including any confidential, proprietary, or trade secret information obtained from a prior employer.

Verified Complaint, Ex. A at 9, ¶ 8(c). However, even as it required these individuals to make this

contractual warranty, NLC knew that these individuals were downloading their customer databases from Academy's systems for subsequent use in their NLC employment in clear violation of this express representation and warranty. *See* Exhs. 2-4. In fact, NLC encouraged and facilitated that violation of its own contractual language. Accordingly, NLC will not succeed in the merits of its claims.

### C.     The TRO imposes an undue hardship on the Defendants.

As to Academy, the current TRO's language prevents Academy from soliciting any NLC customer or employee anywhere in the world. Thus, the TRO has a nationwide impact on the operations and recruiting of an entire national mortgage company, creating an undue hardship on Academy from efficiently operating its business. Moreover, Academy never entered into any contractual agreement with NLC, nor any forum selection provision permitting an injunction against Academy to be entered by an Ohio court. The current language of the TRO, as requested by NLC, is incredibly overbroad and imposes not only an undue – but unlawful – hardship on Academy. This broad prohibition was likely not the intent of the Court and the Court did not intend to enter a nationwide TRO as to a party over whom it lacks jurisdiction. But that is the literal effect of the current TRO's language. That is also precisely why Defendants – and Academy – needed to be heard prior to any issuance or entry of a TRO. Therefore, the TRO should be dissolved and a new hearing set.

As to the individual Defendants, the undue hardship is patently obvious: their careers and ability to support themselves have been derailed based upon unenforceable restrictive covenants, enforced via a one-sided and inaccurate record before a court more than 4,000 miles away from where they live, with no notice or opportunity to defend themselves and their livelihoods. They have been sidelined from their chosen careers with no opportunity to be heard. Thus, the TRO clearly imposes undue hardship on the individual Defendants.

However, NLC will not face any undue hardship if the TRO was not in place. It has not identified any ongoing departure of employees, loans, or officers in the month since these individuals left employment with NLC. It has only identified a few isolated items that occurred

before employment ended (which can be compensated through monetary damages). The undue hardship lies on the Defendants' side, and the balance of hardships therefore favors dissolution of the improvidently granted TRO.

> **D.    The TRO does injure the public, specifically borrowers, builders, and realtors who desire to continue to work with the Defendants at Academy.**

NLC has not been clear as to how loan officer-borrower relationships work. These relationships are not "owned" by NLC. No borrower comes to NLC – or Academy – because of that company. In nearly every case, the borrower relationship is created because their realtor or builder referred them to a specific loan officer. The truly important relationships are between those referral sources and the loan officer. Loan officers work hard to cultivate and maintain these relationships. It is their core value proposition and when they consider these relationships their own, which they take from company to company during their career. This is why NLC, in order to establish a presence in Hawaii, could not simply hire brand new loan officers, give them borrower information, and expect them to immediately start closing a volume of loans. NLC needed to poach a group of Academy employees to utilize their referral relationships to start its first Hawaii branch. It did not build its customer relationships from scratch. This type of hiring is common in the mortgage industry and the departure of loan officer groups from one mortgage company to another is a regular occurrence. NLC inaccurately states that these relationships belong to NLC, that NLC provides the information or means to the loan officers to allow them to close loans, and that NLC and its secret trade secrets are what facilitate loan officers' success. That is simply not true.

As a result of the foregoing realities of the mortgage industry, the TRO not only harms the Defendants but also harms the public. It harms borrowers who have lost their ability to work with their chosen loan officers.[6] It harms realtors who cannot refer to their trusted loan officers. It harms builders who cannot use their preferred loan officers. Some of these relationships have been in

---

[6] The current TRO would even prohibit a loan officer from issuing a mortgage to their own relative (and family members are another frequent category of borrowers). NLC claims even that relationship as its own in its filing.

place for decades. And these longstanding Hawaii relationships have now been disrupted by an improperly obtained court order in Ohio. The public is indisputably harmed. This rebuts NLC's claim that "there are no third parties that will suffer any cognizable harm" if a TRO was entered. *See* TRO Motion at 24.

## IV.    The Equitable Defense of Unclean Hands Applies and Prevents NLC From Obtaining Equitable Relief From This Court in This Matter.

Because injunctive relief is an equitable remedy, the general principles of equity apply, including the well-known maxim that: "He who comes into equity must come with clean hands." *Lamberjack v. Turtle Creek Extension Water Sys. Assoc.*, 6th Dist. Ottawa Court of Appeals No. 91OT023, 1992 Ohio App. LEXIS 2674, at *12 (May 29, 1992) ("a court of equity may leave the parties where it finds them and deny an injunction, where the party seeking it has himself committed acts similar to those complained of, even though in a lesser degree") (quoting 42 American Jurisprudence 2d, Section 35) (citation omitted).

The unclean hands defense clearly applies to this case. NLC comes before this Court, sitting in equity, and implores this Court to exercise its extraordinary equitable powers and protect it from Academy's hiring of its Hawaii employees and their use of their customer databases to solicit borrowers. Yet, in July 2022, it was NLC who raided Academy's workforce and hired these same individuals. NLC complains that Academy unlawfully solicited and coordinated their departures; it complains that these individuals brought their customer databases with them to Academy and transferred a few loans before they left. As to the latter, Leonard Pagan will confirm under oath that NLC, in July 2022, similarly facilitated, and provided an NLC "transition" person to facilitate the transfer of pending loans at Academy over to NLC. As to the former, there is undeniable proof that NLC engaged in the very same misconduct it now complains of when NLC itself helped these individuals download their customer databases from Academy's systems, the very same activity that it now seeks an injunction against. *See, e.g.*, Pagan Dec. Exs. 2-4. In actuality, NLC's misconduct was far worse.[7] NLC provided senior level

---

[7] And NLC can anticipate that Academy will be filing claims and/or counterclaims to redress

employees to help facilitate the taking of the customer databases and requested Academy log-in credentials to log onto Academy's systems and download this information from Academy's servers, and, on a Zoom meeting, helped them to transfer their customer databases. That is unlawful.

NLC's actions confirm that it has not come before this Court and into equity with clean hands. Equity demands that this Court not exercise its equitable powers to "protect" NLC from the very same (or worse) conduct that it engaged in just a year and a half ago.

**V.    Objection to Magistrate's Decision ("Decision") Regarding Temporary Restraining Order Pursuant to Civ .R. 53(D).**

Pursuant to Civ. R. 53(D), a magistrate may issue a written decision and, if requested by the parties, findings of fact and conclusions of law. A party may file objections to the magistrate's decision within 14 days of the decision being filed, regardless of whether the Court adopts the magistrate's decision within that 14 day period. Civ.R. 53(D)(3)(b)(i).

When considering a magistrate's decision, a trial court conducts an independent review of the magistrate's findings of fact and conclusions of law. *Hartt v. Munobe*, 67 Ohio St.3d 3 (1993); Civ. R. 53. The court's role is to determine whether the magistrate has properly determined the factual issues and appropriately applied the law, and where the Magistrate has failed to do so, the court is to substitute its judgment for that of the magistrate. *Coronet Ins. Co. v. Richards*, 76 Ohio App.3d 578, 582 (10th Dist. 1991). The court should not adopt a ruling unless it independently reaches the same findings of fact and conclusions of law. *DeSantis v. Soller*, 70 Ohio App.3d 226, 233 (10th Dist. 1990).

Academy makes the following objections to the Decision:

1.    The Decision and TRO did not comply with the requirements of Civ.R. 65 in the following ways:

- It failed to detail any immediate and irreparable injury that NLC would suffer before Defendants could be heard in opposition (presumably a matter of hours or minutes to

---

NLC's established and flagrantly unlawful conduct, as the applicable statutes of limitations for a variety of meritorious claims to address NLC's unlawful conduct have not yet expired.

provide notice to Defendants and afford them the opportunity to participate in the hearing);

- It failed to require and/or confirm that NLC's attorney certified in writing its efforts to give notice to Defendants;

- It failed to require and/or confirm that NLC's attorney certified in writing the reasons that notice should not be required; and

- It failed to require NLC to post a bond, as expressly required by Civ.R. 65(c).

2.     The Decision improperly exercised personal jurisdiction over Academy without any analysis of whether such jurisdiction properly existed as to Academy, and where no such jurisdiction exists with this Court;

3.     The TRO's language, as written, constitutes a nationwide restriction on Academy's ability to solicit NLC's "customers, prospective customers, and/or employees," where Academy has never contractually agreed to such a restriction, no basis for such a broad finding was before the Court, and it would be impracticable/impossible for Academy to comply with such a restriction on a national basis;

4.     The Decision improperly exercised jurisdiction over the individual Defendants, when the TRO and its requested relief as to individuals and livelihoods located in Hawaii should properly have been filed in and requested before a Hawaii court, and the EA's language further supports this outcome;

5.     The Decision fails to find, mention or address that NLC has met its burden to establish a substantial likelihood of success on the merits, as required by Ohio law in order to grant injunctive relief (*see* TRO Motion at 12-13 (wherein NLC concedes that it "must show" this element in order to obtain an injunction));

6.     The Decision fails to make any factual findings that the EAs are proper and binding contracts and that the relevant terms are enforceable;

7.     The Decision failed to consider the applicability of various legal defenses to the enforcement of the EAs, including but not limited to overbreadth, vagueness, void for public policy reasons, duress, one-sidedness, procedural and substantive unconscionability, illegality, and the fact that NLC drafted a representation and warranty provision (¶ 8(c)) that it knew to be violated

by those who signed it and aided and encouraged them to violate;

8.     The Decision failed to consider the applicability of equitable defenses, including unclean hands, prior to issuing equitable relief in NLC's favor;

9.     The lack of any factual findings in support of the TRO and its broad provisions; and

10.    The lack of legal findings that would support the relief contained in the TRO.

## VI.    Conclusion.

When a Court sits in equity, it must do what is fair and equal. Equity has not been done here. NLC instituted a one-sided process, deprived Defendants of notice and the opportunity to present their valid defenses, and, in so doing, has deprived this Court of the opportunity to hear them. As set forth in this motion, it is clear that the Decision and TRO were entered in violation of Civ. R. 65, this Court lacks personal jurisdiction over Academy and the individual Defendants, NLC has not met its burden to prove by clear and convincing evidence that it has established a substantial likelihood of success on the merits, and NLC's own unclean hands prevent it from obtaining equitable relief from this Court. The Magistrate's Decision is also improper for all of the reasons outlined in the Objection above.

For the foregoing reasons, Academy objects to the Magistrate's decision and the TRO must be dissolved. Academy respectfully requests that the Court dissolve the TRO immediately and either set a new TRO hearing or deny the TRO application altogether.

Respectfully submitted,

*/s/ Caitlin R. Thomas*
Mark R. Butscha, Jr. (0088854)
*Mark.Butscha@ThompsonHine.com*
Caitlin R. Thomas (0093857)
*Caitlin.Thomas@ThompsonHine.com*
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114
T: (216) 566-5500
Fax: (216) 566-5800

*Counsel for Defendant Academy Mortgage
Corporation*

Of Counsel:

*/s/ Joseph A. Kroeger*
Joseph A. Kroeger
SNELL & WILMER L.L.P.
One South Church Avenue
Suite 1500
Tucson, Arizona 85701-1630
Telephone: (520) 882.1200
Facsimile: (520) 884.1294
jkroeger@swlaw.com

Counsel for Defendant Academy Mortgage
Corporation

Electronically Filed 02/29/2024 16:11 / MOTION / CV 24 993402 / Confirmation Nbr. 3101820 / CLAJB

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 29, 2024, a copy of the foregoing was filed via the Clerk

of Court's electronic filing system, which will send notice to all parties of record.

I further certify that a copy of the forgoing was sent by regular U.S. Mail to the

following:

Leonard Pagan
1469 Kuleana Place
Hilo, HI 96720

Joan Pagan
1469 Kuleana Place
Hilo, HI 96720

Christina Fukea-Alves
75-6203 Piena Place
Kailua Kona, HI 96740

Kaeai Hooper
74-5158 Puuolokaa Place
Kailua Kona, HI 96740

Brooks Onishi
46-1058 Emepela Way # IOC
Kaneohe, HI 96744

Lida Gonzalez
3270 Flemming Street
Riverside, CA 92509

/s/ *Caitlin R. Thomas*
One of the attorneys for Academy
Mortgage Corporation

# EXHIBIT A

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | |
|---|---|
| NATIONS LENDING CORPORATION ) | CASE NO. CV-24-993402 |
| ) | |
| Plaintiff, ) | JUDGE JOHN J. RUSSO |
| ) | |
| v. ) | |
| ) | |
| ACADEMY MORTGAGE ) | |
| CORPORATION, et al., ) | |
| ) | |
| Defendants. | |

I, Leonard Pagan, declare as follows:

1.      I am the Branch Manager, Producing for Academy Mortgage Corporation ("Academy") and a defendant in this above-captioned action. I have personal knowledge of the facts set forth herein. As to facts of which I have personal knowledge, they are true and accurate.

2.      Attached as Exhibit 1 is a true and accurate copy of an email, dated February 26, 2024, from Nations Lending Corporation's ("NLC") counsel, Jeffrey Miller, to the individual Defendants in this action attaching a copy of the Complaint, Motion for Temporary Restraining Order, and proposed Temporary Restraining Order filed in this action.

3.      Attached as Exhibit 2 is a true and accurate copy of an email, dated July 19, 2022, from NLC's Field Marketing Manager, Austin Jacks, to myself, during my original employment with Academy regarding the export of customer lists from Academy's systems to NLC's system.

4.      Attached as Exhibit 3 is a true and accurate copy of an email, dated July 26, 2022, from NLC's Field Marketing Manager, Genevieve Howard, to myself, during my original employment with Academy regarding pulling my customer lists from Academy's customer database.

1

5.      Attached as Exhibit 4 is a true and accurate copy of an email chain, dated July 26, 2022, between NLC's Field Marketing Manager, Genevieve Howard, and myself during my original employment with Academy in which I sent my customer contacts to NLC.

6.      In July 2022, NLC approached me and induced me to leave Academy to join NLC and encouraged me to solicit and coordinate the departure of my entire team to NLC.

7.      Over 90% of the contacts in my customer database preexisted my employment with NLC and were exported onto NLC's systems from Academy's system.

I am a resident of Hawaii and older than 21 years of age. I have personal knowledge of the foregoing facts. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on February 29, 2024 in Hilo, Hawaii.

_____
Leonard Pagan

2

# EXHIBIT 1

| | |
|---|---|
| **From:** | Mike Huber <mike.huber@academymortgage.com> |
| **Sent:** | Monday, February 26, 2024 2:55 PM |
| **To:** | Kroeger, Joe |
| **Subject:** | FW: Nations Lending Corporation v. Academy Mortgage Corporation, et al. |
| **Attachments:** | NLC Complaint (Academy et al., Verified, Exhibits).pdf; NLC- Motion for TRO and Preliminary Injunction.pdf; Proposed Order (TRO).docx |

**[EXTERNAL]** mike.huber@academymortgage.com

# Redacted - Attorney-Client Privilege



Mike Huber
EVP–General Counsel | Academy Mortgage
339 W. 13490 S., Draper, UT 84020

Direct: (801) 233-3764 | Office: (801) 233-3700
mike.huber@academymortgage.com



 

Confidentiality Notice.  The information contained in and transmitted with this communication is confidential, intended only for the use of the intended recipient, and is the property of Mike Huber and Academy Mortgage.  If you are not the intended recipient, any use of the information contained in or transmitted with the communication or dissemination, distribution, or copying of this communication is prohibited.  If you received this communication in error, please immediately return this communication to the sender and delete the original message and any copy of it in your possession.

**From:** Jeff Miller <jmiller@stefanikiosue.com>
**Sent:** Monday, February 26, 2024 12:48 PM
**To:** jniaukea@hawaii.edu; lenpagan@hotmail.com; cpiaukea@gmail.com; Kawai.hooper@gmail.com; iaukea@hawaii.edu; bonishi@me.com; Ildagonzalez183@gmail.com; Mike Huber <mike.huber@academymortgage.com>
**Subject:** Nations Lending Corporation v. Academy Mortgage Corporation, et al.

You don't often get email from jmiller@stefanikiosue.com. Learn why this is important

⚠ **EXTERNAL EMAIL:** Open links/attachments cautiously.

Dear Madam/Sir:

On behalf of Nations Lending Corporation, please be advised that the attached Complaint, Motion for Temporary Restraining Order and proposed Temporary Restraining Order were filed today with the Cuyahoga County Court of Common Pleas, Commercial Docket.  The matter was given case number CV 24-993402 assigned to Judge John J. Russo, and we intend to seek immediate injunctive relief today.  A hearing on the Temporary Restraining Order will likely occur within the next 14 days.  I will provide additional follow up as warranted.

Sincerely,

Jeffrey C. Miller – <u>My Calendar</u>
Partner
Stefanik|Iosue
<u>jmiller@**SI**Lawyers.com</u>
<u>www.**SI**Lawyers.com</u>



1109 Carnegie Avenue, Floor 2
Cleveland, OH 44115
Office:  216.651.0451
Cell:  216.287.5265
Fax:  216.675.0018

Both Jeffrey C. Miller and Stefanik Iosue & Associates, LLC, intend that this message be used exclusively by the addressee(s). This message may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unauthorized disclosure or use of this information is strictly prohibited. If you have received this communication in error, please permanently dispose of the original message and notify Jeffrey C. Miller immediately at <u>jmiller@SILawyers.com</u> or (216) 651-0451. Thank you.

# EXHIBIT 2

**len pagan**

| | |
|---|---|
| **From:** | Austin Jacks <Austin.Jacks@nationslending.com> |
| **Sent:** | Tuesday, July 19, 2022 12:20 PM |
| **To:** | lenpagan@hotmail.com; Emma Montague |
| **Cc:** | Howard Lee; Brian Niel Tabujara |
| **Subject:** | Contact Management Assistance |

Hi Len,

I'm reaching out to touch base as *we're super excited to have you joining our team here at Nations Lending!*

Howard our CMO mentioned that you'd need some assistance with contact management coming over which our team would be happy to provide.

1. He mentioned you have your existing database considerations.
2. He also brought up that you have a lead provider we'll want to coordinate with to ensure we can have a smooth transition of driving those leads into our CRM system Partner +, which is built on Total Expert.

I've included @Emma Montague which is our Partner + CRM manager. She's amazing and helps run the platform with Brian's assistance I've included her to help get started here.

Do you already have your lists exported from Surefire yet? If not let us know if you'll need some assistance. In that case can you provide the URL for your login, username and password so we could assist?(*Assuming Gideon hasn't already approached helping you with this).

For the lead vendor:

1. What lead provider are you purcahseing the leads from?
2. Do you typically get those sent to you via an email notification? Or just through a direct api lead integration?

Look forward to having you on the team and appreciate your time Len!

With Gratitude,

Austin Jacks
**Field Marketing Manager**



480-639-8002

NationsLending.com

Terms of Use | Privacy Policy | State Disclosure Requirements
Nations Lending Corporation NMLS# 32416. 4 Summit Park Drive, Suite 200, Independence, OH 44131

# EXHIBIT 3

**len pagan**

| | |
|---|---|
| **From:** | Genevieve Howard <Genevieve.Howard@nationslending.com> |
| **Sent:** | Tuesday, July 26, 2022 6:37 AM |
| **To:** | lenpagan@hotmail.com; cpiaukea@gmail.com |
| **Cc:** | iaukea@hawaii.edu; angelakainoa@yahoo.com; Gideon Sheng |
| **Subject:** | Data Export Screen Share/Walkthrough |

Hi Len, Christina and Team!

Following up here on the meeting regarding getting your data pulled from Surefire. I know you both are in different time zones right now.

Len – would 12pm PT (3pm ET/2pm CT) work for you for a call with our data team?

Christina – I know you are still in HT. I'm not sure if you'll see this email for another few hours – Would you be able to make a call around 10am or 11am HT (4pm or 5pm ET)?

Thank you! Once we hear back from both of you, I will send over Zoom link(s).


Sincerely,

Genevieve Howard
**Partner Success Strategist**



904-735-9870 | Cell

NationsLending.com

Terms of Use | Privacy Policy | State Disclosure Requirements
Nations Lending Corporation NMLS# 32416. 4 Summit Park Drive, Suite 200, Independence, OH 44131

# EXHIBIT 4

**len pagan**

| | |
|---|---|
| **From:** | len pagan <lenpagan@hotmail.com> |
| **Sent:** | Tuesday, July 26, 2022 12:20 PM |
| **To:** | Genevieve Howard |
| **Cc:** | Gideon Sheng; iaukea@hawaii.edu |
| **Subject:** | Re: Len Pagan | Contact Export Walkthrough - Len Pagan contacts |

great, thanks again.

**From:** Genevieve Howard <Genevieve.Howard@nationslending.com>
**Sent:** Tuesday, July 26, 2022 12:01 PM
**To:** len pagan <lenpagan@hotmail.com>
**Cc:** Gideon Sheng <Gideon.Sheng@nationslending.com>; iaukea@hawaii.edu <iaukea@hawaii.edu>
**Subject:** RE: Len Pagan | Contact Export Walkthrough - Len Pagan contacts

Wonderful, Len – thanks for sending this over to us and getting it completed so quickly!

Gideon and his team will start working on scrubbing this data so we can send our correspondence to your contacts once you officially onboard next week.

As I mentioned, next week we'll reach out when you officially join Nations to schedule your marketing onboarding call.

If you have any questions in the meantime, please don't hesitate to reach out!


Sincerely,

Genevieve Howard
**Partner Success Strategist**



904-735-9870 | Cell

NationsLending.com

Terms of Use | Privacy Policy | State Disclosure Requirements
Nations Lending Corporation NMLS# 32416. 4 Summit Park Drive, Suite 200, Independence, OH 44131

**From:** len pagan <lenpagan@hotmail.com>
**Sent:** Tuesday, July 26, 2022 5:54 PM
**To:** Genevieve Howard <Genevieve.Howard@nationslending.com>
**Cc:** Gideon Sheng <Gideon.Sheng@nationslending.com>; iaukea@hawaii.edu
**Subject:** Re: Len Pagan | Contact Export Walkthrough - Len Pagan contacts

Here are my contacts.

**From:** Genevieve Howard <Genevieve.Howard@nationslending.com>
**Sent:** Tuesday, July 26, 2022 8:18 AM
**To:** Christina Alves <cpiaukea@gmail.com>
**Cc:** Gideon Sheng <Gideon.Sheng@nationslending.com>; angelakainoa@yahoo.com <angelakainoa@yahoo.com>; iaukea@hawaii.edu <iaukea@hawaii.edu>; lenpagan@hotmail.com <lenpagan@hotmail.com>
**Subject:** RE: Len Pagan | Contact Export Walkthrough

Yep, that works perfectly. ☺ I'll go ahead and cancel the other meeting. Talk to you soon!

Sincerely,

# Genevieve Howard
**Partner Success Strategist**



904-735-9870 | Cell

NationsLending.com

Terms of Use | Privacy Policy | State Disclosure Requirements
Nations Lending Corporation NMLS# 32416. 4 Summit Park Drive, Suite 200, Independence, OH 44131

**From:** Christina Alves <cpiaukea@gmail.com>
**Sent:** Tuesday, July 26, 2022 2:17 PM
**To:** Genevieve Howard <Genevieve.Howard@nationslending.com>
**Cc:** Gideon Sheng <Gideon.Sheng@nationslending.com>; angelakainoa@yahoo.com; iaukea@hawaii.edu; lenpagan@hotmail.com
**Subject:** Re: Len Pagan | Contact Export Walkthrough

Hi Genevieve

I'll try to jump onto this zoom if it's okay

On Tue, Jul 26, 2022 at 7:07 AM Genevieve Howard <Genevieve.Howard@nationslending.com> wrote:

Genevieve Howard is inviting you to a scheduled Zoom meeting.

Topic: Len Pagan | Contact Export Walkthrough
Time: Jul 26, 2022 03:00 PM Eastern Time (US and Canada)

Join Zoom Meeting
https://us02web.zoom.us/j/86493683412

Meeting ID: 864 9368 3412
One tap mobile
+13017158592,,86493683412# US (Washington DC)
+13126266799,,86493683412# US (Chicago)

Dial by your location
     +1 301 715 8592 US (Washington DC)

+1 312 626 6799 US (Chicago)
+1 646 931 3860 US
+1 929 205 6099 US (New York)
+1 253 215 8782 US (Tacoma)
+1 346 248 7799 US (Houston)
+1 386 347 5053 US
+1 564 217 2000 US
+1 669 444 9171 US
+1 669 900 6833 US (San Jose)
Meeting ID: 864 9368 3412
Find your local number: https://us02web.zoom.us/u/kdGyLL8rZU



176524479

# IN THE COURT OF COMMON PLEAS
# CUYAHOGA COUNTY, OHIO

NATIONS LENDING CORPORATION
    Plaintiff

Case No: CV-24-993402

Judge: JOHN J RUSSO
Magistrate: STEPHEN M BUCHA III

ACADEMY MORTGAGE CORPORATION, ET AL.
    Defendant

## <u>MAGISTRATE'S ORDER</u>

TELEPHONE DEFAULT HEARING SET FOR 04/17/2024 AT 03:30 PM.
ANY PARTY MAY APPEAR AT THE TELEPHONE DEFAULT HEARING BY CALLING 216-443-8505 TEN MINUTES PRIOR TO THE SCHEDULED TIME OF THE HEARING.  THE PARTY MOVING FOR DEFAULT JUDGMENT MUST SEND NOTICE TO ALL PARTIES OF THE DEFAULT HEARING AT LEAST SEVEN DAYS PRIOR TO THE HEARING.  THIS NOTICE MUST PROVIDE THE CALL-IN INFORMATION ABOVE.

THIS HEARING MAY BE ATTENDED ONLY VIA TELEPHONE.

_Sl m Bl III_
_____
Magistrate Signature                03/05/2024
                                              CPSB1

03/04/2024



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**BRIEF IN OPPOSITION**
**March 6, 2024 15:09**

By: DAVID J. HEARTY 0093827

Confirmation Nbr. 3106682

NATIONS LENDING CORPORATION                    CV 24 993402

      vs.

                                     **Judge:**  JOHN J. RUSSO

ACADEMY MORTGAGE CORPORATION, ET AL.

**Pages Filed:**  22

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| NATIONS LENDING CORPORATION, | ) | CASE NO. CV-24-993402 |
| | ) | |
| *Plaintiff,* | ) | JUDGE JOHN J RUSSO |
| | ) | |
| v. | ) | **PLAINTIFF NATIONS LENDING** |
| | ) | **CORPORATION'S BRIEF IN** |
| ACADEMY MORTGAGE | ) | **OPPOSITION TO DEFENDANT** |
| CORPORATION, *et al.*, | ) | **ACADEMY MORTGAGE** |
| | ) | **CORPORATION'S EMERGENCY** |
| *Defendants.* | ) | **MOTION TO DISSOLVE EX PARTE** |
| | ) | **TEMPORARY RESTRAINING ORDER &** |
| | ) | **OBJECTIONS TO MAGISTRATE'S** |
| | ) | **DECISION** |

To continue its brazen participation in the misappropriation of trade secrets and interference with business relations of Plaintiff Nations Lending Corporation ("Nations Lending"), Defendant Academy Mortgage Corporation ("Academy Mortgage") has filed an Emergency Motion to Dissolve Ex Parte Temporary Restraining Order ("Motion") and Objections to the Magistrate's Decision ("Objections"). Its Motion must be denied, and its Objections are without merit.

**I.      Nations Lending has complied with Civ. R. 65.**

Academy Mortgage's first argument is based either on a game of semantics or a lack of reading comprehension, with the first option being the most likely since it deliberately misrepresented the notice to Defendants.

On February 26, 2024, counsel for Nations Lending filed the Complaint and Motion for Temporary Restraining Order. Counsel then sent each Defendant an email notifying them of the filing and that Nations Lending would "seek immediate injunctive relief today." A true and accurate copy of the entire email is attached as Exhibit A.

1

The entire text of the email to each Defendant was as follows:

On behalf of Nations Lending Corporation, please be advised that the attached Complaint, Motion for Temporary Restraining Order and proposed Temporary Restraining Order were filed today with the Cuyahoga County Court of Common Pleas, Commercial Docket.  The matter was given case number CV 24-993402 assigned to Judge John J. Russo, and **we intend to seek immediate injunctive relief today**.  A hearing on the Temporary Restraining Order will likely occur within the next 14 days.  I will provide additional follow up as warranted.

(See Exhibit A) (Emphasis added).

Nations Lending was clear.  It intended to seek **immediate** injunctive relief **today**.  However, in furtherance of its improper behavior, Defendant Academy Mortgage filed its Motion on the language wherein counsel noted that a hearing on the "Temporary Restraining Order will likely occur within the next 14 days." (Motion, p. 2.)

The email did not say that a hearing on the **motion** for TRO would occur within 14 days.  (Exhibit A.) It noted that a hearing on the **order** would occur within 14 days. (Exhibit A.)  Such hearing on the order is required under Civ. R. 65(A).

Next, Academy Mortgage makes a preposterous argument about how Nations Lending's act of not informing of the TRO somehow undermines its legitimacy.  Before responding to this argument, it is important to recap a few facts.  First, Academy Mortgage began its participation in the misappropriation and interference beginning in December of 2023 and continued in January of 2024.  Academy Mortgage **was caught red-handed** in the actionable conduct in February of 2024.  On February 14, 2024, Nations Lending provided Academy Mortgage with specific written explanations and documentary evidence of misappropriation and misdirection of customers.  (See Letter Dated February 14, 2024, attached as Exhibit B.) Academy Mortgage promised to "take appropriate actions" and to address the matter in a "fair and transparent manner." (See Letter Dated January 26, 2024, attached as Exhibit C.)  It has done nothing but continue to provide a haven for

2

on-going misappropriation and interference. It has not implemented any corrective measures. Yet, Academy Mortgage now intimates that it would have complied and acted with nobility had it received an emailed, non-service copy of the TRO from opposing counsel? Its argument lacks any credibility whatsoever.

Academy Mortgage's second procedural argument is that counsel for Nations Lending failed to certify to this Court its efforts to give notice to Defendants. This argument is false. Counsel for Nations Lending provided actual notice, but Academy Mortgage did not read or ignored the words "**we intend to seek immediate injunctive relief today**." (See Exhibit A.) Additionally, at Page 27 of the Motion for Temporary Restraining Order, counsel for Nations Lending provided the Rule 65 Certification. (See Motion for TRO and Preliminary Injunction, p. 27.)

Academy Mortgage's third procedural argument is that Nations Lending failed to post a bond. This argument is without merit. As identified in the Motion for Temporary Restraining Order before the Court, the Individual Defendants agreed to waive any bond requirement in their Employment Agreements. Because the claims against Academy Mortgage are based on its conspiracy with the Individual Defendants, any bond was unnecessary. As such, the Court properly waived any bond requirement.

Academy Mortgage's arguments regarding Civ. R. 65 fail in all respects. The Court did not need to provide findings of fact or conclusions of law under Civ. R. 52. Even so, Civ. R. 52 was satisfied by the reading and entry of the Temporary Restraining Order in conjunction with the record consisting of a Verified Complaint and Exhibits, and Motion for Temporary Restraining Order.

3

## II.     Nations Lending has established this Court's jurisdiction over Defendants.

Nations Lending provided this Court with the basis of personal jurisdiction in the Verified Complaint.  Each of the Individual Defendants specifically agreed to the jurisdiction of state courts in Ohio.  Defendant Academy Mortgage registered to do business within the State of Ohio with the Ohio Secretary of State and made itself subject to the state courts in Ohio.  The Verified Complaint established the basis of jurisdiction for the issuance of the Temporary Restraining Order.

## III.    Nations Lending satisfied its burden for the issuance of a Temporary Restraining Order.

In an effort to obfuscate its actionable misconduct, Defendant Academy Mortgage makes sham attacks against Nations Lending.  Its allegations are untrue, irrelevant, and insufficient to dissolve the TRO.

Academy Mortgage's first (and subsequent) argument is that Defendant Pagan transferred certain contacts to Nations Lending.  This case is not about personal contacts.  Each Individual Defendant confirmed to Nations Lending prior to hiring that they were not using any of the confidential, proprietary, or trade secret information from a prior employer.  This case is about Academy Mortgage and the Individual Defendants using the database of Nations Lending as their source of lead generation.  This case is about Academy Mortgage and the Individual Defendants intentionally stealing customers and prospects from Nations Lending after they started the lending process with Nations Lending.  This case is about the Individual Defendants absconding with the entire Nations Lending database to employment with Academy Mortgage in violation of federal and state law and their Employment Agreements, of which Academy Mortgage had specific knowledge and has allowed to continue unchecked.

4

Academy Mortgage's arguments about the terms of the Nations Lending Employment Agreement are both wrong and irrelevant.  Academy Mortgage's attorneys have not entered an appearance for the Individual Defendants, and Academy Mortgage is not a party to the contracts. Contrary to the arguments of Academy Mortgage, the restrictive covenants in the Employment Agreements are, in fact, narrowly tailored for the protection of Nations Lending.  The covenants were intended to prevent the Individual Defendants from soliciting employees and customers of Nations Lending, both during employment and for 12 months thereafter.  The Individual Defendants chose to ignore and to violate those provisions both during and after their employment. The non-compete provisions are also limited to 12-months and a five (5) mile Restricted Territory. At Section 5(c) of their Employment Agreements, each Individual Defendant agreed that the restrictive covenants would not interfere with their ability to obtain alternative employment, and that the protections to Nations Lending were important, reasonable, and necessary.

In its Motion, Defendant Academy Mortgage completely and deliberately misstates the scope and intent of the covenants in the Nations Lending Employment Agreements.  Its construction of the Temporary Restraining Order is overbroad and/or deliberately ignorant.  The Temporary Restraining Order is plainly based on the contracts and business relationships of Nations Lending related to the Hawaii office and the Confidential Information of Nations Lending from its secure database.

The TRO does not impose any undue hardship on Defendants.  Defendant Academy Mortgage has requested and received permission to operate in the State of Ohio by the Ohio Secretary of State.  The Individual Defendants voluntarily chose employment with a Nations Lending, headquartered in Ohio, and entered into Employment Agreements conferring jurisdiction in the Ohio courts.  They cannot violate federal and state law and the express terms of the

5

Employment Agreements, but then cry about difficulties when Nations Lending seeks to enforce its rights.  Nations Lending has identified an ongoing harm.  Its confidential database has been downloaded by the individual(s) with Defendant Academy Mortgage, and this Court is the proper forum for Nations Lending to enforce its rights.

Finally, Academy's arguments of injury to the public do not make sense.  Nations Lending is not seeking to prevent borrowers, builders, and realtors from obtaining mortgages.  There are plenty of competitors for their business.  Nations Lending is only seeking to prevent one competitor, Defendant Academy Mortgage, and its employees, the Individual Defendants, from engaging in unfair competition.  The Defendants have absconded with and are using the Confidential Information of Nations Lending in violation of federal and state law and the Employment Agreements.  The enforcement of laws and contract terms supersedes any claim of third-party harm.  If Academy and the Individual Defendants are permitted to violate the laws and contract terms as applied to Nations Lending, then they will do the same with their customers.

## IV.  Academy Mortgage's claims of "unclean hands" are wrong and irrelevant.

Academy Mortgage's threats of counterclaims and unclean hands are a false flag.  The affidavit and exhibits do not identify any instance Nations Lending requesting or instructing any interference with Academy Mortgage contracts or the misappropriation of any Academy Mortgage trade secrets.  Notably, Academy Mortgage did not attach any employment agreement or description of its trade secrets to support its specious allegations. As such, it can be presumed that Academy Mortgage did not engage in the basic protections of an employment agreement and its specious arguments of "unclean hands" have only been interposed for distraction.

Nations Lending required each Individual Defendant to confirm that he/she would not utilize any confidential, proprietary, or trade secret information from a prior employer.  (See

6

Employment Agreements, attached to the Verified Complaint as Exhibits A through G, at Section 8(b).) Nations Lending protected its Confidential Information. (Employment Agreements, attached to the Verified Complaint as Exhibits A through G, at Sections 3, 4, and 5).  The Individual Defendants, in conjunction with Defendant Academy Mortgage, violated the federal and state laws and contract terms.  As such, the injunctive relief was proper and the Motion to Dissolve must be denied.

**V.**   **The Objections are without merit.**

In its Motion, Academy Mortgage makes a laundry list of objections to the Court's Temporary Restraining Order.  (Motion, pp. 15-17.)   Nations Lending states its response to each objection as follows:

- **Objection No. 1: The TRO failed to detail any immediate and irreparable injury that NLC would suffer before Defendants could be heard in opposition (presumably a matter of hours or minutes to provide notice to Defendants and afford them the opportunity to participate in the hearing)**

Neither the Magistrate's decision nor the TRO failed to detail any immediate and irreparable injury that Nations Lending would suffer before Defendants could be heard in opposition.  First, under Civ.R. 53(D)(3)(ii), a magistrate's decision "may be general" unless "findings of fact and conclusions are timely requested by a party or otherwise required by law." No such request or requirement applies in this case. Second, the Court did not need to make findings of fact or conclusions of law under Civ.R. 52.   It is well-established that Civ.R. 52 applies to "judgments," not preliminary injunctions or other forms of injunctive relief.  *State ex rel. Add Venture, Inc. v. Gillie*, 62 Ohio St.2d 164, 165, 404 N.E.2d 151, 152 (1980).  Civ.R. 52 also states that findings of fact and conclusions of law are "unnecessary upon all other motions," which includes motions for injunctive relief under Civ.R. 65.  *Id.* Third, the Court did not need to make specific findings of fact or conclusions of law under Civ.R. 65(D).  Civ.R. 65(D) does not require

7

findings of fact or conclusions of law like in Civ.R. 52. Civ.R. 65(D)'s specificity requirements are designed to satisfy the following purposes: (1) "prevent uncertainty and confusion on the part of those faced with injunctive orders, and thus avoid [* * *] a contempt citation on a decree too vague to be understood"; and (2) to "enable an appellate tribunal to know precisely what it is reviewing." *See, e.g., Columbus v. State*, 10th Dist. No. 22AP-676, 2023-Ohio-2858, 223 N.E.3d 540, ¶ 24. None of those purposes are relevant here. Academy Mortgage makes no complaints about uncertainty, confusion, or appellate review. Academy Mortgage only makes petty and technical arguments about findings of fact and conclusions of law that the Magistrate and the Court were not required to make. Academy Mortgage's first objection is, therefore, without merit.

- **Objection No. 2: The TRO failed to require and/or confirm that NLC's attorney certified in writing its efforts to give notice to Defendants.**

As explained above, Civ.R. 53, Civ.R. 52, and Civ.R. 65(D) did not require the Magistrate or the Court to make findings of fact or conclusions of law. Accordingly, the Court did not need to make findings of fact or conclusions of law with respect to Nations Lending's certification that it gave notice to Defendants. Even if that were not the case, Academy Mortgage's objection is without merit. In accordance with Civ.R. 65, Nations Lending certified that it notified all the Defendants that Nations Lending filed the Verified Complaint and Motion for TRO and that Nations Lending would be "proceeding to Court that same day." (See Motion for TRO, p. 27.) There is no genuine dispute that Nations Lending actually provided this notice to all Defendants. In fact, the notice to all the Defendants specifically stated that Nations Lending intended to seek "immediate injunctive relief today [the day of filing the Complaint]." (See Exhibit A.) Thus, Academy's second objection is also without merit.

Electronically Filed 03/06/2024 15:09 / BRIEF / CV 24 993402 / Confirmation Nbr. 3106682 / CLSVE

- **Objection No. 3: The TRO failed to require and/or confirm that NLC's attorney certified in writing the reasons that notice should not be required**

Again, neither the Magistrate nor the Court needed to make findings of fact or conclusions of law under Civ.R. 53(D), Civ.R. 52, or Civ.R. 65(D). Regardless, in accordance with Civ.R. 65, Nations Lending did certify the "reasons supporting his claim that notice should not be required." Throughout the Motion for TRO, Nations Lending repeatedly stated it was seeking "immediate injunctive relief to prevent further irreparable harm," and Nations Lending certified the reasons why immediate injunctive relief was necessary via Rule 11 certification and Rule 65 certification. (See Motion for TRO, at signed certifications, pp. 2, 26-27.) Thus, Academy's third objection lacks merit.

- **Objection No. 4: TRO failed to require NLC to post a bond, as expressly required by Civ.R. 65(c)**

The Court did not need to require Nations Lending to post a bond. As explained in the Motion for TRO, the Court possesses the discretion to determine the appropriate amount for a bond under Civ.R. 65(C). *Vanguard Transp. Svcs. v. Edwards Transfer Storage Co, General Commodities Div.*, 109 Ohio App. 3d 786 (10th Dist. 1996); *citing, Colquett v. Byrd*, 59 Ohio Misc. 45 (M.C. 1979). That amount can be zero dollars. *Id.* Thus, the Court did not need to require Nations Lending to post a bond, especially when all the Individual Defendants' employment agreements waived any need for Nations Lending to post a bond.

- **Objection No. 5: The TRO improperly exercised personal jurisdiction over Academy without any analysis of whether such jurisdiction properly existed as to Academy, and where no such jurisdiction exists with this Court.**

It is well-established that the moving party's burden on a motion for a temporary restraining order or preliminary injunction does not include proving personal jurisdiction over the non-moving party. Lack of personal jurisdiction is a Rule 12 defense. Until Academy Mortgage

9

or any of the other Defendants file a Rule 12 motion, Nations Lending and the Court need not address the issue.

- **Objection No. 6: The TRO's language, as written, constitutes a nationwide restriction on Academy's ability to solicit NLC's "customers, prospective customers, and/or employees," where Academy has never contractually agreed to such a restriction, no basis for such a broad finding was before the Court, and it would be impracticable/impossible for Academy to comply with such a restriction on a national basis.**

Academy Mortgage's interpretation of the TRO is unreasonable.  When the Court granted a TRO against Academy Mortgage, it was preserving the "status quo" with respect to Nations Lending's claims against Academy until the Court could hold a hearing on a preliminary injunction.  The scope of those claims is not genuinely in dispute. Any ordinary person who reads Nations Lending's Complaint understands that these claims arise from the trade secrets, business contracts, and business relationships related to Nations Lending's Hawaii office.  Academy Mortgage, however, completely ignores the scope of the Complaint to reach a wholly erroneous conclusion that the TRO is somehow a "nationwide" bar against competing with Nations Lending. Academy Mortgage either knows or should know that is not the case.  Nowhere in Academy Mortgage's Motion does Academy Mortgage claim any confusion about what trade secrets Academy Mortgage misappropriated or what business contracts or business relationships are subject to Nations Lending's tortious interference claims.   Academy Mortgage knows exactly what it did, and Academy Mortgage does not even deny that it committed the allegedly tortious acts referenced in the Complaint.   (Motion, pp. 6-12.) To the extent that Academy Mortgage is genuinely confused about the scope of the TRO, Academy failed to seek clarification from the Court.

Electronically Filed 03/06/2024 15:09 / BRIEF / CV 24 993402 / Confirmation Nbr. 3106682 / CLSVE

- **Objection No. 7: The TRO improperly exercised jurisdiction over the individual Defendants, when the TRO and its requested relief as to individuals and livelihoods located in Hawaii should properly have been filed in and requested before a Hawaii court, and the EA's language further supports this outcome**

Again, issues related to personal jurisdiction are irrelevant to the inquiry for obtaining a temporary restraining order or preliminary injunction. If Academy Mortgage or the Individual Defendants wish to assert lack of personal jurisdiction as a defense under Rule 12, they must file a Rule 12 motion. Until a Rule 12 motion is filed, Nations Lending and the Court need not address the issue.

- **Objection No. 8: The TRO fails to find, mention or address that NLC has met its burden to establish a substantial likelihood of success on the merits, as required by Ohio law in order to grant injunctive relief (see TRO Motion at 12-13 (wherein NLC concedes that it "must show" this element in order to obtain an injunction))**

Again, neither the Magistrate nor the Court was ever required to make findings of fact or conclusions of law under Civ.R. 53(D), Civ.R. 52, and Civ.R. 65(D). Regardless, in Nations Lending's Motion for TRO, Nations Lending plainly stated its burden and established how Nations Lending met that burden. After reviewing the record, the Court granted Nations Lending's Motion for TRO. Accordingly, Academy Mortgage's petty and technical complaints about the TRO are disingenuous and without merit.

- **Objection No. 9: The TRO fails to make any factual findings that the EAs are proper and binding contracts and that the relevant terms are enforceable**

The TRO did not need to include any "factual findings" that the employment agreements were enforceable. The Magistrate and the Court reviewed the record and concluded that Nations Lending met its burden with respect to a TRO. Academy Mortgage's claims that the Magistrate or the Court needed to do more than that with respect to the decision reflects a misunderstanding of what Civ.R. 53(D), Civ.R. 52, and Civ.R. 65(D) requires.

11

- **Objection No. 10: The Decision failed to consider the applicability of various legal defenses to the enforcement of the EAs, including but not limited to overbreadth, vagueness, void for public policy reasons, duress, one-sidedness, procedural and substantive unconscionability, illegality, and the fact that NLC drafted a representation and warranty provision (¶ 8(c)) that it knew to be violated by those who signed it and aided and encouraged them to violate**

This objection is frivolous.  The Court did not need to read Academy Mortgage's mind, raise Academy Mortgage's defenses, and test those defenses against Nations Lending's Motion for TRO.  On Nations Lending's Motion for TRO, the burden fell on Nations Lending to show a substantial likelihood of success on the merits of Nations Lending's claims, irreparable harm, etc. Nations Lending did not bear the burden to anticipate and disprove Academy Mortgage's affirmative defenses.  Thus, Academy Mortgage's objection lacks merit.

- **Objection No. 11: The TRO failed to consider the applicability of equitable defenses, including unclean hands, prior to issuing equitable relief in NLC's favor**

Academy Mortgage continues to make objections without considering the burden on Nations Lending's Motion for TRO.  The burden did not fall on Nations Lending or the Court to anticipate and disprove Academy Mortgage's affirmative defenses.  Even if it did, Academy Mortgage's unclean hands defense is wholly inapplicable.  The unclean hands doctrine is a defense against claims in equity.  *Graham v. Szuch*, 8th Dist. Cuyahoga No. 100228, 2014-Ohio-1727, ¶ 32.  "It requires a showing that the party seeking relief engaged in reprehensible conduct with respect to the subject matter of the action." Here, Academy Mortgage's unclean hands defense is based on vague, conclusory, and wholly unsupported statements that Nations Lending committed similarly tortious acts against Academy years ago.   To be clear, these vague and conclusory statements are based on pure speculation, and they are patently irrelevant to the operative facts described in Nations Lending's Verified Complaint.   Accordingly, even if the Court were to

consider and make findings of fact and conclusions of law with respect to Academy Mortgage's unclean hands defense, the defense would still fail.

- **Objection No. 12: The lack of any factual findings in support of the TRO and its broad provisions**

As repeatedly referenced throughout, neither the Magistrate nor the Court needed to make findings of fact or conclusions of law.

- **Objection No. 13: The lack of legal findings that would support the relief contained in the TRO.**

Academy Mortgage again fails to consider that neither the Magistrate nor the Court needed to make findings of fact or conclusions of law under Civ.R. 53, Civ.R. 52, and Civ.R. 65(D).

## VI. Conclusion

Defendant Academy Mortgage has directed and/or engaged in a scheme to misappropriate the trade secrets of Plaintiff Nations Lending and to interfere with the contractual relations of Nations Lending.  As a result, Nations Lending requested and properly received a Temporary Restraining Order.  Academy Mortgage's Emergency Motion to Dissolve Ex Parte Temporary Restraining Order is without merit and must be denied.  Its Objections to the Magistrate's Decision ("Objections") are inaccurate and must be overruled.

Respectfully submitted,

*/s/  David J. Hearty*
Jeffrey C. Miller (0068882)
David J. Hearty (0093827)
Stefanik Iosue & Associates
1109 Carnegie Avenue, Floor 2
Cleveland, OH 44115
(216) 651-0451
jmiller@stefanikiosue.com
dhearty@stefanikiosue.com
*Attorneys for Plaintiff Nations Lending Corporation*

13

## CERTIFICATE OF SERVICE

I certify that the foregoing Plaintiff Nations Lending Corporation's Brief in Opposition to Defendant Academy Mortgage Corporation's Emergency Motion to Dissolve Ex Parte Temporary Restraining Order & Objections to Magistrate's Decision was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system. In addition, a copy of the foregoing will be sent to the following via electronic mail:

Leonard Pagan
lenpagan@hotmail.com
Defendant

Joan Pagan
jniaukea@hawaii.edu
*Defendant*

Christina Alves
cpiaukea@gmail.com
*Defendant*

Chandee Hooper
Kawai.hooper@gmail.com
*Defendant*

Jessica Brown
iaukea@hawaii.edu
*Defendant*

Brooks Onishi
bonishi@me.com
*Defendant*

Ilda Gonzalez
Ildagonzalez183@gmail.com
*Defendant*

Mark R. Butscha, Jr.
Caitlin R. Thomas
Mark.Butscha@ThompsonHine.com
Caitlin.Thomas@ThompsonHine.com
*Attorneys for Defendant Academy Mortgage Corporation*

> */s/ David J. Hearty*
> David J. Hearty (0093827)
> *One of the attorneys for Plaintiff*

14

**EXHIBIT**

**A**

# David  Hearty

| From: | Jeff Miller |
|---|---|
| **Sent:** | Tuesday, March 5, 2024 12:02 PM |
| **To:** | David  Hearty |
| **Subject:** | FW: Nations Lending Corporation v. Academy Mortgage Corporation, et al. |
| **Attachments:** | NLC Complaint (Academy et al., Verified, Exhibits).pdf; NLC- Motion for TRO and Preliminary Injunction.pdf; Proposed Order (TRO).docx |

**From:** Jeff Miller
**Sent:** Monday, February 26, 2024 2:48 PM
**To:** jniaukea@hawaii.edu; lenpagan@hotmail.com; cpiaukea@gmail.com; Kawai.hooper@gmail.com;
iaukea@hawaii.edu; bonishi@me.com; lldagonzalez183@gmail.com; mike.huber@academymortgage.com
**Subject:** Nations Lending Corporation v. Academy Mortgage Corporation, et al.

Dear Madam/Sir:

On behalf of Nations Lending Corporation, please be advised that the attached Complaint, Motion for Temporary Restraining Order and proposed Temporary Restraining Order were filed today with the Cuyahoga County Court of Common Pleas, Commercial Docket.  The matter was given case number CV 24-993402 assigned to Judge John J. Russo, and we intend to seek immediate injunctive relief today.  A hearing on the Temporary Restraining Order will likely occur within the next 14 days.  I will provide additional follow up as warranted.

Sincerely,

Jeffrey C. Miller – My Calendar
Partner
Stefanik|Iosue
jmiller@SILawyers.com
www.SILawyers.com



1109 Carnegie Avenue, Floor 2
Cleveland, OH 44115
Office:  216.651.0451
Cell:  216.287.5265
Fax:  216.675.0018

Both Jeffrey C. Miller and Stefanik Iosue & Associates, LLC, intend that this message be used exclusively by the addressee(s). This message may contain information that is privileged, confidential and exempt from disclosure under applicable law. Unauthorized disclosure or use of this information is strictly prohibited. If you have received this communication in error, please permanently dispose of the original message and notify Jeffrey C. Miller immediately at jmiller@SILawyers.com or (216) 651-0451. Thank you.



**nations**
**lending**

February 14, 2024

Mike Huber
Academy Mortgage Corporation
339 West 13490 South
Draper, UT 84020

## RE: Loan diversion by Leonard Pagan's Hawaii office

Mr. Huber:

I'm writing in response to your letter requesting documentation of the offenses committed by former Nations Lending employees Leonard Pagan, Joan Pagan, Christina Alves, Chandee Hooper, and Jessica Brown (along with other unidentified individual Nations Lending employees, hereafter referenced collectively as the "Pagan Employees"), undertaken for their personal benefit as well as the benefit of Academy Mortgage Corporation ("Academy"), and accomplished with the assistance of other Academy employees.

To the extent that the full damages suffered by Nations Lending are still being ascertained and may not be capable of determination until we have fully examined files and records in possession of Academy, our investigation will continue to be ongoing. While we are unwilling to extensively share confidential information with you at this time, I will disclose a limited outline of the scheme we have uncovered along with a representative sampling of the documents that we have uncovered to date to demonstrate that Nations Lending has the capacity to prove its allegations.

Nations Lending has determined that Mr. Pagan and the other employees under his supervision engaged in a systemic pattern of misappropriation of Nations Lending data and diversion of business to Academy beginning several weeks prior to their resignations from Nations Lending in January of this year. This process was undertaken in coordination with Academy Mortgage employees and officers who were aware that Mr. Pagan and the others were Nations Lending employees and yet collaborated with them to transfer loan transactions and other data to Academy. This plan was conceived and implemented some time before Joan Pagan resigned from Nations Lending on January 2. Contemporaneous to her resignation, other employees in the Kailua Kona office, still employed by Nations Lending, began discussing Academy Mortgage with current customers of Nations Lending and drafting letters to provide those consumers to sign requesting transfer of their loans to Academy. The employees attempted to deceive Nations Lending into believing that these customers were initiating these changes on their own accord and concealed their involvement in the transferred transactions by placing them under the name of an Academy loan originator. During this period, these employees also downloaded lists of contacts and customers of Nations Lending and other information to use in competition against Nations Lending. The individuals attempted to conceal their activity by using private email accounts to communicate and discussing their activities in chat applications. Finally, in the final phase of their plan, on January 16, 2024, after they had completed their diversion efforts, the employees resigned from Nations Lending *en masse.* The coordinated departure of this office without advance warning

resulted in further losses to Nations Lending in consequence.

To illustrate some of the evidence of these activities which Nations Lending has so far uncovered, I have included with this letter as Exhibit A an excerpt copy of an email communication dated January 9, 2024, when Mr. Pagan was still a Nations Lending employee, from Matt Keyes to Mr. Pagan's Hotmail account. In this email, Mr. Keyes updates pricing for one of Nations Lending's customer transactions in response to an earlier exchange. Mr. Keyes is a loan originator listed as located at Academy's Utah corporate headquarters office and the messages are sent from his company email account. Also copied on this message is Jimmy MacPherson, another Academy originator, and the referenced consumer is Nations Lending customer Yujia Yang.

This was not an isolated instance, rather only one of many Nations Lending customers who were improperly solicited and diverted by the Pagan Employees and Academy. For another example I will direct your attention to the included document labeled Exhibit B which is a copy of a consumer transfer request letter prepared by the Pagan Employees using Nations Lending's systems. As you will see from the incorporated digital certificate, Jessica Brown, who was a Nations Lending employee until January 16, 2024, created and sent the document to the consumers on January 3, 2024. The letter requests the transfer to Academy of a consumer loan transaction then pending at Nations Lending in order that the consumers could continue to work the loan originator, Kawaii (Chandee) Hooper. Ms. Hooper was at that time was also still a Nations Lending employee and continued so until January 16 when she resigned along with the other Pagan Employees as part of their coordinated plan.

Furthermore, Nations Lending has uncovered the close coordination between Academy and the Pagan Employees. In relevant point, Exhibit C is a copy of an appraisal transfer request for the loan transaction of Shawn Gates that was created and processed by Ms. Brown late on January 9 as part of the diversion of that transaction to Academy. Following the fabrication of this allegedly consumer-initiated transfer, Nations Lending received a request from Matt Keyes to transfer the Gates appraisal. The letter from Mr. Keyes, dated January 12, is included as Exhibit D.

Nations Lending has recovered a number of loan transfer letters, virtually identical to the one provided as Exhibit B. The repetitive format of these requests asking for the transfer of loans being originated by Ms. Alves, Ms. Hooper, and Mr. Pagan would be alone suspicious, even if one discounts that they all are dated weeks before the individuals supposedly began working at Academy. There is no disputing that Academy should have been aware of multiple red flags concerning these transactions and its willful blindness, at a minimum, is no less excusable than the outright culpability of its employees in sanctioning and aiding the unlawful diversion of Nations Lending transactions or facilitating the unlawful activities of the Pagan Employees.

As previously stated, our investigation efforts continue, but the examples already uncovered reflect efforts exceeding three million dollars of consumer loan transactions, not counting files which the Pagan Employees evidently attempted to conceal from Nations Lending entirely. Furthermore, the apparent download of information containing more than 1,200 customer records by the Pagan Employees is a matter of grave concern to Nations Lending. Nations Lending justifiably believes that Academy has incorporated this proprietary data into its systems and is using that information to market to Nations Lending's customers and unfairly compete with it.

Electronically Filed 02/26/2024 13:20 / / CV 24 993402 / Confirmation Nbr. 3097247 / CLAJB
Electronically Filed 03/06/2024 15:09 / BRIEF / CV 24 993402 / Confirmation Nbr. 3106682 / CLSVE

My previous communication to you placed Academy on notice that the Pagan Employees and Academy employees had engaged in concerning activities. This letter should serve as warning that all of the transactions connected with the Pagan Employees as part of their transition to Academy are fairly attributable to the proprietary property of Nations Lending. Academy must exercise best efforts, in line with our previous communication, to preserve all information and evidence in its possession in expectation of forthcoming litigation. To further aid you in understanding Nations Lending's specific claims, we identify the following individuals, known or suspected to be in Academy's employment who have been identified as involved with or having knowledge relevant to this matter:

Pagan Employees                          Academy Employees
Leonard Pagan                            Matthew Keyes
Joan Pagan                               James MacPherson
Christina Alves                          Adam Buniger
Chandee (Kawaii) Hooper
Jessica Brown
Ilda Gonzalez

This list is under ongoing investigation and subject to supplementation and does not waive any preservation obligations with respect to any unidentified individuals.

Nations Lending is contemplating legal action against the listed individuals and those acting in concert with them for various tortious activities and contractual violations. With respect to the Pagan Employees, except for Ilda Gonzales, each was provided with a reminder of their contractual obligations to Nations Lending following the end of their employment. Where Nations Lending had already identified their involvement in loan diversion, Nations Lending issued demands to cease and desist from further violations. To date, none of the recipients has responded. Nations Lending is supplying Academy with copies of the employee agreements with Nations Lending for those individuals which contain the restrictive covenants each agreed to when they began employment (Exhibit E). As a summary, each individual agreed that Nations Lending was the sole owner of all work product and other information generated during their employment and pledged to preserve the confidentiality of such data. All employees agreed that during their employment they would not perform loan origination duties for competitors of Nations Lending. Each employee further agreed not to not to solicit Nations Lending customers or employees for a term of twelve months after leaving employment.

Academy is also advised, that in addition to the consumer transactions for Yang, Gates, and Preston specifically referenced in this letter, Nations Lending has identified a dozen loan transactions in which improper transfer requests were initiated by the Pagan Employees in violation of their contractual obligations to Nations Lending. Nations Lending will seek to recover all proprietary information and data constituting its property and also asserts a claim on all proceeds of transactions closed by or with the assistance of the Pagan Employees. At this time, Nations Lending will disclose the following additional consumer names to aid Academy in its due diligence:

Aiu-Horie
Bowdle
Hatch
Kanakanui-Bishaw
Neva
Sceppe
Tagaca

Additional consumers have been identified but we are withholding further disclosure while our inquiry continues.

Against the Pagan Employees, Nations Lending asserts claims of interference in prospective business relationships, misappropriation of intellectual property and confidential trade secrets and information, violation of contractual restrictions on the misappropriation of information and confidential trade secrets, violation of contractual restrictions on the solicitation of Nations Lending customers, violation of contractual restrictions on the solicitation of Nations Lending employees, civil conspiracy, violations of their duties as an employee of Nations Lending as provided by contract, and violations of fiduciary duties to Nations Lending.

Against Academy, through the acts of its employees, Nations Lending asserts claims of interference in prospective business relationships, misappropriation of intellectual property and confidential trade secrets and information, and civil conspiracy.

The claims asserted above are not exhaustive and Nations Lending does not waive any rights or causes of action thereby, asserting instead that its investigation is ongoing and its claims against any party are subject to amendment and supplementation as further facts come to light.

The information provided in this letter should be adequate as a threshold offering of proof for Academy to initiate its own investigation and undertake its own inquiries into these matters. While Nations Lending is not presenting a detailed complaint or inventory of each transaction it believes to have been diverted, at a minimum Nations Lending asserts a property interest in transactions originated in the name of any individual listed in this letter since December 26, 2023.

Nations Lending intends to complete its investigation in order to come to a clearer assessment of the extent of financial compensation it intends to demand from the Pagan Employees or those acting in concert with them. Nations Lending also expects Academy to conduct a due inquiry with its employees and to admonish them against committing further violations of their obligations to Nations Lending. Nations Lending further reserves its right to seek all appropriate relief if we are unable to obtain satisfactory assurances that the property rights and interests of Nations Lending have been adequately protected from further infringement. At this stage, Nations Lending anticipates that its damages will exceed $200,000.00 from loan diversion alone.

Once you have reviewed this information, I would appreciate your response indicating how Academy proposes to resolve this dispute in lieu of litigation. Also, should you wish to discuss any aspect of this matter further, I may be contacted at any time.

Huber – Academy Mortgage                                    February 14, 2024

R. Christopher Baker
General Counsel

(216) 393-6901
christopher.baker@nationslending.com

Attach:



# ACADEMY

MORTGAGE CORPORATION·



EXHIBIT
C

January 26, 2024

*Sent via FedEx*

R. Christopher Baker
Nations Lending
4 Summit Park Drive, Suite 200
Independence, OH 44131

RE: Reply to Cease and Desist Warning

Dear Mr. Baker,

I am writing in response to your correspondence to Kristi Pickering dated January 16, 2024, regarding allegations of misconduct by former employees of Nations Lending currently employed by Academy Mortgage. We take these allegations seriously and are committed to addressing them in a fair and transparent manner.

Before proceeding further, we kindly request that you provide detailed documentation or evidence supporting the allegations raised against the individuals named in your letter. It is imperative for us to thoroughly review the specifics of these claims to understand the nature and extent of the alleged violations. This will enable us to conduct a comprehensive investigation and take appropriate actions in accordance with our internal policies.

Once we receive the requested documentation, we will initiate an internal review to assess the situation and we will communicate our findings and proposed course of action in a timely manner.

Sincerely,

Mike Huber
EVP, General Counsel



ORIGIN ID:SLCA        (801) 233-3700
ABBY RUESCH
ACADEMY MORTGAGE CORPORATION
339 W. 13490 S.

DRAPER, UT 84020
UNITED STATES US

SHIP DATE: 29JAN24
ACTWGT: 0.50 LB
CAD: 105064199/INET4535

BILL SENDER

TO  R. CHRISTOPHER BAKER
    NATIONS LENDING
    4 SUMMIT PARK DRIVE, SUITE 200

    INDEPENDENCE OH 44131
    (877) 816-1220          REF: 10038
    INV:
    PO:                     DEPT: 10038







FedEx
Express

E

TUE - 30 JAN 10:30A
PRIORITY OVERNIGHT

TRK#
0201   7749 8462 1507

44131

XN CLEA      OH-US  CLE

